UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

———————————————————————

GREENWICH TAXI, INC., ACE TAXI                :          C.A. No.: 3:14-cv-733(AWT)
SERVICE, INC., CASINO CAB COMPANY,            :
INC., CURTIN MOTOR LIVERY SERVICE,            :
INC., EAST HARTFORD CAB COMPANY,              :
INC., EXECUTIVE 2000 TRANSPORTATION,          :
LLC, FARMINGTON VALLEY CAB, LLC,              :
GROTON CAB COMPANY, INC., LASSE'S             :
LIVERY SERVICE, INC., SUBURBAN                :
TRANSPORTATION, INC., TAXICABS AND            :
LIVERY COUNCIL OF CONNECTICUT, INC.,          :
THE WATERBURY YELLOW CAB & SERVICE :
COMPANY, INC., TORRINGTON VALLEY              :
CAB, LLC, UNION-LYCEUM TAXI                   :
COMPANY, INC., and YELLOW CAB                 :
COMPANY OF NEW LONDON & GROTON,               :
INC.                                          :
              Plaintiffs                      :
                                              :
       v.                                     :
                                              :
UBER TECHNOLOGIES, INC. and                   :          SEPTEMBER 15, 2014
LYFT, INC.                                    :
              Defendants                      :

———————————————————————

**AMENDED COMPLAINT AND APPLICATION FOR TRO,
PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION**

**INTRODUCTION**

1.    The Plaintiffs are duly authorized taxicab and livery service operators, which provide

      taxicab and livery service throughout the State of Connecticut, and have invested

      substantial capital in complying with a compendium of federal, state and local laws,

      regulations and rules developed over the last 90 years, which protect customers, ensure

      public safety, and provide non-discriminatory service.  Uber Technologies, Inc. ("Uber")

      and Lyft, Inc. ("Lyft") have created illegal transportation services that violate federal and

state laws and regulations, and deceive customers about the fares they must pay, the safety of the cars and drivers transporting them, the insurance coverage available, and the legality of their offered services.

**THE PARTIES**

2.   Plaintiff Greenwich Taxi, Inc. ("Greenwich Taxi") is a Connecticut corporation with principal offices at Greenwich Plaza, Greenwich, Connecticut 06830.  Greenwich Taxi is an approved taxicab lessor, operating 58 taxicabs under authority of Certificate No. 93.

3.   Plaintiff Ace Taxi Service, Inc. ("Ace Taxi") is a Connecticut corporation with principal offices at 134 East Center Street, Manchester, Connecticut 06040.  Ace Taxi is an approved taxicab lessor, operating 23 taxicabs under authority of Certificate No. 1066.

4.   Plaintiff Casino Cab Company, Inc. ("Casino Cab") is a Connecticut corporation with principal offices at 65 Stillman Street, Bridgeport, Connecticut 06608.  Casino Cab is an approved taxicab lessor, operating 48 taxicabs under authority of Certificate No. 225.

5.   Plaintiff Curtin Motor Livery Service, Inc. ("Curtin Livery") is a Connecticut corporation with principal offices at 176 Cross Road, Waterford, Connecticut 06385.  Curtin Livery is an approved livery vehicle owner, operating 117 livery vehicles under authority of Permit No. 112.

6.   Plaintiff East Hartford Cab Company, Inc. ("East Hartford Cab") is a Connecticut corporation with principal offices at 134 East Center Street, Manchester, Connecticut 06040.  East Hartford Cab is an approved taxicab lessor, operating 29 taxicabs under authority of Certificate No. 1145.

7.   Plaintiff Executive 2000 Transportation, Inc. ("Executive 2000") is a Connecticut limited liability company with principal offices at 11 Alcap Ridge, Suite D, Cromwell, Connecticut

06416.  Executive 2000 is an approved taxicab lessor and livery vehicle owner, operating 21 taxicabs under authority of Certificate No. 1097 and 24 livery vehicles under authority of Permit No. 2840.

8.    Plaintiff Farmington Valley Cab, LLC ("Farmington Cab") is a Connecticut limited liability company with principal offices at 320 East Street, Plainville, Connecticut 06062. Farmington Cab is an approved taxicab lessor, operating 2 taxicabs under authority of Certificate No. 1208.

9.    Plaintiff Groton Cab Company, Inc. ("Groton Cab") is a Connecticut corporation with principal offices at 176 Cross Road, Waterford, Connecticut 06385.  Groton Cab is an approved taxicab lessor, operating 6 taxicabs under authority of Certificate No. 493.

10.   Plaintiff Lasse's Livery Service, Inc. ("Lasse's") is a Connecticut corporation with principal offices at 176 Cross Road, Waterford, Connecticut 06385.  Lasse's is an approved livery company, operating 20 livery vehicles under authority of Permit No. 92.

11.   Plaintiff Suburban Transportation, Inc. ("Suburban") is a Connecticut corporation with principal offices at 320 East Street, Plainville, Connecticut 06062.  Suburban is an approved taxicab lessor, operating a total of 32 taxicabs under authority of Certificate Nos. 1144 and 1193.

12.   Plaintiff Taxicabs and Livery Council of Connecticut, Inc. is a non-stock domestic corporation, whose purpose is to foster and promote the taxicab and livery industry in the State of Connecticut; to be a forum for the exchange of information and views by members of the Taxicabs and Livery Council of Connecticut; to provide a mechanism for the collection of information and inform members concerning matters of mutual interest and concern; to advance the interest of the industry and its members before the General

Assembly and appropriate State Agencies of the State of Connecticut, the Congress of the United States and other Federal authorities; to perform such duties as will benefit the Connecticut Taxicabs and Livery Council and its members; and to contract, rent, buy, or sell, hold and manage personal or real property necessary for the furtherance of the purposes of the Council.

13.  Plaintiff The Waterbury Yellow Cab & Service Company, Inc. ("Waterbury Yellow Cab") is a Connecticut corporation with principal offices at 176 Cross Road, Waterford, Connecticut 06385.  Waterbury Yellow Cab is an approved taxicab lessor, operating 33 taxicabs under authority of Certificate No. 107.

14.  Plaintiff Torrington Valley Cab, LLC ("Torrington Valley Cab") is a Connecticut limited liability company with principal offices at 320 East Street, Plainville, Connecticut 06062. Torrington Valley Cab is an approved taxicab lessor, operating 2 taxicabs under authority of Certificate No. 1161.

15.  Plaintiff Union-Lyceum Taxi Company, Inc. ("Union-Lyceum") is a Connecticut corporation with principal offices at 176 Cross Road, Waterford, Connecticut 06385. Union-Lyceum is an approved taxicab lessor, operating 13 taxicabs under authority of Certificate No. 95.

16.  Plaintiff Yellow Cab Company of New London & Groton, Inc. ("Yellow Cab") (the above referenced entities hereafter referenced cumulatively as "Plaintiffs") is a Connecticut corporation with principal offices at 176 Cross Road, Waterford, Connecticut 06385. Yellow Cab is an approved taxicab lessor and livery vehicle owner, operating 38 taxicabs under authority of Certificate No. 68 and 11 livery vehicles under authority of Permit No. 146.

17.  Defendant Uber is a foreign corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located at 800 Market Street, San Francisco, California 94103.  Uber may be served with process via its registered agent: National Registered Agents, Inc., National Registered Agents, Inc., One Corporate Center, Hartford, Connecticut 06103.  Uber operates a transportation-for-hire service in Connecticut, consisting of Uber black cars, SUVs, taxicabs and what are referred to as UberX vehicles.

18.  Defendant Lyft (Uber and Lyft hereafter referenced cumulatively as "Defendants") is a foreign corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located at 548 Market Street, Suite 68514, San Francisco, California 94104.  Lyft may be served with process by serving the Connecticut Secretary of State, 30 Trinity Street, Hartford, Connecticut 06106, as its agent for service because it engages in business in Connecticut but has not designated or maintained an gent for service of process, and this suit arose from its business in Connecticut.  Lyft operates a transportation-for-hire service in Connecticut.

**JURISDICTION**

19.  This action arises under the federal Lanham Act, 15 U.S.C. §§ 1051, *et seq.*; the federal Racketeer Influences and Corrupt Organizations Act ("RICO"), 18. U.S.C. §§ 1961, *et seq.*, the Connecticut Unfair Trade Practices Act ("CUTPA"), Connecticut General Statutes ("Conn. Gen. Stat.") §§ 42-110a, *et seq.*; and Connecticut common law.

