# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GREENWICH TAXI, INC., ACE TAXI
SERVICE, INC., CASINO CAB COMPANY,
INC., CURTIN MOTOR LIVERY SERVICE,
INC., EAST HARTFORD CAB COMPANY,
INC., EXECUTIVE 2000
TRANSPORTATION, LLC, FARMINGTON
VALLEY CAB, LLC, GROTON CAB
COMPANY, INC., LASSE'S LIVERY
SERVICE, INC., SUBURBAN
TRANSPORTATION, INC.,  TAXICABS
AND LIVERY COUNCIL OF
CONNECTICUT, INC., THE WATERBURY
YELLOW CAB & SERVICE COMPANY,
INC., TORRINGTON VALLEY CAB, LLC,
UNION-LYCEUM TAXI COMPANY, INC.,
and YELLOW CAB COMPANY OF NEW
LONDON & GROTON, INC.,

                 Plaintiffs,

    v.

UBER TECHNOLOGIES, INC. and
LYFT, INC.

                Defendants.

C.A. No.: 3:14-cv-733 (AWT)


**DEFENDANT UBER TECHNOLOGIES,
INC.'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION TO
DISMISS**


November 14, 2014

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

PLAINTIFFS' ALLEGATIONS ..............................................................................3

ARGUMENT ..........................................................................................................4

I.   Plaintiffs Fail to State a Lanham Act Claim for False Advertising ......................................4

    A.   Plaintiffs Cannot Premise Their Lanham Act Claim on Violations of Local Transportation Laws ..........................................................................5

    B.   Plaintiffs Fail to Allege Uber Made Any Misrepresentations ...................................7

    C.   Plaintiffs Fail to Plead That Uber's Alleged Misrepresentation Proximately Caused Their Alleged Injuries ..........................................................................9

II.  Plaintiffs Fail to State a Lanham Act Claim for False Association ...................................12

    A.   Plaintiffs Fail to Allege They Have Recognizable Trademarks ............................13

    B.   Plaintiffs Fail to Allege That Uber "Used" Their Trademarks ...............................13

III. Plaintiffs Fail to State a Claim Under the Connecticut Unfair Trade Practices Act ("CUTPA") ..........................................................................16

    A.   Plaintiffs' CUTPA Claim Fails for the Same Reasons that Their Lanham Act Claims' Fail ..........................................................................16

    B.   Plaintiffs' CUTPA Claim Should Also be Dismissed for Failure to Satisfy Rule 9(b)'s Heightened Pleading Standard ..............................................16

    C.   Plaintiffs Have Not Pled Substantial Injury ..........................................................17

    D.   Plaintiffs' Allegations Fail to Allege Conduct Which Rises to the Level of a CUTPA Violation Under the Cigarette Rule ..........................................19

    E.   Plaintiffs' CUTPA Claim Must Also Be Dismissed For Failure to Allege that Uber's Acts Were the Proximate Cause of the Plaintiffs' Injuries ..................20

IV.  Plaintiffs Fail to State a Claim for Intentional Interference with Contractual Relationships ..........................................................................21

    A.   Plaintiffs Fail to Identify Any Tortious Conduct by Uber ......................................21

B. Plaintiffs Have Failed to Allege That Uber Interferes With Plaintiffs' Contracts With Credit Card Companies ................................................ 24

C. Plaintiffs Have Failed to Allege that Uber Intended to Interfere With Plaintiffs' Contracts ................................................................................ 24

D. Plaintiffs Have Failed to Identify Any Specific Contracts That Uber Was Aware of and Interfered With ........................................................... 25

E. Plaintiffs Have Failed to Allege That They Suffered Actual Loss ......... 27

V. Plaintiffs Fail to State Claims for Violations of RICO ...................................... 28

A. Plaintiffs Fail to Allege a Pattern of Racketeering Activity Sufficient to Meet Rule 9(b) ......................................................................................... 28

B. Plaintiffs Fail to State a Claim Under Each of the Three RICO Subsections .......... 30

1. Plaintiffs Fail to State a Claim Under Section 1962(a), the "Use or Invest" Provision ............................................................................ 30

2. Plaintiffs Fail to State a Claim Under Section 1962(b), the "Interest in or Control Over" Provision ...................................................... 32

3. Plaintiffs Fail to State a Claim Under Section 1962(c), the "Conduct of Enterprise" Provision ............................................................. 34

VI. The Court Should Abstain From Deciding This State and Municipal Issue ...................... 39

CONCLUSION ................................................................................................................ 42

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases</u>

*4 K & D Corp. v. Concierge Auctions, LLC*,
  No. 13 CIV. 2527 JGK, 2 F. Supp. 3d 525 (S.D.N.Y. 2014) ................................... 38

*AGC, Inc. v. Baillargeon*,
  CV10601844S, 2011 WL 1176141 (Conn. Super. Ct. Mar. 9, 2011) ...................... 23

*ALPO Petfoods, Inc. v. Ralston Purina Co.*,
  720 F. Supp. 194 (D.D.C. 1989) ............................................................................. 8

*Allen v. New World Coffee, Inc.*,
  No. 00 CIV 2610 (AGS), 2002 WL 432685 (S.D.N.Y. Mar. 19, 2002)............................ 32, 34

*Allstate Ins. Co. v. Seigel*,
  312 F. Supp. 2d 260 (D. Conn. 2004) .......................................................... 31, 32, 34

*Am. Car Rental, Inc. v. Comm. Of Consumer Protection*,
  273 Conn. 296 (2005) ............................................................................................ 18

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)................................................................................. 11, 36, 37

*Appleton v. Bd. of Educ. of Town of Stonington*,
  254 Conn. 205, 757 A.2d 1059 (2000) ................................................................. 27

*Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*,
  287 Conn. 208, 947 A.2d 320 (2008) ....................................................... 17, 18, 20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................ 11, 18

*Bacarella Transp. Servs., Inc. v. Rightway Logistics, LLC*,
  3:08-CV-1487(PCD), 2009 WL 322871 (D. Conn. Feb. 10, 2009) ....................... 22

*Bio-Tech. Gen. Corp. v. Genentech, Inc.*,
  886 F. Supp. 377 (S.D.N.Y. 1995) ......................................................................... 7

*Bio Tech. Gen. Corp. v. Genentech, Inc.*,
  267 F.3d 1325 (Fed. Cir. 2001).............................................................................. 7

*Boston Cab Dispatch, Inc. v. Uber Technologies, Inc.*,
  No. CIV.A. 13-10769-NMG, 2014 WL 1338144 (D. Mass. Feb. 28, 2014)............................ 12

*Boston Cab Dispatch, Inc. v. Uber Technologies, Inc.*,
  CIV.A. 13-10769-NMG, 2014 WL 1338148 (D. Mass. Mar. 27, 2014) ............................ 11, 12

*Boyle v. United States*,
  556 U.S. 938, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009)....................................... 33

*Bulldog New York LLC v. Pepsico, Inc.*,
    No. 3:08CV1110 AWT, 2014 WL 1284903 (D. Conn. Mar. 31, 2014) ...................................25

*City of New York v. Smokes–Spirits.com, Inc.*,
    541 F.3d 425 (2d Cir. 2008) ........................................................................................34

*Corra v. Sunwood Condo. Ass'n, Inc.*,
    CV126009466S, 2012 WL 6583030 (Conn. Super. Ct. Nov. 26, 2012) ...........................21, 22

*Cruz v. FXDirectDealer, LLC*,
    720 F.3d 115 (2d Cir. 2013) ........................................................................................34

*DeFalco v. Bernas*,
    244 F.3d 286 (2d Cir. 2001) ..................................................................................28, 34

*DiTeresi v. Stamford Health Sys. Inc.*,
    FSTCV065001340S, 2011 WL 4424399 (Conn. Super. Ct. Sept. 2, 2011) ............................17

*Dial A Car, Inc. v. Transp., Inc.*,
    82 F.3d 484 (D.C. Cir. 1996) ......................................................................................5, 6

*Direct Mail Jobs, LLC v. Hughes*,
    HHBCV085009794, 2011 WL 3672086 (Conn. Super. Ct. July 29, 2011) ...........................22

*Doctor's Associates, Inc. v. QIP Holder LLC*,
    CIV.A306CV1710VLB, 2010 WL 669870 (D. Conn. Feb. 19, 2010) ....................................4

*Dovenmuehle v. Gilldorn Mortgage Midwest Corp.*,
    871 F.2d 697 (7th Cir. 1989) .......................................................................................13

*Downes-Patterson Corp. v. First Nat'l Supermarkets, Inc.*,
    64 Conn. App. 417, 780 A.2d 967 (2001) ................................................................21, 25, 27

*Downstream Envtl., L.L.C. v. Gulf Coast Waste Disposal Auth.*,
    No. 05-CV-1865, 2006 WL 1875959 (S.D. Tex. July 5, 2006).........................................37

*Dworkin Constr. Corp. v. Shremshock-Yoder Architects, Inc.*,
    380352, 1996 WL 469742 (Conn. Super. Ct. Aug. 2, 1996) ...................................................26

*E. Point Sys., Inc. v. Maxim*,
    No. 3:13-CV-00215 VLB, 2014 WL 523632 (D. Conn. Feb. 7, 2014) ....................................16

*Eamiello v. Liberty Mobile Homes Sales, Inc.*,
    208 Conn. 620, 546 A.2d 805 (1988) ...............................................................................20

*Fabri v. United Tech. Inter'l, Inc.*,
    387 F.3d 109 (2d Cir. 2004)....................................................................................17, 19

*Ferro v. Metro. Ctr. for Mental Health*,
    No. 13 CIV. 2347 PKC, 2014 WL 1265919 (S.D.N.Y. Mar. 27, 2014)...............................11

*Flava Works, Inc. v. Gunter, Inc.*,
    No. 10 C 6517, 2011 WL 1791557 (N.D. Ill. May 10, 2011) ................................................14

*GICC Capital Corp. v. Tech. Fin. Grp., Inc.*,
  67 F.3d 463 (2d Cir. 1995)....................................................................28

*Gaynor v. Hi-Tech Homes*,
  149 Conn. App. 267 (2014) ...............................................................19

*Glazer v. Dress Barn, Inc.*,
  274 Conn. 33 (2005) .........................................................................18

*Gristede's Foods, Inc. v. Unkechauge Nation*,
  532 F. Supp. 2d 439 (E.D.N.Y. 2007) .............................................38

*Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*,
  No. 12 CIV. 8205, 2013 WL 3943267 (S.D.N.Y. July 31, 2013) ............2

*Hemi Grp., LLC v. City of New York, N.Y.*,
  559 U.S. 1, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010) ......................36, 39

*Holiday Inns, Inc. v. 800 Reservation, Inc.*,
  86 F.3d 619 (6th Cir. 1996) ...........................................................13, 14

*Holmes v. Sec. Investor Prot. Corp.*,
  503 U.S. 258 (1992).........................................................................9, 36

*Hudson United Bank v. Cinnamon Ridge Corp.*,
  81 Conn. App. 557 (2004) ...............................................................19

*Ideal Steel Supply Corp. v. Anza*,
  652 F.3d 310 (2d Cir. 2011)..............................................................36

*Indiaweekly.com, LLC v. Nehaflix.com, Inc.*,
  596 F. Supp. 2d 497 (D. Conn. 2009) ...............................................7

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)..............................................................33

*Johnson v. Celotex Corp.*,
  899 F.2d 1281 (2d Cir. 1990).............................................................10

*Katzman v. Victoria's Secret Catalogue*,
  167 F.R.D. 649 (S.D.N.Y. 1996) .......................................................29

*Katzman v. Victoria's Secret Catalogue, Div. of The Ltd., Inc.*,
  113 F.3d 1229 (2d Cir. 1997)..............................................................29

*L.S. v. Webloyalty.com, Inc.*,
  3:10-CV-1372 CSH, 2014 WL 3547640 (D. Conn. July 17, 2014) ........7

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014).....................................................................9, 11

*Manzo v. Uber Technologies, Inc.*,
  13 C 2407, 2014 WL 3495401 (N.D. Ill. July 14, 2014) .......................6

*McLaughlin Ford, Inc. v. Ford Motor Co.*,
   192 Conn. 558 (1984) ................................................................................................ 18

*Midwest Grinding Co. v. Spitz*,
   976 F.2d 1016 (7th Cir. 1992) ..................................................................................... 2

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993).......................................................................................29

*Mohegan Tribe of Indians of Connecticut v. Mohegan Tribe & Nation, Inc.*,
   255 Conn. 358, 769 A.2d 34 (2001) ...........................................................................16

*Moore v. PaineWebber, Inc.*,
   189 F.3d 165 (2d Cir. 1999).......................................................................................29

*Nat'l Org. for Women, Inc. v. Scheidler*,
   510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) ...............................................31

*Neidig v. Heilig*,
   CV064021341S, 2007 WL 4215479 (Conn. Super. Ct. Nov. 7, 2007) ......................23

*New York Transp., Inc. v. Naples Transp., Inc.*,
   116 F. Supp. 2d 382 (E.D.N.Y. 2000) .......................................................................29

*Nosik v. Bowman, No. CV000379089*,
   2002 WL 1842662 (Conn. Super. Ct. July 12, 2002) ................................................20

*Ouaknine v. MacFarlane*,
   897 F.2d 75 (2d Cir. 1990)..........................................................................................31

*Parola v. Citibank (S. Dakota) N.A.*,
   894 F. Supp. 2d 188 (D. Conn. 2012) ........................................................................21

*Plainville Elec. Products Co. v. Vulcan Advanced Mobile Power Sys., LLC*,
   638 F. Supp. 2d 245 (D. Conn. 2009) .................................................................28, 29

*Proven Methods Seminars, LLC v. Am. Grants & Affordable Hous. Inst., LLC*,
   No. Civ. S-07-01588, 2008 WL 269080 (E.D. Cal. Jan. 29, 2008)...........................38

*Reves v. Ernst & Young*,
   507 U.S. 170, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993) ........................................35

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
   30 F.3d 339 (2d Cir. 1994)..........................................................................................35

*Robert S. Weiss & Associates, Inc. v. Wiederlight*,
   208 Conn. 525 (1988) .................................................................................................22

*S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*,
   84 F.3d 629 (2d Cir. 1996)..........................................................................................29

*Sanford Hall Agency, Inc. v. Dezanni*,
   CV044000576, 2004 WL 3090673 (Conn. Super. Ct. Dec. 2, 2004) ........................22

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)..........................................................................7

*Siemiatkoski v. Windsor Fed. Sav. & Loan Ass'n*,
    X07CV065001791S, 2008 WL 4379060 (Conn. Super. Ct. Sept. 10, 2008) ...........23

*Standard Petroleum Co. v. Fox*,
    CV094028045S, 2009 WL 4282080 (Conn. Super. Ct. Nov. 2, 2009) ....................24

*The Sports Auth., Inc. v. Prime Hospitality Corp.*,
    89 F.3d 955 (2d Cir. 1996)..........................................................................13

*Time, Inc. v. Petersen Pub. Co. L.L.C.*,
    173 F.3d 113 (2d Cir. 1999)........................................................................13

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
    497 F.3d 144 (2d Cir. 2007)....................................................................9, 10

*In re Trilegiant Corp., Inc.*,
    No. 3:12-CV-00396 VLB, 2014 WL 1315244 (D. Conn. Mar. 28, 2014) ..............28

*In re Trilegiant Corp., Inc.*,
    11 F. Supp. 3d 82 (D. Conn. Mar. 28, 2014) ....................................16, 28

*Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*,
    155 F. Supp. 2d 1 (S.D.N.Y. 2001)
    277 F.3d 253 (2d Cir. 2002)........................................................................13

*USA Certified Merchants, LLC v. Koebel*,
    262 F. Supp. 2d 319 (S.D.N.Y. 2003)..........................................................31

*United States v. 43.47 Acres of Land*,
    45 F. Supp. 2d 187 (D. Conn. 1999)..................................................39, 40, 41

*United States v. 43.47 Acres of Land, More or Less,
Situated in Cnty. of Litchfield, Town of Kent*,
    896 F. Supp. 2d 151 (D. Conn. 2012) ..........................................................41

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000)........................................................................29

*United States v. Turkette*,
    452 U.S. 576, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981) ..............................33

*United States v. Western Pac. R.R.*,
    352 U.S. 59, 77 S. Ct. 161, 1 L. Ed. 2d 126 (1956) ....................................39

*United States Fire Ins. Co. v. United Limousine Serv., Inc.*,
    303 F. Supp. 2d 432 (S.D.N.Y. 2004)..........................................................32

*Volunteer Firemen's Ins. Servs., Inc. v. McNeil & Co.*,
    221 F.R.D. 388 (W.D.N.Y. 2004)..................................................................7