20.  The District Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, since there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.  Additionally, this Court has Federal Question jurisdiction

under 28 U.S.C. § 1331 since this matter includes allegations related to Federal statutes. Specifically, the Court has jurisdiction under 15 U.S.C. § 1121 and 18 U.S.C. § 1964. This Court has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367 since those claims are so related to other claims in this action that they form part of the same case or controversy.

21. This Court has personal jurisdiction over the Defendants because they transact business in the State of Connecticut and have purposely availed themselves of the benefits of doing business in the State of Connecticut.

**FACTS**

*Regulation of Taxicabs and Livery Vehicles in Connecticut*

22. To ensure that the public has access to safe and uniform means of vehicle-for-hire transportation, the State of Connecticut has developed a number of laws and regulations to protect the riding public since the 1920's.

23. The Connecticut legislature has given the Connecticut Department of Transportation ("CT DOT") authority to regulate all "all aspects of the planning, development, maintenance and improvement of transportation in the state" including the "[i]mprovement in the transportation of people and goods within, to and from the state by rail, motor carrier or other mode of mass transportation on land is essential for the welfare of the citizens of the state and for the development of its resources, commerce and industry." *See* Conn. Gen. Stat. §§ 13b-3, 13b-32. Dovetailing with the regulatory authority granted to the CT DOT are the statutes that grant the Department of Motor Vehicles ("DMV") the authority to promulgate such regulations as are necessary to "enforce the provisions of the statutes

concerning motor vehicles and the operators of such vehicles." *See* Conn. Gen. Stat. § 14-3.

24. The CT DOT, pursuant to the powers vested in it by the Connecticut legislature, enacted regulations pertaining to the provision of taxicab and livery service in the State of Connecticut.  Taxicab regulations are codified at Regulations of Connecticut State Agencies ("Regs.") §§ 13b-91-1 through 13b-91-51, while the livery regulations are codified at Regs. §§ 16-325-1 through 16-325-26.  Additionally, information pertaining to the prerequisites that must be met to obtain endorsements for the operation of taxicab and livery vehicles is codified in DMV regulations at Regs. §§ 14-44-1, *et seq*.

25. Taxicab and livery companies must abide by these laws and regulations promulgated over decades, designed to protect consumers, ensure public safety, safeguard competition, and ensure non-discriminatory services.  Taxicab and livery companies have invested significant capital and resources to develop systems and infrastructure that ensures regulatory compliance and provides adequate consumer protections.

26. Connecticut's taxicab and livery regulations use three fundamental methods of ensuring that taxicab and livery service is safe, reliable and non-discriminatory.  First, the CT DOT issues a finite number of taxicab Certificates and livery Permits.  A taxicab or livery vehicle cannot operate legally in Connecticut without authorization under one of the 174 currently issued taxicab Certificates or 771 issued livery Permits (*see* Regs. §§ 13b-96-1(3) and 16-321-1), and taxicab and livery vehicle owners must have vehicles that meet strict requirements concerning age, condition and installed equipment (for example, taxicab meters, protective dividers and luggage barriers).  Second, every person interested in operating a taxicab or livery vehicle must apply for and obtain a plate pursuant to the

authority granted to each company, whether it be for taxicab or livery. Third, every lessee or driver must comply with extensive rules of conduct promulgated by the State of Connecticut (for example, requirements for dealing with handicapped passengers, allowed fares and charges, anti-discrimination requirements, and prohibitions on cell phone use).

### *Uber and Lyft*

27. On or about April 24, 2014, the Defendants began taxicab and/or livery operations in Connecticut without complying with the licensure, certification and permitting requirements of the CT DOT.

28. The Defendants are transportation services that own no taxicabs or livery cars and pay none of the substantial capital costs and ongoing expenses required to operate legal taxicab and livery vehicle businesses.

29. Uber offers three types of conveyance-for-hire vehicles to Connecticut travelers – UberX, UberBLACK Cars and Uber SUVs, the latter of which appears to be part of the UberBLACK service. Uber's transportation system communicates with customers through a free smart phone application ("app"). The Uber app allows Connecticut consumers to summon a low cost everyday vehicle (UberX) or a more expensive livery car, including a "black car" that seats four, or an "SUV" that seats six. Uber's other services, namely UberTAXI and UberLUX, are currently not available in the State of Connecticut.

30. The user opens the Uber application, which displays a map of the user's location (or designated pickup point), displays the available vehicles in the neighborhood, and states how long the user will have to wait for each type of car. Depending on how much the user wants to spend and how many cars in each price range are nearby, the user then chooses the type of car they want. Uber's out-of-state computer system then selects and Uber-affiliated

car, displays the driver's name and photograph on the user's smart phone, and sends a text message to the user with the driver's projected arrival time and cellular phone number.

31.    Lyft operates in largely the same way, but at the present time does not appear to offer the same variety in vehicles and services as Uber.  Very recently, however, Lyft announced its "Plus" service, which is aimed at providing a "premium" service "centered around comfort and … affordability."  In short, Lyft Plus is Lyft's answer to UberBLACK.  This week Lyft Plus launched in every market in which Lyft currently operates, including Connecticut.

### *The Defendants' Unlawful Approach to Competition*

32.    The Defendants' business plans cut corners illegally and undermines critical safety provisions of Connecticut taxicab and livery laws.  The Defendants' transportation systems only succeed because, unlike lawful competing taxicab apps, they prey parasitically on established taxicab and livery services without paying for them and without obeying laws designated to protect taxicab and livery customers.  The Defendants own no cars, no Certificates, no Permits, no plates, and employ no drivers.  In short, the Defendants pay little or nothing for infrastructure and profit from the investment of lawful Certificate, Permit, and plate users.  The Defendants induce their drivers ("partners") to illegally substitute the Defendants' computerized dispatching and credit card billing system for the lawfully operated dispatching systems and legal billing systems, knowing full well that in so doing the taxicab and livery drivers who sign up with the Defendants are violating state laws and regulations, as well as their contracts with taxicab and livery vehicle owners—the Plaintiffs.

33.    The Defendants adopt illegal methods because they can only operate profitably by misappropriating the infrastructure of existing taxicab and livery services.  There are

dozens of smart phone taxicab dispatching applications, any one of which could—if they chose to operate illegally—beat the Defendants at their own game.  In order to stay ahead of their competition (and attract investors), the Defendants violate nearly all substantive Connecticut taxicab and livery laws, lying to its customers, forcing taxicab and livery drivers who sign up to violate licensing laws and contracts with vehicle owners, and discriminating unlawfully against handicapped, elderly and less wealthy users of public transportation.

34.  The Defendants do not simply want to take control of revenue generated by licensed taxicabs and livery vehicles.  The Defendants also want to undermine the existing Connecticut taxicab and livery market by having unregulated UberX vehicles, black cars, SUVS, and soon other "luxury" vehicles, function as taxicabs and livery vehicles. Connecticut requires that all conveyances of persons for hire that are dispatched, hailed, or available at taxicab stands must have taxicab licenses that are issued pursuant to a limited number of taxicab Certificates.  The Defendants simply ignore the state-regulated legal limit—and public safety—by signing up an unregulated and unaccountable legion of UberX vehicles, black cars, SUVs, and assorted other unidentified vehicles, linking them to customers in direct competition with taxicabs and livery vehicles and in direct violation of Connecticut's laws and regulations.

35.  The Defendants' full-tilt campaign to woo taxicab and livery drivers is not a public-spirited attempt to modernize the taxicab industry.  To the contrary, it is a carefully crafted plan to insert itself, at no cost and without legal authority, into the taxicab and livery infrastructure that has existed in Connecticut since the 1920's.  The Defendants then profit by simultaneously flouting and taking parasitic advantage of a transportation system in which

all other players must comply with safety rules and consumer protections established by state and city laws.

36. Over 90 years of regulation in Connecticut have produced a set of rules designed to meet the needs and protect the rights of individuals who need a car and driver on short notice— i.e., a taxicab.  Technological advances have made taxicab dispatching more efficient over the years, but the Defendants' approach ignores virtually all taxicab regulations designed to protect customers who suffer from disabilities, who live in less secure neighborhoods, or who simply cannot afford a limousine.