*Votto v. Am. Car Rental*,
    273 Conn. 478 (2005) ..............................................................................18

*Webster Fin. Corp. v. McDonald,*
  No. CV084016026S, 2009 WL 416059 (Conn. Super. Ct. Jan. 28, 2009) ........................ 27, 28

*Yellow Grp. LLC v. Uber Technologies Inc.,*
  12 C 7967, 2014 WL 3396055 (N.D. Ill. July 10, 2014) ........................................................... 6

## Statutes

15 U.S.C. § 1125(a)(1)(A) ................................................................................................. 12, 13

15 U.S.C. § 1125(a)(1)(B) ................................................................................................... 4, 11

15 U.S.C. § 1127 ........................................................................................................... 13, 14, 15

15 U.S.C. § 45(a)(1) ................................................................................................................ 18

15 U.S.C. § 45(n) .............................................................................................................. 18, 19

18 U.S.C. § 1961(4) ................................................................................................................ 33

18 U.S.C. § 1962 ..................................................................................................................... 28

18 U.S.C. § 1962(a) ....................................................................................... 128, 30, 31, 32, 36

18 U.S.C. § 1962(a)-(c) .......................................................................................................... 28

18 U.S.C. § 1962(b) ........................................................................................ 28, 32, 33, 34, 36

18 U.S.C. § 1962(c) ......................................................................................... 28, 34, 35, 36

Conn. Agencies Regs. § 13b-96-50 .................................................................................... 5, 40

Conn. Agencies Regs. § 13b-96-51 .................................................................................... 5, 40

Conn. Gen. Stat. § 13b-3 .................................................................................................... 40

Conn. Gen. Stat. § 13b-32 .................................................................................................. 40

Conn. Gen. Stat. § 13b-95 ................................................................................................ 6, 41

Conn. Gen. Stat. § 14-3 ...................................................................................................... 40

Conn. Gen. Stat. § 42-110b(a) ........................................................................................... 17

Conn. Gen. Stat. § 42-110b(b) ........................................................................................... 18

Federal Rule of Civil Procedure 8 .................................................................................... 7, 17

Federal Rule of Civil Procedure 8(a) .................................................................................... 9

Federal Rule of Civil Procedure 9(b) ..................................................................... 7, 9, 16, 17, 28

## INTRODUCTION

Plaintiffs are Connecticut-based taxicab and livery companies that allege Uber unfairly competes against them by offering a mobile-phone application that allows consumers to easily request transportation from third-party transportation providers.  But there is nothing unfair or illegal about what Uber does.  This lawsuit is merely an attempt by Plaintiffs to use the courts to beat back a legitimate business, which provides a useful service to consumers frustrated with outdated transportation options, so that Plaintiffs can cling to the status quo.

The Amended Complaint includes a laundry list of alleged violations of transportation regulations, all based on a dubious premise—that the regulations, drafted before technology companies like Uber even existed, apply to Uber.  This premise is, at a minimum, subject to reasonable debate, and the proper forum for this debate is before the state agencies specifically tasked with interpreting and enforcing Connecticut's transportation laws, not federal court. Indeed, the Connecticut legislature recently tasked the Connecticut Department of Transportation and other agencies with studying the same issue raised in this suit—whether the existing regulatory structure applies to companies like Uber.  This lawsuit is not the proper place to make, in advance of the conclusion of the ongoing political and regulatory process, the determination that the existing regulations apply to smartphone-based transportation request services.

Plaintiffs have also failed to plead the elements of their claims.  *First*, Plaintiffs assert a Lanham Act claim for false advertising, but they fail to allege the existence of even a single false advertisement.  Nor do they allege facts showing how any purported misrepresentations *to consumers* proximately caused any alleged harm suffered by Plaintiffs.

*Second*, Plaintiffs assert a claim for false affiliation under the Lanham Act, alleging that Uber confuses consumers by falsely associating itself with Plaintiffs' taxicab and livery trademarks.  This claim fails because Plaintiffs fail to allege that they have any valid trademarks or

property interests in their identities and because, as Plaintiffs admit, Connecticut consumers cannot request transportation from taxicabs through the Uber smartphone application ("app"), so it is impossible for Uber to "use" Plaintiffs' purported trademarks.

*Third*, Plaintiffs assert a violation of the Connecticut Unfair Trade Practices Act (CUTPA), but this claim should be dismissed for similar reasons as the Lanham Act false-advertising claim: they allege no misrepresentations, no proximate cause, and no unfair conduct.

*Fourth*, Plaintiffs claim that Uber intentionally interfered with their contractual relations with taxicab and livery drivers, as well as their contracts with credit-card processing companies that place their machines in taxicabs. This claim should be dismissed because, among other things, Plaintiffs fail to plead facts showing Uber acted tortiously rather than simply establishing Uber's own business; they fail to allege Uber specifically intended to interfere with their contracts; and they fail to allege Uber caused any breaches or other harm to Plaintiffs.

*Fifth*, Plaintiffs' three claims for civil violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act should be dismissed. Plaintiffs' use of the RICO statute against a technology company like Uber is a classic case of overreaching "civil RICO plaintiffs [who] persist in trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions."[1] A civil RICO claim in this context does not pass the straight-face test, and Plaintiffs fail to plead facts meeting several elements of their RICO claims, including predicate acts of wire fraud and proximate causation.

*Sixth*, the Court should abstain from deciding this state-law transportation issue under the doctrine of primary jurisdiction. The question of whether Uber should be allowed to operate in Connecticut is a regulatory and political question, not one for this Court to decide. For these

---

[1] *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, No. 12 CIV. 8205, 2013 WL 3943267, at *9 (S.D.N.Y. July 31, 2013) (quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992)).

2

reasons and the others described below, the Court should dismiss the Amended Complaint with prejudice.

## PLAINTIFFS' ALLEGATIONS

Plaintiffs are "taxicab and livery service operators" operating in Connecticut.  Am. Compl. ¶¶ 1, 2–16.  They claim that they have invested "substantial capital" in complying with federal, state and local laws.  Am. Compl. ¶ 1.  According to Plaintiffs, however, Uber does not comply with those laws and otherwise misrepresents the nature of its service.  Am. Compl. ¶ 1.

Uber provides a smartphone application that allows users all over the world to easily request transportation services from third-party transportation providers.  *See* Am. Compl. ¶¶ 29–30.  Uber "own[s] no taxicabs or livery cars . . .,"  Am. Compl. ¶ 28, and similarly owns "no cars, no Certificates, no Permits, no plates, and employ[s] no drivers," *id.* ¶ 32.

Plaintiffs claim that Uber offers three transportation-request options  in Connecticut: uberX, UberBlack, and UberSUV.  Am. Compl. ¶ 29.  The uberX option enables users of the app to request transportation services from third-party transportation providers who do not have commercial driver's licenses and who use their personal vehicles.  *Id.*  This is the least expensive transportation option that users can request through the app.  *See id.*  The UberBlack and UberSUV options, on the other hand, enable users of the app to request transportation services from third-party transportation providers who drive more expensive livery cars (also known as "black cars") or luxury SUVs.  *Id.*  Plaintiffs allege that the non-commercial vehicles requested through the uberX platform, as well as the vehicles requested through UberBlack and UberSUV, "function as taxicabs and livery vehicles."  Am. Compl. ¶ 34.  Plaintiffs admit that the uberTAXI request option, in which users of the app can request transportation from a commercially licensed taxicab, is not currently available in Connecticut.  Am. Compl. ¶ 29 (stating "UberTAXI and

UberLUX[] are currently not available in the State of Connecticut"); *see also* ¶ 37 ("UberTAXI is not even available in Connecticut right now, and may not ever be"), ¶ 63 (same).

Plaintiffs assert seven causes of action against Uber. Count I asserts a violation of the Lanham Act for allegedly false representations about Uber's ability to operate legally in Connecticut. Am. Compl. ¶¶ 73–75. Count II asserts a violation of the Lanham Act for Uber's alleged false partnership with "legally owned and operated taxicab and livery companies." *Id.* at ¶ 77. Count III asserts a claim under the Connecticut Unfair Trade Practices Act for a variety of alleged misrepresentations and for allegedly operating illegally. *Id.* at ¶ 81. Count IV asserts a claim for common-law intentional interference with contractual relationships. *Id.* at ¶ 85. And Counts V through VII assert violations of RICO. *Id.* at ¶¶ 88–102.

## ARGUMENT

## I.    Plaintiffs Fail to State a Lanham Act Claim for False Advertising

Count I of the Amended Complaint asserts a Lanham Act false-advertising claim. This section of the "Lanham Act prohibits any 'false or misleading representation of fact which . . . in commercial advertising or promotion, misrepresents the nature [or] characteristics . . . of another person's goods, services, or commercial activities." *Doctor's Associates, Inc. v. QIP Holder LLC*, CIV.A306CV1710VLB, 2010 WL 669870, at *15 (D. Conn. Feb. 19, 2010) (quoting 15 U.S.C. § 1125(a)(1)(B)).[2] Plaintiffs base their false-advertising claim on the allegation that Uber "represent[s] to consumers in its commercial advertising and promotion that the Defendants'

---

[2]    15 U.S.C. § 1125(a)(1)(B) states: "(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-- . . . (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

vehicles are operating lawfully in Connecticut . . . ."  Am. Compl. ¶ 74.  This bare allegation fails

to state a claim under the Lanham Act for the reasons that follow.

### A.    Plaintiffs Cannot Premise Their Lanham Act Claim on Violations of Local Transportation Laws

The Lanham Act is not a "handy device to reach and decide all sorts of local law

questions."  *Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 490 (D.C. Cir. 1996).  Under *Dial A*

*Car* and other established precedent, Plaintiffs cannot use the Lanham Act to enforce their

subjective interpretation of local transportation laws.  In *Dial A Car*, the D.C. Circuit held that a

limousine company could not use the Lanham Act to enforce limousine regulations against two

taxicab companies that were using their taxicabs as a limousine service.  82 F.3d at 485–88.  The

limousine company alleged that the taxicab companies, by using taxicabs for limousine-like

service, were violating a limousine regulation of the D.C. Taxicab Commission.  *Id.* at 485–86.

But the regulation did not have a private right of action, so the plaintiffs tried to enforce the

regulation indirectly by pleading a false-advertising claim under the Lanham Act based on the

taxicab companies' alleged misrepresentation that they could operate legally.  *Id.* at 486.

The D.C. Circuit saw the limousine company's claim for what it really was: "the alleged

misrepresentation of fact upon which [the plaintiff] has premised its Lanham Act claim is more

appropriately viewed as a disagreement about the proper interpretation of local taxicab regulations

promulgated by the D.C. Taxicab Commission."  *Id.* at 485.  And because the taxicab commission

had not yet resolved the conflicting interpretations, the "misrepresentation" at issue was "a

contested question of statutory interpretation rather than a clearly established fact," and therefore

the "statements at issue cannot form the basis of a Lanham Act claim."  *Id.*

The holding in *Dial A Car* applies squarely here.  Like that case, here the regulations vest

enforcement authority in the Connecticut DMV, *see* Conn. Agencies Regs. §§ 13b-96-50, 51, not

private entities such as Plaintiffs.  Like the plaintiffs in *Dial A Car*, Plaintiffs here are "simply

using the Lanham Act to try to enforce [their] preferred interpretation of [local taxicab regulations] instead of adjudicating the issue before the Commission." *Dial A Car*, 82 F.3d at 488.  And also like in *Dial A Car*, Plaintiffs here allege Uber misrepresents that it complies with local regulations, but as the D.C. Circuit held, "[i]nstead of bringing this claim in federal court, [Plaintiffs] should be forced to take [their] arguments to the [taxicab commission] and lobby the [c]ommission to crack down on [Uber's] activities." *Id.* at 490.  Other courts have similarly applied *Dial A Car* to dismiss claims asserted by taxicab companies against Uber.  *Manzo v. Uber Technologies, Inc.*, 13 C 2407, 2014 WL 3495401, at *4 (N.D. Ill. July 14, 2014) (holding that plaintiff could not use false-advertising claims "'as a backdoor method' to bring a claim that Uber violates Chicago taxi and livery regulations"); *Yellow Grp. LLC v. Uber Technologies Inc.*, 12 C 7967, 2014 WL 3396055, at *7 (N.D. Ill. July 10, 2014) (holding claims based on alleged misrepresentations regarding compliance with regulations are precluded by *Dial A Car*).

Indeed, it is not even clear that Connecticut's transportation laws apply to a technology company like Uber.  As Plaintiffs allege, Uber does not own any cars or employ any drivers.  Am. Compl. ¶¶ 28, 32.  And the definitions in the regulations that Plaintiffs cite do not appear to apply to smartphone-based transportation-request services.  *See, e.g.,* Conn. Gen. Stat. § 13b-95 (defining "taxicab" to "include[] any motor vehicle . . . accepting or soliciting passengers . . . for hire," but not referencing any smartphone-based request service).  It is, at the very least, debatable whether the existing transportation laws, created before companies like Uber existed, even apply to Uber.  In other words, just as the court in *Dial A Car* held, Uber cannot be liable for alleged statements of opinion regarding legal interpretation.  *Dial A Car*, 82 F.3d at 489 (stating "it would be unthinkable for a federal court to suggest that a regulated taxicab company can be held liable under the Lanham Act for failing to anticipate the *court's* subsequent interpretation of a municipal

6

regulation") (emphasis in original). "[N]o matter which view is right, there is no dispute that such a question is within the jurisdiction of the" local taxicab regulators. *Id.* at 488.

Plaintiffs' false-advertising Lanham Act claim should be dismissed on this ground alone.

**B.      Plaintiffs Fail to Allege Uber Made Any Misrepresentations**

Plaintiffs' Lanham Act claim for false advertising also fails because Plaintiffs have not pled even a single, concrete misrepresentation. There is a split in authority regarding whether the heightened pleading standard of Federal Rule of Civil Procedure 9(b) or whether Rule 8 applies to false advertising claims, but no matter what standard applies, Plaintiffs fail to meet it.[3] To satisfy Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). And to satisfy Rule 8, a plaintiff must, at a minimum, state the content of the alleged misrepresentations. *Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 886 F. Supp. 377, 383 (S.D.N.Y. 1995) *aff'd sub nom. Bio Tech. Gen. Corp. v. Genentech, Inc.*, 267 F.3d 1325 (Fed. Cir. 2001).

In Count I, Plaintiffs allege that "[b]y representing to consumers in its commercial advertising and promotion that the Defendants' vehicles are operating lawfully in Connecticut, *as stated above*, the Defendants" are liable for false advertising under the Lanham Act. Am. Compl. ¶ 74 (emphasis added). But there are no specific misrepresentations quoted anywhere in the Amended Complaint. The closest that Plaintiffs come to quoting an alleged misrepresentation from Uber is in paragraph 46:

---

[3]   *Compare L.S. v. Webloyalty.com, Inc.*, 3:10-CV-1372 CSH, 2014 WL 3547640, at *6–7 (D. Conn. July 17, 2014) (applying Rule 9(b) to false advertising claim in which defendant allegedly misled consumers into enrolling in "rewards" program) *and Volunteer Firemen's Ins. Servs., Inc. v. McNeil & Co.*, 221 F.R.D. 388, 393 (W.D.N.Y. 2004) (applying Rule 9(b) to false-advertising claim under the Lanham Act) *with Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 596 F. Supp. 2d 497, 502 n.3 (D. Conn. 2009) (declining to follow *Volunteer Firemen's Ins. Servs.*, but doing so in context of trademark-infringement case, not false advertising).

Uber *previously* attempted to reassure customers that, despite Uber's relaxed standards for selecting partners, it took steps to weed out unsuitable drivers: "We carefully select the fleet partners we work with and ensure that they have proper licensing and insurance." (formerly available at http://support.uber.com/entries/ 22346733-how-does-uber-select-drivers).  Uber, however, has since removed even this reassurance on its website since last accessed on April 3, 2013.

Am. Compl. ¶ 46 (emphasis added).[4]

This allegation fails to adequately allege a misrepresentation for several reasons.  First, Plaintiffs allege Uber "previously" made this representation, which they "last accessed" on April 3, 2013, *id.*, a year before Uber began offering its application in Connecticut, Am. Compl. ¶ 27 (stating Uber became available in Connecticut on April 24, 2014).  Plaintiffs therefore fail to allege the representation existed when Uber made its app available in Connecticut or that any Connecticut consumers were exposed to it.[5]  Second, even if the representation had been made during a relevant time period, Plaintiffs fail to allege that this representation was false "at the time" it was made.  *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 720 F. Supp. 194, 205 n. 12 (D.D.C. 1989) (stating the challenged statements must be allegedly "false or misleading *at the time they are made*") (emphasis in original) (reversed on other grounds).  Third, taken out of context, it is unclear which service (uberX, UberBlack, UberTAXI) was the subject of the representation, and different regulations apply to different services, making it unclear how to determine whether the statement is accurate.  Fourth, on its face nothing about this alleged representation relates to Connecticut.