### *The Defendants' Illegal Operation of Conveyance for Hire Vehicles*

37. The Defendants' business strategies are aimed directly at undermining the existing legal protections consumers receive under Connecticut laws and regulations.  Uber urges its customers to use Uber-affiliated UberX vehicles, black cars and SUVs, rather than its taxicabs.  In fact, UberTAXI is not even available in Connecticut right now, and may not ever be.  Similarly, Lyft does not even offer a "taxicab" vehicle or service.

38. Uber hopes that consumers will see their "classic" black cars and "high end" SUVs as downmarket limousines, and their UberX vehicles as affordable alternatives to taxicabs; Lyft hopes that consumers will view their vehicles as affordable and more convenient alternatives to authorized taxicab and livery vehicles.  But in the ways that matter for public safety, all of these options, whether fancy or affordable, are in fact dangerous taxicabs or livery vehicles.  They are taxicabs and livery vehicles because the affiliated cars are hailed by smart phone app on an "on demand" (taxicab) or "prescheduled" (livery) basis, assigned to customers through the same Uber or Lyft computer systems, and have fares determined by their respective fare charging systems.  Defendant-affiliated vehicles

now function as roving conveyances for hire in Connecticut, and are assigned in response to an "electronic hail" just as quickly as a taxicab or prescheduled livery assignment. Uber itself agrees that its black cars, SUVs and UberX vehicles function as taxicabs, claiming to New York taxicab regulators that the Uber system is a "virtual hail" equivalent to standing on a street corner and flagging a taxicab.

39. All of the Defendants' affiliated vehicles summoned on demand must, therefore, be considered taxicabs or livery vehicles under Connecticut's regulations, and cannot operate legally without a plate applied for and issued pursuant to a taxicab Certificate or livery Permit, and a Connecticut-licensed driver. The taxicab statutes and regulations are clear: "No person, association, limited liability company or corporation shall operate a taxicab until such person, association, limited liability company or corporation has obtained a Certificate from the Department of Transportation certifying that public convenience and necessity require the operation of a taxicab or taxicabs for transportation of passengers, the acceptance or solicitation of which originates within the territory specified in such Certificate except as provided under subsection (d) of this section." Conn. Gen. Stat. § 13b-97(a). "No certificate holder or taxicab driver shall: Permit or authorize any person to operate a taxicab unless that person is properly licensed in accordance with section 14-44 of the Connecticut General Statutes and has obtained a driver's identification card in accordance with section 13b-96-32 of the Regulations of Connecticut State Agencies." Regs. § 13b-96-27(4). The livery statutes are equally clear. *See* Conn. Gen. Stat. § 13b-103(a)(1).

40. Every one of Defendants' vehicles hailed electronically by their customers in Connecticut must, under the provisions of the statute and regulation quoted above, operate pursuant to

authority granted by the state and a plate issued thereunder.  None of them do, and all of Defendants' services currently offered in Connecticut are, therefore, operating illegally.  This massive illegal operation puts the public and consumers at risk in many ways.

### Risks of the Defendants' Illegal Operation of Taxicab and Livery Vehicles

41. The taxicab and livery regulations protect the public from dangerous vehicles by requiring that all vehicles be inspected to ensure they meet specific standards for age, condition, equipment, lack of damage and cleanliness. *See* Regs. §§ 13b-96-41 through 13b-96-44, 13b-96-48, 13b-96-49, 16-325-9, 16-325-11 through 16-325-16, 16-325-19 through 16-325-25.  The Defendants duck these requirements entirely (and illegally) even though they both make attempts to give off the appearance of fully meeting State compliance.

42. Uber tells its customers it inspects these vehicles, but upon information and belief, Uber only superficially inspects these vehicles and checks registration and information when the owner first signs up.  Uber does not have a regular program of rechecking vehicle condition, licensing or insurance.  Similarly, upon information and belief, Lyft only engages in a pre-approval inspection and does not have a regular program for rechecking vehicle condition, licensing or insurance.  In fact, to be approved by Lyft, all that is required mechanically of your car is that it be manufactured in 2000 or later and be in "good working condition."  The State of Connecticut, on the other hand, requires that all vehicles be inspected "at a minimum of once every three (3) months," and that a "written record of said inspections" be maintained at the Certificate-holder's address for "not less than twenty-four (24) months."  Regs. § 13b-96-49(a); *see also* Regs. §§ 16-325-11 through 16-325-25.

43. Connecticut statutes and regulations protect the public from dangerous taxicab and livery drivers by requiring license applicants to obtain a basic non-commercial driver's license (Class D) along with Class S and F endorsements prior to even *applying* for a license to operate under a Certificate holder's authority.  To seek Class S and F endorsements, drivers must submit evidence on a form prescribed by the Commissioner of the DMV that he or she has successfully completed a physical examination and has met the following thirteen (13) minimum physical standards:

    i. no loss of a foot, leg, hand or arm, or has been granted a waiver by the Commissioner;

    ii. no impairment of the use of a foot, leg, hand, fingers or an arm, and no other structural defect which is likely to interfere with his or her ability to control and safely drive the vehicle or has been granted a waiver by the Commissioner;

    iii. no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control;

    iv. no current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease;

    v. no established medical history or clinical diagnosis of a respiratory dysfunction likely to interfere with his or her ability to control and drive a motor vehicle safely;

    vi. no current clinical diagnosis of high blood pressure likely to interfere with his or her ability to operate a motor vehicle safely;

    vii. no established medical history or clinical diagnosis of rheumatic, arthritic, orthopedic, muscular, neuromuscular, or vascular disease which interferes with his or her ability to control and operate a motor vehicle safely;

    viii. no established medical history or clinical diagnosis of epilepsy or any other condition which is likely to cause loss of consciousness or any loss of ability to control a motor vehicle;

    ix. no mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his or her ability to drive a motor vehicle safely;

    x. has distant visual acuity of at least 20/40 inh eye without corrective lenses or visual acuity separately corrected to 20/40 or better with corrective lenses, distant binocularacuity of at least 20/40 in both eyes with or without corrective lenses, field of vision of at least 70 degrees in the horizontal meridian in each eye, and the ability to recognize the colors of traffic signals, and devices showing standard red, green and amber;

    xi. first perceives a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard Z24.5-1951.

xii.  does not use an amphetamine, narcotic or any habit-forming drug; and

xiii.  has no current clinical diagnosis of alcoholism.

If a driver seeking Class S and F endorsements passes the physical examination, he or she may apply to undergo further non-physical examination, wherein he or she is required to meet the following ten (10) criteria:

i.  cannot have four or more moving violations arising from separate incidents occurring within a two-year period;

ii.  cannot have a conviction or administrative license suspension, occurring within the preceding five years, of a violation of Conn. Gen. Stat. §§ 53a-56b, 53a-60d, 14-227b or subsection (a) or (b) of 14-224, or of any statute of another state which is determined by the commissioner of the Department of Motor Vehicles to prohibit the same or substantially similar acts or conduct as said sections of the Connecticut General Statutes;

iii.  cannot have a conviction, occurring within the preceding three years, of a violation of Conn. Gen. Stat. §§ 14-215, 14-222 or 14-222a;

iv.  cannot have a conviction of a serious criminal offense, which adversely reflects on his or her moral character;

v.  cannot have engaged in any other act or conduct which adversely reflects on his or her moral character;

vi.  cannot have a conviction of a serious criminal offense, including, but not limited to, any of the offenses listed in Regs. § 14-44-4(c);

vii.  cannot have finished serving a sentence for a conviction under Regs. § 14-44-4(c) within the five (5) years preceding the date of the application, or, in the case of license holders, five (5) years preceding the date on which the conviction has become known to DMV;

viii.  if the sentence for the conviction of a violation of any offense listed in Regs. § 14-44-4(c) has been completed more than five (5) years ago, the commissioner shall make an assessment of the nature of the offense, and of the entire criminal history of the individual, and then make a determination as to current fitness to hold an endorsement;

ix.  if the applicant or holder of an endorsement has been convicted of a violation of the laws of another state or of federal law, the commissioner shall determine if the conduct involved substantially similar conduct as that involved in the violation of Regs. § 14-44-4(c); and

x.  if the applicant or holder of an endorsement has been arrested for any felony, or a conviction of an offense that is not listed in Regs. § 14-44-4(c), may be subject to a denial or withdrawal of his or her endorsement after a review and evaluation of the official records of any state or federal criminal justice agency, an official driving history record, and any application for the endorsement that is required in Regs. § 14-44-5(a).