---

[4]  Plaintiffs also make the vague allegation that "The Defendants nonetheless falsely assure their customers that their drivers are fully licensed with the appropriate insurance," Am. Compl. ¶ 66, which appears to be based on the same allegation set forth in ¶ 46.

[5]  This is particularly true, given that the representation was allegedly contained in a relatively obscure link that would not be readily accessible from Uber's homepage Plaintiffs allege the representation appeared at http://support.uber.com/entries/22346733-how-does-uber-select-drivers. Am. Compl. ¶ 46.

Plaintiffs must also plead that the alleged misrepresentations at issue "involved an inherent or material quality of the product," *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 n.3 (2d Cir. 2007), which they completely fail to allege, even in conclusory fashion. Plaintiffs' Lanham Act claims should be dismissed for this reason as well.

Plaintiffs have failed to meet Rule 9(b) or even the notice-pleading standard in Rule 8(a). Plaintiffs fail to identify what Uber represented to Connecticut consumers that Plaintiffs believe is misleading, and Uber therefore has no notice of what representations are at issue here.

### C.    Plaintiffs Fail to Plead That Uber's Alleged Misrepresentation Proximately Caused Their Alleged Injuries

Plaintiffs fail to allege facts showing that the claimed misrepresentation proximately caused them harm, and the Court should dismiss the Lanham Act claim for this reason as well. In order to state a claim under the Lanham Act, a plaintiff must "plead (and ultimately prove) an injury to a commercial interest in sales or business reputation *proximately caused* by the defendant's *misrepresentations*." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1395 (2014) (emphasis added). "[T]he proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Id.* at 1390. A plaintiff cannot establish proximate cause "if the harm is purely derivative of 'misfortunes visited upon a third person by the defendant's acts.'" *Id.* (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).[6]

In order to allege proximate cause, Plaintiffs would have to plead an untenable chain of events. First, Plaintiffs would have to allege that Uber actually made a misrepresentation, which

---

[6]   Because all false-advertising claims involve consumer deception, "the intervening step of consumer deception is not fatal to the showing of proximate causation." *Lexmark*, 134 S. Ct. at 1391. Still, a plaintiff "ordinarily must show economic or reputational injury flowing *directly* from the deception wrought by the defendant's advertising; and [] that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* (emphasis added).

as described above, they have failed to do.  Second, Plaintiffs would have to allege that the representation was material to consumers, s*ee Time Warner Cable*, 497 F.3d at 153 n.3, which they also failed to do.  Third, they must allege facts tying this representation to some harm they suffered.  But doing so is impossible, as reflected by the fact that they do not and cannot allege that consumers chose to use Uber's app because of the alleged representation regarding compliance with Connecticut's transportation laws as opposed to, for example, the simple convenience requesting transportation through the app, and that those consumers who chose Uber because of the representation would have instead sought transportation from a driver working for Plaintiffs Greenwich Taxi or East Hartford Cab Company as opposed to some other taxicab company that is not a plaintiff in this lawsuit or some other mode of transportation.  Moreover, because the taxi fares go to the drivers and not to the Plaintiffs directly, Am. Compl. ¶ 85(i), Plaintiffs have not even attempted to allege how much any such lost fares affected Plaintiffs' lease or rental revenue.

A further obstacle to pleading proximate causation is that there are 15 plaintiffs in this case.  Am. Compl. ¶¶ 2–16.  There are no allegations whatsoever tracing the effect of Uber's alleged representations back to any particular Plaintiff.  Instead, the Amended Complaint treats all the Plaintiffs as a single unit, akin to a class action, without any factual or legal justification for doing so.  Including 15 plaintiffs, each of which must establish that Uber's alleged representations proximately caused their injuries, only heightens the difficulty for Plaintiffs to adequately plead proximate causation.  *Cf. Johnson v. Celotex Corp.*, 899 F.2d 1281, 1285 (2d Cir. 1990) (where multiple plaintiffs who allegedly, among other things, suffered similar injuries from the defendants and were represented by the same counsel, trial court acted properly in ensuring that each plaintiff's claim was considered individually).

Plaintiffs' alleged injury "might instead have resulted from 'any number of [other] reasons,'" *Lexmark*, 134 S. Ct. at 1394 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458-59 (2006)), and Plaintiffs would have to identify how much of their lost revenue was due to the alleged misrepresentation, as opposed to the myriad other factors that could affect their businesses, such as general economic conditions, the quality of Plaintiffs' services, other non-actionable representations that Uber made to users, or the mere availability of Uber's application in Connecticut.  Trying to tease out how much of Plaintiffs' alleged drop in revenue came from this one alleged misrepresentation would involve an impermissible amount of "'speculative . . . proceedings'" and "'intricate, uncertain inquiries.'"  *Lexmark*, 134 S. Ct. at 1394 (quoting *Anza*, 547 U.S. at 459-60);[7] *see also Ferro v. Metro. Ctr. for Mental Health*, No. 13 CIV. 2347 PKC, 2014 WL 1265919, at *4 (S.D.N.Y. Mar. 27, 2014) (granting motion to dismiss RICO claim based on misrepresentations because "plaintiffs' alleged harm is too attenuated from the alleged" misrepresentations).[8]  It is simply implausible that Plaintiffs have been injured in some measurable way by this particular alleged representation.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating claim must be "plausible on its face").

The District of Massachusetts dismissed a Lanham Act claim against Uber for similar reasons.  *Boston Cab Dispatch, Inc. v. Uber Technologies, Inc.*, CIV.A. 13-10769-NMG, 2014 WL 1338148, at *1, *7  (D. Mass. Mar. 27, 2014) (dismissing Lanham Act § 1125(a)(1)(B) claim

---

[7]   The Supreme Court ultimately held in *Lexmark* that the plaintiff had alleged proximate cause.  *Lexmark*, 134 S. Ct. at 1394.  But the plaintiff there had alleged the defendant made misrepresentations directly disparaging the plaintiff's products, which Plaintiffs here have not alleged.  *Id.* at 1393.  The defendant had also allegedly disparaged the products of third party remanufacturers that used the plaintiff's components, so "there is likely to be something very close to a 1:1 relationship between the number of" remanufacturers' products sold and the number of plaintiff's components sold (or not sold).  *Id.* at 1394.  There is no similar 1:1 relationship at issue here.

[8]   Although *Ferro* was a RICO case, the Supreme Court in *Lexmark* relied heavily on its opinion in *Anza*, an opinion address proximate cause for RICO claims, for its discussion of proximate cause in the context of the Lanham Act.  *Lexmark*, 134 S. Ct. at 1394

with prejudice).  The taxicab and limousine plaintiffs in that case failed to connect any alleged
misrepresentations by Uber to damage to their businesses: Although they pled harm to their
businesses, "[t]here is no reference to any diversion of sales, any lost customers or any lessening
of goodwill or harm to plaintiffs' reputation *as a result of this misrepresentation*" regarding the
amount of a gratuity.  *Boston Cab Dispatch, Inc. v. Uber Technologies, Inc.*, No. CIV.A. 13-
10769-NMG, 2014 WL 1338144, at *15 (D. Mass. Feb. 28, 2014) *report and recommendation
adopted in part, rejected in part on other grounds*, No. CIV.A. 13-10769-NMG, 2014 WL
1338148 (D. Mass. Mar. 27, 2014) (emphasis added).  The court accordingly held that there was
an "absence of harm as a result of any such misrepresentations" and dismissed the Lanham Act
claim on that basis.  *Id.*

## II.      Plaintiffs Fail to State a Lanham Act Claim for False Association

In addition to their false-advertising claim, in Count II Plaintiffs allege a claim for false
affiliation under the Lanham Act.  Am. Compl. ¶¶ 76–78.  They claim that Uber falsely represents
it is "affiliated with, connected with, associated with, sponsored by and approved by legally
owned and operated taxicab and livery companies including the Plaintiffs."  Am. Compl. ¶ 77
(citing 15 U.S.C. § 1125(a)(1)(A)).[9]  This conclusory allegation fails to state a claim under the
Lanham Act for the reasons that follow.

---

[9]   15 U.S.C. § 1125(a)(1)(A) states: "(1) Any person who, on or in connection with any
goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or
device, or any combination thereof, or any false designation of origin, false or misleading
description of fact, or false or misleading representation of fact, which-- (A) is likely to cause
confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of
such person with another person, or as to the origin, sponsorship, or approval of his or her goods,
services, or commercial activities by another person . . . shall be liable in a civil action by any
person who believes that he or she is or is likely to be damaged by such act."

### A.    Plaintiffs Fail to Allege They Have Recognizable Trademarks

To state a claim under § 1125(a)(1)(A), Plaintiffs must allege they have "a valid mark that is entitled to protection under the Lanham Act."  *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996).  Plaintiffs have failed completely in this regard.  Plaintiffs do not allege any facts establishing that any Plaintiff has valid, protectable trademarks or other intellectual property, and their false-affiliation Lanham Act claim should be dismissed.  *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 155 F. Supp. 2d 1, 21 (S.D.N.Y. 2001) *aff'd in part and remanded,* 277 F.3d 253 (2d Cir. 2002) (dismissing Lanham Act claim because plaintiff lacked valid trademark); *Dovenmuehle v. Gilldorn Mortgage Midwest Corp.*, 871 F.2d 697, 700 (7th Cir. 1989) (dismissing Lanham Act claim because plaintiff had no commercial interest in trade name).

### B.    Plaintiffs Fail to Allege That Uber "Used" Their Trademarks

A fundamental requirement for Lanham Act liability is that the defendant actually "use[] in commerce" the plaintiff's trademarks.  15 U.S.C. § 1125(a)(1)(A) (prohibiting persons from "us[ing] in commerce any word, term, name, symbol, or device, or any combination thereof"); 15 U.S.C. § 1127 (defining "trademark" as "any word, name, symbol, or device, or any combination thereof"); 15 U.S.C. § 1125(a)(1)(A) (defining "use in commerce" as follows: "a mark [is] used in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce."); *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999) (stating plaintiff must prove "that the defendant's *use* of [the mark] is likely to cause confusion") (emphasis added).  "[T]he defendants' use of a protected mark or their use of a misleading representation is a *prerequisite* to the finding of a Lanham Act violation."  *Holiday Inns, Inc. v. 800 Reservation, Inc*., 86 F.3d 619, 626 (6th Cir. 1996).

Courts have interpreted this "use" requirement to mean that the defendant must affirmatively use the trademark. *See Holiday Inns, Inc.*, 86 F.3d at 626 (dismissing claim where, even though there was consumer confusion, defendant never actually used the plaintiff's marks); *Flava Works, Inc. v. Gunter, Inc.*, No. 10 C 6517, 2011 WL 1791557, at *7 (N.D. Ill. May 10, 2011) (holding that even though defendant's website "often contains" plaintiff's marks, that alone was insufficient to establish "use in commerce"). Mere association, without affirmative use of the mark, is insufficient. *See id.*

Here, Plaintiffs fail to allege that Uber uses their marks. First, Plaintiffs allege repeatedly that uberTAXI is not even available in Connecticut. Am. Compl. ¶ 29 (stating "UberTAXI and UberLUX[] are currently not available in the State of Connecticut"); ¶¶ 37, 63. Thus, in Connecticut it is not even possible to request transportation from a taxicab through the Uber app. Because Plaintiffs admit that Uber does not even offer the uberTAXI option in Connecticut, Plaintiffs have not and cannot plead Uber affirmatively used their trademarks.

Second, Plaintiffs do not allege that Uber uses Greenwich Taxi's, or any other Plaintiffs', trademarks in any of Uber's advertising or marketing materials. Plaintiffs do not allege that Uber uses their trademarks on its website or its app. In short, Plaintiffs fail to allege any "use in commerce" of their trademarks as that term is defined under the Lanham Act. 15 U.S.C. § 1127 (defining "use in commerce" as "used or displayed in the sale or advertising of services and the services are rendered in commerce").

Third, despite their claim that uberTAXI is not available in Connecticut, Plaintiffs allege that "Uber also 'partners' with legally operating Connecticut taxicab and livery drivers, who make an illegal side deal with Uber to take its customers while simultaneously working a normal shift with his or her authorized company." Am. Compl. ¶ 60. But they fail to allege that Uber is aware of or permits Connecticut taxicabs to provide transportation through its application. Indeed,

14

Plaintiffs allege that Uber's request service is intended for non-commercial vehicles (uberX) and livery vehicles (UberBlack and UberSUV). Am. Compl. ¶ 60. It thus appears that Plaintiffs are alleging that taxicab drivers[10] are "illegal[ly]" sneaking onto Uber's transportation-request service, but the fact that taxicab drivers are allegedly using uberX improperly cannot be a "use" by Uber of Plaintiffs' trademarks. Uber cannot "use" Plaintiffs trademarks when Plaintiffs admit that the services offered in Connecticut are specifically designed for personal vehicles and livery vehicles, not taxicabs. Am. Compl. ¶ 29.

Fourth, to the extent Plaintiffs are attempting to allege that Uber "uses" Plaintiffs' trademarks when a rider requests transportation through the app and a taxicab inexplicably[11] shows up to transport the consumer, thereby causing the consumer to believe that Uber and the taxicab company are associated, this too fails to state a claim. The Lanham Act defines "use in commerce" as "used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. § 1127. Thus, a "use in commerce" would only occur if Uber "used or displayed" Plaintiffs' marks "in the *sale or advertising* of services . . . ." *Id.* (emphasis added). But even when a taxicab appears in response to a request made through the uberX or UberBlack platforms, Uber still has not used Plaintiffs' marks "in the sale or advertising of services." The request has already occurred, and a taxicab showing up *after the request* is not a sale or advertisement.

Plaintiffs' false-association Lanham Act claim should be dismissed.

---

[10]   Plaintiffs also allege that livery drivers, in addition to taxicab drivers, are using the Uber app. Am. Compl. ¶ 60. Although livery drivers can use the UberBlack platform to receive transportation requests, as discussed above Plaintiffs fail to allege that the Plaintiff livery companies have any valid trademarks or trade dress interests in their presumably unmarked, black vehicles.

[11]   It is inexplicable because, as Plaintiffs admit, uberTAXI is not available in Connecticut, so a consumer would expect a non-commercial vehicle when requesting uberX or a livery vehicle when requesting UberBlack or UberSUV. *See* Am. Compl. ¶ 29.

**III.    Plaintiffs Fail to State a Claim Under the Connecticut Unfair Trade Practices Act ("CUTPA")**

**A.    Plaintiffs' CUTPA Claim Fails for the Same Reasons that Their Lanham Act Claims' Fail**

Plaintiffs' CUTPA claim is based on the same allegations as their Lanham Act claims – namely, that Defendants falsely affiliated with taxicab and livery authority owners and operators and falsely advertised their ability to operate legally in Connecticut and in compliance with Connecticut law.  *Compare* Am. Compl. ¶ 81 (i-iv), *with id.* ¶¶ 73-78.  Given that Plaintiffs have failed to state a viable Lanham Act claim, however, *see supra* §§ I-II, their CUTPA claim necessarily fails as well.  *See Mohegan Tribe of Indians of Connecticut v. Mohegan Tribe & Nation, Inc.*, 255 Conn. 358, 360 n.4, 769 A.2d 34, 37 n.4 (2001).  For this reason alone, Plaintiffs' CUTPA claim should be dismissed.

**B.    Plaintiffs' CUTPA Claim Should Also be Dismissed for Failure to Satisfy Rule 9(b)'s Heightened Pleading Standard**

Although a CUTPA claim need not contain the elements of fraud, where a plaintiff in federal court bases such a claim on allegations of fraud, as the Plaintiffs have done here, they must satisfy the particularity requirement of Rule 9(b).  *In re Trilegiant Corp., Inc.*, 11 F. Supp. 3d 82, 120 (D. Conn. Mar. 28, 2014); *E. Point Sys., Inc. v. Maxim*, No. 3:13-CV-00215 VLB, 2014 WL 523632, at *9 (D. Conn. Feb. 7, 2014).  Here, Plaintiffs vaguely enumerate several actions, sounding in fraud, as the basis for their CUTPA claim – namely, that Uber falsely claims an affiliation with lawfully operating taxicab and livery companies; falsely claims that Uber collects a $1 fee and "pay[s] the full gratuity" to drivers who offer transportation requested through Uber; falsely claims that Uber's application is legal under Connecticut law or that drivers who offer transportation requested through Uber do not need to be licensed; and that Uber unfairly competes by not incurring the expense of complying with Connecticut transportation laws.  Am. Compl. ¶ 81.