44. The Defendants violate the CT DOT and DMV taxicab and livery laws and regulations by signing up drivers who have not met the Connecticut requirements, and the Defendants fail to adequately assure its customers that these drivers could meet any of the driver standards. According to Uber, anyone can drive an Uber-affiliated black car or SUV in Connecticut as long as they have any commercial license and any commercial auto insurance.  Here is Uber's complete description of the standards it applies in selecting drivers for UberBLACK cars and SUVs: "A professional chauffeur with a commercial license and commercial auto insurance."  Even more disconcerting, all that is required to operate an UberX vehicle is: "a personal license and personal auto insurance."  Lyft appears to only require personal auto insurance, but it does offer a "first-of-its-kind" $1M liability insurance policy.  Even this policy falls short of state and federal mandates regarding commercial automobile insurance.  Upon information and belief, both of the Defendants have liability policies provided by James River Insurance Co., which is not licensed or admitted to practice in any state within the United States.  These policies appear not only to insure third-party management companies for the Defendants, making it nearly impossible to collect on the policies because these companies own no cars, but also have myriad other exclusions and exceptions preventing coverage in most scenarios.

45. On May 6, 2014, because of the Defendants' failure to adhere to Connecticut's insurance laws and regulations, the Connecticut Insurance Department issued a Consumer Alert titled "Drivers of Ride-Sharing Services Must Be Aware of Potential Coverage Gaps."  The alert goes on to provide: "Drivers who work for transportation network companies may not be covered by their personal automobile insurance policies while driving for fire.  This is due to a common exclusion in most personal auto policies for claims arising while driving for

hire, a practice sometimes referred to as livery service." In other words, even Defendant-affiliated drivers who believe they are properly insured most likely are not.

46. Uber previously attempted to reassure customers that, despite Uber's relaxed standards for selecting partners, it took steps to weed out unsuitable drivers: "We carefully select the fleet partners we work with and ensure that they have proper licensing and insurance." (formerly available at http://support.uber.com/entries/22346733-how-does-uber-select-drivers). Uber, however, has since removed even this reassurance on its website since last accessed on April 3, 2013.

47. Uber's alleged method of ensuring it has "qualified" drivers consists of a five-star "rating system" by which Uber riders can choose to rate their driver immediately after the ride. Uber claims that if a driver dips below a certain star rating, Uber will "no longer do business with" him or her. But Uber does not tell its customers that every driver receives a five star rating simply for signing up with Uber. Upon information and belief, a driver only drops below a "Five Star" rating if dissatisfied customers take the trouble to post negative reviews, and that Uber continues to use drivers even after they have received multiple negative reviews.

48. Lyft's method of ensuring it has "qualified" drivers consists of a slightly more rigorous process, though still deficient by Connecticut law and regulatory standards. Lyft's method includes: a criminal background check, DMV check, pre-approval vehicle inspection, excess liability inspection, zero-tolerance drug and alcohol policy, a star rating system, and a "driver orientation process" that takes only "a few days." Lyft does not provide any description as to how comprehensive its criminal background and DMV checks are or what minimum requirements must be met thereunder, nor does it provide any explanation as to

whether an investigation is conducted into drug and alcohol use.  Even if one assumes the
best of Lyft's precautions, they still fall well short of Connecticut's regulatory mandates.

49.   Uber's true stance on driver safety is revealed in the waiver of liability it forces every
customer to execute when they first register as an Uber user.  This waiver demonstrates that
Uber pretends to run a safe operation, but in reality refuses to screen its drivers or take
responsibility for anything "dangerous, offensive, harmful to minors, unsafe or otherwise
objectionable" its "quality" drivers may do:

> The company may introduce you to third party transportation providers for the
> purposes of providing transportation.  **We will not assess the suitability,
> legality, or ability of any third party transportation providers and you
> expressly waive and release the company from any and all liability, claims,
> or damages arising from or in any way related to the third party
> transportation provider.  The company will not be a party to disputes,
> negotiations of disputes, between you and such third party providers.**  We
> cannot and will not play any role in managing payments between you and the
> third party providers.  Responsibility for the decisions you make regarding the
> services offered via the application or service (with all its implications) rest
> solely with you.  **We will not assess the sustainability, legality or ability of
> any such third parties and you expressly waive and release the company
> from any and all liability, claims, causes of action, or damages arising from
> your use of the application or service, or in any way related to the third
> parties introduced to you by the application or service.**  You expressly waive
> and release any and all rights or benefits under Section 1542 of the Civil Code of
> the State of California (or any analogous law of any state), which reads as
> follows: "A general release does not extend tot claims which the creditor does
> not know or suspect to exist in his favor at the time of executing the release,
> which, if known by him, must have materially affected his settlement with the
> debtor.
>
> **The quality of the transportation services scheduled through the use of the
> service or application is entirely the responsibility of the third party
> provider who ultimately provides such transportation services to you.  You
> understand, therefore, that by using the application and the service, you
> may be exposed to transportation that is potentially dangerous, offensive,
> harmful to minors, unsafe, or otherwise objectionable, and that you use the
> application and the service at your own risk.**
>
> (https://www.uber.com/legal/terms#)(emphasis added.)

50.    As one could expect, Lyft has a similar stance regarding driver safety and requires a waiver

of liability, as reflected in its own Terms of Service:

> Lyft does not provide transportation services, and Lyft is not a transportation
> carrier.  It is up to the driver or vehicle operator to decide whether not to offer a
> ride to a rider contacted through the Lyft platform, and **it is up to the rider to
> decide whether or not to accept a ride from any driver contacted through
> the Lyft platform.  Any decision by a user to offer or accept transportation
> once such user is matched through the Lyft platform is a decision made in
> such user's sole discretion**.  Lyft offers information and a method to connect
> drivers and riders with each other, but does not and does not intend to provide
> transportation services or act in any manner as a transportation carrier, and has
> no responsibility or liability for any transportation services voluntarily provided
> to any rider by any driver using the Lyft platform.
>
> **Lyft has no responsibility whatsoever for the actions or conduct of drivers
> or riders.  Lyft has no obligation to intervene in or be involved in any way in
> disputes that may arise between drivers, riders, or third parties.
> Responsibility for the decisions you make regarding providing or accepting
> transportation rest solely with You.**  It is each rider and driver's responsibility
> to take reasonable precautions in all actions and interactions with any party they
> may interact with through use of the services.  Lyft may but has no responsibility
> to screen or otherwise evaluate potential riders or users.  **Users understand and
> accept that Lyft has no control over the identity or actions of the** riders and
> **drivers**, and Lyft requests that users exercise caution and good judgment when
> using the services.  Drivers and riders use the services at their own risk.

(https://www.lyft.com/terms)(emphasis added.)

### *The Defendants Discriminate Against Disabled, Elderly and Less Wealthy Riders*

51.    In order to lawfully operate a taxicab or livery vehicle after being permitted by the

Plaintiffs to use an authorized plate, a driver must comply with multiple provisions in state

law and regulations that protect poor, disabled and elderly riders against discrimination.

The taxicab regulations concerning anti-discrimination and refusal to pick-up provide:

    i.   No certificate holder or taxicab driver shall refuse or neglect to transport to and
from any place within its authorized service area any orderly person requesting
service regardless of race, gender, religion, national origin, age, marital status or
handicap who is willing and able to pay the prescribed fee;

    ii.  No certificate holder or taxicab driver shall refuse taxicab service to a patron with a
service animal; and

19

   iii. A hailed taxicab driver shall not seek to ascertain the destination of a passenger before such passenger is seated in the taxicab.

*See* Regs. § 13b-96-26.  Moreover, in the event the drivers violate any regulations adopted pursuant to Conn. Gen. Stat. § 13b-96 with respect to fares, service, operation or equipment, including these anti-discrimination provisions, they may be cited directly and may be subject to fines and sanctions under Conn. Gen. Stat. §§ 13b-97(c) or 13b-108.