16

However, Plaintiffs do not identify with the requisite particularity a single, concrete misrepresentation. As discussed above, *supra* § I.B, the Plaintiffs have not identified what exactly Uber misrepresented to Connecticut users, when those representations were made, or why those statements were fraudulent. Accordingly, Plaintiffs' allegations fail to satisfy Rule 9(b)'s particularity requirement, and Plaintiffs' CUTPA claim should be dismissed.[12]

### C.      Plaintiffs Have Not Pled Substantial Injury

The Plaintiffs have also failed to state a viable CUTPA claim for the additional reason that they do not and cannot adequately plead substantial injury. CUTPA proscribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42–110b(a). Historically, courts have applied the "cigarette rule" to determine whether a practice is unfair under CUTPA.[13] However, the Connecticut Supreme Court repeatedly has questioned the continued viability of the cigarette rule, and currently has pending before it the question of whether the cigarette rule should be abandoned in favor of the "substantial injury test" for determining whether an act or practice is unfair for purposes of CUTPA. *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, SC 19219; *see DiTeresi v. Stamford Health Sys. Inc.*, FSTCV065001340S, 2011 WL 4424399, at *5 (Conn. Super. Ct. Sept. 2, 2011) ("It would appear

---

[12]      For the reasons discussed *supra* § I.B, Plaintiffs' allegations of misrepresentations also fail to meet Rule 8.

[13]      The cigarette rule provides the following three factors to determine whether a practice is unfair under CUTPA:

> (1) Whether the practice, without necessarily having been previously considered unlawful offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].

*Fabri v. United Tech. Inter'l, Inc.*, 387 F.3d 109, 120 (2d Cir. 2004) (alterations in original).

17

that the *Artie's Auto Body, Inc.* litigants have accepted the invitation of four justices of the Connecticut Supreme Court to test the continued viability of the cigarette rule in unfair practices CUTPA cases.").[14]  Given this fact, Uber respectfully requests that, should the Court conclude that application of the substantial injury test would be determinative of the Plaintiffs' CUTPA claim, it reserve ruling until the Connecticut Supreme Court renders its decision regarding the adoption of the substantial injury test.

Assuming that the substantial injury test is held to govern Plaintiffs' CUTPA claim – as it should – the Plaintiffs have failed to meet it.  Under the test, an act or practice cannot be deemed to be unfair "unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or competition."  15 U.S.C. § 45(n).  While the Plaintiffs baldy allege that Defendants' purportedly "unfair and deceptive acts and practices have caused substantial injury to consumers," Am. Compl. ¶ 82, there are no further factual allegations – none – to support the claim.  Rather, it is a mere conclusory recitation of the elements of a CUTPA action.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").[15]

---

[14]  CUTPA states that it "shall be guided by interpretations given by the [FTC] and the federal courts to Section 5(a)(1) of the [FTC] Act (15 U.S.C. § 45(a)(1)), as from time to time amended."  Conn. Gen. Stat. § 42-110b(b).  In 1982, the FTC abandoned the cigarette rule and codified the substantial injury test in 15 U.S.C. § 45(n).  *See Am. Car Rental, Inc. v. Comm. Of Consumer Protection*, 273 Conn. 296, 305 n. 6 (2005); *Votto v. Am. Car Rental*, 273 Conn. 478, 484 n. 3 (2005); *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 82 n. 34 (2005).

[15]  Plaintiffs further allege that Defendants' conduct also caused substantial injury to "lawfully operating taxicab and livery companies."  Am. Compl. ¶ 82.  To the extent this conclusory allegation has any relevance, the Connecticut Supreme Court has opined that the loss of sales or revenue due to increased competition "has been traditionally considered insignificant when compared to the benefit to consumers" and thus "[i]ncreased competition alone, resulting from a practice containing none of the hallmarks of traditionally unfair practices, does not constitute a cause of action under CUTPA."  *McLaughlin Ford, Inc. v. Ford Motor Co.*, 192 Conn. 558, 571 (1984).

Not only have Plaintiffs thus failed to allege substantial injury, they have alleged no facts that could plausibly establish that the purported injury "is not reasonably avoidable by consumers themselves" nor "outweighed by countervailing benefits to consumers or competition."  15 U.S.C. § 45(n).[16]  Accordingly, Plaintiffs do not and cannot meet the substantial injury test, and their CUTPA claim should therefore be dismissed.

### D.   Plaintiffs' Allegations Fail to Allege Conduct Which Rises to the Level of a CUTPA Violation Under the Cigarette Rule

Even if the cigarette rules applies to Plaintiffs' CUTPA claim, it is well established that "'[n]ot every misrepresentation rises to [the] level of [a] CUTPA violation'" under the rule. *Gaynor v. Hi-Tech Homes*, 149 Conn. App. 267, 276 (2014) (quoting *Hudson United Bank v. Cinnamon Ridge Corp.*, 81 Conn. App. 557, 571 (2004)).  To rise to the level of a CUTPA violation, "[t]here must be some nexus with a public interest, some violation of a concept of what is fair, some immoral, unethical, oppressive or unscrupulous business practice or some practice that offends public policy." *Id.* (internal quotation marks and citation omitted).

Here, Plaintiffs' allegations fail to satisfy the first prong of the cigarette rule because they cannot demonstrate that Uber's conduct offends "established" public policy.  *Fabri*, 387 F.3d at 120.  The Plaintiffs' CUTPA claim is predicated entirely on the premise that certain Connecticut taxicab and livery regulations apply to a technology company like Uber.  For the reasons discussed above, *supra* § I.A, however, this premise (at a minimum) is subject to reasonable debate, and thus far from "established."  Consequently, Plaintiffs cannot demonstrate that Uber's alleged conduct offends public policy.[17]  For similar reasons, Plaintiffs cannot satisfy the second

---

[16]   Indeed, there can be no serious dispute that the many benefits to consumers and competition created by the use of Uber's software outweighs whatever loss of sales Plaintiffs' are attempting to claim.

[17]   Conduct stemming from a reasonable disagreement regarding the proper interpretation and application of a statute or regulation is not unfair or deceptive conduct within the meaning of

prong of the cigarette rule.  It cannot be unfair, immoral, or deceptive for Uber legitimately to

disagree with Plaintiffs regarding the proper interpretation of local taxicab and livery regulations

or to make statements and conduct its business in a manner consistent with its good faith

interpretation.  Finally, for the reasons discussed above, *supra* § III.C, the Plaintiffs' conclusory

allegations of substantial injury do not satisfy the third prong of the cigarette rule.[18]

     Simply put, Plaintiffs have failed to plead that Uber's conduct rose to the level of a

CUTPA violation under any prong of the cigarette rule.

    **E.**    **Plaintiffs' CUTPA Claim Must Also Be Dismissed For Failure to Allege that Uber's Acts Were the Proximate Cause of the Plaintiffs' Injuries**

     A plaintiff asserting a CUTPA claim must also allege that the defendant's actions were the

"proximate cause" of the plaintiff's damages.  *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*,

287 Conn. 208, 218, 947 A.2d 320, 330 (2008).  As discussed *supra* in § I.C and *infra* in § V.B.3,

Plaintiffs have not pled facts establishing that Uber's alleged representations and actions have

proximately caused their alleged harm.  The chain of inferences between the misrepresentations

and harm to Plaintiffs is far too attenuated to establish proximate causation.  *See supra* § I.C; *infra*

---

CUTPA.  "Although the subjective good faith of one who has in fact performed an unfair or
deceptive act is not a defense to a CUTPA violation," the Connecticut Supreme Court has
explained that "there is nothing unfair or deceptive in a reasonably grounded constitutional
challenge of a statute." *Eamiello v. Liberty Mobile Homes Sales, Inc.*, 208 Conn. 620, 654, 546
A.2d 805, 821 (1988).  In *Eamiello*, the Connecticut Supreme Court held that CUTPA cannot be
imposed on an alleged failure to comply with a statute where there was a reasonable basis for
challenging the constitutionality of that statute.  *Id.*  The rationale of *Eamiello* is instructive: an
alleged failure to comply with a statute or regulatory regime should not rise to the level of a
CUTPA violation where there is a reasonable basis to challenge the application and interpretation
of that regime.  For the same reasons as articulated in *Eamiello,* there is nothing unfair or
deceptive in Uber's reasonably grounded challenge to the Plaintiffs' interpretation of Connecticut
taxicab and livery regulations.  Thus, Uber's alleged misrepresentations and non-compliance with
those regulations cannot rise to the level of a CUTPA violation.

    [18]  *See Nosik v. Bowman*, No. CV000379089, 2002 WL 1842662, at *3 (Conn. Super. Ct.
July 12, 2002) (unpublished) (striking plaintiff's CUTPA claim because "while the plaintiff [pled]
that the defendant's misrepresentations caused her substantial injury, she [did] not allege any facts
in support of this contention.").

§ V.B.3.  It is at least equally as likely that Plaintiffs' harm was caused by general competition with Uber, unrelated market conditions, or their own shortcomings.  *Parola v. Citibank (S. Dakota) N.A.*, 894 F. Supp. 2d 188, 206 (D. Conn. 2012) (dismissing plaintiff's CUTPA claims because she could not "demonstrate that [her] loss was proximately caused by [the defendant's] conduct as opposed to her own conduct").  Plaintiffs' threadbare and generalized allegations that Uber's conduct has "caused" them to suffer damages do not suffice to state a claim.

For the foregoing reasons, Plaintiffs' CUPTA claim is legally deficient and should be dismissed.

## IV.   Plaintiffs Fail to State a Claim for Intentional Interference with Contractual Relationships

Plaintiffs allege that Uber intentionally interfered with Plaintiffs' contractual relationships with Plaintiffs' taxicab drivers and Plaintiffs' credit-card processing companies.  Am. Compl. ¶¶ 84–86.  This claim is legally deficient and should be dismissed for the reasons set forth below.

### A.   Plaintiffs Fail to Identify Any Tortious Conduct by Uber

Plaintiffs' allegations of tortious interference with contractual relationships fail because Plaintiffs have not alleged that Uber's conduct was in fact tortious.  Competitive behavior between rival enterprises cannot constitute the basis of a claim for tortious interference with contractual relationships unless that behavior is independently tortious.  *Downes-Patterson Corp. v. First Nat'l Supermarkets, Inc.*, 64 Conn. App. 417, 429, 780 A.2d 967, 976 (2001) ("not every act that disturbs a contract or business expectancy is actionable…[F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious"); *Corra v. Sunwood Condo. Ass'n, Inc.*, CV126009466S, 2012 WL 6583030 (Conn. Super. Ct. Nov. 26, 2012) (unpublished) ("[A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself").  To sufficiently allege tortious conduct, Plaintiffs must show that Uber "committed fraud, misrepresentation,

21

intimidation, or molestation" or "acted maliciously." *Bacarella Transp. Servs., Inc. v. Rightway Logistics, LLC*, 3:08-CV-1487(PCD), 2009 WL 322871, at *3 (D. Conn. Feb. 10, 2009). "At a minimum, a plaintiff must plead and prove at least some improper motive or improper means . . . beyond the fact of the interference itself." *Id*. (internal quotation marks & citations omitted).

Plaintiffs have not alleged any tortious conduct here. Plaintiffs allege, in conclusory fashion, that Uber induces Connecticut taxicab and livery drivers to "violate the Connecticut rules and regulations and terms of their individual leases," and that payments through Uber cause credit-card processing companies to lose out on fees. *See* Am. Compl. ¶ 85. Even assuming the truth of these allegations, without more, they fall far short of alleging that Uber acted tortiously. *See Robert S. Weiss & Associates, Inc. v. Wiederlight*, 208 Conn. 525, 536 (1988) (finding that defendant's knowingly encouraging and inducing an employee to breach his contract with the plaintiff did not constitute tortious conduct); *Sanford Hall Agency, Inc. v. Dezanni*, CV044000576, 2004 WL 3090673, at *8 (Conn. Super. Ct. Dec. 2, 2004) (unpublished) (finding no tortious conduct where defendant hired plaintiff's employee even though defendant knew that this violated a contract between the employee and plaintiff); *Corra*, 2012 WL 6583030, at *1-2 (finding no tortious conduct where defendant breached duty to plaintiff to pay credit card bills for account on which plaintiff was guarantor, thus "jeopardiz[ing] [plaintiff's] contractual relationship with the credit card companies").

To sufficiently state a claim for tortious interference, Plaintiffs would have to further allege that defendant acted with "improper motive or improper means." *Bacarella*, 2009 WL 322871, at *3. But a "mere motive to improve one's own business" is not improper. *Direct Mail Jobs, LLC v. Hughes*, HHBCV085009794, 2011 WL 3672086, at *6 (Conn. Super. Ct. July 29, 2011) (unpublished). Nor is it improper to engage the services of another's employees in an effort to benefit your business. *Sanford Hall Agency, Inc. v. Dezanni*, CV044000576, 2004 WL 3090673,

at *7 (Conn. Super. Ct. Dec. 2, 2004) (unpublished) (finding the defendant had not acted with malice where it induced plaintiff's employee to come work for it because her "expertise would benefit [defendant's] customers"). In fact, Connecticut courts have held that defendant's conduct was not "improper" where they were "merely acting as a competitor in a free market, an action that this state has a public policy interest in promoting." *AGC, Inc. v. Baillargeon*, CV10601844S, 2011 WL 1176141, at *29 (Conn. Super. Ct. Mar. 9, 2011) (unpublished). As the language of Plaintiffs' complaint make clear, these market-driven motives are precisely what drives Uber's business in Connecticut. *See, e.g.*, Am. Compl. ¶ 33. Plaintiffs themselves allege that Uber's motives are primarily to "stay ahead of their competition" and to "attract investors." *Id*.

Nor have Plaintiffs alleged any improper means that Uber has used in accomplishing its alleged interference. Plaintiffs resort again to an allegation that Uber functions in Connecticut without adhering to various regulations applicable to taxicabs. Am. Compl. ¶ 27. But as described *supra* in § I.A, Plaintiffs have failed to allege facts establishing that any of Connecticut's transportation regulations even apply to a technology company like Uber. In any event, Uber's general regulatory compliance is beside the point, as the sorts of conduct that Connecticut courts refer to as "improper" relate specifically to the act of interference itself, not to a defendant's general regulatory compliance. *See, e.g.*, *Baillargeon*, 2011 WL 1176141, at *29 (use of trade secrets stolen from plaintiffs); *Siemiatkoski v. Windsor Fed. Sav. & Loan Ass'n*, X07CV065001791S, 2008 WL 4379060, at *8 (Conn. Super. Ct. Sept. 10, 2008) (breach of fiduciary duties owed to plaintiffs); *Neidig v. Heilig*, CV064021341S, 2007 WL 4215479, at *5 (Conn. Super. Ct. Nov. 7, 2007) (wrongful withholding of approval for property transactions proposed by plaintiffs). Plaintiffs have made no such allegations here.

Nor could they—Uber simply advertises the entrepreneurial opportunity its software application presents and this in turn attracts drivers to use its software. Indeed, Plaintiffs only

allege that Uber attempts to "woo" taxicab and livery drivers, who desire to use Uber to "get more fare-paying customers" in alleged breach of their leases with Plaintiffs and Plaintiffs' contracts with credit card companies.  Am. Compl. ¶¶ 35, 69.  This is not the sort of "improper" means of interfering with contractual relations that is required to state a claim for tortious interference.

**B.**      **Plaintiffs Have Failed to Allege That Uber Interferes With Plaintiffs' Contracts With Credit Card Companies**

Plaintiffs' claim that Uber interferes with their contractual relationships with credit-card processing companies fares no better.  Plaintiffs complain that Uber bypasses credit card payment systems installed in plaintiffs' taxicabs.  Am. Compl. ¶ 71.  Plaintiffs allege that this "depriv[es] the credit card processing companies of the processing fees that the Plaintiffs are contractually obligated to give in exchange for the installation of legally required taxicab communications equipment" in their taxicabs.  *Id*.

To the extent Plaintiffs' complaint addresses uberX, UberBlack, and UberSUV—which Plaintiffs acknowledge are the only Uber request services available in Connecticut—this argument is groundless.  Quite simply, taxicabs cannot be requested through uberX or UberBlack, and thus Plaintiff could not plausibly claim that the credit card companies with whom it does business are contractually entitled to the fees paid through these services.  *See Standard Petroleum Co. v. Fox*, CV094028045S, 2009 WL 4282080, at *3 (Conn. Super. Ct. Nov. 2, 2009) (unpublished) (holding plaintiff had failed to state a claim for tortious interference with contractual relations because the alleged contract had not actually been breached or terminated).  Thus, Uber could not have interfered with Plaintiffs' contractual relationship with these companies.