52. Customers in wheelchairs are protected by the regulation language quoted above in addition to Regs. § 13b-96-28(4), which requires that every driver load or unload a passenger's luggage, wheelchair, crutches or other property at the request of the passenger, Regs. § 13b-96-47, which describes the very specific requirements that wheelchair accessible taxicab vans must meet in order to operate legally, and Conn. Gen. Stat. § 13b-105, which gives the CT DOT authorization to grant livery for the specific purpose of transporting the elderly and/or handicapped.  Drivers of conventional taxicabs and livery vehicles must offer service to wheelchair users, and must notify their dispatcher immediately if the customer asks for a non-conventional Wheelchair Accessible Vehicle ("WAV") taxicab vehicle, such as a van.

53. The Defendants illegally flout these obligations.  Neither app allows a customer to request a WAV taxicab or livery vehicle, the Defendants take no steps to provide WAVs, to provide WAV-certified drivers, or to have drivers working for the Defendants assist customers who need a WAV vehicle.

54. But it is not limited solely to disabled individuals.  Drivers affiliated with the Defendants can unlawfully ignore all of the anti-discrimination requirements without any adverse consequences, forcing customers in less secure neighborhoods to use conventional taxicab

20

and livery services, and forcing conventional taxicab and livery services to bear the full burden of complying with the anti-discrimination clauses.

55.    Connecticut taxicab and livery drivers are required to accept multiple forms of payment, including cash, credit cards, debit cards and coupons.  Also, Most Connecticut companies now take part in the New Freedom Fund Taxi Voucher Program, which allow customers who are elderly, handicapped, disabled, suffer from cancer, or who otherwise meet the definition of "disabled" under the federal Americans with Disabilities Act ("ADA") to pay discounted rates.  The Defendants' drivers, however, cannot accept cash, coupons or vouchers.  All payments—even tips—are charged automatically to the customer's preauthorized credit card.  The Defendants' credit card-only payment system discriminates against lower-income individuals without debit and credit cards, and discriminates unlawfully against elderly, handicapped, disabled and cancer patients, who have the legal right to use state- and federally-provided vouchers to assist with payment for taxicab trips.

### The Defendants Charge Illegal Fares

56.    Connecticut taxicab and livery rules protect consumers—and less wealthy customers—by establishing uniform fares.  The Commissioner of the CT DOT approves each taxicab Certificate-holder's proposed tariff or rate schedule prior to the company beginning operations, and the tariff or rate schedule cannot be altered without the approval of the Commissioner.  *See* Regs. §§ 13b-96-37(a), 16-325-7.  Charges for trips within Connecticut that are less than fifteen (15) miles in distance, as calculated by the Official Mileage Guide, must be displayed on a state-inspected, sealed taxicab meter that calculates the fare based on time, distance and the approved tariff.  More distant trips within

Connecticut are set by taxicab Certificate-holders' "fifteen miles or greater" rate of fare, and therefore cannot be altered. *See* Regs. § 13b-96-40.

57. The Defendants make no pretense of obeying these fare limits, charging a flat rate plus additional charges per-mile or per-minute, depending on the car's speed. This illegal variation in rates violates Connecticut's policy in favor of uniform, non-discriminatory charges for taxicab and livery service.

58. Additionally, the Defendants' user agreements allow the companies to use "surge" pricing when demand becomes "high" or "intense." Lyft relatively recently a new service that piggy-backs off this approach; its Happy Hour program lowers prices when demand is low. The mechanism for determining both appears arbitrary and unpredictable, made solely at the discretion of each company. Whether it be increasing or decreasing fares, neither is permitted under Connecticut law.

### The Defendants Operate an Illegal Dispatching Service

59. The Defendants' transportation system benefits financially by enlisting vehicle owners who have no licensure through one of the Plaintiffs' taxicab Certificate or livery Permit authorities granted by the state. By violating these requirements, the Defendants unlawfully evade any investment in plates, Certificates, Permits, vehicles, WAVs, registrations, insurance, dispatching equipment, protective partitions, taxicab meters, credit card machines, and other public safety and anti-discrimination requirements imposed by Connecticut law and regulation. In circumventing the laws and regulations, the Defendants put the public at risk in a variety of ways.

    i. <u>Quality of Owners</u>: Connecticut law and DOT regulations require all individuals or companies seeking authority to operate taxicab or livery operations, to apply for

said authority and then have a determination made as to their suitability.  These

individuals or companies are only granted the applied-for authority if they can

demonstrate that public convenience and necessity requires it, and that they meet

certain suitability requirements including business acumen, experience in the field,

provision of a business plan, financial suitability, and capacity to safely operate as

exemplified in their criminal record, driving record, drug use and sex offender

status, and financial stability documents.  *See* Regs. §§ 13b-96-10, 16-325-8; Conn.

Gen. Stat. §§ 13b-101, 13b-103.  Individuals or companies who are granted

authority to operate must have the capacity to make their business records readily

available to the CT DOT within three (3) business days of any request, records

which include tax returns and pertain to financial condition, disclosure of liens,

mortgages and judgments, and the identity of any individual provided a plate.

Knowing the financial condition of taxicab and livery owners assists the CT DOT in

setting rates that are fair to them and the public.  The Defendants, on the other hand,

enlist as many vehicles as it can, often dealing with individuals or small companies

with a single car.  The Defendants know virtually nothing about the financial

stability, citizenship, criminal background, litigation record, affiliations or true

ownership and control of the vehicle operators.

ii.  <u>Quality of Drivers</u>:  If granted authority to operate either taxicab or livery vehicles,

Connecticut law and DOT regulations then require all drivers to apply for and

operate under plates, which are only granted to applicants who meet standards for

endorsement, testing, training, criminal record, driving record, drug use and sex

offender status, as further described above in Paragraph 53.  Once obtaining the

23

proper endorsements and meeting the other requirements, the regulations state that

each Certificate-holder must properly instruct and review their drivers for

adherence to the following criteria:

    a. must effectively communicate with patrons and properly comply with all record keeping requirements;
    b. driver clothing must be clean and in good repair;
    c. must not use abusive language, be discourteous, solicit gratuities or engage in smoking;
    d. must maintain current map of territory and be geographically familiar with the service area;
    e. must load or unload a passenger's luggage, wheelchair, crutches or other property upon request;
    f. must comply with all reasonable requests of the passenger; and
    g. must comply with passenger requests as to air conditioning and heating.

*See* Regs. § 13b-96-28(a)-(b); *see also* Regs. § 16-325-6.  Additionally,

Certificate-holders must, at least once every twelve (12) months, review the

driving record of each driver to determine whether qualified to continue driving,

and must also require their drivers to continue to meet minimum physical

standards set forth at Regs. § 14-44-1.  *See* Regs. § 13b-96-28(c)-(d).  Also, livery

drivers, if transporting students, must comply with regulations governing school

busses.  *See* Regs. §§ 16-325-6 (referencing Regs. §§ 14-275c-1 through 14-275c-

22, 14-275-44 through 14-275-53, 14-276a-1 through 14-276a-15).

iii. <u>Quality of Cars</u>:  Uber showcases the luxury of its black cars and SUVs, and both

Defendants promote the affordability of their other services, but all of these

vehicles lack essential protections required by Connecticut law and regulations for

all dispatched-on-demand transportation services.

    a. *Construction and Equipment*:  The CT DOT promulgates regulations

        concerning general construction and equipment requirements for vehicles

in taxicab and livery service.  For taxicabs specifically, these requirements include, but are not limited to, passenger restraints in operable condition numbering no fewer than the maximum occupancy, operable heating and air conditioning, a luggage barrier for the safe transport of bags, a fire extinguisher of a size and type approved by the DMV, and an approved driver shield (if authorized and operating in municipalities that exceed certain populations).  *See* Regs. §§ 13b-96-41, 16-325-11 through 16-325-24.  These driver shields not only protect drivers from assault and theft; they also prevent drunk or drugged passengers from interfering with the driver and causing accidents.  Livery vehicles have similar requirements.  *See* Regs. §§ 16-325-11 through 16-325-24.  Uber's marketing plays up the six-person capacity of its SUVs in the same way Lyft Plus will offer amenity consoles and various other features, all of which encourage a party atmosphere, thereby increasing the risk that boisterous passengers will distract the driver—or worse.  Uber black cars and SUVs do not have partitions, and Lyft Plus' vehicles do not appear to have partitions, putting drivers at risk and undermining a critical public safety program of the State of Connecticut.