**C.**      **Plaintiffs Have Failed to Allege that Uber Intended to Interfere With Plaintiffs' Contracts**

To the extent that Plaintiffs are attempting to allege that payments occurring through Uber's application for rides taken in actual taxicabs, Am. Compl. ¶¶ 32, 60, Plaintiffs' complaint

is equally deficient in that it fails to allege Uber acted intentionally.  To allege a claim for tortious interference, Plaintiffs must allege that "the defendant *intentionally* interfered with the business relationship."  *Downes-Patterson*, 64 Conn. App. at 428 (emphasis added).

While at points in their complaint Plaintiffs seem to suggest that rides requested through Uber's app occur in Connecticut use actual taxicabs, Am. Compl. ¶ 60, this baseless suggestion is contradicted by the remainder of Plaintiffs' complaint. Plaintiffs describe rides requested through Uber's app in Connecticut as using "unidentified vehicles," "every day vehicle[s]" or "expensive livery car[s]" as opposed to actual taxicabs.  *Id.* ¶¶ 29, 34.  Further, Plaintiffs expressly admit that uberTAXI—the only Uber product that enables users to request actual taxicabs—"is not even available in Connecticut right now, and may not ever be."  FAC ¶ 37.

Nonetheless, to the extent Plaintiffs claim that actual taxicabs have been involved in uberX, UberBlack, or UberSUV services, Plaintiffs' own allegations make it clear that Uber, at the very least, did not intend this result:  "Uber urges its customers to use Uber-affiliated UberX vehicles, black cars and SUVs, rather than its taxicabs."  *Id*.  Plaintiffs' apparent implication that taxicab drivers nonetheless are somehow "sneaking" onto the uberX, UberBlack, or UberSUV platforms does not state a viable claim against Uber.  *Downes-Patterson*, 64 Conn. App. at 428 (requiring plaintiff to allege defendant "intentionally interfered with the business relationship").

### D.    Plaintiffs Have Failed to Identify Any Specific Contracts That Uber Was Aware of and Interfered With

Plaintiffs' claim that Uber tortiously interfered with its contractual relationships with taxicab drivers must fail for the additional reason that Plaintiffs have not alleged the existence of any specific contracts or contract terms between Plaintiffs and drivers that have been interfered with, let alone that Uber had knowledge of any such contracts.  These are essential elements of Plaintiffs' common law intentional interference with contractual relationships claim.  *See Bulldog New York LLC v. Pepsico, Inc.*, No. 3:08CV1110 AWT, 2014 WL 1284903, at *164 n.1 (D. Conn.

25

Mar. 31, 2014) (finding that plaintiff's complaint could not be construed as a claim for tortious interference with contractual relations because that tort "requires the existence of an enforceable contract" and plaintiffs had failed to "identify any actual, preexisting contracts with which the defendants interfered"); *Dworkin Constr. Corp. v. Shremshock-Yoder Architects, Inc.*, 380352, 1996 WL 469742, at *3 (Conn. Super. Ct. Aug. 2, 1996) (tortious interference requires that defendants "knowing of [plaintiff's] relationship intentionally sought to interfere with it").

Plaintiffs make passing references to their "contracts" and "contractual relationships" with drivers, and the "terms of [drivers'] individual leases." Am. Compl. ¶¶ 32, 33, 85. But Plaintiffs fail to put Uber on notice of any individual contract or contract term that has been breached by the drivers, and they also have not alleged that drivers have ceased their business relationships with Plaintiffs. Indeed, Plaintiffs make clear that drivers' alleged work with Uber occurs while the driver is "simultaneously working a normal shift with his or her authorized company." *Id.* ¶ 60. Nor have Plaintiffs alleged Uber's knowledge of any specific contracts or relationships that it purportedly went on to interfere with. Without alleging any specific contract or contract term that Uber knew about and interfered with, Plaintiffs' claim for tortious interference is deficient and must be dismissed.

Similarly, Plaintiffs' claim that Uber tortiously interfered with its contractual relationship with credit card processing companies is deficient because it fails to allege that Uber knew of this contractual relationship. *See Dworkin Constr. Corp.,* 1996 WL 469742, at *3. Failure to plead this element is grounds to dismiss a tortious interference claim. *Id.* Plaintiffs have failed to plead that Uber knew either of Plaintiffs' contractual relationship with credit card processing companies in general, or, more specifically, that those contracts would forbid any of Uber's actions about which Plaintiffs complain.

### E.     Plaintiffs Have Failed to Allege That They Suffered Actual Loss

Finally, Plaintiffs' tortious interference claim must be dismissed for the additional reason that they have suffered no cognizable loss.  Tortious interference "is not complete unless there has been actual damage suffered."  *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 213, 757 A.2d 1059, 1064 (2000) (internal quotations & citations omitted); *Downes-Patterson*, 64 Conn. App. at 428-29 (finding that plaintiffs must show that, "as a result of [defendant's] interference, the plaintiff suffered actual loss")

Regarding their contractual relationships with credit card companies, Plaintiffs have only alleged that Uber has "depriv[ed] the credit card processing companies of [ ] processing fees." Am. Compl. ¶ 71.  Plaintiffs fail to explain how this causes any of the harms they allege to have suffered.  *Id.* ¶ 103.  Without pleading a harm to Plaintiffs themselves, rather than harm to the credit-card processing companies, Plaintiffs have failed to state a claim.

Plaintiffs similarly fail to allege any harm they have suffered with regard to their contractual relationships with taxicab drivers.  "In order for the plaintiff to establish liability for interference with a contractual relationship, the plaintiff must show that the defendants' tortious conduct caused the [employees] to terminate [their] relationship with the plaintiff."  *Webster Fin. Corp. v. McDonald*, No. CV084016026S, 2009 WL 416059, at *10 (Conn. Super. Ct. Jan. 28, 2009).  Plaintiffs do not allege that any taxicab drivers have left their employ.  In fact, they specifically state that, while allegedly using Uber, drivers are "simultaneously working a normal shift with [their] authorized company."  Am. Compl. ¶ 60.  Nor do Plaintiffs allege the manner in which drivers have allegedly breached their leases with Plaintiffs, the terms of those leases that have been breached, any specific lease that was breached, or any specific harm that has come to Plaintiffs from these breaches.  Instead, Plaintiffs make conclusory, globalized allegations that the behavior of taxicab drivers violates "terms of their individual leases" and that this "has caused the

Plaintiffs substantial harm," *id.* ¶¶ 85-86, which is insufficient. *Webster*, 2009 WL 416059, at *10 (finding that while "the plaintiffs have alleged that they have suffered harm," "these allegations are conclusory" and "[a]motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged").

## V.     Plaintiffs Fail to State Claims for Violations of RICO

Plaintiffs also assert civil RICO claims against Uber.  Am. Compl. ¶¶ 87–93 (Count V); ¶¶ 94–98 (Count VI); ¶¶ 99–102 (Count VII).  "'To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962.'"  *Plainville Elec. Products Co. v. Vulcan Advanced Mobile Power Sys., LLC*, 638 F. Supp. 2d 245, 250 (D. Conn. 2009) (quoting *DeFalco v. Bernas,* 244 F.3d 286, 305 (2d Cir. 2001)) (quotation marks omitted).

Each of the three types of RICO violations require a plaintiff to plead, as a predicate for liability, a "pattern of racketeering activity."  18 U.S.C. § 1962(a)–(c).  Here, Plaintiffs allege that the predicate "racketeering activity" is wire fraud.  Am. Compl. ¶¶ 88–90.  Because Plaintiffs allege wire fraud as the basis for RICO liability, their allegations must meet the strict pleading requirements of Federal Rule of Civil Procedure 9(b).  *In re Trilegiant Corp., Inc.*, No. 3:12-CV-00396 VLB, 2014 WL 1315244, at *11 (D. Conn. Mar. 28, 2014).

Plaintiffs fail to meet several fundamental pleading requirements of their RICO claims, and they should be dismissed.

### A.     Plaintiffs Fail to Allege a Pattern of Racketeering Activity Sufficient to Meet Rule 9(b)

Plaintiffs have failed to plead with particularity a pattern of racketeering activity.  To plead a pattern of racketeering activity, the "plaintiff must plead at least two predicate acts . . ." of wire fraud.  *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 465 (2d Cir. 1995); Am. Compl. ¶¶ 88–90 (alleging wire fraud).  "A complaint alleging . . . wire fraud must show (1) the existence

of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate . . . transmission facilities in furtherance of the scheme." *Plainville Elec. Products Co.*, 638 F. Supp. 2d at 251 (quoting *S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996)).  A scheme to defraud "has been described as a plan to deprive a person 'of something of value by trick, deceit, chicane or overreaching.'" *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000).  Further, Rule 9(b) requires a plaintiff "to specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *New York Transp., Inc. v. Naples Transp., Inc.*, 116 F. Supp. 2d 382, 386 (E.D.N.Y. 2000) (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999)).  "The plaintiffs . . . must allege facts that give rise to a strong inference of fraudulent intent." *Id.* (quoting *Moore*, 189 F.3d at 173).

Plaintiffs have not pled a "scheme to defraud" or even a single misrepresentation sufficient to meet the standard in Rule 9(b).  To the extent the RICO claims rely on the same alleged misrepresentations as the Lanham Act claim, Plaintiffs have not pled "'the contents of the communications, who was involved, where and when they took place, and explain[ing] why they were fraudulent.'" *Plainville Elec. Products Co.*, 638 F. Supp. 2d at 251 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)).  Because Plaintiffs fail to allege any of this, their RICO claims, all of which are based on allegations of wire fraud, must be dismissed. *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) *aff'd sub nom. Katzman v. Victoria's Secret Catalogue, Div. of The Ltd., Inc.*, 113 F.3d 1229 (2d Cir. 1997) (dismissing RICO claim because plaintiffs  "have not, and cannot, point to any language in [the defendant's] catalogue which actually makes" a misrepresentation).

29

Further, to the extent the alleged misrepresentations at issue in Plaintiffs' Lanham Act and RICO claims differ slightly, Plaintiffs still fail to state the alleged RICO misrepresentations with adequate particularity. *Compare* Am. Comp. ¶ 74 (alleging for Lanham Act claim that Uber represents that it operates lawfully) *with id.* ¶ 88 (alleging for RICO claims that Uber misrepresents its fares and falsely claims an association between itself and Plaintiffs). Plaintiffs have not properly pled any misrepresentations or scheme to defraud with respect to the fares paid for trips requested through Uber. Plaintiffs allege only that Uber charges a "mandatory 20% 'gratuity' (half of which goes to Uber) and a $1 fee," thereby violating the taxicab fare regulations. Am. Compl. ¶ 60(i). Not only is this factually inaccurate—gratuity only applies to uberTAXI, which is not available in Connecticut, and there is no gratuity for transportation services requested through uberX and UberBlack—but Plaintiffs merely state an alleged regulatory violation, not a misrepresentation or scheme.

Regarding Plaintiffs' conclusory allegation that Uber "false[ly] claims [] an association between the Defendants and the Plaintiffs," Am. Compl. ¶ 88, as discussed above Plaintiffs fail to allege any affirmative actions by Uber, much less any actual, particularized misrepresentations or scheme to defraud, to support their claim. *Supra* § II. For these reasons, Plaintiffs have failed to allege a pattern of racketeering conduct and all their RICO claims must be dismissed.

**B.     Plaintiffs Fail to State a Claim Under Each of the Three RICO Subsections**

Plaintiffs further fail to allege facts satisfying the elements of the three RICO subsections that Plaintiffs claim Uber has violated.

**1.     Plaintiffs Fail to State a Claim Under Section 1962(a), the "Use or Invest" Provision**

Under 18 U.S.C. § 1962(a), it is unlawful for "any person who has received any income derived . . . from a pattern of racketeering activity . . . to use or invest . . . any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or

operation of, any enterprise . . . ."  "The essence of a violation of § 1962(a) is not commission of

predicate acts but investment of racketeering income."  *Allstate Ins. Co. v. Seigel*, 312 F. Supp. 2d

260, 272 (D. Conn. 2004) (quoting *Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir. 1990)).

Further, to plead a claim under this section, the RICO plaintiff's injury must flow directly from the

"use or investment" of the racketeering income.  *Ouaknine*, 897 F.2d at 82–83 ("We therefore hold

that to state a claim for civil damages under § 1962(a), a plaintiff must allege injury from the

defendants' investment of racketeering income in an enterprise.").

Plaintiffs allege that Uber obtains racketeering income from unspecified "wire fraud"

activity and reinvests that income into Uber's "ongoing operation of [Uber's] transportation

systems," using the racketeering income "to expand the Defendants' network of vehicles."  Am.

Compl. ¶¶ 91–92.  These are precisely the types of allegations that courts have consistently held to

be insufficient to state a claim under § 1962(a).

Plaintiffs interpret § 1962(a) as prohibiting "a channeling of fraud-derived profits back to a

RICO violator, [but] case law squarely rejects such an interpretation."  *Allstate Ins. Co.*, 312 F.

Supp. 2d at 271.  When a plaintiff alleges that "racketeering proceeds are merely reinvested back

into the same RICO enterprise," the plaintiff fails to state a claim under § 1962(a).  *Id.* (listing

cases); *see also, e.g., USA Certified Merchants, LLC v. Koebel*, 262 F. Supp. 2d 319, 331

(S.D.N.Y. 2003) ("Where investment of racketeering proceeds back into the same RICO enterprise

is alleged, the injuries stem proximately not from the investment, but from the predicate acts that

make up the racketeering activity.").

Further, "the 'enterprise' described in § 1962(a)" is "'the victim of unlawful activity,'" not

the alleged perpetrator.  *Allstate Ins. Co.*, F. Supp. 2d at 272 (quoting *Nat'l Org. for Women, Inc.*

*v. Scheidler*, 510 U.S. 249, 259, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994)).  This RICO provision "is

aimed at preventing racketeers from using the proceeds from their racketeering scheme to invest in, or acquire interests in, legitimate enterprises," not from reinvesting in itself. *Id*. at 272.

### 2. Plaintiffs Fail to State a Claim Under Section 1962(b), the "Interest in or Control Over" Provision

Under 18 U.S.C. § 1962(b), it is unlawful for "any person through a pattern of racketeering activity . . . to acquire or maintain . . . any interest in or control of any enterprise which is engaged in . . . interstate or foreign commerce." Section 1962(b) is similar to § 1962(a) in that it "prohibit[s] the takeover of a legitimate business through racketeering, typically extortion or loansharking." *Allstate Ins. Co.*, 312 F. Supp. 2d at 272 (quoting *United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 450 (S.D.N.Y. 2004)). This section also "requires a plaintiff to allege an 'acquisition injury' separate and distinct from the injuries sustained as a result of the defendant's commission of predicate acts." *Id.* at 272–73 (listing cases); *see also Allen v. New World Coffee, Inc.*, No. 00 CIV. 2610 (AGS), 2002 WL 432685, at *5 (S.D.N.Y. Mar. 19, 2002), 2002 WL 432685 at *5 ("A plaintiff cannot recover under § 1962(b) unless he alleges a distinct injury caused not by predicate acts but by the defendant's acquisition or maintenance of an interest in or control of an enterprise.").

Plaintiffs' allegations fail to state a claim under § 1962(b). Plaintiffs claim, upon information and belief, that Uber is somehow taking control of Plaintiffs' taxicab operations. *See* Am. Compl. ¶ 96. They allege that Uber "induce[s]" taxicab and livery drivers "to enter into contracts with" Uber to offer transportation services through Uber's application. *Id.* at ¶ 95. They then allege that through these actions Uber is somehow "increasing its control of the legally operating taxicab authorities in Connecticut," which apparently are the RICO "enterprise" at issue here. *See* Am. Compl. ¶ 96.

This is a nonsensical allegation.  As an initial matter, Plaintiffs fail to properly allege the existence of an "enterprise."  To demonstrate an "association-in-fact" enterprise,[19] a plaintiff must allege facts showing the existence of a "group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).  The decisions of the enterprise may be made in a hierarchy through a chain of command or on an ad hoc basis "and by any number of methods—by majority vote, consensus, a show of strength, etc."  *Boyle v. United States*, 556 U.S. 938, 948, 129 S. Ct. 2237, 2245, 173 L. Ed. 2d 1265 (2009).  Competitors in the same market "who independently engaged in similar types of" activity, without more, cannot be an "enterprise" under RICO.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 375 (3d Cir. 2010).