b.  *Vehicle Age*:  Every vehicle registered for taxicab service after March 31, 2001 cannot be older than ten (10) model years of age as of March 1 of each year thereafter.  Additionally, each vehicle re-registered shall furnish proof of its last two semi-annual inspections performed pursuant to Conn. Gen. Stat. § 13b-99.  *See* Regs. § 13b-96-42.  Livery vehicles have similar

requirements.  Although the Defendants have requirements to register a
car with their service, there is no requirement that regular inspections
occur.

c.  *Appearance:*  The CT DOT also requires that taxicabs and livery vehicles
to meet standards for a baseline level of appearance, some of which, if
adhered to, help to maintain safety.  *See* Regs. § 13b-96-43.  For example,
all molding and mirrors must be securely attached to the vehicle and in
good condition, seats shall be firmly attached to the chassis, body of
vehicle must be free from exposed wire and sharp edges from metal or
vinyl, windows cannot be broken or cracked, and each vehicle must be
equipped with two operable windshield wipers, non-streaking blades and a
functional windshield washing system.  Livery vehicles have similar
requirements.  *See* Regs. §§ 16-325-11 through 16-325-24.  Again,
although the Defendants have requirements to register a car with their
service, it does not appear as though any of these standards are considered,
nor is there a requirement that regular inspections occur.

d.  *Taxicab and Livery Meters and Flat Rates*:  The fare for every
Connecticut taxicab and livery trip is set by an inspected and sealed meter,
the Certificate-holder's flat rate handbook, or Permit-holder's state
authorized rate schedule, ensuring that every customer pays the same rate
based on a Commissioner approved tariff or rate schedule.  The
Defendants' vehicles make no attempt to comply with these legally-
mandated maximum rates.  Fares are set by the Defendants' proprietary

algorithms, which always charge more than the Connecticut taxicab and livery rates.  The Defendants' user agreements also allow the companies to use "surge" pricing when demand becomes "high" or "intense."  Uber took advantage of this contractually-permitted price gouging to hike prices 625% early on New Year's Day 2012. (http://blog.uber.com/2012/01/01/take-a-walk-through-surge-pricing/) Lyft engages in the same practice, but also recently introduced its Happy Hour, which provides that when demand is low, prices will fall.

60. The Defendants' illegal transportation system is not limited to their own drivers' non-conventional taxicab and livery vehicles.  As stated above, Uber also "partners" with legally operating Connecticut taxicab and livery drivers, who make an illegal side deal with Uber to take its customers while simultaneously working a normal shift with his or her authorized company.  Legally operating Connecticut taxicab and livery drivers are also free to sign up with Lyft, although Lyft does not have specific terminology for its partnership.  A taxicab or livery operator who accepts work from its radio dispatch, whether computerized or not, while at the same time accepting work from either or both of the Defendants, is violating Connecticut's taxicab and livery laws and regulations.  Examples include the following:

    i.  <u>Illegal Fares</u>:  In Connecticut, each Certificate-holder or Permit-holder must maintain on file with the Commissioner of the CT DOT a tariff for taxicab service or rate schedule for livery service.  Defendants' fares, on the other hand, are set by the Defendants' proprietary algorithms, which always charge more than the Connecticut taxicab rate.  Furthermore, by charging a mandatory 20% "gratuity"

(half of which goes to Uber) and a $1 fee, Uber's drivers violate the maximum

fare provisions of Regs. §§ 13b-96-37(b), 16-325-7.  Lyft is similar; by charging

$1 "Pickup" fee and $1 "Trust & Safety" fee, the driver violates the same

provision.  "Surge" and "Happy Hour" pricing, as described above, are also not

permitted under Connecticut law.

ii.   <u>Illegal Cellular Phone Use</u>:  Defendants' drivers must use cell phones to receive

and accept assignments and to communicate with the Uber or Lyft customer.  The

Defendants' computerized system requires drivers to respond to an "electronic

hail" within a few seconds or lose the job, increasing stress, distraction, and the

potential for accidents.  The Defendants then compound the risk by requiring

drivers to call the customer when the taxicab is close to the pickup point.

iii.  <u>Discrimination</u>:  Connecticut regulations prohibit discrimination based on the

passenger's personal characteristics (disability, age, gender, race, etc.).  The

Defendants' assignment system permits a driver to discriminate for any of these

unlawful reasons.

iv.   <u>Refusal to Honor Payment Options</u>:  Connecticut regulations ensure that

customers without the means to use a credit card or smart phone can also pay by

cash, voucher or discount coupon.  Defendant-affiliated vehicles unlawfully limit

these options, only allowing payment through the customer's smart phone (even

for tips), charging a credit card previously registered with Uber or Lyft.

***The Defendants Unfairly Compete with Connecticut Licensed Taxicabs and Livery Car
Services that Comply with the Taxicab and Livery Laws and Regulations***

61.   The Defendants try to avoid regulation of their vehicles by claiming they are livery cars.

True livery vehicles provide prearranged transportation and are not subject to Connecticut's

28

taxicab rules.  But the Defendants' computerized service allows spur-of-the-moment assignment and "virtual hails" of Defendant-affiliated vehicles driving in a customer's neighborhood, putting the Defendants' vehicles in direct competition with taxicabs, whether dispatched, hailed, or parked at a designated taxicab stand.

62. Connecticut taxicabs must comply with laws and regulations that protect the public from harm, prohibit discrimination against the disabled, elderly and other victims of bigotry, and set maximum fares to protect the less wealthy.  To comply with these laws and regulations, Connecticut taxicabs must invest in equipment, training, and licenses, charge only prescribed fares, and serve all areas, including the less profitable sections of the city.  In contrast, the Defendants' vehicles defy the taxicab laws and regulations, skimming customers who are wealthy and sophisticated enough to use a smart phone to summon a ride.  Uber's "partners" and Lyft's functional equivalent are a fleet of gypsy taxicabs recruited by the Defendants to compete unlawfully and unfairly against licensed Connecticut taxicabs by ignoring the laws and regulations.

63. In addition to competing unfairly and unlawfully against Connecticut taxicabs, the Defendants' vehicles compete unfairly against true livery car services, which need not comply with the taxicab laws and regulations if they convey passengers on prearranged trips for flat rates.  The Defendants' vehicles ignore these restrictions, are dispatched as quickly as UberTAXIs (even though these are not currently available in Connecticut), and thus have a substantial (and unfair) competitive advantage over livery car services that comply with the taxicab rules by refusing to participate in an on-demand dispatching system like the Defendants'.

64. Most of the Defendants' drivers only have personal or general commercial insurance coverage, as this is all that the Defendants require to sign up and get approved as a driver. Upon information and belief, however, the Defendants' drivers who purchase service-specific insurance also compete unfairly by unlawfully purchasing insurance that by law can only cover true livery vehicles. Insurance premiums for livery vehicles are lower than the premiums for taxicabs, and it thereby follows that the Defendants' vehicles must pay the higher insurance rates charged to taxicabs, rather than other service cars.

65. Defendant-affiliate vehicles are not eligible for these lower livery insurance rates because they operate as taxicabs, not livery. They connect instantly with customers through the Defendants' computerized system, and thus "pick up hail fares on the street." The Defendants' GPS systems calculate fares with "a rate meter," and fares are "charge[d] based upon miles traveled." These characteristics by definition require all Defendant-affiliated vehicles to pay taxicab insurance rates. The Defendants' vehicles that pay livery service rates thus compete unfairly by functioning as Connecticut taxicabs while paying substantially lower insurance rates than taxicabs. The Defendants, by improperly obtaining livery insurance, are also putting customers at risk, as insurers may disclaim coverage for Defendant-affiliated vehicles that have not paid taxicab insurance rates.

66. The Defendants know or should know that their affiliated vehicles are not paying proper insurance rates and are therefore putting their customers in jeopardy. The Defendants nonetheless falsely assure their customers that their drivers are fully licensed with the appropriate insurance.

### *The Defendants Falsely Claim to be Affiliated with Connecticut Taxicab Authority Owners*

67.   Each time the Defendants assign a taxicab or livery vehicle operating under a plate issued

to one of the Plaintiffs as authorized by the State of Connecticut in response to an

electronic hail, the Defendants fraudulently lead their customers to believe that they are

legally authorized to do so, and that the Defendants are legally authorized by the State and

the Plaintiff companies to charge the fees and "gratuity" over and above the maximum

lawful fare set by Connecticut regulations, even though they are not authorized to do so.