All of the "legally operating taxicab authorities in Connecticut" cannot be a RICO "enterprise."  *See id.*  They do not allege facts showing any ongoing organization between *all* of the Connecticut taxicab companies or various individuals functioning as a continuing unit.  To the contrary, these are separate businesses competing in the same market, which are at most "independently engaged in similar types of" activity.  *Id.*  Plaintiffs also fail to allege that their enterprise of "legally operating taxicab authorities in Connecticut" is engaged in or affects interstate commerce.  18 U.S.C. § 1962(b).  They fail to allege this even in a conclusory way, much less with the requisite facts.  *See* Am. Compl. ¶¶ 94–98.

Moreover, Plaintiffs fail to allege that Uber exerts any control over this claimed "enterprise."  To the extent drivers previously affiliated with Plaintiffs now offer transportation requested through Uber's application, that does not mean that Uber has "acquire[d] or

---

[19]   The RICO statute defines enterprise to be "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  All the taxicab companies in Connecticut are not part of one legal entity, so Plaintiffs must be attempting to allege they are part of an "associat[ion] in fact."

maintain[ed] . . . an[] interest in or control of an[] enterprise . . . ."  18 U.S.C. § 1962(b).  Uber has contracts with the drivers that offer transportation services through its application, but that has nothing to do with exerting control over the Plaintiffs' supposed enterprise.

Finally, Plaintiffs do not allege any injuries that are distinct from the alleged predicate acts of wire fraud, as they must do to state a claim under § 1962(b).  *Allstate Ins. Co.*, 312 F. Supp. 2d at 272–73.  They simply allege that Uber is "fraudulent[ly]" obtaining riders and drivers to use its smartphone application, Am Compl. ¶ 95, which is both the alleged predicate act and the alleged cause of Plaintiffs' injuries.  In other words, the source of their alleged injury is not any takeover of Plaintiffs' so-called taxicab enterprise.  Their § 1962(b) claim should be dismissed for this reason as well.  *Allstate Ins. Co.*, 312 F. Supp. 2d at 272–73 (stating "[a] plaintiff cannot recover under § 1962(b) unless he alleges a *distinct injury* caused not by predicate acts but by the defendant's acquisition or maintenance of an interest in or control of an enterprise") (quoting *Allen*, 2002 WL 432685, at *5).

### 3.      Plaintiffs Fail to State a Claim Under Section 1962(c), the "Conduct of Enterprise" Provision

Under 18 U.S.C. § 1962(c), it is unlawful for "any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  "To establish a violation of § 1962(c) . . . a plaintiff must show that a person engaged in '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)).

"'[U]nder the so-called distinctness requirement, . . . a plaintiff must allege . . . the existence of two distinct entities: (1) a person; and (2) an enterprise that is not simply the same person referred to by a different name.'"  *Cruz*, 720 F.3d at 120 (quoting *City of New York v. Smokes–Spirits.com, Inc.*, 541 F.3d 425, 438 n. 15 (2d Cir. 2008)) (internal quotation marks

omitted).  As the Second Circuit "ha[s] long recognized, the plain language and purpose of the statute contemplate that a *person* violates the statute by conducting an *enterprise* through a pattern of criminality.  It thus follows that a corporate person cannot violate the statute by corrupting itself."  *Id.* at 120.  A RICO enterprise may not "consist 'merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant . . . .'" *Id.* at 121(quoting *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir. 1994)).

As discussed above, Plaintiffs have failed to properly plead any type of "enterprise" at all, and the § 1962(c) should be dismissed on this ground alone.  To the extent Plaintiffs allege that Uber itself is the enterprise and participates in "wire fraud," then their claim must be dismissed for failure to comply with the "distinctness requirement."   *Id.* at 120.

Plaintiffs also claim that Uber has "insinuated [itself] into the operations of approved taxicab and livery authorities, including the Plaintiffs and their drivers . . . ."  Am. Compl. ¶ 100. If Plaintiffs are attempting to plead that Uber has somehow participated in an enterprise consisting of the "approved taxicab and livery authorities," *id.*, this claim also fails because, as described above, Plaintiffs have failed to allege the existence of an enterprise and have failed to allege facts showing that Uber *participates* in this purported enterprise.  The RICO defendant, in this case Uber, must "participate[] in the operation or management of the enterprise itself."  *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S. Ct. 1163, 1172, 122 L. Ed. 2d 525 (1993).  Even assuming all the taxicab and livery authorities, which are all business competitors, operate as a single RICO enterprise, Plaintiffs fail to plausibly allege Uber participates in the operation or management of the purported enterprise.  Beyond making the bare allegation that Uber has "insinuated" itself into this purported enterprise, Am. Compl. ¶ 100, Plaintiffs make no factual allegations to support this

vague and conclusory allegation or explain in what way Uber participates in the operation or management of the purported enterprise.

Further, under § 1962(c) the plaintiff must allege that the predicate acts, in this case the alleged wire fraud, were the proximate cause of the plaintiff's injury.[20] *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9, 130 S. Ct. 983, 989, 175 L. Ed. 2d 943 (2010) (stating that "to state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well'"). Thus, Plaintiffs must plausibly allege that Uber's alleged wire fraud (i.e., the alleged misrepresentations) have proximately harmed Plaintiffs, *see id.*, but they have failed to do so.

Alleged racketeering conduct must have a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). The Supreme Court has applied this requirement in a very similar case, holding that, in a suit between competitors, the connection between the defendant's alleged violation of tax regulations in order to lower its prices and the plaintiff's alleged lost market share was too tenuous. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 452 (2006).

The plaintiff in *Anza* claimed that the defendant was filing false tax returns to the State of New York, allowing it to lower its own prices and lure customers from the plaintiff. *Id.* at 457–58. But the Supreme Court held that there were too many links in the causal chain between the defendant's alleged racketeering conduct (the filing of false tax returns) and the plaintiff's harm (lost sales). *Id.* at 458–59. The "direct victim of this conduct was the State of New York, not" the plaintiff; and it was "the State that was being defrauded," not the plaintiff. *Id.* at 458.

---

[20]   The proximate cause requirement under § 1962(c) is different from that under §§ 1962(a) and (b) in that, as discussed above, those sections require that the RICO violation be the proximate cause of the plaintiffs' injuries, whereas § 1962(c) requires that the predicate acts be the proximate cause. *See Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 321 (2d Cir. 2011).

The plaintiff, who competed with the defendant, was injured "indirectly" by the alleged tax fraud in that the defendant allegedly was able to lower its prices due to the tax savings and, with those lower prices, take market share from the plaintiff. *Id.* at 460. But the defendant "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud," and the plaintiff's lost sales "could have resulted from factors other than [defendant's] acts of fraud." *Id.* at 458-59. If the court in *Anza* had accepted the plaintiff's theory, it would have had to determine what portion of the defendant's price drop was attributable to the fraudulent tax returns and what portion of the plaintiff's lost sales was attributable some portion of the price drop. *Id.* at 459–60. But the "element of proximate causation . . . is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation."[21] *Id.* at 460. *See also Downstream Envtl., L.L.C. v. Gulf Coast Waste Disposal Auth.*, No. 05-CV-1865, 2006 WL 1875959, at *6–*7 (S.D. Tex. July 5, 2006) (dismissing claim that defendant was "disposing of grease and grit trap waste without the necessary permit and by illegal dumping, allowing it to charge lower prices, which cause [plaintiff] competitive injury").

*Anza* applies squarely here. Any alleged misrepresentations that Uber made to consumers—which Plaintiffs have failed to allege in the first instance—are too remote from Plaintiffs' alleged injuries. Like the plaintiffs in *Anza*, Plaintiffs here are not the target of Uber's alleged racketeering conduct; instead, Uber allegedly targets consumers, which allegedly harms Plaintiffs only indirectly. *See* Am. Compl. ¶ 88. Like in *Anza*, this Court would have to determine what portion of Plaintiffs' lost market share is attributable directly to Uber's allegedly false statements, a matter that has not even been alleged here, and which, in all events, the Supreme Court held is an impermissible inquiry under RICO. *Anza*, 547 U.S. at 460. Plaintiffs' alleged

---

[21] Presumably, a civil RICO claim would be more applicable to a claim that a defendant directly defrauded a plaintiff and took money directly from the plaintiff, not a claim where the defendant defrauded a third party, which indirectly may have caused harm to the plaintiff.

harm "could have resulted from factors other than [Uber's alleged] acts of fraud," *id.* at 458–59,
and there is no way to identify which alleged losses are due to Uber's alleged conduct and which
are from the innumerable other factors affecting Plaintiffs' businesses. *See also 4 K & D Corp. v.
Concierge Auctions, LLC*, No. 13 CIV. 2527 JGK, 2 F. Supp. 3d 525, 542  (S.D.N.Y. 2014)
(dismissing RICO claim for failure to allege proximate cause and stating "because there was no
assurance that property sellers would have chosen [plaintiff's services] had they not been allegedly
defrauded by the defendants, it is difficult to ascertain and apportion the damage that Concierge's
allegedly unfair advantage caused specifically to Grand Estates"); *Proven Methods Seminars, LLC
v. Am. Grants & Affordable Hous. Inst., LLC*, No. Civ. S–07–01588, 2008 WL 269080, at *6
(E.D. Cal. Jan. 29, 2008) (dismissing the defendants' RICO counterclaim for failure to satisfy
proximate cause requirement because "[t]here is simply no basis upon which to assume that
prospective consumers, absent plaintiffs' alleged scheme [of publishing false advertisements],
would have chosen defendants' products and services as opposed to one of the many
alternatives").

 Plaintiffs' claim is also similar to the claim dismissed in *Gristede's Foods, Inc. v.
Unkechauge Nation*, 532 F. Supp. 2d 439, 444 (E.D.N.Y. 2007).  The plaintiff there alleged that
the defendant, its competitor, sold cigarettes at prices lower than the plaintiff because the
defendant failed to properly apply taxes to the cigarettes. *Id.* at 444–45.  The plaintiff alleged it
had lost "in excess of $20 million in cigarette sales." *Id.* at 445 (quoting complaint).

 The court held that the connection between the plaintiff's lost sales and the defendant's
predicate acts were "too 'attenuated'" to state a RICO claim because the "direct victim of the
defendants' conduct is the State of New York, who is allegedly losing tax revenue on illegally
untaxed cigarettes, or perhaps the purchasers of those cigarettes, who erroneously believe that they
need not pay taxes on the cigarettes." *Id.*  The same is true here.  The alleged victims or Uber's

allege wire fraud are Connecticut users of Uber's application, and there are several other competitors, beyond Plaintiffs in this case, who operate in the applicable market.  *Id.* at 445–46 (stating that because other competitors were in the market, it would be even more difficult to trace defendant's actions to harm to plaintiff).  Plaintiffs have made no attempt to and cannot plausibly trace the effect of any misrepresentations to Connecticut consumers to any harm suffered by Plaintiffs.

Plaintiffs must also allege that the purported wire fraud was the "but for" cause of Plaintiffs' harm.  *Hemi Grp., LLC*, 559 U.S. at 9.  Plaintiffs have not alleged this, even in conclusory fashion.  Nor would they plausibly be able to allege facts establishing but-for causation.  Plaintiffs have made no showing that the alleged acts of wire fraud—distinct from the general availability of Uber's request service itself—is the but-for cause of Plaintiffs' harm.  If the alleged misrepresentations ceased, Uber would still offer its transportation-request service to Connecticut users, and Plaintiffs' alleged harms would, at least according to Plaintiffs, continue to exist.  Thus, because Plaintiffs' alleged harm would exist independently of the alleged acts of wire fraud, Plaintiffs have failed to plead but-for causation.

## VI.   The Court Should Abstain From Deciding This State and Municipal Issue

The Court should decline to exercise jurisdiction over this case under either the doctrine of primary jurisdiction.  The doctrine of primary jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body . . . ."  *United States v. 43.47 Acres of Land*, 45 F. Supp. 2d 187, 191 (D. Conn. 1999) (quoting *United States v. Western Pac. R.R.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)).  The factors courts consider in applying the doctrine are "the need for uniform agency action, the degree to which expert or specialized knowledge is required, the nature

of the dispute, whether the agency's determination will prove helpful, . . . the agency's authority, whether the dispute lies at the heart of the agency's assignment from Congress, and the potential delay . . . ." *United States v. 43.47 Acres of Land*, 45 F. Supp. 2d at 191.

At their core, Plaintiffs' claims seek to enforce Connecticut's existing statutory and regulatory transportation laws against Uber. *See* Am. Compl. ¶¶ 22–26 (discussing statutory and regulatory structure); ¶¶ 32–72 (alleging that Uber violates transportation statutes and regulations). But Plaintiffs are not the proper parties to bring these claims, and federal court is not the proper forum to decide them. As Plaintiffs admit, the Connecticut Department of Transportation (CDOT) has authority to regulate "all aspects of the planning, development, maintenance and improvement of transportation in the state," including the "[i]mprovement in the transportation of people and goods . . . by . . . motor carrier." Am. Compl. ¶ 23 (quoting Conn. Gen. Stat. §§ 13b-3, 13b-32). And the Connecticut Department of Motor Vehicles has "the authority to promulgate such regulations as are necessary to 'enforce the provisions of the statutes concerning motor vehicles and the operators of such vehicles.'" Am. Compl. ¶ 23 (quoting Conn. Gen. Stat. § 14-3). The regulations give the Department of Transportation explicit authority to enforce the transportation regulations, including assessing civil penalties. Conn. Agencies Regs. 13b-96-50, 13b-96-51.

Further, the Connecticut legislature recently ordered CDOT to perform a study, to be completed on February 1, 2015, related to precisely the issues that Plaintiffs raise in this lawsuit, including the applicability of the current regulatory structure to companies like Uber. The legislation states that "[t]he study shall (1) review how emerging technologies, such as smartphone applications, currently fit into the regulatory scheme, and (2) offer recommendations as to how and if such technologies and the businesses offering them should be regulated to ensure the safety

40

of the riding public."  *See* Decl. of Amit Patel, Ex. A at 21 (Conn. Pub. Act 14-199 (2014)

*available at* http://www.cga.ct.gov/2014/act/pa/pdf/2014PA-00199-R00SB-00235-PA.pdf).[22]

All the relevant factors support dismissal or stay under the doctrine of primary jurisdiction.

As described above and more extensively in Plaintiffs' Amended Complaint, Connecticut has

established a comprehensive set of statutory and regulatory laws governing transportation,

including the ability to enforce violations of those laws.  Enforcing Plaintiffs' subjective

interpretation of these laws—which were created before technology companies like Uber even

existed and which therefore were never intended to apply to them—would disrupt Connecticut's

interest in maintaining a uniform regulatory structure.  *United States v. 43.47 Acres of Land*, 45 F.

Supp. 2d at 191 (staying case under primary jurisdiction doctrine in part because of concerns for

uniformity).  Plaintiffs have not identified a single statute or regulation that purports to apply to a

company that offers a smartphone-based transportation request service, and adjudicating this

dispute would necessarily involve resolving "debatable construction[s]" of the transportation laws,

including whether they apply to Uber in the first instance.  *See, e.g.,* Conn. Gen. Stat. § 13b-95

(defining "taxicab" to "include[] any motor vehicle . . . accepting or soliciting passengers . . . for

hire," but not referencing any smartphone-based request service).

The CDOT is also activity analyzing the issues raised in the Amended Complaint, and

there is no reason for this Court to get ahead of, and possibly contradict the outcome of, the

ongoing political and regulatory process.  The CDOT has expertise in interpreting and applying its

own regulations, and the outcome of the study, which will address whether existing regulations

---

[22]   The Court is permitted to consider the public acts of other governmental bodies in
determining whether to decline to exercise jurisdiction under the primary jurisdiction doctrine on a
motion to dismiss.  *See, e.g., United States v. 43.47 Acres of Land, More or Less, Situated in Cnty.
of Litchfield, Town of Kent*, 896 F. Supp. 2d 151, 158 (D. Conn. 2012) (granting motion for
judgment on the pleadings on primary jurisdiction grounds after considering a Notice of the
Bureau of Indian Affairs' determination of tribal status).

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| GREENWICH TAXI, INC., ACE TAXI SERVICE, INC., CASINO CAB COMPANY, INC., CURTIN MOTOR LIVERY SERVICE, INC., EAST HARTFORD CAB COMPANY, INC., EXECUTIVE 2000 TRANSPORTATION, LLC, FARMINGTON VALLEY CAB, LLC, GROTON CAB COMPANY, INC., LASSE'S LIVERY SERVICE, INC., SUBURBAN TRANSPORTATION, INC.,  TAXICABS AND LIVERY COUNCIL OF CONNECTICUT, INC., THE WATERBURY YELLOW CAB & SERVICE COMPANY, INC., TORRINGTON VALLEY CAB, LLC, UNION-LYCEUM TAXI COMPANY, INC., and YELLOW CAB COMPANY OF NEW LONDON & GROTON, INC.,<br><br>        Plaintiffs,<br><br>  v.<br><br>UBER TECHNOLOGIES, INC. and LYFT, INC.<br><br>        Defendants. | C.A. No.: 3:14-cv-733 (AWT)<br><br><br>**DECLARATION OF AMIT PATEL**<br><br><br><br><br>November 14, 2014 |

## <u>DECLARATION OF AMIT PATEL</u>

I, Amit Patel, hereby declare and state as follows:

1.  The document attached to this declaration as Exhibit A is a true and accurate copy of Public Act No. 14-199, an Act Concerning Revisions to the Transportation Statutes.