68.   The Defendants falsely lead customers to believe that the owners and operators of licensed

Connecticut taxicabs have approved these charges, and falsely suggest that they are

"partners" with lawfully operating taxicab and livery companies.  Having invested nothing

to acquire and equip vehicles, purchase licenses, pay carrying costs for insurance,

inspection and regulatory compliance, the Defendants have unilaterally established a new

system for linking customers to taxicabs and tricked the customers into believing that

taxicab owners and operators have granted the Defendants legal authority to sell taxicab

services in Connecticut and collect fares.

### *The Defendants Unlawfully Interfere with Contractual Relations between*
### *Licensed Taxicabs and Service Providers*

69.   As stated above, Connecticut taxicab laws and regulations require every authority owner to

install thousands of dollars of integrated equipment, including an approved, inspected and

sealed taxicab meter to measure fares, dispatching assignment equipment, and a credit card

payment machine.  When the Defendants convince lawfully operating taxicab drivers to

sign on to their services and get more fare-paying customers, the Defendants pay nothing

for the capital cost of this infrastructure.  They simply divert the fare, processing it through

the Defendants' credit card processing facility and taking a fee before paying the driver anything.

70.   In order to afford the capital cost of required taxicab equipment, Connecticut taxicab Certificate-holders reach agreements with credit card processing companies approved to operate within the State of Connecticut.  These credit card companies pay for and install legally-required dispatching and fee-processing equipment in exchange for the right to collect credit card processing fees for fares.

71.   In exchange, these companies receive transaction processing revenues when passengers pay with credit or debit cards.  The Defendants bypass the credit card payment system installed in the Plaintiffs' authorized taxicabs and livery vehicles, depriving the credit card processing companies of the processing fees that the Plaintiffs are contractually obligated to give in exchange for the installation of legally required taxicab communications equipment.  The Defendants' misappropriation of credit card fees unlawfully interferes with the Plaintiffs' contracts with their credit card processing companies and violates Connecticut laws and regulations.

72.   Upon information and belief, the Defendants' have agreements with drivers dispatched by all of the Plaintiffs, and that all the Plaintiffs have similar contracts, which grant an approved credit card processing company the right to receive processing fees when passengers pay fares by credit or debit card.  The Defendants' diversion of credit card payments and fees interferes with all of the Plaintiffs' contracts with their credit card processing companies by stealing revenue that is legally committed to paying for safety equipment required in all legally operated Connecticut taxicabs.

## COUNT I

### MISREPRESENTATION OF SERVICES IN
### VIOLATION OF LANHAM ACT, 15 U.S.C. § 1125(a)(1)(B)

73.   The Plaintiffs incorporate in this Count One the allegations in Paragraphs 1-72 of this Complaint as if fully set forth herein.

74.   By representing to consumers in its commercial advertising and promotion that the Defendants' vehicles are operating lawfully in Connecticut, as stated above, the Defendants falsely describe facts and falsely represent facts, thereby misrepresenting the nature, characteristics and qualities of its services, in violation of 15 U.S.C. § 1125(a)(1)(B).

75.   The Defendants misrepresentations have caused harm to the Plaintiffs.

## COUNT II

### MISREPRESENTATION OF SERVICES IN
### VIOLATION OF LANHAM ACT, 15 U.S.C. § 1125(a)(1)(A)

76.   The Plaintiffs incorporate in this Count Two the allegations in Paragraphs 1-75 of this Complaint as if fully set forth herein.

77.   By fabricating a nonexistent "partnership" with legally owned and operated taxicab and livery companies in Connecticut and by misrepresenting its legal authority to operate a dispatch service, as alleged above, the Defendants have used false descriptions and representations of fact to cause confusion and mistake in consumers, who are likely to believe that the Defendants are affiliated with, connected with, associated with, sponsored by and approved by legally owned and operated taxicab and livery companies including the Plaintiffs, in violation of 15 U.S.C. § 1125(a)(1)(A).

78.   The Defendants' misrepresentations have caused harm to the Plaintiffs.

## COUNT III

**UNFAIR AND DECEPTIVE TRADE PRACTICES IN VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONN. GEN. STAT. §§ 42-110a, ET SEQ.**

79.   The Plaintiffs incorporate in this Count Three the allegations of Paragraphs 1-78 of this Complaint as if fully set forth herein.

80.   The Defendants' actions offend public policy as it has been established by statutes, common law or other established concept of fairness as described herein.

81.   The Defendants' actions constitute immoral, unethical, oppressive or unscrupulous behavior.  These actions include, but are not limited to:

   i.   falsely claiming an affiliation with lawfully operating taxicab and livery authority owners and operators;

   ii.   falsely claiming that they only collect a $1 fee and pay the full "gratuity" to their vehicle drivers;

   iii.   falsely claiming that its taxicab service is lawful under applicable Connecticut laws and regulations pertaining to the ownership and operation of taxicab and livery companies and vehicles;

   iv.   falsely claiming that their vehicles do not need to be licensed and regulated as taxicabs in Connecticut;

   v.   unlawfully operating their transportation services without incurring the expense of compliance with Connecticut laws and regulations, as alleged above, and thereby unfairly competing with the Plaintiffs.

82. The Defendants' unfair and deceptive acts and practices have caused substantial injury to consumers and lawfully operating taxicab and livery companies, including but not limited to the Plaintiffs and their drivers.

83. Pursuant to Conn. Gen. Stat. § 42-110g(c), the Plaintiffs have mailed a copy of this Verified Complaint to the Connecticut Attorney General and the Commissioner of Consumer Protection.

## COUNT IV

### COMMON LAW INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

84. The Plaintiffs incorporate in this Count Four the allegations of Paragraphs 1-83 of this Complaint as if fully set forth herein.

85. The Defendants intentionally interfered with the Plaintiffs' contractual relationships in one or both of the following ways:

   i. By inducing legally operating Connecticut taxicab and livery drivers, including those using vehicles leased or owned by the Plaintiffs, to violate the Connecticut rules and regulations and terms of their individual leases, the Defendants intentionally interfered with the contractual relationships between the Plaintiffs and their taxicab drivers.

   ii. By requiring legally operating Connecticut taxicab and livery drivers, including those using vehicles leased or owned by the Plaintiffs, to receive payment through the Defendants' own personal credit card processing systems rather than the credit card companies that the Plaintiffs have contracted with, the Defendants are misappropriating credit card fees and unlawfully interfering with the Plaintiffs' contracts with their credit card processing companies.

35

86.   The Defendants' intentional interference with the contractual relationships between the Plaintiffs and their drivers and/or their credit card processing companies has caused the Plaintiffs substantial harm.

## COUNT V

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT "USE OR INVEST" PROHIBITION, 18 U.S.C. § 1962(a)

87.   The Plaintiffs incorporate in this Count Five the allegations of Paragraphs 1-86 of this Complaint as if fully set forth herein.

88.   By using the internet to transmit fraudulent misrepresentations of Connecticut consumers about fares in the Defendants' vehicles and false claims of an association between the Defendants and the Plaintiffs, the Defendants are violating the federal Wire Fraud statute, 18 U.S.C. § 1343.  These fraudulent representations have been transmitted to Connecticut users of the Defendants' transportation systems hundreds, if not thousands of times over a period in excess of three weeks.

89.   The Defendants' thousands of violations of the federal Wire Fraud act over a period of over three weeks with Connecticut customers are a continuous, related series of predicate acts that constitute a pattern of racketeering activity under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(5).

90.   The Defendants derive income from their wire fraud violations by enlisting lawfully operating taxicab and livery drivers to drive the Defendants' customers, diverting all credit card payments by the Defendants' customers through their own collection systems, and collecting illegal fees from those payments.

91.   Upon information and belief, the Defendants use some of the income illegally derived from the diverted Connecticut fares in their ongoing operation of the Defendants' transportation

systems.  The Defendants' transportation systems are engaged in and affect interstate commerce.

92. The Defendants' investment of the proceeds of their racketeering activity in the Defendants' ongoing operations causes injury to the Plaintiffs by providing investment funds used to expand the Defendants' network of vehicles.  These taxicab substitutes divert business from licensed and legally operating taxicab and livery vehicles that are managed by the Plaintiffs, causing substantial economic injury to the Plaintiffs.