2.  I retrieved this copy of Public Act No. 14-199 from the following web address: http://www.cga.ct.gov/2014/act/pa/pdf/2014PA-00199-R00SB-00235-PA.pdf

3.  I obtained this copy of Public Act No. 14-199 on November 13, 2014.

Executed in Chicago, Illinois

Dated: November 14, 2014

Signed: _____

# EXHIBIT A



**Substitute Senate Bill No. 235**

# Public Act No. 14-199

## AN ACT CONCERNING REVISIONS TO THE TRANSPORTATION STATUTES.

Be it enacted by the Senate and House of Representatives in General Assembly convened:

Section 1. Section 13b-2 of the general statutes is amended by adding subdivision (10) as follows (*Effective October 1, 2014*):

(NEW) (10) "Fare inspector" means an employee of (A) the department designated by the commissioner, or (B) a third-party contractor employed by the department, whose duties are to inspect tickets, passes or other documentation required to show compliance by the passenger with the fare payment requirements of state-owned or controlled bus public transportation service when the fare payment is off board or a combination of off board and on board such bus.

Sec. 2. Subsection (a) of section 13b-34 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2014*):

(a) The commissioner shall have power, in order to aid or promote the operation, whether temporary or permanent, of any transportation service operating to, from or in the state, to contract in the name of the state with any person, including but not limited to any common carrier, any transit district formed under chapter 103a or any special

*Substitute Senate Bill No. 235*

act, or any political subdivision or entity, or with the United States or any other state, or any agency, instrumentality, subdivision, department or officer thereof, for purposes of initiating, continuing, developing, providing or improving any such transportation service. Such contracts may include provision for arbitration of disputed issues. The commissioner, in order to aid or promote the operation of any transportation service operating outside the state, may contract in the name of the state with any person, including, but not limited to, any common carrier, or with the United States or any other state, or any agency, instrumentality, subdivision, department or officer thereof, for purposes of providing any transportation service in the event such assistance is required in the case of an emergency or a special event. The state, acting by and through the commissioner, may, by itself or in concert with others, provide all or a portion of any such service, share in the costs of or provide funds for such service, or furnish equipment or facilities for use in such service upon such terms and conditions as the commissioner may deem necessary or advisable, and any such contracts may include, without limitation thereto, arrangements under which the state shall so provide service, share costs, provide funds or furnish equipment or facilities. To these ends, the commissioner may in the name of the state acquire or obtain the use of facilities and equipment employed in providing any such service by gift, purchase, lease or other arrangements and may own and operate any such facilities and equipment and establish, charge and collect such fares and other charges or arrange for such collection for the use or services thereof as he may deem necessary, convenient or desirable. <u>The commissioner or any fare inspector, as defined in section 13b-2, as amended by this act, shall have the authority to issue citations for any violation of section 3 of this act.</u> The commissioner may also acquire title in fee simple to, or any lesser estate, interest or right in, any rights-of-way, properties or facilities, including properties used on or before October 1, 1969, for rail or other forms of transportation services. The commissioner may hold such properties

*Substitute Senate Bill No. 235*

for future use by the state and may enter into agreements for interim use of such properties for other purposes. Any person contracting with the state pursuant to this section for the provision of any transportation service shall not be considered an arm or agent of the state. Any damages caused by the operation of such transportation service by such person may be recovered in a civil action brought against such person in the superior court and such person may not assert the defense of sovereign immunity in such action.

Sec. 3. (NEW) (*Effective October 1, 2014*) Any person who, with intent to obtain state-owned or controlled bus public transportation service without payment of the lawful charge therefor or to avoid payment of the lawful charge for such service that has been rendered to such person, obtains such service or avoids payment therefor by force, intimidation, stealth, deception or mechanical tampering, or by unjustifiable failure or refusal to pay, shall have committed an infraction.

Sec. 4. Subdivision (7) of section 53a-119 of the 2014 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2014*):

(7) Theft of services. A person is guilty of theft of services when: (A) With intent to avoid payment for restaurant services rendered, or for services rendered to him as a transient guest at a hotel, motel, inn, tourist cabin, rooming house or comparable establishment, he avoids such payment by unjustifiable failure or refusal to pay, by stealth, or by any misrepresentation of fact which he knows to be false; or (B) (i) except as provided in section 3 of this act, with intent to obtain railroad, subway, bus, air, taxi or any other public transportation service without payment of the lawful charge therefor or to avoid payment of the lawful charge for such transportation service which has been rendered to him, he obtains such service or avoids payment therefor by force, intimidation, stealth, deception or mechanical

*Substitute Senate Bill No. 235*

tampering, or by unjustifiable failure or refusal to pay, or (ii) with intent to obtain the use of equipment, including a motor vehicle, without payment of the lawful charge therefor, or to avoid payment of the lawful charge for such use which has been permitted him, he obtains such use or avoids such payment therefor by means of any false or fraudulent representation, fraudulent concealment, false pretense or personation, trick, artifice or device, including, but not limited to, a false representation as to his name, residence, employment, or driver's license; or (C) obtaining or having control over labor in the employ of another person, or of business, commercial or industrial equipment or facilities of another person, knowing that he is not entitled to the use thereof, and with intent to derive a commercial or other substantial benefit for himself or a third person, he uses or diverts to the use of himself or a third person such labor, equipment or facilities.

Sec. 5. Subsection (a) of section 16a-38k of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) Notwithstanding any provision of the general statutes, any (1) new construction of a state facility that is projected to cost five million dollars, or more, and for which all budgeted project bond funds are allocated by the State Bond Commission on or after January 1, 2008, (2) renovation of a state facility that is projected to cost two million dollars or more, of which two million dollars or more is state funding, approved and funded on or after January 1, 2008, (3) new construction of a facility that is projected to cost five million dollars, or more, of which two million dollars or more is state funding, and is authorized by the General Assembly pursuant to chapter 173 on or after January 1, 2009, and (4) renovation of a public school facility as defined in subdivision (18) of section 10-282 that is projected to cost two million dollars or more, of which two million dollars or more is state funding,

*Substitute Senate Bill No. 235*

and is authorized by the General Assembly pursuant to chapter 173 on or after January 1, 2009, shall comply with or exceed compliance with the silver building rating of the Leadership in Energy and Environmental Design's rating system for new commercial construction and major renovation projects, as established by the United States Green Building Council, or an equivalent standard, including, but not limited to, a two-globe rating in the Green Globes USA design program until the regulations described in subsection (b) of this section are adopted. The Commissioner of Energy and Environmental Protection, in consultation with the Commissioner of Administrative Services and the Institute for Sustainable Energy, shall exempt any facility from complying with said regulations if the Commissioner of Energy and Environmental Protection finds, in a written analysis, that the cost of such compliance significantly outweighs the benefits. Nothing in this section shall be construed to require the redesign of any new construction of a state facility that is designed in accordance with the silver building rating of the Leadership in Energy and Environmental Design's rating system for new commercial construction and major renovation projects, as established by the United States Green Building Council, or an equivalent standard, including, but not limited to, a two-globe rating in the Green Globes USA design program, provided the design for such facility was initiated or completed prior to the adoption of the regulations described in subsection (b) of this section. For purposes of subdivisions (1) and (2) of this subsection, a state facility shall not include a salt shed, parking garage or any type of maintenance facility, provided such shed, garage or facility has incorporated best energy efficiency standards to the extent economically feasible.

Sec. 6. (*Effective from passage*) The Commissioner of Transportation shall conduct an analysis of the corrosive effects of chemical road treatments on (1) state snow and ice equipment vehicles, (2) state bridges, highways and other infrastructure, and (3) the environment.

*Substitute Senate Bill No. 235*

Such analysis shall determine the cost of corrosion created by chemical road treatments and shall include an evaluation of alternative road treatment techniques and products, including, but not limited to, the addition of rust inhibitors to current chemical road treatments, and a comparison of costs and effectiveness. Not later than October 1, 2014, the commissioner shall submit a progress report, in accordance with the provisions of section 11-4a of the general statutes, to the joint standing committee of the General Assembly having cognizance of matters relating to transportation. Not later than July 1, 2015, the commissioner shall submit a final report, in accordance with the provisions of section 11-4a of the general statutes, to the joint standing committee of the General Assembly having cognizance of matters relating to transportation. Such final report shall include the findings, conclusions and recommendations of such analysis.

Sec. 7. (*Effective from passage*) Notwithstanding the provisions of section 13b-268 of the general statutes or any other provision of the general statutes, special act or regulation that prohibits the construction of any new highway railroad crossing at grade, the Department of Transportation shall allow the city of East Hartford or its authority or agent to construct an at-grade crossing on the Connecticut Southern Railroad Line between McAuliffe Park and Columbus Circle. The project shall first be approved by the legislative body of the city of East Hartford and the Connecticut Southern Railroad Company and constructed in accordance with the department's recommendations.

Sec. 8. (*Effective from passage*) Notwithstanding the provisions of section 13b-268 of the general statutes or any other provision of the general statutes, special act or regulation that prohibits the construction of any new highway railroad crossing at grade, the Department of Transportation shall allow the city of Waterbury or its authority or agent to construct an at-grade crossing on the Torrington

*Substitute Senate Bill No. 235*

Branch between Thomaston Avenue (State Road 847) and Commons Court. The project shall first be approved by the legislative body of the city of Waterbury and the Naugatuck Railroad Company and constructed in accordance with the department's recommendations.

Sec. 9. Section 15-120mm of the 2014 supplement to the general statutes is amended by adding subsection (h) as follows (*Effective from passage*):

(NEW) (h) The executive director, as described in subsection (d) of section 15-120bb, as amended by this act, may, at the discretion of the authority and at the one-time irrevocable option of the executive director, be exempted from the provision of subsection (g) of this section for the purposes of retirement under chapter 66 or group welfare benefits under sections 5-257 and 5-259. If the executive director elects either or both such options, as approved by the authority, the executive director's participation in the retirement or group benefits plan, as applicable, shall be suspended during the period of such election while the executive director is an employee of the authority. The authority may develop and implement retirement plans and group welfare benefits for the executive director. Such plans shall not be subject to supervision, oversight or approval by the State Employees Retirement Commission under chapter 66 or the Comptroller, Attorney General or Insurance Commissioner under chapter 67, provided any such retirement plan shall be considered a Connecticut retirement plan for purposes of subsection (d) of section 5-160. The authority shall pay all costs, fees, contributions and other expenses incurred as a result of any such retirement plan or group welfare benefit.

Sec. 10. Section 20-340 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

The provisions of this chapter shall not apply to: (1) Persons

employed by any federal, state or municipal agency; (2) employees of any public service company regulated by the Public Utilities Regulatory Authority or of any corporate affiliate of any such company when the work performed by such affiliate is on behalf of a public service company, but in either case only if the work performed is in connection with the rendition of public utility service, including the installation or maintenance of wire for community antenna television service, or is in connection with the installation or maintenance of wire or telephone sets for single-line telephone service located inside the premises of a consumer; (3) employees of any municipal corporation specially chartered by this state; (4) employees of any contractor while such contractor is performing electrical-line or emergency work for any public service company; (5) persons engaged in the installation, maintenance, repair and service of electrical or other appliances of a size customarily used for domestic use where such installation commences at an outlet receptacle or connection previously installed by persons licensed to do the same and maintenance, repair and service is confined to the appliance itself and its internal operation; (6) employees of industrial firms whose main duties concern the maintenance of the electrical work, plumbing and piping work, solar thermal work, heating, piping, cooling work, sheet metal work, elevator installation, repair and maintenance work, automotive glass work or flat glass work of such firm on its own premises or on premises leased by it for its own use; (7) employees of industrial firms when such employees' main duties concern the fabrication of glass products or electrical, plumbing and piping, fire protection sprinkler systems, solar, heating, piping, cooling, chemical piping, sheet metal or elevator installation, repair and maintenance equipment used in the production of goods sold by industrial firms, except for products, electrical, plumbing and piping systems and repair and maintenance equipment used directly in the production of a product for human consumption; (8) persons performing work necessary to the manufacture or repair of any apparatus, appliances,

*Substitute Senate Bill No. 235*

fixtures, equipment or devices produced by it for sale or lease; (9) employees of stage and theatrical companies performing the operation, installation and maintenance of electrical equipment if such installation commences at an outlet receptacle or connection previously installed by persons licensed to make such installation; (10) employees of carnivals, circuses or similar transient amusement shows who install electrical work, provided such installation shall be subject to the approval of the State Fire Marshal prior to use as otherwise provided by law and shall comply with applicable municipal ordinances and regulations; (11) persons engaged in the installation, maintenance, repair and service of glass or electrical, plumbing, fire protection sprinkler systems, solar, heating, piping, cooling and sheet metal equipment in and about single-family residences owned and occupied or to be occupied by such persons; provided any such installation, maintenance and repair shall be subject to inspection and approval by the building official of the municipality in which such residence is located and shall conform to the requirements of the State Building Code; (12) persons who install, maintain or repair glass in a motor vehicle owned or leased by such persons; (13) persons or entities holding themselves out to be retail sellers of glass products, but not such persons or entities that also engage in automotive glass work or flat glass work; (14) persons who install preglazed or preassembled windows or doors in residential or commercial buildings; (15) persons registered under chapter 400 who install safety-backed mirror products or repair or replace flat glass in sizes not greater than thirty square feet in residential buildings; (16) sheet metal work performed in residential buildings consisting of six units or less by new home construction contractors registered pursuant to chapter 399a, by home improvement contractors registered pursuant to chapter 400 or by persons licensed pursuant to this chapter, when such work is limited to exhaust systems installed for hoods and fans in kitchens and baths, clothes dryer exhaust systems, radon vent systems, fireplaces, fireplace flues, masonry chimneys or prefabricated metal chimneys rated by

*Substitute Senate Bill No. 235*

Underwriters Laboratories or installation of stand-alone appliances including wood, pellet or other stand-alone stoves that are installed in residential buildings by such contractors or persons; (17) employees of or any contractor employed by and under the direction of a properly licensed solar contractor, performing work limited to the hoisting, placement and anchoring of solar collectors, photovoltaic panels, towers or turbines; [and] (18) persons performing swimming pool maintenance and repair work authorized pursuant to section 20-417aa; and (19) any employee of the Connecticut Airport Authority covered by a state collective bargaining agreement.

Sec. 11. Section 15-120bb of the 2014 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) There is hereby established and created a body politic and corporate, constituting a public instrumentality and political subdivision of the state of Connecticut established and created for the performance of an essential public and governmental function, to be known as the Connecticut Airport Authority. The authority shall not be construed to be a department, institution or agency of the state.

(b) The powers of the authority shall be vested in and exercised by a board of directors, which shall consist of eleven members, appointed as follows: (1) (A) The Treasurer or the Treasurer's designee, (B) the Commissioner of Transportation or the commissioner's designee, and (C) the Commissioner of Economic and Community Development or the commissioner's designee, each serving ex officio; (2) one appointed by the speaker of the House of Representatives for a term of four years; (3) one appointed by the minority leader of the House of Representatives for a term of four years; (4) one appointed by the president pro tempore of the Senate for a term of four years; and (5) one appointed by the minority leader of the Senate for a term of four years. Thereafter, such members of the General Assembly shall

*Substitute Senate Bill No. 235*

appoint members of the board to succeed such appointees whose terms expire and each member so appointed shall hold office for a period of four years from the first day of July in the year of his or her appointment. The Governor shall appoint four members to the board as follows: (A) Two members for two years; and (B) two members for four years. Thereafter, the Governor shall appoint members of the board to succeed such appointees whose terms expire and each member so appointed shall hold office for a period of four years from July first in the year of his or her appointment. Appointed directors shall have business and management experience and shall include individuals who have experience and expertise in one or more of the following areas: (i) Financial planning, (ii) budgeting and assessment, (iii) marketing, (iv) master planning, (v) aviation, and (vi) transportation management.

(c) Appointed directors may not designate a representative to perform in their absence their respective duties under this section. Any appointed director who fails to attend three consecutive meetings of the board or who fails to attend fifty per cent of all meetings of the board held during any calendar year shall be deemed to have resigned from the board. Any vacancy occurring other than by expiration of term shall be filled in the same manner as the original appointment for the balance of the unexpired term.