93. The Defendants' conduct in using illegal profits from diverted Connecticut taxicab and livery fares to develop their own fleets that take business from licensed Connecticut taxicab and livery vehicles violates 18 U.S.C. § 1962(a), which makes it "unlawful for any person who has received any income derived … from a pattern of racketeering activity … to use or invest … any part of such income" in the "operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

## COUNT VI

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT "INTEREST IN OR CONTROL OVER" PROHIBITION, 18 U.S.C. § 1962(b)

94. The Plaintiffs incorporate in this Count Six the allegations of Paragraphs 1-93 of this Complaint as if fully set forth herein.

95. The Defendants use the fraudulent representations alleged above to expand their Connecticut customer base and increase the demand for the Defendant-affiliated vehicles in Connecticut.  This increased demand permits the Defendants to induce lawfully operating taxicab and livery drivers in Connecticut, including some drivers of vehicles leased or owned by the Plaintiffs, to enter into contracts with the Defendants.

96.   Upon information and belief, the number of the Defendant-affiliated vehicle drivers in Connecticut is expanding and the Defendants are thereby increasing its control of the legally operating taxicab authorities in Connecticut that make up the Connecticut public transportation system, including control of dispatching, control of selection of the customers and neighborhoods that receive taxicab services, and control of fares paid by taxicab customers.

97.   The Defendants' conduct violates 18 U.S.C. § 1962(b), which "prohibits any person from acquiring or maintaining … any … control over an enterprise through a pattern of racketeering activity."

98.   By exercising an increasing level of control over the taxicab and livery operations of the Plaintiffs and their lawfully operating, plate utilizing drivers, as alleged above, the Defendants are causing substantial economic harm to the Plaintiffs.

## COUNT VII

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT "CONDUCT OF ENTERPRISE" PROHIBITION, 18 U.S.C. § 1962(c)

99.   The Plaintiffs incorporate in this Count Seven the allegations of Paragraphs 1-98 of this Complaint as if fully set forth herein.

100.  By unlawfully generating demand for its services in Connecticut, as alleged above, and entering into contracts with a growing number of lawfully operating Connecticut taxicab and livery drivers, the Defendants have insinuated themselves into the operations of approved taxicab and livery authorities, including the Plaintiffs and their drivers, and have participated in the business of the Plaintiffs and their drivers by means of racketeering conduct.

101.   The Defendants' conduct violates 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

102.   The Defendants' participation in the conduct of the affairs of the Plaintiffs and their drivers has caused significant economic harm to the Plaintiffs.

**DAMAGES**

103.   By reason of the Defendants' acts alleged herein, the consumers have been injured and the Plaintiffs have suffered, and will continue to suffer, damages to their business, reputation, and good will and have lost sales and profits that the Plaintiffs would have made but for the Defendants' acts.

104.   The Plaintiffs also request that the Court award damages to the Plaintiffs, treble the amount of actual damages suffered by the Plaintiffs, pursuant to 18 U.S.C. § 1964(c).

105.   The Plaintiffs further request that the Court award as damages to the Plaintiffs the greater of (1) the Defendants' profits, (2) the amount of actual damages suffered by the Plaintiffs, (3) any sum above these amounts not exceeding three times the amount, or (4) any higher amount as the Court may award in its discretion according to the circumstances of this case, pursuant to 15 U.S.C. § 1117(a).

**REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

106.   The Plaintiffs seek injunctive relief pursuant to common law, Fed. R. Civ. P. 65, as well as by statute as provided for in 15 U.S.C. § 1116(a) and 18 U.S.C. § 1964(a).  The Plaintiffs also seek an order from the Court entered against the Defendants to cease and desist their illegal activities including the rogue dispatching described herein.

107. Consumers and the Plaintiffs will suffer imminent and irreparable injury if the Defendants are not immediately restrained from operating illegally in the State of Connecticut and continue to make misrepresentations as described above.  Fed. R. Civ. P. 65(b)(1); *see Sampson v. Murray*, 415 U.S. 61, 88-89 & n.59 (1974).  The Defendants have shown a complete disregard for the efforts by the Connecticut General Assembly to put in place rigid new insurance requirements for drivers that holds them to the same set of standards as taxicabs and livery vehicles by (a) requiring that each of the Defendants' cease and desist from utilizing the waivers of liability as described above, and (b) requiring that each of the Defendants' drivers carry proper commercial insurance coverage in addition to their personal liability coverage.  As such, their illegal activities are likely to continue and will cause irreparable injury to the Plaintiffs that are difficult if not impossible to calculate.  However, in cases where a violation of a statute is alleged, as in this case, a showing of irreparable injury is not required.  *See U.S. v. Caribbean Ventures, Ltd.*, 387 F.Supp. 1256, 1257 (D.N.J. 1974) (citing *C.A.B. v. Donaldson Line (Air Services) Limited*, 343 F.Supp. 1059 (S.D.N.Y.1972); *C.A.B. v. Modern Air Transport, Inc.*, 81 F.Supp. 803, 806 (S.D.N.Y.1949), *aff'd*, 179 F.2d 622 (2d Cir. 1950).

108. In *Caribbean Ventures*, the U.S. was seeking to enjoin the defendants from proving unlicensed air transportation for hire, even though they alleged their service was free.  The court found a reasonable probability of success in favor of the U.S. and granted the injunction because the defendant was violating FAA regulations which required any person engaged in air transportation to obtain the required operating Certificate.  *Caribbean Ventures*, 387 F.Supp. at 1261.  The court further found that the "defendants fail to take into account the overriding public interest in the safe passage of air travelers..." and that the

"...defendants cannot be permitted to jeopardize the public interest which the regulations were reasonably designed to protect." *Id.* at 1262.

109. Just like in *Caribbean Ventures*, there is a substantial likelihood that the Plaintiffs here will prevail on the merits because the Defendants are plainly operating in violation of the Connecticut laws and regulations.

110. The threatened harm to the consumers and the Plaintiffs outweighs the harm that a temporary restraining order would inflict on the Defendants because they can have no reasonable expectation of protection from their own statutory and regulatory violations.

111. An issuance of a temporary restraining order would not adversely affect the public interest and public policy because, like in *Caribbean Ventures*, the public interest must weigh in favor of the safe passage of travelers, for which the applicable CT DOT and DMV statutes and regulations were designed in the first place.

112. Since the Defendants have no right to operate their business illegally or through the execution of a scheme to defraud, the bond should be minimal.

113. The Plaintiffs ask the Court to set the request for a preliminary injunction for hearing at the earliest possible time and, after hearing the request, to issue a preliminary injunction against the Defendants.

## REQUEST FOR PERMANENT INJUNCTION

114. The Plaintiffs ask the Court to set their application for injunctive relief for a full trial on the issues in this application and, after the trial, to issue a permanent injunction against the Defendants enjoining them forever from the conduct described herein.

## CONDITIONS PRECEDENT

115. The Plaintiffs herein certify that all conditions precedent to Plaintiffs' claim for relief have been performed or have occurred.


WHEREFORE, the Plaintiffs demand judgment in their favor on all counts jointly and severally and a trial before a JURY, and awarding the Plaintiffs the following: the Defendants' profits from all fares collected by Defendant-affiliated Connecticut vehicles; damages caused to the Plaintiffs by the Defendants' unlawful operation of vehicles in Connecticut; multiple, treble and punitive damages as prayed for herein for the Defendants' unlawful operation of their vehicles in Connecticut; attorney's fees; interest; costs; and further relief as deemed appropriate by the Court including, but not limited to, a temporary restraining order, preliminary and permanent injunction, and a cease and desist order.


THE PLAINTIFFS,

BY: _____/s/_____
     Mary Alice Moore Leonhardt (ct02996)
     mmooreleonhardt@rms-law.com
     Moore Leonhardt & Associates LLC
     102 Oak Street
     Hartford, CT 06106
     Tel. (860) 549-1000
     Fax (860) 724-3921

BY: _____/s/_____
     Glenn E. Coe (ct05372)
     gcoe@rms-law.com
     Rome McGuigan, P.C.
     One State Street
     Hartford, CT 06103
     Tel. (860) 549-1000
     Fax (860) 724-3921

     Their Attorneys

42

## <u>CERTIFICATION</u>

I hereby certify that on September 15, 2014, a copy of the foregoing was filed electronically and served by mail to anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system, or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____/s/_____

Mary Alice Moore Leonhardt, Esq.