(d) The board of directors of the authority shall appoint an executive director who shall not be a member of the board and who shall serve at the pleasure of the board and receive such compensation as shall be fixed by the board. The executive director shall be the chief administrative officer of the authority and shall direct and supervise administrative affairs and technical activities in accordance with the directives of the board. The executive director shall approve all accounts for salaries, allowable expenses of the authority or of any employee or consultant thereof, and expenses incidental to the

*Substitute Senate Bill No. 235*

operation of the authority. The executive director shall perform such other duties as may be directed by the board in carrying out the purposes of subdivision (12) of section 1-79, sections 1-120, 1-124 and 1-125, subsection (f) of section 4b-3, sections 13b-4 and 13b-42, subsection (a) of section 13b-44 and sections 15-101aa and 15-120aa to 15-120oo, inclusive. The executive director shall be exempt from the classified service. The executive director shall attend all meetings of the board, keep a record of the proceedings of the authority and shall maintain and be custodian of all books, documents and papers filed with the authority and of the minute book or journal of the authority and of its official seal. The executive director may cause copies to be made of all minutes and other records and documents of the authority and may give certificates under the official seal of the authority to the effect that such copies are true copies, and all persons dealing with the authority may rely upon such certificates.

(e) Each director shall be entitled to reimbursement for such director's actual and necessary expenses incurred during the performance of such director's official duties.

(f) Directors may engage in private employment, or in a profession or business, subject to any applicable laws, rules and regulations of the state or federal government regarding official ethics or conflict of interest.

(g) Six directors of the authority shall constitute a quorum for the transaction of any business or the exercise of any power of the authority. For the transaction of any business or the exercise of any power of the authority, and except as otherwise provided in this section, the authority may act by a majority of the directors present at any meeting at which a quorum is in attendance.

(h) The board may delegate to six or more directors such board powers and duties as it may deem necessary and proper in conformity

*Substitute Senate Bill No. 235*

with the provisions of this section and its bylaws.

(i) The appointing authority for any director may remove such director for inefficiency, neglect of duty or misconduct in office after giving the director a copy of the charges against the director and an opportunity to be heard, in person or by counsel, in the director's defense, upon not less than ten days' notice. If any director shall be so removed, the appointing authority for such director shall file in the office of the Secretary of the State a complete statement of charges made against such director and the appointing authority's findings on such statement of charges, together with a complete record of the proceedings.

(j) The authority shall continue as long as it has bonds or other obligations outstanding and until its existence is terminated by law. Upon the termination of the existence of the authority, all its rights and properties shall pass to and be vested in the state of Connecticut.

(k) Notwithstanding any provision of the general statutes, it shall not constitute a conflict of interest for a trustee, director, partner or officer of any person, firm or corporation, or any individual having a financial interest in a person, firm or corporation, to serve as a director of the authority, provided such trustee, director, partner, officer or individual shall abstain from deliberation, action or vote by the authority in specific respect to such person, firm or corporation.

(l) The Governor shall appoint the chairperson of the board, who shall serve for a term of four years. The board shall elect from its members a vice chairperson and such other officers as it deems necessary. Vacancies among any officers shall be filled within thirty days following the occurrence of such vacancy in the same manner as the original selection. Said board shall establish bylaws to govern its procedures and shall appoint such committees and advisory boards as may be convenient or necessary in the transaction of its business.

*Substitute Senate Bill No. 235*

(m) The initial members of the board may begin service immediately upon appointment, but shall not serve past the sixth Wednesday of the next regular session of the General Assembly unless qualified in the manner provided in section 4-7. Thereafter, all appointments shall be made with the advice and consent of both houses of the General Assembly, in the manner provided in section 4-19.

(n) The executive director of the Connecticut Airport Authority shall establish an advisory committee to consult with on matters relating to Bradley International Airport and business related to said airport. The committee may consist of not more than six members, one of whom shall be appointed by the cochairpersons of the joint standing committee of the General Assembly having cognizance of matters relating to transportation, and one of whom shall be appointed by the ranking members of the joint standing committee of the General Assembly having cognizance of matters relating to transportation. The advisory committee shall consist of residents of and representatives of businesses located in the Bradley Airport development zone. Members of such advisory committee may attend public meetings of the Connecticut Airport Authority and monthly managers' meetings of the Connecticut Airport Authority.

Sec. 12. Subsection (e) of section 13a-123 of the 2014 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(e) The following types of signs, displays and devices may, with the approval of and subject to regulations adopted by the commissioner, be permitted within the six-hundred-sixty-foot area of interstate, primary and other limited access state highways, except as prohibited by state statute, local ordinance or zoning regulation: (1) Directional and other official signs or notices, which signs and notices shall include, but not be limited to, signs and notices pertaining to natural

*Substitute Senate Bill No. 235*

wonders and scenic and historical attractions which are required or authorized by law; (2) signs, displays and devices advertising the sale or lease of the property upon which they are located; (3) signs, displays and devices advertising activities conducted on the property on which they are located; **[**(4) directional and other official signs or notices pertaining to facilities in this state where Connecticut-made beer is manufactured or sold, including, but not limited to, signs or notices containing the words "Connecticut Brewery Trail"; (5)**]** (4) signs, displays or advertising devices which are in place for sixty days or less; and **[**(6)**]** (5) advertising signs, displays or devices (A) located or erected on real property or abutting real property within areas owned, leased or managed by a public authority for the purpose of (i) railway or rail infrastructure facilities, including, but not limited to, associated structures located within areas zoned solely or predominantly for the development of a railway or rail infrastructure facilities, (ii) bus rapid transit corridors, including, but not limited to, the Hartford-New Britain busway project authorized in section 13b-15a, and any shelter, structure or other facility associated with the operation of such bus rapid transit corridor, (iii) airport development zones designated in section 32-75d, or (iv) any other similar transit or freight purpose, or (B) upon or within buildings, structures or other venues in the custody or control of the state and designed, operated or intended to be operated for the purpose of presenting athletic, artistic, musical or other entertainment events. Subject to regulations adopted by the commissioner and except as prohibited by state statute, local ordinance or zoning regulation signs, displays and devices may be erected and maintained within six hundred sixty feet of primary and other limited access state highways in areas which are zoned for industrial or commercial use under authority of law or located in unzoned commercial or industrial areas which areas shall be determined from actual land uses and defined by regulations of the commissioner. The regulations of the commissioner in regard to size, spacing and lighting shall apply to any segments of the interstate system which traverse

*Substitute Senate Bill No. 235*

commercial or industrial zones wherein the use of real property adjacent to the interstate system is subject to municipal regulation or control, or which traverse other areas where the land use, as of September 21, 1959, was clearly established under state law as industrial or commercial.

Sec. 13. Section 13a-124 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

No person, firm or corporation shall erect or maintain or cause to be erected or maintained, within three hundred feet of any state highway, any sign which has thereon any of the following words: "Stop", "caution", "danger", "dangerous", "warning" or "slow", or any other word or character or any device, floodlight or spotlight, signal or symbol intended to give or capable of giving warning or direction to or interfering with traffic, except with the approval or under the direction of the commissioner. No provision of this section shall be construed to prevent any officer of any municipality or any public utility company from erecting or maintaining any danger or warning sign required by statute or any sign designed for the protection of the public or to aid in the operation of any public utility. No such direction or danger sign shall bear the name of any article or product or the name or address of any person, firm or corporation or any advertisement, except that a directional sign may bear directions and other official notices pertaining to (1) farming that is part of the state's agricultural tourism; (2) facilities in this state where Connecticut-made beer is manufactured or sold, including, but not limited to, signs or notices containing the words "Connecticut Brewery Trail"; or (3) any farm in this state located within ten miles of a state-maintained limited access highway, except a parkway, where Connecticut-made wine is manufactured or sold, including, but not limited to, signs or notices containing the words "Connecticut Wine Trail". The commissioner may enter upon any property and remove any sign which does not conform to the

provisions of this section. Any person, any member of any firm or any corporation violating any provision of this section shall be fined not more than one hundred dollars for the first offense and not more than five hundred dollars for each subsequent offense.

Sec. 14. Section 13a-124b of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

The design and production of directional and other official signs or notices pertaining to facilities in this state where Connecticut-made beer is manufactured or sold, pursuant to **[**subsection (e) of section 13a-123**]** section 13a-124, as amended by this act, may be paid for by private persons or entities affiliated with Connecticut-made beer manufacturers or sellers.

Sec. 15. Subsection (f) of section 13a-26 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(f) The provisions of this part restricting the use and accommodation of motor vehicle traffic on parkways to noncommercial vehicles shall not apply to use of the Merritt and Wilbur Cross Parkways by (1) taxicabs, as defined in section 13b-95, (2) vanpool vehicles, as defined in section 14-1, or (3) service buses, service buses for students with special needs, or two-axle, four-wheeled type II, registered school buses with a gross vehicle weight rating of **[**nine thousand six hundred**]** ten thousand pounds or less, which are owned by or under contract to a public, private or religious school or public school district and which are engaged in the transportation of school children to and from school or school activities, provided (A) such service buses conform to the regulations establishing the maximum weight, length, height or width of vehicles permitted to use such parkways; **[**and**]** (B) such school buses are **[**no**]** not more than ninety-eight inches high, eighty-four inches wide and

*Substitute Senate Bill No. 235*

two hundred three inches long; and (C) such service buses for students with special needs are not more than one hundred twenty inches high, ninety inches wide and two hundred eighty-eight inches long. The Office of the State Traffic Administration shall adopt regulations in accordance with chapter 54 establishing the maximum allowable length and height for any vanpool vehicle using said Merritt and Wilbur Cross Parkways and, not later than July 1, 1984, publish in the Connecticut Law Journal a notice of intent to adopt proposed regulations, as defined in section 4-166, reducing the maximum weight, length, height or width of, or limiting the registration classes of, motor vehicles permitted to use such parkways, in order to fully carry out the prohibition on the operation of commercial motor vehicles on such parkways.

Sec. 16. Section 13b-102 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) (1) Each person, association, limited liability company or corporation owning or operating a motor vehicle in livery service shall be subject to the jurisdiction of the Department of Transportation, and the department may prescribe adequate service and reasonable rates and charges and prescribe and establish such reasonable regulations with respect to fares, service, operation and equipment as it deems necessary for the convenience, protection, safety and best interests of passengers and the public.

(2) Notwithstanding the provisions of subdivision (1) of this subsection with respect to reasonable rates and charges, each person, association, limited liability company or corporation operating a motor vehicle in livery service having a seating capacity of ten or more adults shall file a schedule of reasonable maximum rates and charges with the Department of Transportation. The provisions of subdivision (1) of this subsection with respect to rates and charges shall not apply to any person, association, limited liability company or corporation operating

*Substitute Senate Bill No. 235*

a motor vehicle engaged in the transportation of passengers for hire by virtue of a contract with, or a lower tier contract for, any federal, state or municipal agency.

(b) Each person, association, limited liability company or corporation operating a motor vehicle by virtue of authorization issued by the Federal Highway Administration for charter and special operation shall register such authorization for interstate operation with the Department of Transportation if such person, association, limited liability company or corporation maintains a domicile or principal office in the state. Each person operating a motor vehicle by virtue of authorization issued by the Federal Highway Administration for charter and special operation shall, prior to such registration, submit to a state and national criminal history records check, conducted in accordance with section 29-17a, and provide the results of such records check to the Department of Transportation.

Sec. 17. Section 13b-329 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) Each engine used upon a railroad shall be supplied with an audible signal of sufficient amplification for existing circumstances, which audible signal shall be so attached to such engine as to be conveniently accessible to the engineer and in good order for use. [Each] Except where a wayside horn has been installed pursuant to subsection (b) of this section, each person controlling the motions of an engine on a railroad shall commence sounding the audible signal when such engine is approaching and is within eighty rods of the place where such railroad crosses any highway at grade and shall keep such audible signal occasionally sounding until such engine has crossed such highway, provided when it appears to the Commissioner of Transportation upon the written complaint of an elected official of any town, city or borough wherein such crossing at grade is located that public safety requires the commencing of the sounding of the audible

signal at a distance greater or lesser than eighty rods from such crossing at grade, the Commissioner of Transportation shall make such order in relation thereto as he deems advisable, provided in no event shall said Commissioner of Transportation order the sounding of any audible signal to commence at a distance of less than twenty-seven rods from any crossing at grade. The company in whose service such person may be shall pay all damages which may accrue to any person in consequence of any omission to comply with any provision of this subsection; and no railroad company shall knowingly employ an engineer who has been twice convicted of violating any provision of this subsection.

(b) A wayside horn may be used in lieu of a horn attached to an engine at any highway-rail grade crossing equipped with an active warning system consisting of, at a minimum, flashing lights and gates. Such wayside horn shall (1) conform to the federal requirements for wayside horn use, and (2) sound at a minimum of twenty-nine seconds prior to the train's arrival at the crossing, while the lead locomotive is traveling across the crossing and occasionally thereafter until such engine has crossed such highway. Any entity installing a wayside horn shall comply with the federal requirements for written notice set forth in 49 CFR 222. For the purposes of this section, "wayside horn" has the same meaning as provided in 49 CFR 222.9, as amended from time to time.

[(b)] (c) The Commissioner of Transportation, with the advice of the Commissioner of Energy and Environmental Protection, may establish by regulation the maximum decibel levels which may be emitted by any audible signal attached to a train engine, provided such maximum decibel level shall not be less than eighty-seven decibels.

[(c)] (d) Any railroad company operating any train engine which is equipped with an audible signal which produces noise emissions in excess of the maximum decibel levels allowed for such devices as

*Substitute Senate Bill No. 235*

established by said Commissioner of Transportation is in violation of this section.

Sec. 18. (*Effective from passage*) Not later than January 1, 2015, the Department of Transportation shall, within available appropriations, submit a report, in connection with the state-certified industrial reinvestment project authorized pursuant to public act 14-2 and in accordance with the provisions of section 11-4a of the general statutes, to the joint standing committee of the General Assembly having cognizance of matters relating to transportation. Such report shall include a study of the challenges to access and egress in and around the stadium facility site, as defined in section 32-651 of the general statutes, recommendations for solutions to such challenges and an estimate of the cost of such solutions.

Sec. 19. (*Effective upon passage*) The Commissioner of Transportation, in consultation with the Commissioner of Motor Vehicles and the Commissioner of Consumer Protection, shall, within available appropriations, conduct a study of the regulation of for-hire transportation services in this state. The study shall be conducted with input from the taxicab, the motor vehicle in livery service and the for-hire transportation services industries regarding the current regulatory scheme. The study shall (1) review how emerging technologies, such as smartphone applications, currently fit into the regulatory scheme, and (2) offer recommendations as to how and if such technologies and the businesses offering them should be regulated to ensure the safety of the riding public. Such recommendations shall include, but need not be limited to, mandatory insurance coverage, licensing and background checks on drivers and vehicle safety and maintenance. Not later than February 1, 2015, the Commissioner of Transportation shall submit, in accordance with the provisions of section 11-4a of the general statutes, a report to the joint standing committee of the General Assembly having cognizance of matters relating to transportation.

*Substitute Senate Bill No. 235*

Such report shall include the findings, conclusions and recommendations from such study.

Sec. 20. (*Effective from passage*) The southern section of Saybrook Road in Middletown, between Randolph Road and Aircraft Road/Route 9 ramps, shall be classified as an urban minor arterial by the Department of Transportation in their functional roadway classification listing.

Approved June 12, 2014

apply to companies like Uber, will materially aid the Court in resolving this dispute.  The Court should dismiss or stay this case under the doctrine of primary jurisdiction.

## CONCLUSION

For the foregoing reasons, Uber respectfully requests that the Court dismiss the Amended Complaint with prejudice.  Or in the alternative, Uber requests that the Court stay this case pending the outcome of the CDOT's study.

DEFENDANT
UBER TECHNOLOGIES, INC.

/s/ Kevin M. Smith
Kevin M. Smith (ct24774)
Melissa Fernandez (ct29519)
Wiggin and Dana, LLP
One Century Tower
265 Church Street
New Haven, Connecticut  06510
Phone: (203) 498-4400
Fax: (203) 782-2889
ksmith@wiggin.com
mfernandez@wiggin.com

Stephen A. Swedlow (*pro hac vice*)
Amit B. Patel (*pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Tel: (312) 705-7400
Fax: (312) 705-7401
stephenswedlow@quinnemanuel.com
amitbpatel@quinnemanuel.com

Arthur M. Roberts (*pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
50 California St., 22nd Floor
San Francisco, California  94111
Tel: (415) 875-6600
Fax: (415) 875-6700
arthurroberts@quinnemanuel.com