# **Appendix 2**

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)

2014 WL 1338144

2014 WL 1338144
Only the Westlaw citation is currently available.
United States District Court,
D. Massachusetts.

BOSTON CAB DISPATCH, INC., and EJT Management, Inc., Plaintiffs,

v.

UBER TECHNOLOGIES, INC., Defendant.

Civil Action No. 13–10769–NMG.   |   Signed Feb. 28, 2014.

**Attorneys and Law Firms**

Samuel Perkins, Michael Stefanilo, Jr., Richard E. Brody, Brody, Hardoon, Perkins & Kesten LLP, Boston, MA, for Plaintiffs.

Patrick A. Fitch, Quinn Emanuel Urquhart & Sullivan, LLP, Washington, DC, Stephen A. Swedlow, Quinn Emanuel Urquhart & Sullivan, LLP, Chicago, IL, Michael Mankes, Littler Mendelson P.C., Boston, MA, for Defendant.


**REPORT AND RECOMMENDATION RE: DEFENDANT'S MOTION TO DISMISS (DOCKET ENTRY # 5)**

BOWLER, United States Magistrate Judge.

 **\*1**  Pending before this court is a motion to dismiss filed by defendant Uber Technologies, Inc. ("Uber"). (Docket Entry # 5). Plaintiffs Boston Cab Dispatch, Inc. ("Boston Cab") and EJT Management, Inc. ("EJT") (collectively "plaintiffs") oppose the motion. The complaint alleges that Uber unfairly competes and unlawfully functions as a taxicab service in violation of Boston taxicab rules, two Massachusetts statutes and an ordinance of the City of Boston. After conducting a hearing, this court took the motion (Docket Entry # 5) under advisement.

The complaint raises the following causes of action: (1) violation of section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a) (1)(B) ("section 43(a)(1)(B)") (Count I); (2) violation of section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1) (A) ("section 43(a)(1)(A)") (Count II); (3) violation of Massachusetts General Laws chapter 93A ("chapter 93A"), section 11, based on Uber's unfair and deceptive acts and practices (Count III); (4) violation of chapter 93A, section 11, based on Uber's unfair competition (Count IV); (5) unfair competition under Massachusetts common law (Count V); (6) interference with contractual relationships (Count VI); (7) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a) (Count VII); (8) violation of RICO, 18 U.S.C. § 1962(b) (Count VIII); and (9) violation of RICO, 18 U.S.C. § 1962(c). (Docket Entry # 1–1).


*STANDARD OF REVIEW*

The motion seeks dismissal under Fed.R.Civ.P. 12(b)(1) ("Rule 12(b)(1)") and Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)"). (Docket Entry # 5). Neither the supporting memorandum nor the reply brief cite Rule 12(b)(1) or discuss a dismissal for lack of subject matter jurisdiction. All of the captions to each section in the supporting brief seek dismissal for failure to state a claim, i.e., Rule 12(b)(6). (Docket Entry # 6). Likewise, the supporting brief sets out the standard of review only for a Rule 12(b)(6) motion. At best, the chapter 93A argument relies and quotes a case, *Katz v. Pershing, LLC,* 806 F.Supp.2d 452 (D.Mass.2011), *aff'd,* 672 F.3d 64 (1st Cir.2012), which includes a Rule 12(b)(1) constitutional standing challenge as well as a Rule 12(b)(6) statutory standing challenge to a chapter 93A claim. [1] The court in *Katz* dismissed the entire action on the basis of lack of constitutional standing under Rule 12(b)(1) and also dismissed the chapter 93A count under Rule 12(b)(6) because Katz lacked statutory

**Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)**
2014 WL 1338144

standing. *Id.* at 458 & 461.Uber seeks to dismiss the chapter 93A claim due to a lack of a private right of action in a Boston taxicab rule and enabling statutes, i.e., a Rule 12(b)(6) challenge. Disconnected from any facts and legal argument, the Rule 12(b)(1) "argument" is waived. *See O'Connell v. Marrero–Recio,* 724 F.3d 117, 124 (1st Cir.2013); *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 260 (1st Cir.1999); *see also U.S. v. Caparotta,* 676 F.3d 213, 218 (1st Cir.2012).

1       *See* footnote 37.

**\*2**  In conducting a Rule 12(b)(6) analysis, a court "accept[s] as true all well pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiffs."*Gargano v. Liberty International Underwriters, Inc.,* 572 F.3d 45, 48 (1st Cir.2009)."To survive a motion to dismiss, the complaint must allege 'a plausible entitlement to relief.' " *Fitzgerald v. Harris,* 549 F.3d 46, 52 (1st Cir.2008). While "detailed factual allegations" are not required, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement for relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic v. Twombly,* 550 U.S. 554, 555 (2007); *Maldonado v. Fontanes,* 563 F.3d 263, 266 (1st Cir.2009); *Thomas v. Rhode Island,* 542 F.3d 944, 948 (1st Cir.2008). Additionally, "a well-pleaded complaint may succeed even if ... actual proof of those facts is improbable." *Bell Atlantic v. Twombly,* 550 U.S. at 556.

In evaluating a Rule 12(b)(6) motion, a court may consider inter alia " 'documents central to the plaintiffs' claim,' " and " 'documents sufficiently referred to in the complaint.' " *Curran v. Cousins,* 509 F.3d 36, 44 (1st Cir.2007); *see also Trans–Spec Truck Service, Inc. v. Caterpillar Inc.,* 524 F.3d 315, 321 (1st Cir.2008); *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993). The complaint refers to and quotes Boston Police Department Rule 403 Hackney Carriage Rules and Flat Rate Handbook ("Rule 403"). It also refers to and quotes a portion of the terms and conditions that Uber requires each "customer to execute" when registering as a user of Uber. (Docket Entry # 1–1, ¶ 28). In addition, the complaint refers to taxicab leases between EJT and taxicab drivers. (Docket Entry # 1–1, ¶¶ 3 & 77). Uber attaches Rule 403, the terms and conditions and the sign up screen for the terms and conditions as exhibits to the motion. (Docket Entry6–1, 6–2 & 6–3). Plaintiffs attach a copy of a form lease to their memorandum. (Docket Entry # 14–1). These documents, all central to the claims and sufficiently referred to in the complaint, are therefore part of the Rule 12(b)(6) record.

Uber also moves to dismiss the RICO counts for failure to satisfy the heightened pleading standard of Fed.R.Civ.P. 9(b) ("Rule 9(b)").Rule 9(b) dictates that, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."Fed.R.Civ .P. 9(b).

## *FACTUAL BACKGROUND* [2]

2       Citations to the record are provided only for direct quotations. The majority of the facts are taken directly from the complaint.

Boston Cab is an approved taxicab dispatch service referred to as a "radio association" under Rule 403. (Docket Entry # 1–1, ¶ 2). Boston Cab's members consist of owners of Boston licenses, defined as "medallions" under Rule 403, who operate taxicabs, defined as "hackney carriages" under Rule 403. Boston Cab provides dispatch services to taxicab drivers. Uber connects and introduces individuals seeking transportation for hire with drivers who sign up with Uber and operate Uber affiliated vehicles.

## I. *Boston Taxicab Regulations and Oversight* [3]

3       Because a proper understanding of the facts entails an understanding of the statutory and regulatory framework, it is summarized here as well as addressed in the discussion section.

**\*3**  By statute, the Massachusetts "Legislature empowered the [Police] Commissioner [of the City of Boston] to regulate the taxi business in Boston and to fix rates of fare."*Town Taxi Inc. v. Police Commissioner of Boston,* 377 Mass. 576, 387 N.E.2d 129, 131 (Mass.1979) (citing Mass. Gen. L. ch. 392, §§ 1, 3 (1930), as amended by Mass. Gen. L. ch. 280 (1934), and Mass. Gen. L.

ch. 386 (1963)). [4] Chapter 392 "authorizes the [Police Commissioner of the City of Boston] to regulate the taxi business in Boston in part by issuing hackney licenses, or medallions, authorizing the holder to operate a cab within the city." *Boston Neighborhood Taxi Association v. Department of Public Utilities,* 410 Mass. 686, 575 N.E.2d 52, 53–54 (Mass.1991); *Town Taxi Inc. v. Police Commissioner of Boston,* 387 N.E.2d at 134;*see Lynch v. Police commissioner of Boston,* 43 Mass.App.Ct. 107, 681 N.E.2d 307, 308 & 310 (Mass.App.Ct.1997) (describing chapter 392 as "the enabling act" with respect to granting annual licenses to "suitable persons" to operate taxicabs in Boston). In exercising the duties under the statute, the Police Commissioner of the City of Boston ("the Commissioner") issues licenses known as "taxicab 'medallions' " that "entitle[ ] the holder[s] thereof to operate a taxicab within the city." *Town Taxi Inc. v. Police Commissioner of Boston,* 387 N.E.2d at 131;*see Teixeira v. Cab Three, Inc.,* 1994 WL 413034, at *1 (Mass.App.Div. July 29, 1994) ("the common term 'medallion' " refers "to what is officially a 'hackney carriage license' issued by the Police Commissioner of the City of Boston pursuant to Chapter 386 of the Acts of 1963").

[4]    The cited statutes, Massachusetts General Laws chapter 392 (1930) ("chapter 392") and Massachusetts General Laws chapter 386 (1963) ("chapter 386"), are set out in Appendix I to Rule 403, which Uber filed as an exhibit to the motion. (Docket Entry # 6–3). Neither Uber nor plaintiffs maintain that the statutes, as set out in the appendix, are not current for present purposes or do not apply to the case at bar.

Chapter 392, section one, endows the Commissioner with "exclusive authority to make rules and orders for the regulation for hackney carriages and hackney stands" in the City of Boston "with penalties for the violation thereof not exceeding twenty dollars...." (Docket Entry # 6–3). Section two defines a "hackney carriage" as a "vehicle used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston."(Docket Entry # 6–3). Section three provides that:

> no person shall drive *or have charge of a hackney carriage,* nor shall any person, firm or corporation set up and use a hackney carriage, unless licensed thereto by the Police Commissioner of the City of Boston; nor shall any person having the care or ordering of such a vehicle in said city suffer or allow any other person other than a driver so licensed to drive such a vehicle.

(Docket Entry # 6–3) (emphasis added).

Chapter 386, enacted in 1963, likewise proscribes any person who drives or *has charge* of a taxicab from soliciting the carriage of any passenger for hire unless the driver "is licensed as a hackney carriage driver and" the vehicle "is licensed as a hackney carriage" by the Commissioner. Chapter 386 limits "the right of persons not holding a Boston medallion to solicit passengers within the city."*Town Taxi Inc. v. Police Commissioner of Boston,* 387 N.E.2d at 131. The statute set a maximum fine per violation of the statute of $50.00.

*4 The Boston City Council adopted an ordinance with similar provisions. It prohibits any person or firm from "having charge of a taxicab or other private vehicle" from offering the vehicle for hire for transportation unless the driver "is licensed as a hackney carriage driver" and the "vehicle is licensed as a hackney carriage by" the Commissioner. (Docket Entry # 6–3). The ordinance, section 16–15.05 of the City of Boston Municipal Code ("ordinance 16–15.05"), reads as follows:

16–15.05 Vehicle for Hire Ordinance.

In the City of Boston, no person, firm, or corporation driving or having charge of a taxicab or other private vehicle shall offer the vehicle for hire for the purpose of transporting, soliciting and/or picking up a passenger or passengers unless said person is licensed as a hackney driver and said vehicle is licensed as a hackney carriage by the Police Commissioner.

(Docket Entry # 6–3). [5] "Anyone found in violation" of ordinance 16–15.05 "shall be punished by fine of not more than five hundred ($500.00) dollars for each violation."(Docket Entry # 6–3).

**Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)**

2014 WL 1338144

5    "Local regulations," such as ordinances, "are presumed valid, unless they exceed the authority conferred by the enabling statute or the Home Rule Amendment (art. 89 of the Amendments to the Massachusetts Constitution)."*Springfield Preservation Trust, Inc. v. Springfield Library and Museums Association, Inc.*, 447 Mass. 408, 852 N.E.2d 83, 92 (Mass.2006) (examining validity of ordinance).

Where, as here, a statute grants authority to an administrative officer, such as the Commissioner, that grant includes "not only those powers expressly conferred by statute, but also those reasonably necessary to carry out its mission."*Boston Neighborhood Taxi Association v. Department of Public Utilities*, 410 Mass. 686, 575 N.E.2d 52, 56 (Mass.1991). Thus, absent a "statutory limitation," the Commissioner has the "authority to employ all ordinary means reasonably necessary for the full exercise of the power and for the faithful performance of the duty."*Town Taxi Inc. v. Police Commissioner of Boston,* 377 Mass. 576, 387 N.E.2d 129, 135 (Mass.1979).

Here, section three of chapter 392 authorizes the Commissioner to issue licenses to all hackney carriage drivers. The statute also proscribes anyone from being in charge of a hackney carriage, i.e., a vehicle for hire, and allowing any person other than a licensed hackney carriage driver to operate the vehicle. Hence, the statute expressly grants the authority to license hackney carriage drivers to the Commissioner. *See generally Lynch v. Police Commissioner of Boston,* 43 Mass.App.Ct. 107, 681 N.E.2d 307, 308–309 (Mass.App.Ct.1997) (parties agreed "that no one but the commissioner has the authority to issue licenses to particular individuals to engage in the taxi business in the city of Boston" and, as plaintiff "recognizes, 'the Commissioner has discretion to determine who is a qualified person to hold a taxi medallion' ") (internal ellipses omitted). The statutory grant of authority in chapter 392 therefore necessarily implies the authority to license dispatch services and it includes the reasonably necessary authority to determine what entity or person qualifies as an approved radio association. [6] *See id.*

6    At all times, however, the Commissioner must operate within the limits imposed by the enabling statue. *See Town Taxi Inc. v. Police Commissioner of Boston,* 387 N.E.2d at 132–133 ("[u]nless, however, the Commissioner exceeded the authority " 'from time to time (to) fix maximum and minimum rates' delegated to him ..., there can be no objection that he has usurped legislative power"); *Cambridge Taxi Co. v. City Manager of Cambridge,* 322 Mass. 108, 76 N.E.2d 135, 136 (Mass.1947) ("[t]here is nothing in the statute ... limiting the power of the city or town to the fixing of maximum rates" of taxicab fares" thereby allowing city "to enact the ordinance fixing the single rate" for all taxicab operators). He must also exercise his authority and discretion "to effectuate the purposes of the statute."*Lynch v. Police Commissioner of Boston,* 681 N.E.2d at 310.

Citing chapters 392 and 386, the Commissioner issued Rule 403. (Docket Entry # 6–3, App. I). The rule, effective August 29, 2008, states that it "is intended to be a comprehensive and definitive listing of all regulations affecting the Hackney Carriage industry in the City of Boston."(Docket Entry # 6–3). The rule regulates new applicants for a hackney carriage driver's license or medallion (Docket Entry # 6–3, § 2), existing medallion owners seeking to renew or transfer their hackney carriage driver's licenses (Docket Entry # 6–3, §§ 2 & 4), the conduct of existing medallion owners or licensed hackney carriage drivers (Docket Entry # 6–3, §§ 4 & 5), the requirements to register and maintain a vehicle as a hackney carriage (Docket Entry # 6–3, § 3) and the standards applicable to *approved* radio associations (Docket Entry # 6–3, § 7).

**\*5** Rule 403 defines a "hackney carriage" in the same manner as section two of chapter 392. It requires any person seeking a hackney driver's license, i.e., a medallion, to complete an application and satisfy certain requirements. Under the rule, the applicant must be at least 21 years old, not have any convictions for operating a motor vehicle under the influence of drugs or alcohol ("OUI") in the past five years, have no outstanding driving infractions, "not have been adjudicated a[n] Habitual Traffic Offender," [7] not have more than four at fault accidents in the last three years, not have any drug convictions in the last five years and not be required to register as a sexually dangerous person ("SDP"). (Docket Entry1–1 & 6–3). The applicant must also have a valid Massachusetts driver's license. If the applicant satisfies all these requirements and is deemed suitable, the Commissioner or the Inspector of Carriages will issue the applicant a hackney carriage license. [8] The City of Boston issues a set number of medallions presently capped at 1,825.

7    *See*Mass. Gen. L. ch. 90, § 22F.

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)

2014 WL 1338144

<hr/>

8    The Commissioner designated an enforcement unit known as the Hackney Carriage Unit to enforce the regulations. The unit is "[a]lso known as the Office of the Inspector of Carriages."(Docket Entry # 6–3).

        An applicant may appeal a denial of a medallion to the Director of Licensing. The Director of Licensing then makes a recommendation on the appeal to the Commissioner. Subject to complying with the time limits in Rule 403, an aggrieved applicant may seek relief in a court of competent jurisdiction.

Rule 403 requires all medallion owners to maintain a properly equipped and functioning hackney carriage. As stated in the rule, a hackney carriage, "also known as a taxicab," must have a protective partition between the driver and the passengers, a taximeter that calculates the fare and the distance traveled, an approved credit card machine and a "two-way communication" system with "an approved dispatch service or radio association."(Docket Entry # 6–3, §§ 1(I)(b), 3(III)(c) & 4(II)(q)). Under Rule 403, the Commissioner sets maximum allowable meter rates as well as flat rates from Boston to certain suburbs. Vehicles are subject to inspection by the Hackney Carriage Unit.

Under Rule 403, all licensed hackney drivers or medallion owners must be members of "an approved dispatch service or radio association."(Docket Entry # 6–3). Radio associations, such as Boston Cab, provide services "solely and exclusively for City of Boston Licensed Hackney Carriages."(Docket Entry # 6–3). Each approved radio association maintains specific colors and markings approved by the Inspector of Carriages. Medallion owners must paint their hackney carriages in the colors and markings of the radio association to which they belong.[9] Medallion owners pay a weekly membership fee to their radio association and must provide a discount to elderly riders.

9    The relevant provisions of Rule 403 require radio association members to display the "Radio Association's color scheme as approved by the Inspector of Carriages" on their hackney carriage. (Docket Entry # 6–3). The rule similarly requires that, "All taxis must be painted in approved Radio Association markings and colors" except for certain grand fathered vehicles in a 1998 agreement. (Docket Entry # 6–3). Rule 403 further states that, "All radio association colors, markings, designs, decal or logos must be approved by the Inspector of Carriages, as required by the Hackney Rules."(Docket Entry # 6–3).

In order to comply with Rule 403, each radio association, including Boston Cab, must install thousands of dollars of integrated equipment including "dispatching assignment equipment." (Docket Entry # 1–1, ¶ 51). Uber does not incur these costs.

Rule 403 prohibits all hackney carriage drivers from operating a hackney carriage while under the influence of alcohol or illegal drugs. The rule additionally proscribes the use of cellular telephones "for any purpose, including text messaging."(Docket Entry # 6–3). Drivers are "required to accept multiple forms of payment, including cash, credit cards, vouchers" and coupons from qualified elderly and handicapped passengers. (Docket Entry # 1–1, ¶ 33).

**\*6** The rule creates an administrative means for individuals to report violations of a vehicle against the medallion owner by filing a "Hackney Complaint" with the Inspector of Carriages. (Docket Entry # 6–3). A police officer who observes a vehicle operating as a hackney carriage in violation of the rule may cite the vehicle for a "Hackney Violation." Decisions by the Inspector of Carriages regarding vehicle violations are final. For other kinds of reported violations and complaints against a medallion owner or driver, Rule 403 has an appeal process culminating with a final appeal to an appeal board which makes a recommendation to the Commissioner. Subject to certain time periods, "Any person aggrieved" by the Commissioner's final decision may seek relief "in any court of competent jurisdiction."(Docket Entry # 6–3, § 8(IV)(d)(iv)(7)).

Rule 403 additionally contains an administrative process to resolve complaints against an existing medallion owner, a manager such as EJT, or a lessee. If the Inspector of Carriages sustains a complaint against the medallion owner, manager or lessee, he or the Commissioner may discipline the person, including suspending or revoking any medallion under his control. The rule does not set out an appeal process beyond the Commissioner's decision.

As to approved radio associations, also referred to as dispatch services, section 7(I)(d) of Rule 403 mandates certain minimum services. Each association must provide 24 hour dispatch capability, two way radio service, discount reimbursements for the elderly and record keeping for all dispatch services including the time and location of each dispatched taxicab. Radio

associations provide "services solely and exclusively for City of Boston Licensed Hackney Carriages."(Docket Entry # 6–3, § 7). Penalties for not complying with these standards "shall be cause for immediate removal of the Radio Association from the list of approved Radio Associations."(Docket Entry # 6–3, § 7). Under Rule 403, an approved radio association can appeal its removal from the list of approved associations to the Commissioner. The rule does not contain an appeal process beyond the Commissioner's decision. Presently, there are seven approved radio associations in Boston.

## II. *Uber*

Uber operates "by signing up" vehicles whose drivers provide transportation to paying customers. (Docket Entry # 1–1, ¶¶ 13 & 16). In order to obtain transportation, these paying customers must download and install a copy of Uber's "free smart phone application" ("the Uber app") onto their "single mobile device or computer." (Docket Entry # 6–1) (Docket Entry # 1–1, ¶ 13). These customers agree to Uber's terms and conditions by using the service "and downloading, installing or using" the Uber app. (Docket Entry # 6–1) (Docket Entry # 1–1, ¶ 13). Uber itself does not own the vehicles used to transport these customers and it does not own a radio association or medallions or employ drivers. [10]

[10]    Uber therefore argues that it is not using any Boston Cab "logo on a Partner's vehicle under the Lanham Act."(Docket Entry # 6). Similarly, because it does not own the vehicles, medallions or radio associations, it does not " 'have charge of a hackney carriage' " within the meaning of chapter 392, chapter 386 or ordinance 16–15.05, according to Uber. (Docket Entry # 19).

*7 Uber affiliated vehicles fall into three categories consisting of "Uber Black Cars, Uber SUVs and Uber Taxis."(Docket Entry # 1–1, ¶ 12). Uber also plans to introduce a fourth category of Uber affiliated vehicles known as "UberX" to the Boston market. (Docket Entry # 1–1, ¶¶ 12 & 55–57). Uber determines the fares or rates charged for each category of vehicle for each paying customer. For Uber Black Cars and Uber SUVs, "Uber's metering device" determines fares and charges "a flat rate plus additional charges per-mile or per-minute, depending on the car's speed." [11] (Docket Entry # 1–1, ¶¶ 20 & 35). When demand for Uber's services "becomes 'intense,' " Uber might also "use 'surge' pricing.' " (Docket Entry # 1–1, ¶ 41). For example, it increased prices by "625% early on New Year's Day 2012." (Docket Entry # 1–1, ¶ 41).

[11]    The complaint also describes the method as calculated by "[t]he Uber GPS system." (Docket Entry # 1–1, ¶ 47). The global positioning system ("GPS") "calculates fares with a 'rate meter,' and fares are 'charged based upon miles traveled." (Docket Entry # 1–1, ¶ 47) (brackets omitted). Approved radio associations use a GPS system that allows them as well as "the Boston police to track every taxi all the time."(Docket Entry # 1–1, ¶ 51).

The fare for Uber Taxis is calculated by Uber's computer system and begins "with the Taximeter or Flat rate" applicable to Boston hackney drivers. Uber then adds a $1.00 " 'fee' and a 20% 'gratuity .' " (Docket Entry # 1–1, ¶¶ 14 & 36). The final charge therefore exceeds the maximum rate applicable to taxicabs under Rule 403. On its website, Uber represents that, " 'With Uber TAXI we'll automatically add 20% gratuity for the driver, and you'll see it reflected on your receipt.' " (Docket Entry # 1–1, ¶¶ 20 & 37). Uber actually gives only half of the 20% gratuity to the driver. (Docket Entry # 1–1, ¶ 38).

All payments for Uber affiliated vehicles, including Uber Taxis, "are charged automatically to the customer's preauthorized credit card."(Docket Entry # 1–1, ¶ 33). Uber affiliated "drivers cannot accept cash, coupons or vouchers."(Docket Entry # 1–1, ¶ 33). A customer pays for the transportation service "through the customer's smart phone" with a charge to the preauthorized credit card registered with Uber. (Docket Entry # 1–1, ¶ 42).

Uber Taxis are comprised of "Boston taxi cab drivers" who are subject to Rule 403 and belong to a radio association. These taxi drivers partner with Uber and, while working a shift and subject to dispatch by their radio association, are available for hire through Uber. When connected to a paying customer by Uber's computer system, these taxicab drivers use "Uber's computerized dispatching system," which does not comply with section 7(I)(d) of Rule 403, and Uber's "credit card billing system." (Docket Entry # 1–1, ¶¶ 12, 14, 36 & 42).

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)
2014 WL 1338144

When an individual with an Uber app wants to summon an Uber affiliated vehicle, the customer opens the Uber app. Once opened, the app "displays a map of the user's location or designated pickup point, displays the available black cars, SUVs and taxis in the neighborhood," and informs the customer about the wait time for each category of vehicle. (Docket Entry # 1–1, ¶ 13). The three categories of vehicles vary in price range and passenger capacity. The customer then chooses the category of vehicle and Uber's "computer system then selects an Uberaffiliated car, displays the driver's name and photograph on the user's smart phone, and sends a text message to the user with the driver's projected arrival time and cell phone number."(Docket Entry # 1–1, ¶ 13). This "spur-of-the moment assignment" summons an Uber affiliated vehicle "just as quickly as a taxi."(Docket Entry # 1–1, ¶¶ 20 & 43).

*8  In contrast to Boston hackney carriages, Uber affiliated Black Cars and SUVs are not periodically inspected to ensure that the vehicle complies with the requirements for hackney carriages in Rule 403. The vehicles do not have partitions, a taximeter or the colors of an approved radio association. Contrary to the requirements imposed on hackney carriages, Uber Black Cars and SUVs are not enrolled in a radio association with a GPS that allows "the Boston police to track every taxi" and they lack "a panic button that automatically sends a signal to the dispatcher" in the event of an emergency. (Docket Entry # 1–1, ¶¶ 41(C) & 51) (Docket Entry # 6–3). Uber inspects its affiliated "vehicles and checks registration and insurance information when the [vehicle] owner first signs up" but it does not have a regular program to reinspect the vehicles' "condition, licensing or insurance." (Docket Entry # 1–1, ¶ 23).

Drivers of Uber Black Cars and Uber SUVs are not subject to criminal background checks and SDP registration checks required for drivers of hackney carriages in Boston. Drivers of Uber Black Cars and Uber SUVs are required to "have a conventional driver's license and insurance."(Docket Entry # 1–1, ¶ 25). Insurance premiums for drivers of Uber Black Cars and Uber SUVs are at times lower than insurance premiums applicable to taxicabs.

Drivers of Uber affiliated vehicles are subject to a five star rating system. All drivers of Uber affiliated vehicles begin with a five star rating and drop below this rating if a customer posts a negative review. Uber continues to use drivers with a rating below five stars.

Whereas Rule 403 prohibits a hackney carriage driver from using a cellular telephone, Uber requires all drivers of Uber affiliated vehicles to have a cellular telephone. Drivers of Uber affiliated vehicles must respond to an assignment generated by the Uber computer system "within a few seconds or lose the job" and they must use their cellular telephone to call the customer when their vehicle "is close to the pickup point."(Docket Entry # 1–1, ¶ 42).

By downloading and installing the Uber app, all users of Uber agree to abide by the company's terms and conditions. Although Uber's actions depict it as providing transportation services to paying customers, the terms and conditions state that, "The company does not provide transportation services, and the company is not a transportation carrier."(Docket Entry # 6–1) (capitalization omitted). The sign up screen also notes that, "Uber is a request tool not a transportation carrier."(Docket Entry # 6–2).

Elsewhere, the terms and conditions state that:

> "The company may introduce you to third party transportation providers for the purposes of providing transportation. We will not assess the suitability, legality, or ability of any third party transportation providers and you expressly waive and release the company from any and all liability, claims, or damages ... The company will not be a party to disputes, negotiations of disputes, between you and such third party providers ... The quality of the transportation services scheduled through the use of the service of application is entirely the responsibility of the third party provider who ultimately provides such transportation services to you...."

*9  (Docket Entry # 1–1, ¶ 28) (quoting terms and conditions with capitalization omitted).

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)

2014 WL 1338144

### III. *Boston Cab and EJT*

EJT contracts with medallion owners "to manage all aspects of the ownership, licensing and leasing" of the taxicabs that bear their medallions. (Docket Entry # 1–1, ¶¶ 3 & 77). In conjunction thereto, it enters into leases with medallion owners to lease taxis bearing their medallion. (Docket Entry # 1–1, ¶¶ 3 & 77).

Rule 403 dictates that managers such as EJT and medallion owners use the lease agreements or shift rental agreements ("lease agreements") issued by the Inspector of Carriages or the Commissioner. The form lease agreement between a lessor, such as EJT, and a lessee, such as a taxicab driver, requires the lessee to comply with the hackney carriage rules and the regulations of the Commissioner, i.e., Rule 403.

Boston Cab, an approved radio association, is the licensee of the trademarks and trade dress associated with its taxicab operations. Members of the Boston Cab radio association must paint their taxicabs with the " 'Boston Cab' logos and color schemes approved by the City of Boston."(Docket Entry # 1–1, ¶ 4).

Radio associations, including Boston Cab, enter into "agreements with one of three credit card processing companies certified by the Inspector of Carriages."(Docket Entry # 1–1, ¶ 52). Boston Cab has "an exclusive" contract with Creative Mobile Technologies, LLC ("CMT"). (Docket Entry # 1–1, ¶ 53). Under the contract, CMT purchases and installs "dispatching and fee processing equipment in exchange for the right to collect credit card processing fees."(Docket Entry # 1–1, ¶¶ 52–53). When a driver of an Uber Taxi who belongs to Boston Cab receives and accepts an Uber assignment, Uber charges the fare to the customer's Uber registered credit card. Uber thereby bypasses the credit card system installed by CMT in the taxicabs of medallion owners who belong to Boston Cab and deprives CMT of the credit card processing fees Boston Cab is required to give CMT under the contract.

### *DISCUSSION*

### I. *Lanham Act Claims*

Uber's arguments to dismiss counts I and II are twofold. First, Uber maintains that both counts do not state a claim for relief based on a failure to satisfy various elements of each claim. Second, it submits that a 1996 decision by the United States Court of Appeals for the District of Columbia ("the D.C. Circuit"), *Dial A Car, Inc. v. Transportation, Inc.,* 82 F.3d 484 (D.C.Cir.1996) (*"Dial A Car"* ), forecloses relief on both counts.

### A. *Section 43(a)(1)(B) (Count I)*

Uber moves to dismiss Count I on the basis that plaintiffs fail to identify a false advertisement or promotion and fail to identify any consumer deception. Plaintiffs do not address these arguments or identify the advertisements or promotion in their opposition nor did they raise the issue during the motion hearing. Uber also contends that plaintiffs fail to show any resulting competitive injury. Plaintiff addresses this argument in a limited manner.

**\*10** Accordingly, this court turns to the complaint to identify the advertisement or promotion that plaintiffs challenge. Count I, captioned "Misrepresentation of Services" in violation of 15 U.S.C. § 1125(a)(1)(B) (Docket Entry # 1–1) (capitalization omitted), alleges that:

> By representing to consumers in its commercial advertising and promotion that Uber-*assigned* taxis *are operating lawfully* in Boston, as stated above, Uber falsely describes facts and falsely represents facts, thereby misrepresenting the nature, characteristics and qualities of its services, in violation of 15 U.S.C. § 1125(a)(1)(B).

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)
2014 WL 1338144

(Docket Entry # 1–1, ¶ 60) (emphasis added). Count I therefore focuses on Uber assigned taxis. It is based on a purportedly false advertisement or promotion that "Uber-assigned taxis are operating lawfully." (Docket Entry # 1–1, ¶ 60).

The complaint articulates the manner in which Uber Taxis do not comply with Rule 403. Although the complaint additionally cites to chapters 392 and 386, these statutes simply require that all persons driving a hackney carriage have a license as a hackney carriage driver granted by the Commissioner. Chapter 386 requires that taxicabs be "licensed as a hackney carriage" [12] by the Commissioner and that any person who has charge of a hackney carriage not allow anyone other than a licensed hackney carriage driver to operate the vehicle. Ordinance 16–15.05 proscribes similar license requirements. Uber assigned taxis however are all driven by licensed hackney drivers. The complaint fails to state or allege that such taxis are not driven by licensed hackney drivers or that the vehicle is not licensed as a hackney carriage. The false advertising or promotion therefore reduces to false advertising or promotion that "Uber-assigned taxis are operating lawfully" in compliance with Rule 403. (Docket Entry # 1–1, ¶ 60).

[12]  Rule 403 explains that a decal is "affixed to locations on the taxi indicating the vehicle is an official Boston Licensed hackney carriage."(Docket Entry # 6–3, § 3).

Paragraph 42 in the complaint denotes a number of situations in which Uber assigned taxis are not complying with Rule 403. (Docket Entry # 1–1, ¶ 42). [13] First, Uber assigned taxi drivers charge fees in excess of "the maximum fare provisions of Rule 403."(Docket Entry # 1–1, ¶¶ 34–38 & 42(A)). Under Rule 403, a hackney carriage driver "may only charge the amount indicated by the meter" and the Commissioner "shall establish ... the rate for hire of a taxi."(Docket Entry # 6–3, § 5, ¶ II(e)) (Docket Entry # 6–3, § 10, ¶ II(b)). An appendix to Rule 403 lists the current maximum allowable rates. (Docket Entry # 6–3, § 10, ¶ II(b) & App. IV). Uber however adds a 20% gratuity and a $1.00 fee to the maximum allowable fares. (Docket Entry # 1–1, ¶¶ 34–37).

[13]  Paragraph 42 sets out "Uber's illegal transportation system" with respect to Uber Taxis. (Docket Entry # 1–1, ¶ 42). The bulk of the complaint targets the conduct of Uber Black Cars and Uber SUVs. The only allegation specific to Count I is the false representation that Uber Taxis are operating lawfully. (Docket Entry # 1–1, ¶ 60). To the extent the complaint sets out other false or misleading statements in Uber's commercial advertising or promotion, it was incumbent upon plaintiffs to identify them in response to Uber's argument. Plaintiffs only identify Uber's single option credit card payment system and the gratuity and $1.00 fee (Docket Entry # 1–1, ¶¶ 33 & 34–38) (Docket Entry # 14, p. 20) also noted in paragraph 42. Thus, insofar as the complaint identifies additional false or misleading statements in Uber's commercial advertisements or promotions beyond those in paragraphs 33, 34 to 38 and 42, the issue is waived as a basis for liability under section 43(a)(1)(B).*See O'Connell v. Marrero–Recio,* 724 F.3d at 124 (district court "had no reason to factor into its analysis of O'Connell's retaliation claim the allegations concerning her participation in the NPP's primary elections" because O'Connell's brief did not premise the claim on this allegation); *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d at 260 ("district court is free to disregard arguments that are not adequately developed"); *see also U.S. v. Caparotta,* 676 F.3d at 218 ("argument consist[ing] of just two sentences and two cursory citations in his brief ... is therefore waived").

Second, Uber assigned taxi drivers receive text messages on their cellular telephones with assignments and Uber's computer system requires drivers to accept and respond to the assignment "within a few seconds or lose the job."(Docket Entry # 1–1, ¶ 42(B)). Rule 403 states that, "A Hackney Carriage Driver may not use a cellular telephone for any purpose, including text messaging."(Docket Entry # 6–3, § 5, ¶ II(n)).

**\*11** Third, "Uber's assignment system permits a driver to discriminate for any ... unlawful reasons" such as disability, age, gender and race. (Docket Entry # 1–1, ¶ 42(C)). Rule 403 states that, "A Hackney Carriage Driver may not refuse any passenger on the basis of race, sex, religion, disability, sexual orientation [or] national origin."(Docket Entry # 6–3, § 5, ¶ II(p)).

Fourth, Uber assigned taxis provide only one option for payment which consists of charging the customer's credit card registered with Uber. (Docket Entry # 1–1, ¶¶ 33 & 42(D)). Rule 403 requires all hackney carriage drivers to accept qualified coupons from the elderly, handicapped "and cancer crusade taxicab passengers." [14] (Docket Entry # 6–3, § 9, ¶ II(b)).

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)

2014 WL 1338144

14     The rule also prevents a driver from refusing "to accept a credit card as payment."(Docket Entry # 6–3, § 5, ¶ II(bb)). The complaint adds that Boston taxicab drivers must also accept cash. (Docket Entry # 1–1, ¶¶ 33 & 59).

A false advertising or promotion claim under the Lanham Act requires the plaintiff to allege that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Ave.,* 284 F.3d 302, 310–311 (1st Cir.2002). Uber seeks dismissal for failure to allege facts to support the first, third and fifth requirements.

With respect to the first requirement, Uber argues that plaintiffs fail to show "a specifically-offending advertisement or promotion." (Docket Entry # 6). According to Uber, the complaint does not establish that Uber "made any false or deceptive advertisements."(Docket Entry # 6). Except for identifying Uber's required credit card payment system and the gratuity and $1.00 fee, plaintiffs do not address the argument. (Docket Entry # 14, p. 20).

A false advertising claim under the Lanham Act "prohibits misrepresentations only in 'commercial advertising or promotion.' " *Podiatrist Association Inc. v. La Cruz Azul De Puerto Rico, Inc.,* 332 F.3d 6, 19 (1st Cir.2003) (quoting section 43(a)(1)(B)) (emphasis added). " [I] dentifying a false or misleading statement that was made in" Uber's " 'commercial advertising or promotion' is a pleading requirement." *Id.* at 20 (citing 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:24 (2003)); *see also Avon Products, Inc. v. S.C. Johnson & Son, Inc.,* 984 F.Supp. 768, 796 (S.D.N.Y.1997) ("the law does not impute representations of government approval or supporting test data in the absence of explicit claims"). For example, in the context of an implied falsehood regarding Federal Drug Administration approval based on a package insert, the Fourth Circuit in *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130 (4th Cir.1993), explained that:

> *\*12* Mylan's claims that the defendants' falsely represented that their drugs had been "properly approved by the FDA" must fail. First, in its complaint, Mylan nowhere points to any statement or representation in the defendants' advertising which declared "proper FDA approval." Moreover, that fatal deficiency cannot be cured by contentions that the very act of placing a drug on the market, with standard package inserts often used for FDA-approved drugs, somehow implies (falsely) that the drug had been "properly approved by the FDA." Such a theory is, quite simply, too great a stretch under the Lanham Act.

*Id.* at 1139.

An advertisement may be literally false or impliedly false. *See Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave.,* 284 F.3d at 311. Liability under section 43(a)(1)(B) necessitates a showing "either that the defendant's advertisement is literally false or implicitly false-that is, the advertisement is true or ambiguous yet misleading."*Id.; see Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 153 (2nd Cir.2007) ("[t]wo different theories of recovery are available to a plaintiff who brings a false advertising action," one that an advertisement "is literally false" and the other that the advertisement is an " 'implied falsehood' " that is "likely to mislead consumers"). Literal falsity devolves into "two factual questions." *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,* 228 F.3d 24, 34 (1st Cir.2000). First, the "factfinder must determine the claim conveyed by the advertisement." *Id.* Second, "the factfinder must then evaluate whether that claim is false." Id. On a motion to dismiss, the issue is simply whether a rational factfinder could conclude that the advertisement or promotion is claiming that Uber assigned Taxis are operating lawfully either explicitly or by necessary implication. *See id.* at 35.A showing of consumer

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)
2014 WL 1338144

deception is not required where the advertisement or promotion is literally false.*Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave.,* 284 F.3d at 311 & 314–315.

The complaint does not identify a representation in which Uber states explicitly or conveys by necessary implication that "Uber assigned taxis are operating lawfully," as alleged in Count I. (Docket Entry # 1–1, ¶ 60); *see id.*("[a]lthough factfinders usually base literal falsity determinations upon the explicit claims made by an advertisement, they may also consider any claims the advertisement conveys by 'necessary implication' "). Likewise, the complaint does not point to a statement by Uber that Uber assigned taxis are "operating lawfully" by charging legal fares, using cellular telephones, not accepting coupons or accepting only the credit card registered with Uber as payment. Rather, the falsity, if any, is implicit because the Uber assigned taxis are violating Rule 403 due to the illegal gratuity, the illegal cellular telephone use, the failure to accept coupons and/or the ability to accept payment only in the form of the customer's Uber registered credit card. [15] *See, e.g., Ameritox, Ltd. v. Millennium Laboratories, Inc.,* 889 F.Supp.2d 1304, 1315 (M.D.Fla.2012) ("[b]ecause Ameritox has not alleged that these representations explicitly address legality, Ameritox must allege that these representations are false by implication"). Where a plaintiff presents an implied falsity claim, the plaintiff bears the underlying burden to show "that a substantial portion of the audience for that advertisement was actually misled,"*Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,* 228 F.3d at 33, unless the defendant "intentionally deceived the consuming public." *Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave.,* 284 F.3d at 311 n. 4. [16]

[15]    As discussed below, the gratuity representation also raises a literally false claim that Uber Taxi drivers approve the gratuity and that the drivers receive a 20% gratuity.

[16]    The complaint at issue in *Clorox* recited the results of a consumer survey which the lower court did not properly credit. *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,* 228 F.3d at 37 (reversing dismissal of section 43(a)(1)(B) claim).

**\*13** Except for the gratuity representation, the other three aforementioned "advertisements or promotions" all implicate Uber's assignment system or an Uber assigned taxi or taxi driver. In order "[t]o constitute advertising or promotion, commercial speech must at a bare minimum target a class or category of purchasers or potential purchasers, not merely particular individuals." [17] *Podiatrist Association Inc. v. La Cruz Azul De Puerto Rico, Inc.,* 332 F.3d at 19. An Uber assignment of an Uber Taxi targets only one person, the particular individual that opened the Uber app and chose the Uber Taxi category of vehicles. An Uber assigned taxicab driver's use of his cellular telephone target the single Uber client. As such, the speech does not constitute commercial advertising or promotion. *See id.*

[17]    In order to constitute "commercial advertising or promotion" under section 43(a)(1)(B):
         a representation must (a) constitute commercial speech (b) made with the intent of influencing potential customers to purchase the speaker's goods or services (c) by a speaker who is a competitor of the plaintiff in some line of trade or commerce and (d) disseminated to the consuming public in such a way as to constitute "advertising" or "promotion."
         *Podiatrist Association Inc. v. La Cruz Azul De Puerto Rico, Inc.,* 332 F.3d at 19.

In addition, as to the use of cellular telephones, the complaint does not denote an advertisement or promotion that Uber Taxi drivers legally or lawfully use cellular telephones. In fact, the complaint does not identify any advertisement or promotion regarding the use of cellular telephones by Uber Taxi drivers let alone a false advertisement or promotion stating or implying that Uber Taxi drivers use cellular telephones legally. Instead, the complaint simply states that Uber Taxi drivers must use cellular telephones and that Rule 403 prohibits such use by taxicab drivers. (Docket Entry # 1–1, ¶ 42(B)). The fact that Uber Taxi drivers "must use cell phones to receive and accept Uber assignments" or that the Uber Taxi drivers must telephone the customer when the Uber Taxi nears the pickup point (Docket Entry # 1–1, ¶ 42) is not an advertisement or promotion. There is no literal or implicitly false representation to the viewer that the Uber assigned taxi driver's use of the cellular telephone is lawful. Use of the cellular telephone as a basis for the section 43(a)(1)(B) claim therefore fails. *See Mylan Laboratories, Inc. v. Matkari,* 7 F.3d at 1139.

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)

2014 WL 1338144

Further, to survive a motion to dismiss a section 43(a)(1)(B) false advertising claim even under the more permissive standard applicable prior to *Twombly,* 550 U.S. at 555, "a plaintiff at the very least must identify some medium or means through which the defendant disseminated information to a particular class of consumers." *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.,* 332 F.3d at 20. Here again, the only means alleged is the use of the cellular telephone by the actual driver to the Uber customer, i.e., a particular individual as opposed to a targeted class or category of purchasers. *See id.* at 19.

The aforementioned discrimination "advertisement or promotion" similarly fails to support a section 43(a)(1)(B) claim for the same reasons. The complaint alleges that "Uber's assignment system permits a driver to discriminate for any ... unlawful reasons" such as disability, age, gender and race. (Docket Entry # 1–1, ¶ 42(C)). The complaint fails to identify a purportedly false representation that Uber is operating lawfully by not discriminating. *See Mylan Laboratories, Inc. v. Matkari,* 7 F.3d at 1139. Likewise, it does not identify the means or the medium by which Uber communicates the false message that it is not discriminating. *See Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.,* 332 F.3d at 20. Failing to identify the false or misleading statement made in Uber's advertising or promotion warrants dismissal of a section 43(a)(1)(B) claim based on Uber operating the assignment system lawfully relative to discrimination. *See id.*

  **\*14** As to the single option credit card payment, it is literally true that Uber assigned taxis provide only one option for payment which consists of charging the customer's credit card registered with Uber. Again, however, the complaint fails to identify an Uber advertisement or promotion with the explicit or implicit message or claim that Uber is operating legally by allowing only payments that charge the Uber registered credit card. *See Mylan Laboratories, Inc. v. Matkari,* 7 F.3d at 1139. The complaint does not denote the means or medium in which Uber made the false advertisement or communication relative to operating legally by allowing such payment. *See Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.,* 332 F.3d at 20. Moreover, there is no indication that Uber disseminated the information relative to payment "to the consuming public in such a way as to constitute 'advertising' or 'promotion.' " *Id.* at 19. Failing to identify the false or misleading statement made in Uber's advertising or promotion warrants dismissal of a section 43(a)(1)(B) claim based on Uber operating lawfully by allowing payment only by an Uber user's registered credit card. *Id.* at 20.

Turning to the gratuity and $1.00 fee representation, insofar as plaintiffs seek to challenge a message that Uber is operating legally when, in fact, it is operating illegally, the gratuity statement does not convey explicitly or by necessary implication that Uber is operating lawfully. With respect to whether the message misleads the viewing public who access the website, the statement does not imply that the gratuity is lawful. There is no reference to any legal or illegal activity or any other ordinance or statute. The statement does not suggest that Uber Taxis are operating lawfully by charging the gratuity. There is also no reference to Rule 403 let alone a reference to the limits placed on maximum metered and flat rate fares. Thus, to the extent plaintiffs seek to raise a section 43(a)(1)(B) claim based on an advertisement or promotion that literally or implicitly conveys that Uber is operating lawfully by charging the gratuity or fee, it does not survive the motion to dismiss. *See, e.g., Mylan Laboratories, Inc. v. Matkari,* 7 F.3d at 1139.

Drawing reasonable inferences in plaintiffs' favor, however, the statement that, " '[W]e'll automatically add 20% gratuity for the driver ... so there's no need to hand any payment to the driver' " may imply or convey a message to the viewing public that the Uber Taxi driver, including Boston Cab drivers who partner with Uber, approve the gratuity charges. (Docket Entry # 1–1, ¶¶ 37, 49, 50 & 60). Hence, with respect to the gratuity statement, the complaint sets out a section 43(a)(1)(B) claim that the website communication falsely conveys a message that Boston Cab drivers who partner with Uber approve the gratuity. (Docket Entry # 1–1, ¶¶ 37, 49, 50, 59 & 60). The message explicitly refers to the gratuity for the driver of the Uber Taxi and necessarily implies that the driver knows the customer will not hand him any payment and therefore approves the payment method and the gratuity. The size of the "20% gratuity for the driver" also implies the driver's approval. Viewing the message in its entirety, a viewer could recognize the claim that the driver approves the gratuity as if stated explicitly. *See Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave.,* 284 F.3d at 315 (" 'claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated' "). The gratuity representation is also false because it conveys a message that the driver receives the full 20% gratuity (" 'we'll automatically add 20% gratuity for the driver' ") when in fact the "drivers only get half of the 20% charge." (Docket Entry # 1–1, ¶¶ 38, 42). In short, at the

motion to dismiss stage, the complaint adequately sets out a viable claim that Uber represents, falsely and Boston Cab drivers who partner with Uber approve the 20% gratuity and that they receive the 20% gratuity.

**\*15** Uber raises the additional argument that plaintiffs fail to show any resulting competitive injury traceable to the false statement. (Docket Entry # 6, § I(B)(3)). As noted above, causation is a required element of a section 43(a)(1)(B) claim. *Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Ave.,* 284 F.3d at 311. A plaintiff must establish he has been or is "likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with his products."*Id.* An injury to the plaintiff's reputation may also suffice. *See Beacon Mut. Ins. Co. v. OneBeacon Ins. Group,* 376 F.3d 8, 15 (1st Cir.2004) (noting injury in the form of " 'loss of control over reputation' "); [18] *see, e.g., MMM Healthcare, Inc. v. MCS Health Management Options,* 818 F.Supp.2d 439, 451 (D.P.R.2011) (plaintiff adequately pled "financial and reputation damages as a result of" defendants' false advertising). Simply stated, a plaintiff must show "that the false advertisement actually harmed its business."*Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Ave.,* 284 F.3d at 318.

[18]     Although *Beacon* addressed a Lanham Act section 43(a)(1) (A) claim, the statutory language ("he or she is likely to be damaged by such act") prefaces both subparagraphs (a)(1)(A) and (a)(1)(B).

Here, the complaint generically states that, "Uber's misrepresentations have caused harm to the plaintiffs."(Docket Entry # 1–1, ¶ 64). Such conclusory allegations are ignored in conducting a Rule 12(b)(6) review. *Manning v. Boston Medical Center Corp.,* 725 F.3d 34, 43 (1st Cir.2013) ("conclusory allegations that merely parrot the relevant legal standard are disregarded"). Taking the remaining factual allegations in the complaint as true, the complaint fails to show a plausible entitlement to relief under section 43(a)(1)(B). Nowhere does the complaint set out factual allegations or permit a reasonable inference from such allegations that Uber's false advertisement that it " 'automatically add[s] 20% gratuity for the driver' " caused plaintiffs' harm to their businesses. There is no reference to any diversion of sales, any lost customers or any lessening of goodwill or harm to plaintiffs' reputation as a result of this misrepresentation. [19] Plaintiffs' attempt to cure this defect with statements in their opposition brief is impermissible because such statements are outside the scope of the record when evaluating a Rule 12(b) (6) motion. *See Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2nd Cir.1988) ("[f]actual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading for purposes of Rule 12(b)"). The false gratuity representations therefore fail to provide a viable section 43(a)(1)(B) claim.

[19]     The alleged diversion of fares and revenue in the complaint is not made in reference to the 20% gratuity.

In sum, as previously explained, plaintiffs waived relying on false advertisements or promotions to set out a section 43(a)(1) (A) claim outside the parameters of the foregoing representations. [20] Because these identified representations fail to set out a viable section 43(a)(1)(B) claim due to the absence of a false commercial advertisement or promotion and the absence of harm as a result of any such misrepresentation, it is not necessary to address Uber's *Dial A Car* argument as it pertains to the Lanham Act claim in Count I.

[20]     *See* footnote 12.

## B. *Section 43(a)(1)(A) (Count II)*
**\*16** Uber moves to dismiss the section 43(a)(1)(A) claim due to the absence of any *use* by Uber of any *designation* belonging to plaintiffs in *interstate commerce.*Pointing out that it does not own any vehicles, Uber submits that the complaint fails to allege any wrongful use of a protected designation in connection with plaintiffs' goods or services. Uber additionally seeks dismissal due to the absence of consumer confusion and causally related damages.

Plaintiffs submit that the transmission of the false claims of a partnership over the internet satisfies the interstate commerce requirement and that the complaint adequately sets out consumer confusion. Plaintiffs also point out that they are not making an " 'infringement/false designation' " Lanham Act claim. (Docket Entry # 14). Rather, according to plaintiffs, they are asserting

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)

2014 WL 1338144

"false claims of partnership" or " 'false claims of an association.' " (Docket Entry # 14) (quoting complaint). Plaintiffs further argue that the diversion of business from EJT as well as Boston Cab as a result of the false affiliation avoids dismissal on the basis of Uber's causally related damages argument.

Before addressing Uber's arguments, it is helpful to examine the nature of the claim in the context of section 43(a)(1)(A). Section 43(a)(1) " 'proscribes the unauthorized use of a service mark when the particular usage causes a likelihood of confusion with respect to the identity of the service provider.' " *Oriental Financial Group, Inc. v. Cooperativa de Ahorro y Credito Oriental,* 698 F.3d 9, 16 (1st Cir.2012). In pertinent part, the statute states that:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake ... as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ...
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

In setting out the claim, which is captioned as a "misrepresentation of connection, association, sponsorship and approval," the complaint alleges that:

> By fabricating a nonexistent "partnership" with Boston taxi owners and misrepresenting its legal authority to operate a dispatch service, as alleged above, Uber has used false descriptions and representations of fact to cause confusion and mistake in consumers, who are likely to believe that Uber is affiliated with, connected with, associated with, sponsored by, and approved by Boston medallion owners, including plaintiff EJT Management, Inc. and lawful Radio Associations, including plaintiff Boston Cab Dispatch, Inc., in violation of 15 U.S.C. § 1125(a)(I)(A).

**\*17** (Docket Entry # 1–1, ¶ 63). Count II is therefore based on Uber's false descriptions and representations of its affiliation, sponsorship or association as a partner with Boston Cab and EJT. *See Swarovski Aktiengesellschaft v. Building No. 19, Inc.,* 704 F.3d 44, 49 (1st Cir.2013); *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 639 (1st Cir.1992) (section 43(a)(1)(A)'s "prohibition against false designation of origin encompasses more than deceptions as to geographic origin; it extends, as well, to origin of source, *sponsorship or affiliation"* ) (emphasis added); *see also*4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:8 (2013) (confusion is "not only as to source, but also as to affiliation, connection or sponsorship").

By its terms, section 43(a)(1) refers not only to a "false designation of origin" but also to a "false or misleading description of fact, or ... representation of fact."25 U.S.C. § 1125(a)(1). Likewise, section 43(a)(1)(A) refers not only to a likelihood of confusion "as to the origin" of a plaintiff's "goods, services or commercial activities" but also to the "sponsorship, or approval" of such "goods, services or commercial activities" and "to the affiliation, connection, or association of such person with another person."15 U.S.C. § 1125(a)(1)(A).Section 43(a)(1)(A) therefore "prohibits a false representation which is likely to cause confusion ... as to the affiliation, connection, or association of" the defendant with the plaintiff "or as to the sponsorship or approval of the defendant's goods, services, or commercial activities" by plaintiff. 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 28:15 (2013) (discussing false endorsement claims). Boston Cab, which dispatches the taxicabs carrying its recognizable color scheme, design and logo, is the exclusive licensee of the trademarks, trade names and trade dress associated with its taxi services. (Docket Entry # 1–1, ¶ 4). Count II therefore differs from the typical scenario of an infringer passing off another's mark as his own in a manner likely to cause confusion as to the source of the goods or services. *See Swarovski Aktiengesellschaft v. Building No. 19, Inc.,* 704 F.3d at 48–49; *Century 21 Real Estate Corp. v. LendingTree, Inc.,* 425 F.3d

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)
2014 WL 1338144

211, 217 (3rd Cir.2005). Rather, Uber is purportedly using Boston Cab's mark to refer to Uber's own Uber Taxi services. *See Century 21 Real Estate Corp. v. LendingTree, Inc.,* 425 F.3d at 217.

Uber initially argues that plaintiffs do not identify a " 'designation' allegedly misappropriated by Uber." (Docket Entry # 6) (quoting *Brown v. Armstrong,* 957 F.Supp. 1293, 1300 (D.Mass.1997)). Uber further submits that plaintiffs fail to identify that Uber uses the designation. Assuming arguendo that plaintiffs must show designation and use to avoid dismissal of a false affiliation or sponsorship claim, the complaint adequately sets out both elements. As reasonably inferred from facts in the complaint, Boston Cab is an exclusive licensee of a recognizable mark. Its recognizable logo, design and color scheme appear on each of the hackney carriages driven by the 500 medallion owners or lessees who belong to Boston Cab. Uber signs up or partners with members of Boston Cab and thereby uses taxicabs with Boston Cab's color scheme, design and label as Uber Taxis. Dismissal on the basis of a failure to specify designation and use is not appropriate.

**\*18** Similar reasons avoid dismissal of the claim on the basis of Uber's argument that the complaint fails to allege that Uber's use " 'was in connection with goods or services.' " (Docket Entry # 6) (quoting *Brown v. Armstrong,* 957 F.Supp. at 1300). By its terms, section 43(a)(1) applies to "uses in commerce ... in connection with any goods or services." 15 U.S.C. § 1125(a)(1); *see Island Insteel Systems, Inc. v. Waters,* 296 F.3d 200, 213 (3rd Cir.2002) (quoting 15 U.S.C. § 1125(a)).

As alleged in the complaint, Uber's use of Boston taxicab drivers, including members of Boston Cab who use the Boston Cab unique colors, design and logo on their hackney carriages, creates a false affiliation, sponsorship, partnership or connection between Uber and plaintiffs. Uber partners with Boston taxicab drivers including a number of the 500 medallion owners or lessees who belong to Boston Cab and drive vehicles with the radio association's identifying color scheme, design and logo. (Docket Entry # 1–1, ¶¶ 4, 42 & 63). Uber's attempt to distance itself from its use of these services by noting that it does not own any vehicles (Docket Entry # 1–1, ¶ 14) and therefore does not use the Boston Cab logo when it connects an Uber client to an Uber Taxi is misguided for purposes of a motion to dismiss. When an Uber client opens the Uber app and chooses an Uber Taxi, Uber's computer system connects that customer to an Uber Taxi including, at times, Boston Cab vehicles bearing Boston Cab's mark.Section 43(a)(1) addresses use "in connection with any goods and services" as opposed to ownership or title.

Uber next maintains that the complaint fails to evidence or support the use of any designation in interstate commerce. The relevant statutory language proscribes the conduct of any person who, "in connection with any goods or services ...*uses in commerce* any word, term, name symbol, or device, or any combination thereof," i.e., a mark,[21] "or any false designation of origin" or "false or misleading representation of fact."15 U.S.C. § 1125(a)(1) (emphasis added); *see Purolator, Inc. v. EFRA Distributors, Inc.,* 687 F.2d 554, 558 (1st Cir.1982) (citing 15 U.S.C. §§ 1125 and 1127). The term "commerce" refers to "all commerce which may lawfully be regulated by Congress."15 U.S.C. § 1127. The statute defines "in commerce" as the "use of a mark in the ordinary course of trade."15 U.S.C. § 1127. A mark on services is used "in commerce" inter alia when it is "used or displayed in the sale or advertising of services and the services are rendered in commerce."15 U.S.C. § 1127; *see also Patsy's Italian Restaurant, Inc. v. Banas,* 658 F.3d 254, 268 (2nd Cir.2011) (noting that " 'use in commerce' is defined differently for trademarks and service marks" under 15 U.S.C. § 1127).

[21]  *See*15 U.S.C. § 1127 (defining "mark" as including any trademark, service mark, collective mark, or certification mark").

The language of section 43(a)(1), as amended in 1989, "requires that the defendant's accused use be 'in commerce,' it does not require that the plaintiff's mark have been used in commerce."5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:47 (2013); *see generally Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave.,* 284 F.3d at 311 (false advertising claim requires proof that "the defendant placed the false or misleading statement in interstate commerce").[22] Uber removed this action on the basis of diversity of citizenship, 28 U.S.C. § 1332, (Docket Entry # 1) such that subject matter jurisdiction exists.

[22]  Case law nevertheless deems the "in commerce" requirement satisfied when "the *plaintiff* used its mark in interstate commerce and the defendant's infringement damages plaintiff's interstate reputation."5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair*

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)

2014 WL 1338144

*Competition* § 27:47 (2013) (emphasis in original) (citing *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir.1998), in footnote). Thus, as stated in a 2003 First Circuit case in finding that the plaintiff made only "meager showings of commerce and harm," there was "no evidence in the record that Danielson even operated outside Massachusetts at this time, in order to establish the necessary interstate commerce nexus for the market in which business was allegedly lost."*John G. Danielson, Inc. v. Winchester–Conant Properties, Inc.*, 322 F.3d 26, 46 (1st Cir.2003) (citing *Johnson v. Jones*, 149 F.3d at 502).

**\*19** Focusing on the conduct of Uber and its use of the mark in commerce, as indicated by the statutory language, the complaint states that Uber used "the internet to transmit fraudulent misrepresentations to Boston consumers about fares in Uber Taxis and false claims of association between Uber and Boston Cab."(Docket Entry # 1–1, ¶ 80). Moreover, Uber transmitted the false representations to Boston users of Uber "thousands of times over a period in excess of five months."(Docket Entry # 1–1, ¶ 80). The complaint also describes the "thousands of violations" as being "with Boston Uber customers."[23] (Docket Entry # 1–1, ¶ 81).

23    Plaintiffs identify these statements (Docket Entry # 1–1, ¶¶ 80–81) as satisfying the "in commerce" requirement. (Docket Entry # 14). Although Count II (Docket Entry # 1–1, ¶¶ 1–61) does not expressly incorporate these statements (Docket Entry # 1–1, ¶¶ 80–81), Uber had the opportunity to object to their consideration in the reply brief and failed to address the issue. *See O'Connell v. Marrero–Recio,* 724 F.3d at 124; *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d at 260.

Drawing reasonable inferences in plaintiffs' favor, Uber uses false statements of fact regarding its association with Boston Cab over the internet and therefore outside the Commonwealth.[24] The false affiliation or sponsorship arises when a customer chooses an Uber Taxi and/or a taxicab driven by a Boston Cab member with its identifiable color scheme, design and logo and the member accepts the assignment from the Uber computer system and arrives at the pickup location. The transmissions by Uber of such false statements of association thousands of times over the internet outside the Commonwealth satisfies, barely, the "in commerce" requirement under the relatively forgiving Rule 12(b)(6) standard of review. *See NTP Marble, Inc. v. AAA Hellenic Marble, Inc.,* 799 F.Supp.2d 446, 451 (E.D.Pa.2011) ("press release was accessible through the Internet" thus causing "it to appear outside of Pennsylvania, where it might also have an impact on parties outside the state" deemed sufficient to satisfy "Lanham Act's interstate commerce requirement"); *Futuristic Fences, Inc. v. Illusion Fence Corp.,* 558 F.Supp.2d 1270, 1277 (S.D.Fla.2008) ("[a]dvertising that affects interstate commerce and solicitation of sales across state lines is commerce within the meaning of Lanham Act") (internal ellipses omitted); *Nike, Inc. v. Rubber Mfrs. Ass'n, Inc. .,* 509 F.Supp. 919, 924 (D.C.N.Y.1981) ("mere solicitation of sales is 'commerce' within the meaning of Section 43(a)"); *see also Purolator, Inc. v. EFRA Distributors, Inc.,* 687 F.2d at 559 (" 'jurisdiction exists to grant relief under the Lanham Act if a defendant's activities although wholly intrastate tend to have a damaging effect on plaintiff's federally protected interstate business' ").

24    Although the complaint does not expressly state that Uber's internet transmissions include those made outside Massachusetts, a reasonable inference of such use arises by use of the internet.

Uber next submits that the section 43(a)(1)(A) claim falters because of the lack of confusion. Uber presents the argument as confusion regarding a false designation of origin as opposed to the pled claim of false representations of an affiliation, partnership or sponsorship between Uber and EJT as well as Boston Cab.[25] (Docket Entry # 1–1, ¶ 63). Accordingly, before addressing the confusion, it is worth distinguishing the parameters of an origin of service claim and a false affiliation claim vis-à-vis a likelihood of confusion.

25    Uber does not distinguish between EJT and Boston Cab. It simply asserts that "plaintiffs" fail to cite evidence of consumer confusion. (Docket Entry6 & 19). Uber also seeks to dismiss the entire claim as opposed to the claim with respect to EJT or Boston Cab. Uber's failure to distinguish between EJT and Boston Cab regarding the arguments waives the argument that the claims against EJT as opposed to Boston Cab is subject to dismissal. *See O'Connell v. Marrero–Recio,* 724 F.3d at 124; *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d at 260.

Historically, trademark law guards against confusion about "the source of the good or service to which the mark is attached."*Swarovski Aktiengesellschaft v. Building No. 19, Inc.,* 704 F.3d at 49 (addressing "a nominative use case" and liability under section 43(a)(1)(A)). A " 'typical situation ... involves the defendant's having passed off another's mark as its own or

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)

2014 WL 1338144

having used a similar name, confusing the public as to precisely whose goods are being sold."*Id.* (quoting *Century 21 Real Estate Corp. v. LendingTree, Inc.,* 425 F.3d at 217); *International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Center,* 103 F.3d 196, 202 (1st Cir.1996) ( "[i]n the typical commercial setting, confusion as to the source of goods or services occurs when ... a buyer may purchase one product or service in the mistaken belief that she is buying a different product or service"). Thus, when a defendant designates or passes off the plaintiff's mark as its own, liability attaches where there is a likelihood of confusion as to the source or origin of the goods.

**\*20** Here, the facts in the complaint give rise to a nominative use case. *See generally id.*Indeed, plaintiffs disclaim bringing an " 'infringement/false designation' " case and, instead, describe their section 43(a)(1)(A) claims as "false claims of an association" or partnership. (Docket Entry # 14); *see, e.g., Century 21 Real Estate Corp. v. Lendingtree, Inc.,* 425 F.3d at 217 (defendant "is using plaintiff's mark in order to refer to defendant's own goods or to the goods of the trademark owner in a way that might confuse the public as to the relationship between the two").

Nominative use may arise where the alleged infringer uses the plaintiff's mark to describe the plaintiff's product even if the ultimate goal is to describe its own product. *See*4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:11 (2013) (quoting *Cairns v. Franklin Mint Co.,* 292 F.3d 1139, 1151 (9th Cir.2002)). It may also arise in a fair use case wherein the defendant uses plaintiff's mark only to describe his own product or service. *See Swarovski Aktiengesellschaft v. Building No. 19, Inc. .,* 704 F.3d at 49 n. 3; *Century 21 Real Estate Corp. v. LendingTree, Inc.,* 425 F.3d at 218; 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:11 (2013).

In a nominative use case, the confusion "is not one of source ... but rather of *endorsement or affiliation.*"*Swarovski Aktiengesellschaft v. Building No. 19, Inc.,* 704 F.3d at 49 (emphasis in original). Here too, plaintiffs are claiming that Uber's use of Boston taxicab drivers, including the 500 members of Boston Cab who use the Boston Cab unique and identifiable colors, design and logo on their hackney carriages, creates a false affiliation, sponsorship or partnership between Uber and plaintiffs. (Docket Entry # 1–1, ¶¶ 3, 4, 14, 42 & 63). Plaintiffs are not claiming that Uber falsely designated the source of its services as Boston Cab or EJT. As explained in greater detail in *Swarovski,* a case in which Building 19 acquired a number of Swarovski crystal figurines and advertised them using the Swarovski mark along with the Building 19 name:

> The potential for confusion in a nominative use case is not one of source-here, the crystal really was manufactured by Swarovski-but rather one of endorsement or affiliation. The fear is that *a consumer glancing at Building # 19's proposed advertisement might mistakenly believe that Swarovski had some official association with the sale;* perhaps that Swarovski sponsored the sale and so stood behind the goods as a direct seller, *or that it had partnered with Building # 19 in a way that might detract from its luxury status.*

*Id.* (emphasis added). Plaintiffs' section 43(a)(1)(A) claim involves a false endorsement or affiliation leading to a likelihood of confusion as opposed to a false designation of the source or origin of Boston Cab's services.

Having articulated the nature of the claim, Uber is correct that a likelihood of confusion is a required element of any section 43(a)(1) claim. *See id.*(absent a likelihood of confusion "showing, no trademark infringement has occurred and so the trademark holder has no cause of action"); *Venture Tape Corp. v. McGills Glass Warehouse,* 540 F.3d 56, 60 (1st Cir.2008) (plaintiff must show that defendant's "use of the Venture mark likely confused" consumers thereby causing harm); *Boston Duck Tours, LP v. Super Duck Tours, LLC,* 531 F.3d 1, 12 (1st Cir.2008) ("plaintiff must establish ... that the allegedly infringing use is likely to cause consumer confusion"); *Borinquen Biscuit Corp. v. M.V. Trading Corp.,* 443 F.3d 112, 116 (1st Cir.2006) (plaintiff must "demonstrate ... that the allegedly infringing use is likely to result in consumer confusion"). In addition, "the likelihood of confusion inquiry is not limited to actual or potential purchasers, but also includes others whose confusion threatens the trademark owner's commercial interest in its mark."*Beacon Mut. Ins. Co. v. OneBeacon Ins. Group,* 376 F.3d at 16.

**\*21** Ordinarily, in deciphering whether a likelihood of confusion exists, the First Circuit examines the following eight factors:

"(1) the similarity of the marks; (2) the similarity of the goods (or, in a service mark case, the services); (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) the evidence of actual confusion; (7) the defendant's intent in adopting its allegedly infringing mark; and (8) the strength of the plaintiff's mark."

*Dorpan, S.L. v. Hotel Melia, Inc.*, 728 F.3d 55, 65 (1st Cir.2013) (quoting *Int'l Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir.1996)); *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482 (1st Cir.1981). The issue of whether to apply all or some of those factors to a nominative use case and/ or include other factors, such as whether Uber "accurately portrayed the relationship between itself" and plaintiffs, is an issue of first impression in this circuit. *See Swarovski Aktiengesellschaft v. Building No. 19, Inc.*, 704 F.3d at 50 & 53. For present purposes, it is not necessary to resolve the issue because the *Pignons* factors permit a likelihood of confusion finding and the addition or substitution of factors used in the Ninth and Third Circuit cases cited in *Swarovski*, 704 F.3d at 50, [26] yields the same conclusion.

[26]    *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175–76 (9th Cir.2010); *Century 21 Real Estate Corp. v. LendingTree, Inc.*, 425 F.3d at 222.

Overall, each member vehicle of Boston Cab carries a Boston Cab color scheme, design and logo. (Docket Entry # 1–1). Five hundred of the 1,825 medallion owners in Boston are members of Boston Cab. Such a proportionally large number of taxicabs in Boston bearing Boston Cab's mark gives rise to a finding that Boston Cab is a well known and recognizable taxi dispatch service in Boston. Facts in the complaint also reasonably infer that the color scheme, design and logo serve the function of identifying the vehicles as driven by Boston Cab members and dispatched by Boston Cab. Consumers seeking transportation for hire thereby associate Boston Cab's mark on taxicabs as identifying a taxicab emanating from and dispatched by Boston Cab.

When a consumer seeking transportation for hire opens the Uber app, he sees the option of an Uber Taxi with a map of the various "taxis in the neighborhood" from which he can choose the Uber Taxi category. (Docket Entry # 1–1, ¶ 13). Associating Boston Cab with taxicabs in Boston, the consumer may falsely draw the conclusion that Uber is affiliated with or sponsored by taxis in Boston, including taxicabs that carry Boston Cab's mark. When a Boston Cab member appears as the Uber assigned taxi in response to an Uber customer's choice of an Uber Taxi, the customer sees and uses a hackney carriage with Boston Cab colors and logo thereby further cementing the false affiliation in the minds of these Uber clients that Uber partners with Boston Cab. *See Swarovski Aktiengesellschaft v. Building No. 19, Inc.*, 704 F.3d at 52 (use of the word "Swarovski" "in Building # 19's proposed advertisement might, in theory, have created confusion" by "suggest[ing] some official affiliation between Swarovski and Building # 19").

**\*22** In short, at *both* the time the customer chooses an Uber Taxi and at the time the Uber Taxi appears at the pickup location, the consumer may believe there is an association, partnership or endorsement between Boston Cab's taxi services and Uber's transportation services. *See generally id.* at 49. Uber's argument that there is no likelihood of confusion because the Uber customer does not see the Boston Cab until it arrives at the pickup location is therefore misplaced. Uber's reliance on the disclaimer of association with third party transportation services in the legal terms and conditions is also not determinative particularly in the context of a motion to dismiss. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d at 639 ("use of a mark may be deceptive and, thus, violative of section 43(a), in light of the overall appearance of the package, despite the existence of fine print identifying the true origin"). Turning to the *Pignons* factors with greater specificity, Uber uses Boston Cab's identifying color scheme, design and logo each time a Uber customer opens the app, chooses the Uber Taxi category and a taxi with Boston Cab's color scheme, design and logo arrives at the pickup location. Uber and its Uber Taxis use Boston Cab's mark as its own. *See generally Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d at 61 ("McGills' website incorporated Venture's exact marks"). The first two *Pignons* factors, similarity of the marks and the goods or services, support a likelihood of confusion.

Both Uber and Boston Cab also offer transportation services for hire in Boston. (Docket Entry # 1–1, ¶ 5) ("Uber operates a transportation-for-hire service" in Boston). Although Uber's sign up sheet and its terms and condition indicate a distance between Uber and its member drivers who provide the transportation service, the complaint and the Rule 12(b)(6) record as a whole present a closer relationship between Uber and its member drivers. For purposes of the motion to dismiss, the relationship between Uber's and Boston Cab's channels of trade closely overlap. Uber and Boston Cab both use apps that allow a customer seeking transportation for hire in Boston to use a smart phone to summon a vehicle for hire such as a taxicab. (Docket Entry # 1–1, ¶¶ 12–15). The fourth *Pignons* factor thereby supports a likelihood of confusion. There is also a significant overlap in the classes of purchasers. Uber and Boston Cab compete for the same class of prospective purchasers, i.e., individuals seeking transportation for hire in Boston.

It is true that the Rule 12(b)(6) record fails to show actual confusion or a strong showing on the strength of Boston Cab's mark as well as Uber's intent. Taking these factors into account, the complaint and other documents that comprise the Rule 12(b) (6) record still permit a sufficient showing that Uber's use of Boston Cab's color scheme, design and logo is likely to confuse consumers that Uber is affiliated or associated with Boston Cab and/or EJT and that plaintiffs sponsor or partner with Uber. *See Swarovski Aktiengesellschaft v. Building No. 19, Inc.,* 704 F.3d at 49 & 52.

**\*23** The three additional factors noted in *Swarovski,* 704 F.3d at 50 (citing Third and Ninth Circuit cases),[27] standing alone or in combination with the eight *Pignons* factors do not alter this finding. It is difficult to distinguish between an Uber Taxi and a Boston Cab vehicle with its color scheme, design and logo that accepts an assignment and arrives at the pickup location. Although the terms and conditions portray differences between Uber and Boston Cab or EJT, the Uber computer system nevertheless dispatches drivers with vehicles bearing Boston Cab's color scheme, design and logo thereby inaccurately portraying a close association and affiliation with Boston Cab. There is little indication that Uber uses more of Boston Cab's mark than is necessary given the lack of allegations regarding Uber advertising a direct affiliation with Boston Cab or EJT on its website or elsewhere. On balance, however, there is an adequate showing of a likelihood of confusion to avoid a Rule 12(b) (6) dismissal.

27    *See* the previous footnote.

Uber next asserts there is no showing of "causally-related damages" or competitive harm. (Docket Entry 6 & 19). Uber also points to plaintiffs' statement in their brief that, " 'The predicate acts of lying to customers about fare and affiliation do not, standing alone, cause the plaintiffs appreciable harm.' "[28] (Docket Entry # 19) (brackets omitted). Plaintiffs argue that Uber misappropriates their good will by claiming a partnership. In their brief, plaintiffs also contend that Uber diverts business from EJT which "has experienced a drop in demand for its cabs." (Docket Entry 314).

28    Plaintiffs made this statement to address Uber's RICO argument that they do not allege harm from the investment of funds derived from the wire fraud. A RICO injury, *see George v. National Water Main Cleaning Co.,* 2011 WL 841226, at \*13 (D.Mass. March 23, 2011), differs from a Lanham Act injury, which may include a lessening of goodwill or an injury to the plaintiffs' reputation. *See Beacon Mut. Ins. Co. v. OneBeacon Ins. Group,* 376 F.3d at 15; *Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Ave.,* 284 F.3d at 311. Because of the context in which plaintiffs made the statement and the differing legal principles, Uber's reliance on the statement is unsound.

Turning to the facts in the Rule 12(b)(6) record, Boston Cab dispatches only drivers that pass background checks and accept all forms of payment, including coupons. They drive vehicles equipped with a panic button, protective partitions and a GPS that gives the Boston Police "real time" internet access. Uber Black Cars and Uber SUVs and their drivers lack such protective safety features. Competitive harm may take the form of associating Boston Cab and its mark with Uber in a manner that detracts from the safety, reliability and assurances offered when a customer hails a taxicab through Boston Cab, *see generally id.* at 49 (consumer might mistakenly believe that Swarovski "had partnered with Building # 19 in a way to detract from its luxury status"), and thereby negatively impact Boston Cab's reputation and good will. In addition, Boston Cab drivers do not use cellular telephones. Uber Taxis, including drivers that use the Boston Cab color scheme, design and logo, use cellular telephones which puts customers at risk. (Docket Entry # 1–1).

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)

2014 WL 1338144

The fact that Boston Cab receives weekly fees from its members does not eviscerate the harm caused by the damage to its good will and reputation resulting from the affiliation. Although the harm to plaintiffs' goodwill and reputation is sufficient to avoid dismissal, Uber also "divert[s] taxi revenues" by replacing taxis with Uber Black Cars and Uber SUVs. (Docket Entry # 1–1, ¶ 55). Dismissal on the basis of the absence of facts to support the presence of causally related damages is not appropriate.

## C. Dial A Car

**\*24** As an additional basis to dismiss Count II, Uber argues that plaintiffs cannot premise a Lanham Act claim based on violations of Rule 403, chapters 386 or 392 or ordinance 16–15.05 because they do not create a private right of action. Uber maintains that chapters 386 and 392 as well as ordinance 16–15.05 delegate the exclusive authority to make rules and to enforce Rule 403 to the Commissioner. According to Uber, plaintiffs seek to bypass the administrative process in Rule 403 by bringing claims under the Lanham Act premised on Uber's violations of Rule 403 and/or the foregoing statutes and ordinance. Uber submits that, "Claimed violations of local ordinances are, in this instance, for the designated local municipal authority to determine."(Docket Entry # 6). It also points out that the municipal authority has not held Uber subject to or in violation of Rule 403 or had the opportunity to address the issue.

In presenting the argument, Uber relies exclusively on *Dial A Car, Inc. v. Transportation, Inc.,* 82 F.3d 484 (D.C.Cir.1996). In *Dial A Car,* the plaintiff, a transportation service licensed to operate a "point-to-point" corporate account service known as " 'Blue Car' service" in the District of Columbia ("D.C."), filed suit against two taxicab companies licensed in Virginia and Maryland but not in D.C. *Id.* at 485.For taxicabs licensed in another jurisdiction, the D.C.Code required a reciprocal agreement to operate taxicabs in D.C. *Id.*Promulgated by the D.C. Taxicab Commission, the reciprocal agreement at issue allowed the defendants' taxicabs to drop off and pick up passengers in D.C. as long as the pick up or drop off location was outside D.C. and in the county of licensure. *Id.* Although licensed to provide Blue Car service in D.C., the defendants used their taxicabs, as opposed to their other vehicles, to render Blue Car service in D.C. According to the plaintiff, the use of taxicabs to perform Blue Car service violated the reciprocal agreement. The plaintiff therefore brought a false advertising claim under section 43(a)(1)(B) based on the defendants' false representation "in their promotional brochure that they lawfully may perform corporate account services in the District."*Id.*

The court did not resolve the issue of whether the defendants violated the reciprocal agreement because it deemed the matter "within the jurisdiction of the D.C. Taxicab Commission" and "the Commission [had] not addressed" the issue. *Id.* at 488.Noting that the plaintiff was "simply using the Lanham Act to try to enforce its preferred interpretation of [the reciprocal agreement] instead of adjudicating the issue before the Commission," the court found "no reason to reach out and apply federal law to [the] quintessentially local dispute."*Id.* at 488–489.Uber highlights and quotes the following language from the opinion:

> By entertaining appellant's claim, we would be transforming the Lanham Act into a handy device to reach and decide all sorts of local law questions. Not surprisingly, although the Act has been interpreted in literally hundreds of appellate cases since its enactment in 1946, we cannot find a single case that purports to extend the Act to allow federal judges to interpret and enforce municipal regulations, thereby affording plaintiffs remedies over and above those provided by local law.

**\*25** *Id.* at 490.

A number of reasons counsel against dismissing Count II on the basis of Uber's *Dial A Car* argument. First, the First Circuit has neither cited nor adopted *Dial A Car's* reasoning prohibiting a Lanham Act claim when a matter involves an issue covered by a municipal regulation not yet addressed by the regulatory body. [29] Although not cited by Uber, a number of federal circuit courts, however, use *Dial A Car's* reasoning to preclude false advertising claims under the Lanham Act based on mislabeling prescription or non-prescription drugs or hazardous products. *See PhotoMedex, Inc. v. Irwin,* 601 F.3d 919, 928 (9th Cir.2010) (affirming summary judgment on section 43(a)(1)(B) claim because "PhotoMedex is not permitted to circumvent the FDA's exclusive enforcement authority by seeking to prove that Defendants violated the FDCA, when the FDA did not reach that

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)
2014 WL 1338144

conclusion"); *Schering–Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.,* 586 F.3d 500, 508–510 (7th Cir.2009) (agreeing with lower court that "Schering jumped the gun by suing [under section 43(a) (1)(B) ] before the FDA addressed the misbranding issue"); [30] *IQ Products Co. v. Penzoil Products Co.,* 305 F.3d 368, 374 (5th Cir.2002) (affirming summary judgment on section 43(a)(1)(B) claim because Federal Hazardous Substances Act "does not create a private cause of action" and "vests the CPSC with the authority to enforce federal labeling requirements"); *Sandoz Pharmaceuticals Corp. V. Richardson–Vicks,* 902 F.2d 222, 231 (3rd Cir.1990) ("[n]either of these agencies' constituent statutes creates an express or implied private right of action and what the FD & C Act and the FTC Act do not create directly, the Lanham Act does not create indirectly").

[29]     Two district court cases cite to *Dial A Car* only in relation to the court's Sherman Act analysis. *See CCBN.Com, Inc. v. Thomson Financial, Inc.,* 270 F.Supp.2d 146, 155 (D.Mass.2003); *Wojcieszek v. New England Tel. and Tel. Co.,* 977 F.Supp. 527, 533–534 (D.Mass.1997).

[30]     The *Schering–Plough* court articulates the nature of the argument as based on the principle of primary jurisdiction. *Schering–Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.,* 586 F.3d at 507.

Here, it is doubtful that the First Circuit would defer to the Commissioner before deciding the false affiliation claim. The section 43(a)(1)(A) claim does not require the Commissioner's determination that Uber is operating as a taxi service or a radio association or that Uber is in charge of hackney carriages driven by unlicensed drivers. Rather, it involves an assessment of Uber's use of Boston taxicab drivers, specifically members of Boston Cab with its logo, color scheme and design, as creating a false affiliation or sponsorship with Boston Cab. In particular, the likelihood of confusion determination entails an adjudication of Uber's use of Boston Cab's mark as creating a likelihood of consumer confusion of a false affiliation or endorsement between Boston Cab or EJT and Uber. *See generally Swarovski,* 704 F.3d at 49–50. No decision by the Commissioner is required or usurped by proceeding with the section 43(a)(1)(A) false endorsement claim.

In addition, Uber's argument that plaintiffs should proceed before the Commissioner under Rule 403 and that the rule includes a "mandatory administrative process for adjudicating alleged rules violations" (Docket Entry # 19) is misguided. Uber overstates the reach of the available administrative procedures in Rule 403. Those procedures allow administrative challenges to a denial of a hackney carriage license application followed by court review. Rule 403 also sets out procedures for medallion owners when another person files a hackney complaint or a police officer files a hackney carriage violation culminating in court review. [31] Rule 403 additionally includes an express procedure for complaints against an approved radio association for violating the radio association standards in Rule 403. (Docket Entry # 6–3, § 7).Rule 403 does not attempt to proscribe unfair competition based on a false affiliation between an existing approved radio association and an unapproved taxi or dispatch service. Whether Uber is operating as a radio association without approval from the Inspector of Carriages under Rule 403 or is in charge of unlicensed drivers of hackney carriages in violation of chapter 392 or 386 is not the focus of the Lanham Act false affiliation claim. Likewise, whether Boston Cab members who partner with Uber are violating Rule 403 is not the focus of the Lanham Act claim. Accordingly and contrary to Uber's position (Docket Entry # 6, p. 9), plaintiffs are also not "using the Lanham Act to try to enforce [their] preferred interpretation of [Rule 403] instead of adjudicating the issue before the Commission."*Dial A Car,* 82 F.3d at 488. Unlike the false advertising section 43(a) (1)(B) claim and the facts in *Dial A Car* well as the above FDA cases, there is little that the Commissioner or the Inspector of Carriages would adjudicate regarding the false affiliation claim and the likelihood of confusion as between Boston Cab's mark and Uber's false endorsement or sponsorship. The issues regarding the section 43(a)(1)(B) claim are therefore not within the exclusive purview of the Commissioner, Rule 403 or the regulations therein.

[31]     Decisions by the Inspector of Carriages with respect to hackney carriage violations for vehicle deficiencies are final.

**\*26** Similarly, the absence of a private right of action to enforce Rule 403 or the foregoing state statutes with respect to an approved radio association seeking to sue a competitor does not warrant dismissing the section 43(a)(1)(A) claim. First, the claim does not require a decision by the Commissioner that Uber is violating a particular provision of Rule 403. The claim also does not invade the Commissioner's "exclusive authority to make rules and orders" regulating hackney carriages under chapter

**Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)**

2014 WL 1338144

392. (Docket Entry # 6–3). It involves a subject matter relatively distinct from regulating and licensing Boston taxicabs, their drivers and their dispatch services.

Second, the Lanham Act provides a private right of action for false endorsement or affiliation claims and " 'federal courts have a "virtually unflagging obligation to exercise the jurisdiction given them." ' " *Chico Service Station, Inc. v. Sol Puerto Rico Ltd.,* 633 F.3d 20, 29 (1st Cir.2011) (internal ellipses omitted). The doctrine of primary jurisdiction, cited by one of the above cases that relies on *Dial A Car's* reasoning, also does not apply because the section 43(a)(1)(A) claim does not require the special competence of the Commissioner to decide the issues. *See Chico Service Station, Inc. v. Sol Puerto Rico Ltd.,* 633 F.3d 20, 30 n. 13 (1st Cir.2011) ("primary jurisdiction doctrine counsels abstention 'whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body' "); *see also Arroyo–Melecio v. Puerto Rican American Ins. Co.,* 398 F.3d 56, 73–74 (1st Cir.2005) ("doctrine's application depends on ... whether the agency determination lay at the heart of the task assigned" agency by legislature; "whether agency expertise was required to unravel intricate, technical facts;" and whether agency's "determination would materially aid the court"). [32] The section 43(a)(1)(B) claim primarily concerns the false partnership or association in the use of Boston Cab's mark which does not require the Commissioner's expertise as to whether Uber is operating in violation of a particular provision in Rule 403.

---

[32]   Uber does not raise or seek dismissal based on *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).*See O'Connell v. Marrero–Recio,* 724 F.3d at 124; *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d at 260. Uber does not cite to *Burford* or to any of its progeny and Uber discusses only *Dial A Car,* a case that did not cite or mention abstention on the basis of *Burford.*

Uber's argument based on *Dial A Car* therefore does not require dismissal of the section 43(a)(1)(A) claim. Uber also seeks to extend the reasoning to the state law claims. [33] The *Dial A Car* argument with respect to the state law claims is addressed separately, if necessary, with respect to each of the state law claims.

---

[33]   Uber did not present an argument based on federal preemption of the state law claims.

### D. *Chapter 93A*
Uber seeks to dismiss the unfair or deceptive acts chapter 93A claim alleged in Count III and the unfair competition chapter 93A claim in Count IV based on a number of arguments. First, Uber submits that plaintiffs fail to allege an independent basis for chapter 93A liability. Thus, because the Lanham Act claims fail, the chapter 93A claims therefore fail. (Docket Entry # 6, p. 13). Inasmuch as the Lanham Act claim in Count II survives dismissal, this brevis argument does not merit a dismissal of the chapter 93A claims.

 *27  Second, the reply brief asserts that plaintiffs "have no evidence" to show "actual consumer deception" with respect to the false affiliation alleged in Count III. (Docket Entry # 1–1, ¶ 66(a)). Count III includes the allegation that Uber engages in unfair and deceptive acts and practices by "[f]alsely claiming an affiliation with medallion owner and radio associations."(Docket Entry # 1–1, ¶ 66(a)). [34] Uber points out that it disclaims any affiliation with Uber assigned drivers in the terms and conditions and on the initial sign up page.

---

[34]   The complaint identifies three other allegations specific to Count III. (Docket Entry # 1–1, ¶ 66(b)–66(d)); *see* fn. 39.

"[A]ctual consumer deception, as posited by Uber, is not the standard for deception in a section 11 (or section nine) action under chapter 93A. "Whether conduct is deceptive is initially a question of fact, to be answered on an *objective* basis and not by the subjective measure argued by the defendants.' *Aspinall v. Philip Morris Companies, Inc.,* 442 Mass. 381, 813 N.E.2d 476, 486 (Mass.2004) (emphasis added). Uber's argument based on actual as opposed to objective deceptive conduct is therefore incorrect. *See id.*The correct standard is whether the act or practice "has the 'capacity or tendency' to deceive." *In re Pharmaceutical Industry Average Wholesale Price Litigation,* 582 F.3d at 185. A practice is "deceptive" when " 'it "could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted."

'35 *Aspinall v. Philip Morris Companies, Inc. .,* 442 Mass. 381, 813 N.E.2d 476, 486 (Mass.2004). Because Uber seeks dismissal based on an incorrect standard, a dismissal of the section 11 false affiliation claim in Count III is not appropriate. In any event, applying the correct standard does not lead to a dismissal of the claim.

35   The "crucial factors" to determine whether an act or practice is "unfair" are "the nature of challenged conduct" as well as the "purpose and effect of that conduct."*Massachusetts Employers Ins. Exchange v. Propac–Mass, Inc.,* 420 Mass. 39, 648 N.E.2d 435, 438 (Mass.1995) (also noting as "uninstructive" the language " 'level of rascality' " and " 'rancid flavor of unfairness' "). Examining the circumstances, "An act or practice is 'unfair' if it is 'within at least the penumbra of some common-law, statutory or other established concept of unfairness,' is 'immoral, unethical, oppressive, or unscrupulous,' and 'causes substantial injury to consumers (or competitors or other businessmen).' " *In re Pharmaceutical Industry Average Wholesale Price Litigation,* 582 F.3d at 184; *Massachusetts Employers Ins. Exchange v. Propac–Mass, Inc.,* 648 N.E.2d at 69.

Third, Uber maintains that plaintiffs lack a private right of action under Rule 403 and, therefore a cause of action under chapter 93A with respect to both counts III and IV. Citing and relying exclusively on *Katz v. Pershing, LLC,* 806 F.Supp.2d 452, 458 & 461 (D.Mass.2011), and *Dial A Car,* Uber argues that because Rule 403"confers exclusive jurisdiction in the Police Department" and "does not confer a private right of action on Plaintiffs," they cannot maintain a chapter 93A claims. (Docket Entry6 & 19). Uber submits that "Rule 403 and its authorizing statutes occupy the field of Boston taxicab regulations and include a mandatory process for adjudicating alleged rules violations."(Docket Entry # 19).

The plaintiff in *Katz* sued a brokerage clearing house on the basis that it failed to safeguard customers' non-public personal information ("NPPI") on its proprietary software platform. [36] *Id.* at 457.She nevertheless failed to allege that her NPPI was misappropriated or any instances of actual data loss or unauthorized access to customers' NPPI. The district court therefore dismissed the chapter 93A claim for lack of constitutional and statutory standing. [37] *Katz v. Pershing, LLC,* 806 F.Supp.2d at 457–459 & 461.

36   The plaintiff also sought class action status. *Id.* at 457–458.

37   On appeal, the First Circuit explained the distinction between constitutional and statutory standing. *Katz v. Pershing, LLC,* 672 F.3d 64, 75 (1st Cir.2012). The latter turns upon whether "the statute gives that plaintiff authority to sue."Id.;*see Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 92, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (implying that "whether EPCRA authorizes this plaintiff to sue" presents issue of statutory standing); *In re American River Transp. Co.,* 728 F.3d 839, 846 (8th Cir.2013) (statutory standing asks " 'whether this plaintiff has a cause of action under the statute' "); *see also Northwest Airlines, Inc. v. County of Kent, Mich.,* 510 U.S. 355, 365, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994) (whether federal statute creates private right of action "is not jurisdictional")."[S]tatutory standing goes to the merits of the claim" whereas constitutional "standing presents a question of justiciability; if it is lacking, a federal court has no subject matter jurisdiction over the claim."*Katz v. Pershing, LLC,* 672 F.3d at 75;*see Steel Co.,* 523 U.S. at 97 n. 2.

**\*28** The statutory standing decision in *Katz* relied on the reasoning that Uber seeks to apply to the case at bar. The plaintiff in *Katz* based her chapter 93A claim solely on the violation of a state statute [38] that imposed an obligation on businesses to notify customers of a known breach of security regarding their stored personal and financial information. *Katz v. Pershing, LLC,* 806 F.Supp.2d at 458. As noted by the district court, chapter 93H limited the enforcement of that statute to the Massachusetts Attorney General and it did "not incorporate or authorize a private right of action."Id. The relevant language quoted and relied on by Uber states that, "Because Katz cannot maintain an action under Chapter 93A based on an alleged violation of Chapter 93H, she cannot look to the state consumer protection statute to establish standing."Id. On appeal, the First Circuit did *not* address the issue of the enforcement scheme in chapter 93H as precluding a chapter 93A claim based upon the former statute. *See Katz v. Pershing, LLC,* 672 F.3d at 75–76.

38   Massachusetts General Laws chapter 93H ("chapter 93H").

In response to Uber's private right of action argument, plaintiffs maintain that three of the four unfair or deceptive acts or practices in Count III (Docket Entry # 1–1, ¶ 66(a), 66(b) & 66(d)) do not depend upon interpreting Rule 403. [39] Plaintiff is

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)

2014 WL 1338144

correct with respect to paragraphs 66(a) and 66(b). Deception in the form of a false affiliation between Uber and Boston Cab or EJT does not require an adjudication of a Rule 403 violation as a material part of the claim or otherwise usurp the authority of the Commissioner. [40] The unfair or deceptive act or practice concerns the false affiliation between Uber and plaintiffs. Similar to the Lanham Act claim in Count II, the deceptive act or practice of creating a false affiliation between Uber and plaintiffs exists irrespective of Uber's violations, if any, of Rule 403 and irrespective of Uber being in charge of unlicensed hackney carriage drivers under chapters 392 and 382. Likewise, whether Uber is falsely claiming that it pays the full 20% gratuity to its drivers and only receives a $1.00 fee does not depend upon interpreting or enforcing Rule 403. The claim turns upon the existence of these purportedly false and fraudulent statements as opposed to whether Uber is operating as a de facto and unapproved radio association and using licensed hackney carriage drivers that charge in excess of the metered or flat rate fares set by the Commissioner.

39      The four allegedly unfair or deceptive acts or practices identified in the paragraph specific to Count III are:
            (a) Falsely claiming an affiliation with medallion owners and radio associations;
            (b) Falsely claiming that it only collects a $ 1 fee and pays the full 20% "gratuity" to taxi drivers;
            (c) Falsely claiming that its taxi service is lawful under Boston Taxi Rules;
            (d) Falsely claiming that its Black Cars, SUVs and UberX vehicles do not need to be licensed and regulated as taxis in Boston.
            (Docket Entry # 1–1, ¶ 66).

40      This court is not making the converse finding that if a showing was required, it would preclude the chapter 93A claim.

*Katz* is therefore distinguishable because the plaintiff based her chapter 93A claim exclusively on a violation of chapter 93H. *See Katz v. Pershing, LLC*, 806 F.Supp.2d at 458. Here, neither the false affiliation nor the gratuity allegations in Count III depend upon an interpretation of Rule 403 or usurp the authority of the Commissioner to regulate taxicabs in Boston and enforce Rule 403. The absence of a private right of action therefore does not foreclose the chapter 93A claims based on a false affiliation or gratuity. [41]

41      Uber raises a new argument in the reply brief seeking to dismiss Count III because plaintiffs offer no cognizable theory of harm
            regarding the chapter 93A claim based on the gratuity. (Docket Entry # 19). Uber presents the argument in a single sentence bereft of
            any developed argument. The argument is therefore waived with respect to the present motion. *See U.S. v. Caparotta*, 676 F.3d at 218
            ("argument consist[ing] of just two sentences and two cursory citations in his brief ... is therefore waived"); *U.S. v. Pizarro–Berrios*,
            448 F.3d 1, 5–6 (1st Cir.2006) ("[w]e have consistently held that, except in extraordinary circumstances, arguments not raised in a
            party's initial brief and instead raised for the first time at oral argument are considered waived"); *Higgins v. New Balance Athletic
            Shoe, Inc.*, 194 F.3d at 260 ("district court is free to disregard arguments that are not adequately developed"); *see also CMM Cable
            Rep., Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d 1504, 1526 (1st Cir.1996) (courts are "entitled to expect represented parties to
            incorporate all relevant arguments in the papers that directly address a pending motion").

**\*29** Count III also includes the allegations that Uber's "taxi service is lawful" and that Uber Black Cars, Uber SUVs and UberX vehicles do not require hackney carriage licences. (Docket Entry # 1–1, ¶ 66(c) & 66(d)). In contrast to paragraphs 66(a) and 66(b), these allegations more closely implicate Rule 403 and the foregoing statutes. By their terms, chapters 386 and 392 uniformly proscribe any person from having charge of a vehicle used to convey persons for hire within Boston unless the driver is licensed to drive the hackney carriage. Chapter 386 also explicitly prohibits a person from being in charge if a taxicab that is not licensed as a hackney carriage. Count IV includes the allegation that Uber competes unfairly because it evades the expense of complying with obtaining hackney carriage licenses for the drivers of Uber Black Cars and Uber SUVs. [42]

42      The above allegation is one of the two identified means by which Uber competes unfairly in Count IV. The other allegation (diverting
            credit card processing fees) fails for lack of injury under section 11. Accordingly, the allegation is not addressed with respect to
            Uber's argument that Rule 403 and chapters 392 and 386 occupy the field thereby precluding a chapter 93A claim.

As noted above with respect to the foregoing allegations in Count III and the foregoing allegation in Count IV, Uber maintains that Rule 403 and the statutes and ordinance occupy the field and that neither Rule 403 nor its authorizing statutes confer a private right of action to plaintiffs. [43] (Docket Entry6 & 19). Where the Massachusetts legislature enacts a comprehensive

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)
2014 WL 1338144

regulatory scheme with a specific statute geared towards remedying the misconduct at issue, the more specific statute with its limited remedies may preclude the broader remedies in chapter 93A. *See Cabot Corp. v. Baddour*, 394 Mass. 720, 477 N.E.2d 399, 402 (Mass.1985) (state securities statute enacted four days after chapter 93A precluded chapter 93A relief because it was "comprehensive regulatory scheme" that included criminal enforcement mechanism and private right of action for defrauded purchaser without recovery of punitive or multiple damages); *Reiter Oldsmobile, Inc. v. General Motors Corp.*, 378 Mass. 707, 393 N.E.2d 376, 378 (Mass.1979) (automotive industry); *see also Darviris v. Petros*, 442 Mass. 274, 812 N.E.2d 1188, 1195 (Mass.2004) (Attorney General's chapter 93A rule making power continues to exist unless legislature "covered the field in a way which precludes further remediation by regulation under [chapter 93A]"). The statutes implicated in *Cabot* and *Reiter*, each enacted after chapter 93A, covered the same misconduct at issue as did chapter 93A yet limited the remedies. *See Cabot Corp. v. Baddour*, 477 N.E.2d at 401–402; *Reiter Oldsmobile, Inc. v. General Motors Corp.*, 393 N.E.2d at 377 (Massachusetts General Laws chapter 93B"declares unlawful '(u)nfair methods of competition and unfair or deceptive acts or practices' occurring in the automotive industry"). In each case, the more specific, subsequently enacted statute prevailed over the broader and more general chapter 93A statute.

43      Somewhat different concerns apply to this argument when it seeks to preclude the state law cause of action as opposed to the federal law cause of action.

In other circumstances, a specific and more general regulatory scheme can coexist without conflict. *See Dodd v. Commercial Union Ins. Co.*, 373 Mass. 72, 365 N.E.2d 802, 805 (Mass.1977). [44] "The mere existence of one regulatory statute does not affect the applicability of a broader, nonconflicting statute, particularly when both statutes provide for concurrent coverage of their common subject matter."*Id.* (also noting that Massachusetts General Laws chapters 176D and 93A "overlap but do not conflict"). For example, the regulation of rental car companies under Massachusetts General Laws chapter 90 and a rental car company's collision damage waiver agreement's violation of section 32E1/2 of chapter 90 did not preclude a chapter 93A claim against the rental car company. *Hershenow v. Enterprise Rent–A–Car Company Of Boston, Inc.*, 445 Mass. 790, 840 N.E.2d 526, 529 (Mass.2006). The *Hershenow* court rejected the rental car company's argument that chapter 90 barred a chapter 93A claim because section 32E1/2 only provided for civil fines and a public enforcement action brought by the Commonwealth without a private cause of action. *Id.*

44      A statutory amendment to chapter 93A after the *Dodd* decision overrode the decision's "restrictive interpretation" of the plaintiffs "who could bring private causes of action for unfair insurance claim settlement practices."*Hopkins v. Liberty Mut. Ins. Co.*, 434 Mass. 556, 750 N.E.2d 943, 950 n. 12 (Mass.2001) (discussing *Dodd*).

  *30 In addition, "Statutes addressing the same subject matter" are "construed harmoniously so as to give full effect to all of their provisions and give rise to a consistent body of law."*Ciardi v. F. Hoffmann–La Roche, Ltd.*, 436 Mass. 53, 762 N.E.2d 303, 311 (Mass.2002) (state antitrust law did not preclude chapter 93A claim). It is also presumed that the legislature was aware of chapters 392 and 386 at the time it enacted section 11 of chapter 93A. *See Hadley v. Amherst*, 372 Mass. 46, 360 N.E.2d 623, 626 (Mass.1977); *see also Cabot Corp. v. Baddour*, 477 N.E.2d at 402 (paraphrasing *Hadley*, 360 N.E.2d at 626, in parenthetical).

Overall, chapters 392 and 386 as well as ordinance 16–15.05 and Rule 403 are not as pervasive or comprehensive with respect to the regulated subject area as the regulatory schemes and statutes which the Massachusetts Supreme Judicial Court ("SJC") interpreted as precluding a chapter 93A claim because the former occupied the field. *See Cabot Corp. v. Baddour*, 477 N.E.2d at 401 (state securities law); *Fleming v. National Union Fire Ins. Co.*, 445 Mass. 381, 837 N.E.2d 1113, 1117–1118 (Mass.2005) (workers compensation benefits for injured employees); *Reiter Oldsmobile, Inc. v. General Motors Corp.*, 393 N.E.2d at 378 (automotive industry). Neither chapter 392 nor chapter 386, which imposes a statutory fine of $50.00, provide a civil private right of action thereby indicating a lack of pervasive regulation. *See Hershenow v. Enterprise Rent–A–Car Company Of Boston, Inc.*, 840 N.E.2d at 532; [45] *Cabot Corp. v. Baddour*, 477 N.E.2d at 401. [46] In addition, the statute at issue in *Reiter* [47] expressly referred to chapter 93A and included and excluded certain remedies of chapter 93A thereby evidencing the legislature's intention to exclude the broader chapter 93A remedy. *See Reiter Oldsmobile, Inc. v. General Motors Corp.*, 393 N.E.2d at 377 ("Legislature was aware of the private injunctive relief available under c. 93A, s 9, but made explicit reference in c. 93B, s 12, only to the damage remedy set forth in s 9, excluding by implication injunctive relief").

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)
2014 WL 1338144

45    The SJC in *Hershenow* contrasted the *Cabot* and *Reiter* decisions, which found preclusion, with *Dodd,* which allowed the chapter 93A claim, in a manner indicative of finding that a statute is more likely to occupy the field when it allows a private right of action and embodies limited remedies. The relevant citations to *Cabot, Reiter* and *Dodd* are as follows:

> Contrast *Cabot Corp. v. Baddour,* 394 Mass. 720, 722–723, 725, 477 N.E.2d 399 (1985) (Uniform Securities Act intended to provide comprehensive regulation of securities field, and distinguishing *Dodd v. Commercial Union Ins. Co.,* supra, where absence of private actions established that insurance field not comprehensively regulated); *Reiter Oldsmobile, Inc. v. General Motors Corp.,* 378 Mass. 707, 711, 393 N.E.2d 376 (1979) (G.L. c. 93B, which addresses unfairness in dealings in the automotive industry, provided specific private remedies for violation, so no relief available under G.L. c. 93A).

> *Hershenow v. Enterprise Rent–A–Car Company Of Boston, Inc.,* 840 N.E.2d at 532.

46    Likewise the SJC in *Cabot* contrasted the decisions in *Reiter* and *Dodd* to note that an absence of private right of action indicates a lack of comprehensive regulation:

> We distinguished the result in *Reiter* from that reached in *Dodd v. Commercial Union Ins. Co.,* 373 Mass. 72, 76–78, 365 N.E.2d 802 (1977), reasoning that "[u]nlike c. 93B, c. 176D made no provision for private actions," and therefore the latter did not comprehensively regulate unfair or deceptive insurance practices. *Reiter, supra* 378 Mass. at 711, 393 N.E.2d 376.

> *Cabot Corp. v. Baddour,* 477 N.E.2d at 401.

47    Massachusetts General Laws chapter 93B ("chapter 93B").

Here, chapter 93A, the later enacted statute, does not expressly preclude a cause of action based on chapters 392 and 386. Chapter 93A does not mention either chapter 392 or chapter 386. Like the subsequently enacted statute in *Hershenow,* chapter 93A is devoid of any "clearly expressed legislative intent" to bar a private civil cause of action that implicates misconduct encompassed by chapters 392 and 386. *See Hershenow v. Enterprise Rent–A–Car Company Of Boston, Inc.,* 840 N.E.2d at 531 ("[w]e do not perceive a conflict between the two statutory schemes, nor do we perceive any clearly expressed legislative intent that G.L. c. 90, § 32E1/2, displace entirely any existing private remedies for deceptive practices"). Presumably, the Massachusetts legislature was aware of these statutes and the regulatory scheme when it enacted section 11 of chapter 93A. Recognizing a cause of action under chapter 93A for misconduct that may also fall within the scope of chapters 392 and 382 [48] is consistent with the legislative purpose of section 11"to 'encourage more equitable behavior in the marketplace and impose liability on persons seeking to profit from unfair practices.' " *In re Pharmaceutical Industry Average Wholesale Price Litigation,* 582 F.3d at 194 (quoting *Arthur D. Little, Inc. v. Dooyang Corp.,* 147 F.3d 47, 55 (1st Cir.1998)); *see generally Kattar v. Demoulas,* 433 Mass. 1, 739 N.E.2d 246, 257 (Mass.2000) (chapter 93A " 'creates new substantive rights,' " " ' provides new procedural devices for the enforcement of those rights' " and " 'makes conduct unlawful which was not unlawful under the common law or any prior statute' ") (internal brackets omitted). In addition, allowing the private cause of action under chapter 93A does not render chapters 392 or 382 surplusage because these statutes impose statutory fines as opposed to civil damages. *See Cabot Corp. v. Baddour,* 477 N.E.2d at 402 (recognizing chapter 93A cause of action would render the limitations upon private remedies in the more specific statute "surplusage"). In short, there is no conflict between chapters 392 and 386 and section 11 of chapter 93A.

48    One example of the overlapping misconduct is "falsely claiming that its black cars, SUVs and UberX vehicles do not need to be licensed and regulated as taxis in Boston."(Docket Entry # 1–1, ¶ 66(d)). Establishing this premise as a violation of section 11 entails determining if Uber is a person in "charge of a hackney carriage" driven by an unlicensed hackney carriage driver under chapters 392 and/or 386. As previously indicated, the statutory grant of authority to the Commissioner in chapter 392, section four, to grant hackney carriage licences impliedly encompasses the authority to determine if Uber qualifies as an approved radio association.

**\*31** The overall regulatory framework of Boston taxicabs and, in particular, the operation of an unapproved dispatch service, as discussed at length in the factual background, is not as detailed as the frameworks at issue in *Cabot, Fleming* and *Reiter.*The limited express remedy imposing a statutory fine against Uber under chapter 386 [49] and the absence of an express administrative process in Rule 403 to resolve a complaint against an unapproved dispatch service [50] allows the chapter 93A cause of action to easily coexist without a conflict. [51] Accordingly, the Commissioner's regulation of licensed hackney carriages, medallion owners and, primarily, approved as opposed to unapproved radio associations under Rule 403 [52] does not conflict with the recognition of a private cause of action under chapter 93A against an entity such as Uber. *See generally Hershenow v. Enterprise*

*Rent–A–Car Company Of Boston, Inc.,* 840 N.E.2d at 531 ("[w]e do not perceive a conflict between the two statutory schemes, nor do we perceive any clearly expressed legislative intent that G.L. c. 90, § 32E1/2, displace entirely any existing private remedies" under chapter 93A). Allowing a chapter 93A cause of action, whether for unfair or deceptive practices in Count III or unfair competition in Count IV, is not barred by the regulatory scheme in Rule 403 or chapters 392 and 386. The statutes' failure to refer to chapter 93A coupled with the principle that statutes addressing the same subject matter are construed harmoniously lend support for allowing the chapter 93A causes of action. Legislative intent to bar the chapter 93A claims is absent. Contrary to Uber's position, the chapter 93A claims are not an attempt to bypass the administrative enforcement procedures under Rule 403.

49    For purposes of resolving the motion to dismiss, the facts in the complaint construed in plaintiffs' favor permit a finding that Uber is a person in charge of vehicles for hire operated by drivers who do not have hackney carriage licenses.

50    With respect to radio associations, the rule expressly sets out only the penalty of a removal of a radio association from "the list of approved radio associations."(Docket Entry # 6–3, § 7).

51    It is therefore not necessary to decide dubi#ante that a regulation enacted after a statute can impliedly override the express cause of action in the prior statute.

52    Rule 403 does proscribe that only approved radio associations may accept licensed hackney carriage medallion owners as members.

As an aside, Massachusetts case law allows an aggrieved individual or entity to file suit in equity and obtain injunctive relief against a competitor for unlawful competition that causes harm to a plaintiff notwithstanding the existence of a regulatory scheme similar to the Commissioner's regulation and authority over Boston taxicabs. *See A.B. & C. Motor Transp. Co. v. Department of Public Utilities,* 327 Mass. 550, 100 N.E.2d 560 (Mass.1951) (allowing suit in equity against competitor to preclude transfers of competitor's licenses authorizing carriage of property for hire). Equity may therefore provide relief to "restrain competition by an unlicensed carrier."*Id.* at 561 (collecting cases); *see Boston & M.R.R. v. Hart,* 254 Mass. 253, 150 N.E. 212, 213 (Mass.1926) (allowing suit in equity against defendant, which operated "line of motor busses ... for the carriage of passengers for hire over public ways by regular routes" and "had no licenses at any time for carrying on his business in any of the cities or towns through which his busses run, such as were and are required by G.L. c. 159, § 45"); *Boston & M.R.R. v. Cate,* 254 Mass. 248, 150 N.E. 210, 211 (Mass.1926) (allowing suit in equity against defendant which was "operating his motor vehicles ... for the carriage of passengers for hire ... similar to that afforded by a railway company" without license from city council, in violation of city ordinances and without certificates from department of public utilities); *see also New York, N.H. & H.R. Co. v. Deister,* 253 Mass. 178, 148 N.E. 590, 591 (Mass.1925) (allowing suit by railroad operator because "agreed facts disclose irreparable injury to the plaintiff in the loss of revenue derived from patronage diverted by the defendant through his illegal conduct in operating buses without the licenses required by law"). In fact, the Massachusetts Appeals Court in *Lynch* rejected an argument that a court order requiring the Commissioner to notify applicants for hackney carriage licenses about the rejection of their applications as stale and the need to file new applications was "an impermissible infringement upon his discretion."*Lynch v. Police Commissioner of Boston,* 681 N.E.2d at 311.

**\*32** In sum, the Commissioner's delegated authority, the regulatory scheme and/or the absence of a private right of action do not require dismissal of Counts III or IV. Uber's arguments based on *Dial A Car* and *Katz* fail to warrant dismissing the chapter 93A claims.

Uber next asserts that Count IV fails for two reasons, each specific to the two allegations in Count IV. Count IV incorporates the previous paragraphs in the complaint and then alleges the following:

  69. By unlawfully operating its taxi, Black Car, SUV and UberX transportation services without incurring the expense of compliance with Massachusetts and Boston laws, as alleged above, Uber unfairly competes with plaintiffs, in violation of M.G.L. c. 93A, § 11.

  70. By diverting revenues for credit card processing that the plaintiffs are contractually obligated to pay to CMT, Uber unfairly competes with the plaintiffs.

Whoa

(Docket Entry # 1–1). With respect to paragraph 69, Uber asserts that the allegation fails because Uber does not own any vehicles. Liberally reading the facts in the complaint, it allows for a finding that Uber is in charge of unlicensed vehicles for hire in Boston.

Uber's challenge to paragraph 70 is that plaintiffs do not suffer any harm as a result of the uncollected credit card processing fees. Uber points out that it is CMT that does not receive the processing fees and that plaintiffs fail to plead an interest in CMT that would result in harm.

Section 11 provides a cause of action for any person engaged in "any trade or commerce and who suffers any loss of money or property" due to "an unfair method of competition or an unfair or deceptive act or practice" of "another person who engages in any trade or commerce."Mass. Gen. Laws ch. 93A, § 11; *RTR Technologies, Inc. v. Helming*, 707 F.3d 84, 92 (1st Cir.2013). Notably, the plaintiff must allege the "loss of money or property ...*as a result of* the use or employment by another person ... of an unfair method of competition or an unfair or deceptive act or practice."Mass. Gen. Laws ch. 93A, § 11 (emphasis added); *Arthur D. Little, Inc. v. Dooyang Corporation*, 147 F.3d 47, 56 (1st Cir.1998) (loss of money or property must stem from the chapter 93A misconduct)."In the absence of a causal connection between the alleged unfair acts and the claimed loss, there can be no [chapter 93A] recovery."*Farm Bureau Federation v. Blue Cross*, 403 Mass. 722, 532 N.E.2d 660, 665 (Mass.1989)."Money means money, not time, and property means the kind of property that is purchased or leased, not such intangibles as a right to a sense of security, to peace of mind, or to personal liberty."*Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d at 56 (internal quotation marks, ellipses and brackets omitted).

Here, the loss of credit card processing fees experienced by CMT does not equate to a loss of money to Boston Cab or EJT. It is true that Boston Cab has a contract with CMT, an approved taxicab credit card processing company. In return for CMT installing equipment in taxicabs owned or leased by members of Boston Cab, CMT receives "credit card processing fees for fares" and "advertising revenue" from approved video screens in licensed taxicabs. (Docket Entry # 1–1, ¶ 52). Payments by Uber clients bypass "the credit card system installed in Boston Cabs" and deprive *"CMT* of the processing fees that" Boston Cab "is contractually obligated to give CMT." (Docket Entry # 1–1, ¶ 53) (emphasis added). It is CMT, not plaintiffs, which suffers the loss of money in the form of credit card processing fees. Although Count IV survives dismissal with respect to paragraph 69 and the complaint as a whole, the allegation in paragraph 70 is insufficient to support a loss of money or property and, as a result, a basis for the unfair competition claim in Count IV.

### E. *Common Law Claims*

**\*33** Counts V and VI respectively set out common law claims for unfair competition and interference with contractual relationships. Uber seeks to dismiss Count V because it is derivative of the Lanham Act and chapter 93A claims and therefore subject to dismissal to the same extent. (Docket Entry # 6).

A common law unfair competition claim encompasses a claim against a defendant " 'palming off his goods as those of the plaintiff to the injury of the latter.' " *Planned Parenthood Federation of America, Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 498 N.E.2d 1044, 1047 (Mass.1986); *see Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 489 N.E.2d 185, 191 (Mass.1986); *see also Open Software Foundation, Inc. v. U.S. Fidelity and Guar. Co.*, 307 F.3d 11, 17 (1st Cir.2002). The common law unfair competition claim in Count V is therefore similar to the Lanham Act false affiliation or sponsorship claim in Count II. Because Count II survives dismissal, Count V is not subject to dismissal as derivative of the Lanham Act claim in Count II. Similarly, because the chapter 93A claim in Count III is also not subject to dismissal, Count V is likewise not subject to dismissal based on Uber's argument.

Uber next summarily states that, "Because Count IV fails, so does Count V." (Docket Entry # 19). Count IV survived dismissal except to the extent that it depended upon the allegation in paragraph 70. Paragraph 70 did not support the chapter 93A claim because of the complaint's failure to set out any facts regarding a "loss of money or property." No such statutory requirement

applies to the common law unfair competition claim. Uber's brevis argument therefore does not provide a basis to dismiss Count V. Uber's *Dial A Car* argument fails for a number of the reasons addressed with respect to the chapter 93A claims.

Turning to Count VI, Uber moves to dismiss the claim because the complaint fails to satisfy the requirements that: (1) plaintiffs "had an advantageous relationship with a third party"; (2) Uber "knowingly induced a breaking of that relationship"; (3) Uber's interference was "improper in motive and means"; and (4) the interference harmed plaintiffs. [53] (Docket Entry # 6) (citing *Blackstone v. Cashman,* 448 Mass. 255, 860 N.E.2d 7, 12–13 (Mass.2007)). Plaintiffs submit that the complaint adequately sets out a plausible claim of intentional interference with contractual relationships with facts to support each element.

[53]   Uber incorrectly sets out elements of an intentional interference with an advantageous business relationship claim as opposed to the related tort of an intentional interference with a contract or contractual relations. Uber also misstates the motive or means requirement as requiring "motive and means." (Docket Entry # 6).

Count VI and the complaint as a whole include two contractual relations or contracts. First, Uber purportedly induced drivers of taxicabs managed by EJT to breach the terms of their lease agreements. (Docket Entry # 1–1, ¶¶ 2–3, 14, 29, 33, 42, 51–53, 58 & 76–78). In particular, the lease agreements between a driver and EJT require the driver/lessee to comply with Rule 403. Among other requirements, Rule 403 requires drivers to accept coupons, vouchers and credit card payments and not use a cellular telephone. The rule also dictates that taxicabs, including those driven by Boston Cab members and lessees, must have a functioning credit card reader in the vehicle. Hence, medallion owners and drivers with taxicabs managed by EJT who partner with Uber may violate Rule 403 and therefore their lease agreements with EJT.

**\*34** Second, Count VI alleges that Uber intentionally interferes with Boston Cab's contract with CMT. (Docket Entry # 1–1, ¶¶ 2, 3, 14, 33, 42, 51–54 & 76–78). Specifically, Uber mandates that drivers of Uber Taxis, including drivers who belong to Boston Cab, use Uber's computerized billing system that charges the customer's Uber registered credit card in lieu of the credit card reader in the taxicab. Under Boston Cab's contract with CMT, the latter collects the credit card processing fee when the customer uses the credit card reader. The benefit to Boston Cab under the contract is that CMT pays for and installs the required credit card equipment or reader. (Docket Entry # 1–1, ¶¶ 2, 3, 14, 33, 42, 51–54 & 76–78). Uber's diversion of the credit card processing fees from CMT purportedly interferes with Boston Cab's contract with CMT.

In order to establish a claim for intentional interference with contractual relations or relationships, the plaintiff must show that "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."*G.S. Enterprises, Inc. v. Falmouth Marine, Inc.,* 410 Mass. 262, 571 N.E.2d 1363, 1369 (Mass.1991); *Pierce v. Cotuit Fire Dist.,* 741 F.3d 295, 2014 WL 291946, at \*8 (1st Cir. Jan.28, 2014); *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 551 N.E.2d 20 (Mass.1990); *Melo–Tone Vending, Inc. v. Sherry, Inc.,* 39 Mass.App.Ct. 315, 656 N.E.2d 312, 314–315 (Mass.App.Ct.1995) (citing *Restatement (Second) of Torts* § 768(1)(d) cmt. g. (1986)). [54] As noted above, Uber seeks to dismiss the claim due to the absence of all four elements.

[54]   Massachusetts cases look to the *Restatement (Second) of Torts* §§ 766–766B (1979), for guidance in this area. *See Blackstone v. Cashman,* 448 Mass. 255, 860 N.E.2d 7, 12 (Mass.2007).

As to the required element of harm, there must be a showing "that the plaintiff suffer[ed] damages as a consequence of the defendant's conduct, and those damages cannot be speculative or conjectural losses."*Chemawa Country Golf, Inc. v. Wnuk,* 9 Mass.App.Ct. 506, 402 N.E.2d 1069, 1072–1073 (Mass.App.Ct.1980) (no disruption of the contract and no evidence that golf club lost members or green fees due to defendant's interference); *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.,* 571 N.E.2d at 1371 (plaintiff must sustain "damages due to [third party's] breaking off of its contract with" plaintiff and such damages cannot be "speculative" or "conjectural") (citations omitted); *see Sharratt v. Housing Innovations, Inc.,* 365 Mass. 141, 310 N.E.2d 343, 348 (Mass.1974) (dicta that, for intentional interference of contractual relations claim, "it is the actual and not the assumed damage which provides the basis for recovery, and which accordingly *must be alleged"* ) (emphasis added); *see also Tech Plus, Inc. v. Ansel,* 59 Mass.App.Ct. 12, 793 N.E.2d 1256, 1263 (Mass.App.Ct.2003) (insufficient harm alleged

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)
2014 WL 1338144

because, although "plaintiffs were removed as sales representatives" from transactions, they received all of the commissions). The court in *Chemawa* reversed a denial of a motion for judgment notwithstanding a verdict that found the defendant liable for intentional interference with business or contractual relations because there was no evidence "that Chemawa was damaged by Wnuk's conduct."*Chemawa Country Golf, Inc. v. Wnuk,* 402 N.E.2d at 1073. Thus, a recovery of emotional distress damages "is not allowed unless *the elements* of the tort are made out[,] i.e., actual damage to an economic relationship or prospective relationship."*Ratner v. Noble,* 35 Mass.App.Ct. 137, 617 N.E.2d 649, 650 (Mass.App.Ct.1993).

**\*35**  In the case at bar, the complaint sets out a conclusory allegation of harm (Docket Entry # 1–1, ¶ 78) (Uber's interference with contractual relationships between "plaintiffs and Boston cab drivers has caused the plaintiffs harm"); *see generally Hill v. Gozani,* 638 F.3d 40, 55 (1st Cir.2011); *Gagliardi v. Sullivan,* 513 F.3d 301, 305 (1st Cir.2008). The complaint fails to show any facts that plaintiffs experienced harm as a result of Uber's interference with the contract between Boston Cab and CMT to pay for and install credit card equipment in return for credit card processing fees. It is true that one who interferes "with the performance of a contract ... between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him."*Restatement (Second) of Torts* § 766B (1979); *Shafir v. Steele,* 431 Mass. 365, 727 N.E.2d 1140, 1144 (Mass.2000). The complaint however does not indicate that CMT will not continue the relationship or plans to terminate the contract as a result of reduced credit card processing fees due to Uber's interference thereby causing Boston Cab pecuniary harm. *See generally Restatement (Second) of Torts* § 766B & cmt. c (1979). The complaint also fails to show any facts that Uber's interference is making it more expensive or burdensome for Boston Cab to perform the contract with CMT under which Boston Cab provides CMT with the credit card processing fees when customers pay with credit or debit cards. (Docket Entry # 1–1, ¶ 53). Boston Cab is contractually obligated to provide CMT these processing fees but there is no indication that Boston Cab experiences a greater burden to perform the contract due to the reduction in credit card processing use.

With respect to the allegation that Uber induces Boston Cab members subject to a lease agreement with EJT to violate the terms of the lease agreement by not complying with Rule 403, there is no indication that Boston Cab or EJT experience harm as a result of Uber's interference. There is no indication that Boston Cab is subject to being removed as an approved radio association resulting in a loss of income as a result of Uber's interference. There are also no facts or reasonable inferences that EJT's income is reduced because of Uber's interference with the lease agreements that causes the drivers to violate Rule 403.

Uber's request to dismiss Count VI without leave to amend is nevertheless unwarranted. Under certain circumstances, a court may allow a plaintiff an opportunity to amend in lieu of a dismissal of a claim with prejudice. *See Eastern Food Services, Inc. v. Pontifical Catholic University Services Ass'n, Inc.,* 357 F.3d 1, 8 (1st Cir.2004) (leave to amend often allowed "for failure to state a claim where court thinks that the case has some promise"); *see, e.g., Rodi v. Southern New England School of Law,* 389 F.3d 5, 20 (1st Cir.2004) (directing district court to afford the plaintiff opportunity to amend and replead chapter 93A claim). The terms of the contract between CMT and Boston Cab may set a baseline number of credit card processing transactions that, if not met, require Boston Cab to reimburse CMT or include other conditions such that Uber's interference caused Boston Cab harm. EJT may be experiencing a drop in revenue because Boston Cab members and former or existing lessees are no longer leasing their vehicles because of Uber's interference.[55] Given the preference to decide cases on their merits, a dismissal of Count VI with prejudice is not appropriate. *See generally Rodi v. Southern New England School of Law,* 389 F.3d at 20 (noting that " 'the purpose of pleading is to facilitate a proper decision on the merits' "). Plaintiffs may therefore seek leave to amend the complaint to set out facts to support a plausible entitlement to relief under Count VI within the time frame of any case management deadline.[56]

[55]   Plaintiffs' brief, which is not part of the Rule 12(b)(6) factual record, alleges that Uber's diversion of business has caused a diminution in the number of cabs leased and therefore economic harm. (Docket Entry # 14). The complaint does not state that EJT experienced harm in the form of reduced lease agreements as a result of Uber's interference in the lease agreements.

[56]   The recommendation to dismiss Count VI without prejudice due to the absence of harm makes it unnecessary to address Uber's other arguments. Uber can raise these arguments in the event plaintiffs seek leave to amend the complaint. At present, it is premature to

address the arguments because a proposed amended complaint might include additional facts that place the arguments in a different light.

### F. RICO Claims

**\*36** Uber moves to dismiss the RICO claims under Rule 9(b). The predicate RICO acts alleged in the complaint consist of wire fraud in violation of 18 U.S.C. § 1343.

Where, as here, the predicate acts are wire fraud, Rule 9(b) requires the pleader " 'to go beyond a showing of fraud and state the time, place and content of the alleged ... wire communications perpetrating that fraud.' " *Cordero–Hernandez v. Hernandez–Ballesteros*, 449 F.3d 240, 244 (1st Cir.2006) (quoting *N. Bridge Associates, Inc. v. Boldt*, 274 F.3d 38, 43 (1st Cir.2001)). Wire fraud requires: "(1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the specific intent to defraud; and (3) the use of interstate ... wire communications in furtherance of the scheme." *Sanchez v. Triple–S Management, Corp.*, 492 F.3d 1, 9–10 (1st Cir.2007); *United States v. Cassiere*, 4 F.3d 1006, 1011 (1st Cir.1993) (stating elements of wire fraud). Uber maintains that the complaint does not comply with Rule 9(b) with respect to all three requirements. (Docket Entry 6 & 19).

The schemes to defraud based on false pretenses arise from the false representations about the fare or gratuity with respect to Uber Taxis (Docket Entry # 1–1, ¶¶ 3, 4, 20, 35–38, 42, 49–50, 79–80, 86 & 91) and the false representations that Uber, through Uber Taxi, partners or associates itself with Boston Cab and EJT (Docket Entry # 1–1, ¶¶ 3, 4, 14, 42, 50, 63, 66, 79, 80, 86 & 91). The facts in the complaint set forth in these paragraphs adequately particularize a scheme to defraud under Rule 9(b). They also adequately plead an intent to deceive under Rule 9(b). Uber uses these schemes to deceive Uber clients that it is paying a 20% gratuity to the driver and that it associates with Boston taxicabs, in particular, those driven by Boston Cab members or lessees. *See Sanchez v. Triple–S Management, Corp.*, 492 F.3d 1, 12 (1st Cir.2007) ("scheme must be intended to deceive another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct"); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir.1990).

Turning to the use of interstate wire communications, Uber customers use their Uber app to view a map of nearby Uber affiliated vehicles including Uber Taxis. Based on the fact that Boston Cab has 500 medallion owner members out of the 1,825 "city issued medallions" (Docket Entry # 1–1, ¶¶ 2, 4 & 11), taxicabs driven by Boston Cab members have a strong and recognized presence in Boston. When a taxicab driven by a Boston Cab member with the Boston Cab logo and color scheme accepts the assignment and picks up the Uber client, the client falsely associates Uber and Uber Taxi with Boston Cab. As to the misrepresentation regarding fares, Uber's website states that, " 'we'll automatically add 20% gratuity for the driver" when, in fact, the driver only gets "half of the 20% charge." (Docket Entry # 1–1, ¶¶ 37–38).

**\*37** Aside from content, the specificity regarding the time and place of the use of interstate wire communications is absent. As explained in *Cordero–Hernandez*, the plaintiffs "did not make the requisite allegations identifying specific interstate phone calls by time, place, and content." *Cordero–Hernandez v. Hernandez–Ballesteros*, 449 F.3d at 244. To the extent the complaint particularizes the time and place of the interstate wire communications, it does so in paragraph 80. The paragraph reads as follows:

> 80. By using the internet to transmit fraudulent misrepresentations to Boston consumers about fares in Uber taxis and false claims of an association between Uber and Boston Cab Dispatch, Uber violates the federal Wire Fraud statute, 18 U.S.C. § 1343. These fraudulent representations have been transmitted to Boston users of the Uber taxi transportation system thousands of times over a period in excess of five months.

(Docket Entry # 1–1, ¶ 80). Using the internet to transmit the misrepresentations "thousands of times" for "a period in excess of five months" does not particularize the time and place of the use of interstate wire communications. The information is not within the exclusive control of Uber to warrant additional discovery. *See N. Bridge Associates, Inc. v. Boldt*, 274 F.3d at 43–44. Plaintiffs have access to Uber clients who choose Uber Taxi in the event a Boston Cab member accepts the assignment

**Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)**
2014 WL 1338144

and transports the Uber client. Plaintiffs also do not request additional discovery to ascertain the time, place and content of the interstate wire communications.

The issue therefore reduces to whether leave to amend to particularize the time and place of interstate wire communications is appropriate. Plaintiff has not filed previous complaints deficient under Rule 9(b) and the outline of the complaint provides Uber adequate notice of wire fraud to frame a response. There is also a preference to decide cases on their merits. Plaintiffs do not however request an opportunity to amend the RICO claims if deemed deficient under Rule 9(b). On balance, the circumstances support allowing an opportunity to amend the complaint. *See Juarez v. Select Portfolio Servicing, Inc.*, 708 F.3d 269, 281 (1st Cir.2013) (district court abused its discretion in denying amendment after Rule 9(b) dismissal because "totality of the circumstances" warranted allowing plaintiff to re-plead fraud at "this first procedural stage"); *North American Catholic Educational Programming Foundation, Inc. v. Cardinale*, 567 F.3d 8, 16 (1st Cir.2009) (for Rule 9(b) deficiencies, "leave to amend is often given, at least for plausible claims"). In light of the potential damage to Uber's reputation resulting from the RICO claims, a time limit of 30 days is appropriate to allow a motion for leave to amend the complaint to particularize the RICO claims in counts VII to IX.

### CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS** [57] that the motion to dismiss (Docket Entry # 5) be **ALLOWED** to the extent that Count I is dismissed with prejudice and counts VI and VII to IX are dismissed without prejudice. Plaintiffs shall have 30 days to file a motion for leave to amend the RICO claims. This court **RECOMMENDS** [58] that the motion otherwise be **DENIED.**

[57]   Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. *See* Rule 72(b), Fed.R.Civ.P. Any party may respond to another party's objections within 14 days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order.

[58]   *See* the previous footnote.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)

2014 WL 1338148

2014 WL 1338148
Only the Westlaw citation is currently available.
United States District Court,
D. Massachusetts.

BOSTON CAB DISPATCH, INC. and EJT Management, Inc., Plaintiffs,
v.
UBER TECHNOLOGIES, INC., Defendant.

Civil Action No. 13–10769–NMG.   |   Signed March 27, 2014.

**Attorneys and Law Firms**

Samuel Perkins, Michael Stefanilo, Jr., Richard E. Brody, Brody, Hardoon, Perkins & Kesten, LLP, Boston, MA, for Plaintiffs.

Patrick A. Fitch, Quinn Emanuel Urquhart & Sullivan, LLP, Washington, DC, Stephen A. Swedlow, Quinn Emanuel Urquhart & Sullivan, LLP, Chicago, IL, Michael Mankes, Littler Mendelson P.C., Boston, MA, for Defendant.

### *MEMORANDUM & ORDER*

GORTON, District Judge.

**\*1** Plaintiffs Boston Cab Dispatch, Inc. ("Boston Cab") and EJT Management, Inc. ("EJT") allege that defendant Uber Technologies, Inc. ("Uber") violates various federal and state false advertising and unfair competition laws and Boston taxicab ordinances by providing a private car service that allows users to call taxicabs associated with Boston Cab and other dispatch services without complying with Boston taxicab regulations.

Plaintiffs' complaint asserts the following causes of action: (1) violation of § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count I); (2) violation of § 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (Count II); (3) violation of M.G.L. c. 93A, § 11 based on Uber's allegedly unfair and deceptive acts and practices (Count III); (4) violation of c. 93A, § 11 based on Uber's unfair competition (Count IV); (5) unfair competition under Massachusetts common law (Count V); (6) interference with contractual relationships (Count VI); and (7) various violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a-c) (Counts VII, VIII and IX).

In April, 2013, Uber moved to dismiss the complaint in its entirety. That motion was referred to Magistrate Judge Marianne Bowler for a Report and Recommendation ("R & R"). Judge Bowler's 96–page R & R recommends (1) dismissing Count I with prejudice, (2) denying the motion to dismiss with respect to Counts II through V and (3) dismissing Counts VI through IX without prejudice. Uber timely objected to Judge Bowler's recommendations with respect to Counts II through V. Plaintiffs have not filed an objection.

For the reasons that follow, the Court will sustain Uber's objections with respect to Counts II and III, reject the magistrate judge's recommendations with respect to those counts and dismiss Counts II and III with prejudice. It will overrule Uber's objections with respect to Counts IV and V, however, and accept and adopt the magistrate judge's recommendations with respect to Count I and Counts IV through IX.

### I. *Background*
The subject dispute arose after Uber entered the market for private transportation services in Boston. The crux of plaintiffs' complaint is that Uber has gained an unfair competitive advantage over traditional taxicab dispatch services and license-holders

because it avoids the costs and burdens of complying with extensive regulations designed to ensure that residents of Boston have access to fairly priced and safe transportation options throughout the city and yet reaps the benefits of others' compliance with those regulations.

The main source of regulation of the Boston taxicab industry is the Police Commissioner for the City of Boston ("the Commissioner"), who is authorized by statute to regulate the taxi business in Boston. In exercising that authority, the Commissioner requires anyone who drives or is "in charge of" a "hackney carriage" (i.e.taxicab) to possess a license known as a "taxicab medallion". Applicants for taxicab medallions must satisfy certain criteria with respect to driving and criminal history. In 2008, the Commissioner issued a comprehensive set of regulations as Boston Police Department Rule 403 ("Rule 403"). That rule requires all taxicab operators to, *inter alia,* possess medallions, maintain a properly equipped and functioning taxicab, refrain from cell phone use while operating a taxicab and belong to an approved dispatch service or "radio association".

**\*2** Pursuant to Rule 403, radio associations are required to provide 24-hour dispatch capability, two-way radio service and discount reimbursements for the elderly. They must also keep records of their dispatch services and, specifically, where each taxicab is dispatched at any given time. Moreover, each radio association maintains specific colors and "markings" approved by the Inspector of Carriages and taxicab operators must paint their taxicabs in the colors and markings of the association to which they belong.

Plaintiff Boston Cab is an approved radio association under Rule 403. It has contracted with the owners of 500 medallions (i.e. 500 licensed taxicab operators) who pay weekly membership fees to Boston Cab and paint their taxicabs with Boston Cab's colors and markings in exchange for Boston Cab's dispatching services.

Plaintiff EJT states that it has

> contracted with the owners of 370 Boston medallions to manage all aspects of the ownership, licensing and leasing of the owners' medallions and the taxis bearing these medallions.

EJT also asserts that it has the authority to seek the protection of those 370 taxicab owners/medallion holders' rights against all forms of unfair competition and trademark infringement.

Defendant Uber provides a tool for requesting private vehicles-for-hire to users who download Uber's free "smart phone application" ("the Uber app"). Users who open the Uber app on their mobile phones are shown a map of their location or designated pick-up point and the available Uber-affiliated vehicles in that vicinity. The user can select a type of car based on price and the number of seats they need. At the time the motion to dismiss was filed, Uber offered three kinds of vehicles-for-hire: 1) "Uber Black Cars", which are unmarked four-seat sedans, 2) "Uber SUVs", which are unmarked SUVs that seat six passengers and 3) "Uber Taxis", which are vehicles operated by Boston taxicab drivers. [1]

[1]   Since the motion to dismiss was filed, Uber added a fourth option, "UberX," which are privately-owned vehicles that cost less to hire than Uber Black Cars or Uber SUVs.

Uber requires all drivers of Uber-affiliated vehicles to carry mobile telephones. They must respond to assignments generated by the Uber computer system "within seconds" or they will lose the job. The fare for each ride arranged through the Uber app is charged automatically to the customer's preauthorized credit card and therefore Uber-affiliated drivers cannot accept cash or other credit cards.

Uber does not own any taxicabs or taxicab medallions. Instead, taxicab drivers who are subject to Rule 403, own or lease medallions and belong to radio associations such as Boston Cab have agreed to be available for hire through Uber while they are working shifts and subject to dispatch by their radio associations. Their fares are calculated based on the flat rate applicable to all Boston taxicab drivers. Uber adds a $1 "fee" and a 20% "gratuity" to the flat rate and therefore the final charge exceeds

*Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)*

2014 WL 1338148

the maximum that taxicabs are permitted to charge under Rule 403. While Uber's website represents that the 20% gratuity is "for the driver", drivers in fact only receive a 10% gratuity and Uber retains the other 10%.

**\*3** Uber Black Cars and Uber SUVS, in contrast to Uber Taxis, do not comply with Rule 403 regulations with respect to, *inter alia,* 1) membership in approved radio associations or dispatch services, 2) regular inspections, 3) partitions between drivers and passengers, 4) panic buttons and GPS tracking to allow customers to alert police when they are in danger, 5) criminal background checks of drivers, 6) non-discrimination with respect to passengers with handicaps and 7) use of mobile telephones.

There is no evidence in the Fed.R.Civ.P. 12(b)(6) record that Boston Cab has suffered any harm as a result of members of its association picking up passengers who request a vehicle through the Uber app rather than through Boston Cab's dispatch service or that EJT has lost business as a result of Uber. In plaintiffs' opposing memorandum, however, they contend that

> By falsely portraying taxis, including the plaintiffs' 500 cabs, as one choice among several Uber-affiliated forms of transportation that appear on a smartphone screen, Uber diverts fares that would go to licensed Boston taxis if Uber did not falsely claim taxis were part of its affiliated businesses. This diversion of business has already caused a decrease in the demand for the plaintiffs' cabs, a diminution in the number of cabs leased, and a loss of revenue.

## II. *Report and Recommendation on the Motion to Dismiss*

Judge Bowler's R & R recommends that this Court (1) dismiss Count I with prejudice, (2) deny the motion to dismiss with respect to Counts II through V and (3) dismiss Counts VI through IX without prejudice. Uber timely objected to Judge Bowler's R & R with respect to Counts II through V. Plaintiffs have not objected to any recommendation made in the R & R.

When a district court refers a dispositive motion to a magistrate judge for a recommended disposition, it must "determine de novo any part of the magistrate judge's disposition that has been properly objected to".Fed.R.Civ.P. 72(b)(3). Thus, the Court reviews de novo the magistrate judge's recommendations with respect to Counts II through V, *seriatim.*

## A. Legal Standard

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In considering the merits of a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. Am. Airlines, Inc.,* 199 F.3d 68, 69 (1st Cir.2000). Yet "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice to state a cause of action. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Accordingly, a complaint does not state a claim for relief where the well-pled facts fail to warrant an inference of anything more than the mere possibility of misconduct. *Id.* at 679.

## B. False association under the Lanham Act (Count II)

**\*4** Plaintiffs allege in Count II of their complaint that Uber violates § 43(a)(1)(A) of the Lanham Act by misrepresenting that it is affiliated with Boston Cab. Section 43(a)(1)(A) provides, in relevant part, that

> Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> > (A) is likely to cause confusion, or to cause mistake, or to deceive *as to the affiliation, connection, or association of such person with another person,* or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ...

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)
2014 WL 1338148

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A) (emphasis added). To succeed on such a claim, plaintiffs must prove each of the following elements:

> (1) [d]efendant[ ] used a designation (any word, term, name, device, or any combination thereof); (2) the use was in interstate commerce; (3) the use was in connection with goods or services; (4) the designation or false designation is likely to cause confusion, mistake, or deception as to (a) the affiliation, connection, or association of defendant with another person, or (b) as to the origin, sponsorship, or approval of defendant's goods, services, or commercial activities by another person; and (5) plaintiff[s] ha[ve] been or [are] likely to be damaged by these acts.

*Brown v. Armstrong,* 957 F.Supp. 1293, 1300 (D.Mass.1997)*aff'd,*129 F.3d 1252 (1st Cir.1997).

Uber objects to the magistrate judge's report that 1) Uber "uses" Boston Cab's colors and markings in violation of the Lanham Act and 2) plaintiffs have sufficiently pled that they are likely to be damaged or have been damaged by said use.

The Court need not address Uber's first objection because it finds, contrary to the magistrate judge's finding, that plaintiffs have not carried their burden of pleading damages so as to survive Uber's Fed.R.Civ.P. 12(b)(6) motion. The magistrate judge identified three possible sources of injury to plaintiffs but each of the potential harms lacks a causal connection to the alleged use of Boston Cab's color and markings.

First, the magistrate judge reasoned that plaintiffs could suffer damage to their reputation and goodwill because Uber Black Cars and Uber SUVs lack the safety features mandated by Rule 403, such as a panic button or GPS. Uber objects and points out that the false-association claim is based entirely on Uber's alleged use of taxicab colors and markings and has nothing to do with the other Uber options. This Court agrees that the complaint does not claim a connection between the alleged use of the Boston Cab colors and markings and the lack of safety features in Uber Black Cars or Uber SUVs. *See Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 318 & n. 16 (1st Cir.2002) (requiring causal connection between alleged violation and harm to prove false advertising claim under § 43(a) of Lanham Act). Nor can any reasonable inference be drawn that a consumer would hold the lack of safety features in Uber Black Cars or Uber SUVs against plaintiffs, resulting in harm to their reputations or goodwill. *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.,* 376 F.3d 8, 15–16 (1st Cir.2004) (explaining that harm to goodwill or reputation suffices under § 43(a) of the Lanham Act).

 **\*5** Second, the magistrate judge reasoned that plaintiffs could be harmed because Rule 403 forbids mobile phone use by taxi drivers and yet drivers who contract with Uber, including those who use the Boston Cab colors and markings, are required to use mobile telephones to communicate with Uber and Uber customers. Accepting, for the purpose of a motion to dismiss, that driver cell phone use increases the potential for accidents and therefore risk to passengers, plaintiffs do not allege any facts that would support the conclusion that *plaintiffs* are harmed by that risk as a result of consumers possibly mistaking the relationship between plaintiffs and Uber. Even if Uber's service resulted in an increase in accidents involving taxis bearing the Boston Cab markings, any harm to Boston Cab's reputation would not be the result of customer confusion about the relationship between Uber and Boston Cab. *See Cashmere & Camel Hair Mfrs. Inst.,* 284 F.3d at 318 & n. 16.

Finally, the magistrate judge explained that plaintiffs alleged that they are harmed by lost revenues due to Uber offering Uber Black Cars and Uber SUVs as an alternative to taxicabs. Uber objects that the entry of Uber SUVs and Uber Black Cars into the market has nothing to do with any alleged confusion about the relationship between Uber and Boston Cab and therefore, any harm due to those new alternatives lacks the requisite causal connection to Uber's alleged use of Boston Cab's marks. This Court concurs and finds that this allegation of plaintiffs also fails to satisfy the pleading requirements with respect to harm.

Because the Court finds that plaintiffs have not adequately pled damages under the Lanham Act, it declines to address Uber's other objections to the recommendation with respect to Count II. Count II will be dismissed with prejudice.

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)
2014 WL 1338148

## C. Violation of Chapter 93A based on unfair and deceptive acts (Count III)

Count III of plaintiffs' complaint alleges that Uber has engaged in a series of false representations that constitute unfair and deceptive acts in commerce. The magistrate judge recommends denial of defendant's motion to dismiss. The Court agrees with Uber that Count III fails to meet the pleading standards and should be dismissed.

Chapter 93A proscribes those engaged in trade or commerce from employing "unfair methods of competition and unfair or deceptive acts or practices" and authorizes businesses to sue one another for engaging in such practices.M.G.L. c. 93A, §§ 2, 11. Whether a particular set of circumstances is unfair or deceptive under Chapter 93A is a question of fact. *Incase, Inc. v. Timex Corp.,* 421 F.Supp.2d 226, 239 (D.Mass.2006). In the context of disputes among businesses, where both parties are sophisticated commercial players, the "objectionable conduct must attain a level of rascality that would raise an eyebrow to the rough and tumble of the world of commerce."*Vision Graphics v. E.I. Du Pont de Nemours,* 41 F.Supp.2d 93, 101 (D.Mass.1999) (quoting *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (Mass.App.Ct.1979) (Kass, J.)). Yet even under the heightened standard governing business disputes,

> **\*6** misrepresentations may be so seriously deceptive and harmful as to permit some recovery for the injury really caused by them.... Business strategy 'in the rough and tumble of the world of commerce' should not use conscious misrepresentation as a competitive weapon.

*Zayre Corp. v. Computer Sys. of Am., Inc.,* 24 Mass.App.Ct. 559, 511 N.E.2d 23, 30 n .23 (Mass.App.Ct.1987).

Count III alleges that the following four misrepresentations of the defendant Uber give rise to a claim under Chapter 93A:

> a) that it is affiliated with medallion owners and radio associations;

> b) that it only collects a $1 fee and pays the full 20% "gratuity" to taxi drivers;

> c) that its service is lawful under Boston Taxi Rules; and

> d) that its black cars, SUVs and UberX vehicles do not need to be licensed and regulated as taxis in Boston.

Alleged misrepresentations (a) and (b) fail to meet the pleading requirements for the reasons stated above and by the magistrate judge in her R & R. The former rests upon the same theory as plaintiffs' false association claim under the Lanham Act but, as this Court explained above, plaintiffs have not met their burden of pleading injury as both the Lanham Act and Chapter 93A, § 11 require. *See Frullo v. Landenberger,* 61 Mass.App.Ct. 814, 814 N.E.2d 1105, 1113 (Mass.App.Ct.2004) ("[T]he unfair or deceptive act or practice must be shown to have caused the loss of money or property that § 11 makes actionable.").

Similarly, the magistrate judge found that plaintiffs have not pled a cognizable injury caused by misrepresentation (b) in recommending dismissal of Count I, plaintiffs' misrepresentation claim arising under the Lanham Act.

With respect to alleged misrepresentations (c) and (d), Uber correctly notes that, elsewhere in her R & R, the magistrate judge explained that

> [t]he complaint does not identify a representation in which Uber states explicitly or conveys by necessary implication that "Uber assigned taxis are operating lawfully"....

The Court agrees with the magistrate judge that Uber has not made such explicit representations and also notes that plaintiffs have alleged no facts to support their allegations with respect to either (c) or (d). Conclusory allegations such as these, unsupported by facts, will not survive a motion to dismiss. *Iqbal,* 556 U.S. at 678.

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2014)
2014 WL 1338148

## D. Violation of Chapter 93A based on unfair competition (Count IV)

Count IV of the complaint alleges that Uber unfairly competes with plaintiffs, in violation of Chapter 93A, by 1) "operating" its service without incurring the expense of compliance with Massachusetts law and Boston ordinances and 2) diverting revenues for credit card processing that the plaintiffs are contractually obligated to pay to its credit card processor. The magistrate judge recommended dismissing the second part of the claim but allowing the first to survive. The Court agrees that plaintiffs have sufficiently stated such a claim.

The Court finds Uber's objection to the magistrate judge's reasoning unconvincing. Uber claimed in its memoranda in support of its motion to dismiss that it could not be held liable under Chapter 93A because it does not own any cars, medallions, or radio associations and does not employ drivers. The magistrate judge correctly found that Uber's argument was based on an unduly narrow conception of the term "operating". The Court agrees with the magistrate judge that there is sufficient evidence that Uber exercises control over (or is "in charge of") vehicles-for-hire that compete with plaintiffs in the private transportation business.

  **\*7**  Uber's other objections require only brief examination. The Court finds no fault with the finding that plaintiffs' Chapter 93A claim is not barred by regulations that, according to Uber, occupy the field. Moreover, it disagrees with Uber that plaintiffs have failed to state a claim against Uber because any unlawful conduct is attributable only to drivers and not Uber in light of the fact that Uber sets policies that those drivers follow, such as the use of mobile telephones.

## E. Common law unfair competition claim (Count V)

For similar reasons, the Court will accept and adopt the magistrate judge's recommendation to deny the motion to dismiss Count V, which alleges unfair competition in violation of Massachusetts common law.

In its memoranda submitted in support of its motion to dismiss, Uber rests on the argument that plaintiffs' common law claim was derivative of the claims set out in Counts I through IV and therefore should fail because those claims fail. The Court has found that plaintiffs stated a claim with respect to Count IV and therefore that argument is unavailing.

Now that the magistrate judge has recommended denying the motion to dismiss Count V, Uber argues that her reasoning with respect to Count V is inconsistent with her reasoning with respect to Count II. The Court finds that argument irrelevant because plaintiffs' common law unfair competition claim closely tracks Count IV, not Count II, and the magistrate judge found only that plaintiffs did not assert a "palming off" claim with respect to Count II.

**ORDER**

In accordance with the foregoing,

  1) Defendant's objections to Magistrate Judge Bowler's Report and Recommendation ("the R & R") (Docket No. 42) are, with respect to Counts II and III, **SUSTAINED,** but are otherwise **OVERRULED,** and

  2) Magistrate Judge Bowler's R & R (Docket No. 41) pertaining to defendant's motion to dismiss for failure to state a claim (Docket No. 5) is, with respect to Counts I, IV, V, VI, VII, VIII and IX, **ACCEPTED and ADOPTED,** but is, with respect to Counts II and III, **REJECTED.**

**So ordered.**

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 314131
Only the Westlaw citation is currently available.
United States District Court,
D. Massachusetts.

BOSTON CAB DISPATCH, INC. and EJT Management, Inc., Plaintiffs,
v.
UBER TECHNOLOGIES, INC., Defendant.

Civil Action No. 13–10769–NMG.   |   Signed Jan. 26, 2015.

**Attorneys and Law Firms**

Samuel Perkins, Michael Stefanilo, Jr., Richard E. Brody, Brody, Hardoon, Perkins & Kesten LLP, Boston, MA, for Plaintiffs.

Patrick A. Fitch, Quinn Emanuel Urquhart & Sullivan, LLP., Washington, DC, Stephen A. Swedlow, Quinn Emanuel Urquhart & Sullivan, LLP, Chicago, IL, Michael Mankes, Littler Mendelson P.C., Boston, MA, for Defendant.

## *MEMORANDUM & ORDER*

GORTON, District Judge.

**\*1** Plaintiffs Boston Cab Dispatch, Inc. ("Boston Cab") and EJT Management, Inc. ("EJT") allege that defendant Uber Technologies, Inc. ("Uber") violates various unfair competition and racketeering laws by providing a private car service that allows users to call taxicabs associated with Boston Cab and other dispatch services without complying with Boston taxicab regulations.

Plaintiffs' amended complaint asserts causes of action against Uber for 1) violation of M.G.L. c. 93A, § 11 based on unfair competition (Count I), 2) unfair competition under Massachusetts common law (Count II) and 3) various violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a-c) (Counts III–V).

For the reasons that follow, the motion will be allowed, in part, and denied, in part.

## I. *Background*

The subject dispute arose after Uber entered the market for private transportation services in Boston. The crux of plaintiffs' complaint is that Uber has gained an unfair competitive advantage over traditional taxicab dispatch services and license-holders because it avoids the costs and burdens of complying with extensive regulations designed to ensure that residents of Boston have access to fairly priced and safe transportation options throughout the city and yet reaps the benefits of others' compliance with those regulations.

The main source of regulation of the Boston taxicab industry is the Police Commissioner for the City of Boston ("the Commissioner"), who is authorized by statute to regulate the taxi business in Boston. In exercising that authority, the Commissioner requires anyone who drives or is "in charge of" a "hackney carriage" (i.e.taxicab) to possess a license known as a "taxicab medallion". Applicants for taxicab medallions must satisfy certain criteria with respect to driving and criminal history. In 2008, the Commissioner issued a comprehensive set of regulations under Boston Police Department Rule 403 ("Rule 403"). That rule requires all taxicab operators to, *inter alia,* possess medallions, maintain a properly equipped and functioning taxicab, refrain from cell phone use while operating a taxicab and belong to an approved dispatch service or "radio association".

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2015)
2015 WL 314131

Pursuant to Rule 403, radio associations are required to provide 24–hour dispatch capability, two-way radio service and discount reimbursements for the elderly. They must also keep records of their dispatch services and, specifically, where each taxicab is dispatched at any given time. Moreover, each radio association maintains specific colors and "markings" approved by the Inspector of Carriages and taxicab operators must paint their taxicabs in the colors and markings of the association to which they belong.

Plaintiff Boston Cab is an approved radio association under Rule 403. It has contracted with the owners of 500 medallions (i.e. 500 licensed taxicab operators) who pay weekly membership fees to Boston Cab and paint their taxicabs with Boston Cab's colors and markings in exchange for Boston Cab's dispatching services.

*2   Plaintiff EJT has contracted with the owners of 370 Boston medallions to manage all aspects of the ownership, licensing and leasing of the owners' medallions and the taxis bearing these medallions. It also has the authority to seek the protection of those 370 taxicab owners/medallion holders' rights against all forms of unfair competition and trademark infringement.

Defendant Uber provides a tool for requesting private vehicles-for-hire to users who download Uber's free "smart phone application" ("the Uber app"). Users who open the Uber app on their mobile phones are shown a map of their location or designated pick-up point and the available Uber-affiliated vehicles in that vicinity. The user can select a kind of car based on price and the number of seats they need. Uber offers four kinds of vehicles-for-hire: 1) "Uber Black Cars", which are unmarked four-seat sedans, 2) "Uber SUVs", which are unmarked SUVs that seat six passengers, 3) "Uber Taxis", which are vehicles operated by Boston taxicab drivers and 4) "UberX," which are cut-rate, unlicensed personal vehicles owned by individual drivers.

Uber requires all drivers of Uber-affiliated vehicles to carry mobile telephones. They must respond to assignments generated by the Uber computer system "within seconds" or they will lose the job. The fare for each ride arranged through the Uber app is charged automatically to the customer's preauthorized credit card and therefore Uber-affiliated drivers cannot accept cash or other credit cards.

Uber does not own any taxicabs or taxicab medallions. Instead, taxicab drivers who are subject to Rule 403, own or lease medallions and belong to radio associations such as Boston Cab have agreed to be available for hire through Uber while they are working shifts and subject to dispatch by their radio associations. Their fares are calculated based on the flat rate applicable to all Boston taxicab drivers. Uber adds a $1 "fee" and a 20% "gratuity" to the flat rate and therefore the final charge exceeds the maximum that taxicabs are permitted to charge under Rule 403. While Uber's website represents that the 20% gratuity is "for the driver", drivers in fact only receive a 10% gratuity and Uber retains the other 10%.

Uber Black Cars, Uber SUVS and UberX, in contrast to Uber Taxis, do not comply with Rule 403 regulations with respect to, *inter alia,* 1) membership in approved radio associations or dispatch services, 2) regular inspections, 3) partitions between drivers and passengers, 4) panic buttons and GPS tracking to allow customers to alert police when they are in danger, 5) criminal background checks of drivers, 6) non-discrimination with respect to passengers with handicaps, 7) use of mobile telephones and 8) taximeters and flat rates.

## II. *Procedural history*

Plaintiffs filed suit against defendant in Suffolk Superior Court in March, 2013, alleging 1) violation of § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count I), 2) violation of § 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (Count II), 3) violation of M.G.L. c. 93A, § 11 based on Uber's allegedly unfair and deceptive acts and practices (Count III), 4) violation of c. 93A, § 11 based on Uber's unfair competition (Count IV), 5) unfair competition under Massachusetts common law (Count V), 6) interference with contractual relationships (Count VI) and 7) various violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a-c) (Counts VII, VIII and IX).

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2015)
2015 WL 314131

**\*3**  Uber timely removed the case to this Court and filed a motion to dismiss the complaint in its entirety the following month. That motion was referred to Magistrate Judge Marianne Bowler for a Report and Recommendation ("R & R"). Magistrate Judge Bowler issued an R & R in February, 2014, recommending 1) dismissal of Count I with prejudice, 2) denial of the motion to dismiss with respect to Counts II through V and 3) dismissal of Counts VI through IX without prejudice. Uber timely objected to Judge Bowler's recommendations with respect to Counts II through V. Plaintiffs did not file an objection.

In March, 2014, this Court accepted and adopted the Magistrate Judge's recommendations with respect to Count I and Counts IV through IX but sustained Uber's objections with respect to Counts II and III and dismissed those Counts with prejudice.

Plaintiffs filed an amended complaint in July, 2014. Uber moved to dismiss the amended complaint the following month and the Court held a hearing on the defendant's motion to dismiss in November, 2014.

## III. *Defendant's motion to dismiss plaintiffs' amended complaint*

### A. Legal standard

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In considering the merits of a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. Am. Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir.2000). Yet "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice to state a cause of action. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Accordingly, a complaint does not state a claim for relief where the well-pled facts fail to warrant an inference of anything more than the mere possibility of misconduct. *Id.* at 679.

### B. Violation of M.G.L. c. 93A, § 11 based on unfair competition (Count I)

Count I of the amended complaint alleges that Uber unfairly competes with plaintiffs, in violation of Chapter 93A, by 1) "operating" its services without incurring the expense of compliance with Massachusetts law and Boston ordinances and 2) diverting revenues that would otherwise be paid to taxis and thereby reducing the value of taxi medallions.

Chapter 93A proscribes those engaged in trade or commerce from employing "unfair methods of competition and unfair or deceptive acts or practices" and authorizes a business "who suffers any loss of money or property" as a result to initiate a suit against those engaging in such practices. M.G.L. c. 93A, §§ 2, 11. In the absence of a causal connection between the alleged unfair acts and the claimed loss, there can be no recovery. *Massachusetts Farm Bureau Fed'n, Inc. v. Blue Cross of Massachusetts, Inc.*, 403 Mass. 722, 730, 532 N.E.2d 660 (1989); *see also Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 56 (1st Cir.1998) (holding that the "loss of money or property must stem from" the Chapter 93A misconduct).

### 1. Causal connection

**\*4**  Uber contends that plaintiffs fail to plead facts showing that it proximately caused them any injury because plaintiffs 1) have not explained why any revenues obtained by Uber were at the plaintiffs' expense rather than from other taxi companies, 2) do not explain why the alleged diversion in revenues is due to Uber's conduct rather than the conduct of the other radio associations in the city and 3) fail to plead any facts with respect to their alleged lost revenues or the reduction in the value of their medallions.

Uber's argument that the plaintiffs must negate all potential causes of loss other than those related to Uber's activities in order to allege damages causation exceeds the pleading requirements necessary to survive a motion to dismiss. At the pleading stage, plaintiffs must state a facially plausible legal claim and the Court must take non-conclusory factual allegations in the complaint as true. *Ocasio–Hernandez v. Fortuno–Burset*, 640 F.3d 1, 11 (1st Cir.2011).

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2015)
2015 WL 314131

Contrary to Uber's contention that the plaintiffs' lost business might have gone to other medallioned taxis, common economic sense suggests that Uber's expansion of its car service business would have a high likelihood of affecting the revenue of all Boston medallioned taxis, including the plaintiffs. *See Katin v. Nat'l Real Estate Info. Servs., Inc.*, 2009 WL 929554, at *7 (D.Mass. Mar.31, 2009) (explaining that the *Twombley* standards for pleading injury in fact can be met by establishing the overall effect of the defendant's unlawful behavior on the relevant market and the likelihood of harm to the plaintiff). If Uber's argument were to prevail, any plaintiff with more than two competitors would be unable to state a claim.

The First Circuit has confirmed that economic realities can be used to analyze injury-in-fact allegations at the pleading stage. *See Adams v. Watson*, 10 F.3d 915, 923 (1st Cir.1993) (noting that "basic economic theory ... transcends utter randomness by positing elemental laws of cause and effect predicated on actual market experience and *probable* market behavior."); *see also Am. Soc. of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145, 157 (D.C.Cir.1977) (acknowledging that "all claims of competitive injury are to some extent speculative, since they are predicated on the independent decisions of third parties; i.e., customers. However, economics is the science of predicting these economic decisions ...").

Moreover, plaintiffs claim that they will be able to show that Uber's vehicles have deprived revenue from all Boston medallioned taxis, including the plaintiffs. Accordingly, plaintiffs have adequately pled the causal connection between Uber's alleged unfair acts and the diversion of revenue experienced by plaintiffs "to raise a reasonable expectation that discovery will reveal evidence of" their allegations of lost revenue. *Twombly*, 550 U.S. at 556. Defendant's motion to dismiss Count I of plaintiffs' amended complaint will be denied.

### 2. Scope of the unfair competition claims

**\*5** Defendants contend that plaintiffs have recast their previously-dismissed tortious interference and false association claims to expand the scope of their unfair competition claims. They emphasize that the Court already dismissed 1) plaintiffs' claim under the Lanham Act and the corresponding state law claim under Chapter 93A, along with the underlying allegations that Uber falsely associated itself with plaintiffs by contracting with drivers of plaintiffs' taxicabs to allow Uber users to request those taxis through its application and 2) plaintiffs' tortious interference claim based on Uber's alleged interference with contracts between plaintiffs and a third-party payment processor and between plaintiffs and third-party taxi drivers. Defendants assert that the underlying allegations used in support of the dismissed claims cannot, therefore, be resurrected under the unfair competition claim.

The Court disagrees to the extent that the allegations are factual or are legal arguments upon which the Court has not yet ruled. Plaintiffs are permitted to expand the factual basis for their unfair competition claims. That is to be expected in response to the Court's authorization to file an amended complaint. To the extent plaintiffs are re-asserting an already-discredited legal argument, such allegations may not be used to support their claims.

### C. Common law unfair competition claim (Count II)

Plaintiffs allege that Uber unfairly competes in violation of Massachusetts common law by 1) operating its services without incurring the expense of compliance with Massachusetts law and Boston ordinances, 2) diverting revenues for credit card processing that plaintiffs are contractually obligated to pay to Creative Mobile Technologies ("CMT"), the company that installs credit card processing equipment in Boston Cab's taxis and 3) diverting revenues that would otherwise be paid to taxis and thus reducing the value of taxi medallions.

As an initial matter, this Court, in accepting and adopting the Magistrate Judge's R & R, has already concluded that the alleged diversion of revenues for credit card processing claim does not equate to money damages to Boston Cab or EJT. It is CMT, not plaintiffs, that suffers the loss in the form of credit card processing fees. Such an allegation cannot be a basis for plaintiffs' common law unfair competition claim. Count II is therefore supported by the same two factual allegations made in Count I.

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2015)
2015 WL 314131

Uber contends that plaintiffs' common law claim is entirely derivative of their claim for unfair competition under Chapter 93A and that it should fail because the Chapter 93A claim fails. The Court has found that plaintiffs have stated a claim with respect to Count I and therefore that argument is unavailing.

Accordingly, the Court will deny the motion to dismiss Count II.

### D. Violation of the RICO, 18 U.S.C. §§ 1962(a)-(c) (Counts III, IV and V)

In their amended complaint, plaintiffs allege various RICO violations by Uber based on the predicate acts of wire fraud in violation of 18 U.S.C. § 1343. They claim that Uber uses interstate wires to transmit false information regarding fares for taxi rides. To establish a claim for wire fraud, plaintiffs must prove

> **\*6** (1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the specific intent to defraud; and (3) the use of interstate ... wire communications in furtherance of the scheme.

*Sanchez v. Triple–S Management, Corp.,* 492 F.3d 1, 9–10 (1st Cir.2007).

Plaintiffs allege that Uber's schemes to defraud based on false pretenses arise from the misrepresentations about the true recipient of the gratuity charged to users of Uber Taxis. In particular, they contend that the schemes deceive clients into believing that they are paying a 20% gratuity to the driver, when actually, the drivers receive only 10% and Uber pockets the rest. The revenues generated by such alleged misrepresentation (so say the plaintiffs) support Uber's expansion of its operations, thereby violating 18 U.S.C. § 1962(a), which makes it unlawful for anyone who receives income derived "from a pattern of racketeering activity ... to use or invest ... any part of such income" in the operation of any enterprise affecting interstate commerce.

Plaintiffs further claim that Uber's fraudulent representations violate 18 U.S.C § 1962(b), which prohibits any person "from acquiring or maintaining ... any ... control over an enterprise through a pattern of racketeering activity," because Uber's expanding Boston customer base induces increasing numbers of Boston taxi drivers to become Uber-affiliated taxis, thereby enabling Uber to exercise an increasing level of control over the taxi operations in Boston.

Finally, plaintiffs allege that Uber's conduct violates Section 1962(c), which prohibits

> any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C § 1962(c).

### 1. Pleading with particularity

The Court, in adopting Magistrate Judge Bowler's R & R, accepted her determination that the plaintiffs' original complaint adequately pled a scheme to defraud and an intent to deceive. With respect to the third prong of the wire fraud claim, however, plaintiffs failed to specify the time and place of the use of interstate wire communications to satisfy the particularity requirement of Federal Rules of Civil Procedure 9(b). The RICO Counts were dismissed without prejudice and plaintiffs were afforded the opportunity to amend their complaint to particularize the time and place of the use of interstate wire communications.

In their amended complaint, plaintiffs 1) allege that the violation occurred continuously between mid-October, 2012 and March 13, 2013 or later through the Uber website, 2) identify two individuals by name who signed up for Uber on May 27, 2012 and December 29, 2012 and 3) claim that every one of the thousands of Massachusetts residents who signed up for Uber was falsely informed by the Uber website as part of the sign-up process. [1]

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2015)

2015 WL 314131

1     Paragraph 75 of the amended complaint states that the violation began in "mid-October, 2011" instead of "mid-October, 2012." The Court perceives a typographical error.

**\*7** As the defendant notes, one of the individuals named by the plaintiffs signed up for Uber approximately three months before Uber began its taxi operation in Massachusetts. Uber could not have made representations during the sign-up process in May, 2012 about a non-existent service. Nonetheless, the Court concludes that plaintiffs have adequately pled with particularity the time and place of the alleged wire fraud. Even though they were wrong about one individual, plaintiffs allege that every individual who signed up for the service between October, 2012 and March, 2013 was falsely informed about gratuities through the website during the sign up process. That satisfies the heightened pleading requirement of Fed.R.Civ.P. 9(b) and sets forth an allegation of a "pattern of racketeering activity" as is required by the RICO statute. *Sys. Mgmt., Inc. v. Loiselle,* 303 F.3d 100, 103 (1st Cir.2002) (noting that a pattern of racketeering activity requires at least two acts of racketeering activity occurring within ten years of each other).

**2. Proximate causation**

Private actions for RICO violations are "cognizable ... only if the defendant's alleged violation proximately caused the plaintiff's injury."*Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461–62, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006). The proximate cause analysis requires a finding of "direct relation between the injury asserted and the injurious conduct alleged."*Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

Defendant contends that plaintiffs fail to allege facts showing that Uber's alleged RICO violations proximately caused harm to the plaintiffs because the purported misrepresentations about Uber Taxi gratuity charges directly harms users of Uber (who are charged twice as much for gratuity than their drivers actually receive), but at most only indirectly harms the plaintiffs. Defendant further contends that plaintiffs' claims cannot be sustained because it is impossible to determine what portion of plaintiffs' purported revenue loss and reduction in medallion values are attributable directly to Uber's alleged RICO violations. *See Anza,* 547 U.S. at 459 ("A court considering the claim would need to begin by calculating the portion of [the alleged harm] attributable to the alleged pattern of racketeering activity.").

Plaintiffs do not appear to dispute defendant's arguments regarding their failure to plead proximate causation with respect to 18 U.S.C §§ 1962(b) or (c). The Court will therefore address those provisions of the RICO statute only briefly.

Plaintiffs contend that defendant violates Section 1962(b) because its RICO activity leads to increased occupation of taxis and taxi drivers in the city. The causation chain, however, between the alleged misrepresentations to customers about gratuities and Uber's increased control over the taxi operations in Boston is too attenuated to satisfy proximate cause. *See Anza,* 547 U.S. at 461 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injury."). This Court concludes that plaintiffs have not adequately pled their claim under § 1962(b) and Count IV of plaintiffs' amended complaint will therefore be dismissed.

**\*8** The Court also concludes that plaintiffs cannot maintain their Section 1962(c) claim because they have failed to allege that Uber's misrepresentations about gratuities caused them direct injury. The direct victims of the alleged RICO violation are the Uber customers who pay the 20% gratuity surcharge. As the United States Supreme Court has emphasized,

> [a] direct causal connection is especially warranted where the immediate victims can be expected to vindicate the laws by pursuing their own claims.

*Anza,* 547 U.S. at 460–61. Here, the direct victims of the alleged fraud are capable of pursuing their own claims. Plaintiffs are affected only indirectly by the alleged gratuity misrepresentation because the additional revenue accrued by Uber presumably allows it to expand its market share at plaintiffs' expense. Because the alleged violation does not lead directly to plaintiffs' damages, defendant's motion to dismiss Count V of the amended complaint will be allowed.

Boston Cab Dispatch, Inc. v. Uber Technologies, Inc., Slip Copy (2015)

2015 WL 314131

The frame of reference for the proximate cause analysis for Section 1962(a) differs from that in subsections (b) and (c).*See Ideal Steel Supply Corp. v. Anza,* 652 F.3d 310, 321 (2d Cir.2011) ("Subsection (a), in contrast, focuses the inquiry on conduct different from the conduct constituting the pattern of racketeering activity."). A viable claim for a violation of Section 1962(a) must allege that the use or investment of racketeering income, rather than the pattern of racketeering activity itself, was the proximate cause of the plaintiffs' injuries. *See Ideal Steel,* 652 F.3d at 323; *Sybersound Records, Inc. v. UAV Corp.,* 517 F.3d 1137, 1149 (9th Cir.2008).

Plaintiffs contend that they have adequately pled proximate causation because Uber's unlawfully obtained revenue was used and invested to expand Uber's operations which adversely affects plaintiffs' revenue and the value of their medallions. They contend that such allegations meet the *Twombly* standard, which does not impose a "probability requirement" at the pleading stage and

> simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal[ity].

550 U.S. at 556.

Defendant responds that plaintiffs have failed to allege that the alleged racketeering income is either the but-for cause or the proximate cause of their injury because 1) plaintiffs cannot show that the income Uber allegedly invested to expand its business was racketeering income at all because consumers may have used Uber for reasons unrelated to the alleged misrepresentations, 2) Uber Black and Uber SUV, whose operations are unrelated to the alleged racketeering activity, were generating income for a year prior to the introduction of Uber Taxi and therefore the alleged harm to the plaintiffs would have occurred regardless of its investment of the so-called racketeering income and 3) other factors and other competitors may have caused plaintiffs' damages.

Although the defendant's arguments may be meritorious, they do not negate the causal connection alleged by plaintiffs and it is therefore more appropriate to address such arguments at the summary judgment stage. The Court concludes that plaintiffs have adequately pled a claim under 18 U.S.C. § 1962(a) and the motion to dismiss Count III of plaintiffs' amended complaint will be, accordingly, denied.

### *ORDER*

**\*9** In accordance with the foregoing, defendant's motion to dismiss plaintiffs' amended complaint (Docket No. 54) is, with respect to Counts IV and V, **ALLOWED**, but is otherwise **DENIED**.

**So ordered.**

---

End of Document © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Bulldog New York LLC v. Pepsico, Inc., 8 F.Supp.3d 152 (2014)
2014 WL 1284903

8 F.Supp.3d 152
United States District Court,
D. Connecticut.

BULLDOG NEW YORK LLC, Plaintiff,

v.

PEPSICO, INC., and Pepsi–Cola Advertising and Marketing, Inc., Defendants.

Civil No. 3:08cv1110(AWT).   |   Signed March 31, 2014.

**Synopsis**
**Background:** Marketing company brought action against food and beverage corporation, alleging breach of contract based on a letter of intent between the parties regarding consumer experience project, misappropriation of trade secrets in violation of the Connecticut Uniform Trade Secrets Act (CUTSA), common law misappropriation of trade secrets in violation of New York law, tortious interference with business opportunity in violation of both Connecticut and New York law, and violation of the Connecticut Unfair Trade Practices Act (CUTPA). Corporation moved for summary judgment.

**Holdings:** The District Court, Alvin W. Thompson, J., held that:

[1] New York law applied to breach of contract claims;

[2] New York law applied to misappropriation of trade secrets claims;

[3] New York law applied to claim for tortious interference with business expectancy;

[4] CUTPA did not apply to misappropriation and tortious interference claims;

[5] company failed to produce evidence of damages or give any indication of what damages it claimed to have suffered, as required to support breach of contract claim;

[6] any trade secrets claimed by company concerning consumer experience project marketed to corporation were marketing concepts or new product ideas, and therefore did not constitute a protectable trade secret; and

[7] there was no evidence that corporation's entering into business venture with competitor of company was the proximate cause of harm to company's relations with third parties, as required to support company's claim for tortious interference with business relations.

Motion granted.

**Attorneys and Law Firms**

**\*157** Jonathan J. Kelson, Matthew C. Wagner, Diserio Martin O'Connor & Castiglioni LLP, Stamford, CT, for Plaintiff.

Catherine Dugan O'Connor, Day Pitney LLP, One Canterbury Green, Stamford, CT, Elizabeth Ann Alquist, Michael A. Bucci, Day Pitney LLP, Hartford, CT, for Defendants.

Bulldog New York LLC v. Pepsico, Inc., 8 F.Supp.3d 152 (2014)
2014 WL 1284903

### *RULING ON MOTION FOR SUMMARY JUDGMENT*

ALVIN W. THOMPSON, District Judge.

**\*1** Bulldog New York LLC ("Bulldog"), a Delaware limited liability company with its principal place of business in Connecticut, filed a nine-count First Amended Complaint against defendants Pepsico, Inc. ("Pepsico") and Pepsi–Cola Advertising and Marketing, Inc. ("PCAM") (collectively, "Pepsi"). Count 1 alleges breach of contract based on a May 18, 2007 letter of intent between Bulldog and PCAM. Count 2 alleges misappropriation of trade secrets in violation of the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen.Stat. § 35–51, based on actions taken by representatives of PCAM and Pepsico, and Count 3 alleges common law misappropriation of trade secrets in violation of New York law for the same actions. Count 4 alleges tortious interference with business opportunity in violation of both Connecticut and New York law based on actions taken by Pepsico and PCAM during the **\*158** course of their relationship with Bulldog. Count 6 alleges a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42–110. Counts 5, 7, 8, and 9 were previously dismissed by the court.

### I. Factual Background

In late 2004, Bulldog approached Pepsico and PCAM to pitch the idea of developing a Pepsi-branded consumer experience in Times Square, New York City. This project was codenamed "Sinatra" (the "Bulldog Project") in order to maintain its confidentiality and to prevent information from leaking to both Pepsi's competitors and customers. The Bulldog Project evolved over time, particularly as it changed potential locations within the Times Square area. On occasion, Bulldog presented to various Pepsi representatives slide shows, referred to as "decks," demonstrating the potential attractions and aspects of the Bulldog Project, including presentations that referred to the Bulldog Project using the title "Rise." At least one in-person meeting occurred on Friday, May 4, 2007 between the Bulldog team and the Pepsico and PCAM teams at Pepsi headquarters in Purchase, New York, where a presentation about the Bulldog Project was made. On May 18, 2007, Bulldog and PCAM entered into a letter of intent (the "Bulldog LOI"). It was signed by David Marchi ("Marchi") on behalf of Bulldog and Russell Weiner on behalf of PCAM. Throughout the parties' relationship, all in-person meetings took place either at the Pepsi headquarters or in Times Square, New York.

Prior to the signing of the Bulldog LOI, a number of emails were exchanged among Pepsico, PCAM, and Bulldog, as well as counsel representing the three parties, to determine the scope of the Bulldog Project at Times Square and to negotiate the language of the Bulldog LOI. The parties agreed that New York law would govern the Bulldog LOI. Both before and after the execution of the Bulldog LOI, Bulldog worked closely with Pepsi's Director of Marketing, Kristina Mangelsdorf ("Mangelsdorf"). Pepsi's then President and CEO of PepsiCola North America and Pepsico Food Service, Dawn Hudson ("Hudson"), was also a party to several emails and meetings with respect to the Bulldog LOI and the Bulldog Project.

**\*2** On or about June 6, 2007, Mangelsdorf made a phone call to Marchi informing him that Pepsi would not be going forward with the Bulldog Project at Times Square. Subsequent to that phone call, Marchi sent an email to Mangelsdorf requesting, *inter alia,* that final costs expended by Bulldog during the presentations of the Bulldog Project be reimbursed by PCAM pursuant to the Bulldog LOI. The parties disagree about whether that phone call and email exchange terminated the agreement, or whether the agreement was terminated only after a confirmatory writing was sent to Marchi on June 23, 2008, more than a year later, indicating that the contract was terminated.

Pepsico and PCAM claim that as early as December of 2006, Matti Leshem ("Leshem"), president of Protagonist, a third party vendor to Pepsi, brought to Pepsi's attention a sponsorship opportunity with a company called Xanadu Ventures for a project at "Meadowlands Xanadu" in New Jersey (the "Xanadu Project"). Bulldog claims that confidential information regarding its Bulldog Project was misappropriated by the defendants and divulged to the Xanadu Project team during and after the time that the Bulldog LOI was in effect. It is undisputed that at least one in-person meeting occurred in May 2007 that included

Bulldog New York LLC v. Pepsico, Inc., 8 F.Supp.3d 152 (2014)
2014 WL 1284903

Leshem, the Xanadu Project team, and the Pepsico and PCAM teams. **\*159** The parties disagree about whether any confidential information regarding the Bulldog Project was divulged to the Xanadu Project team.

The parties also disagree about whether the Bulldog LOI was entered into in good faith or was an effort on the part of Pepsico and PCAM to delay Bulldog from further developing the Bulldog Project or marketing it to Pepsi competitors while the final details of the Xanadu Project were being completed with Protagonist.

A contract was signed committing Pepsi to the Xanadu Project on or around January 2, 2008. In February 2008, through a press release, Xanadu Ventures announced that Pepsi was entering into a 10–year "tenant/naming rights" agreement with Meadowlands Xanadu. Bulldog claims that various aspects of the Xanadu Project that were highlighted in this press release are identical or substantially similar to aspects originally included in the Bulldog Project.

## II. Legal Standard

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223 (2d Cir.1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987). Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224.

**\*\*3** Summary judgment is inappropriate only if the issue to be resolved is both genuine *and* related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. As the Court observed in *Anderson:* "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are crucial and which facts are irrelevant that governs." *Id.* Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trustees of* **\*160** *Columbia University,* 131 F.3d 305, 315 (2d Cir.1997) (quoting *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## III. Discussion

First, the court must determine which law governs each of the plaintiff's claims in accordance with Connecticut choice of law rules. Then the court must determine with respect to each claim whether genuine issues of material fact exist based on the substantive law that governs that claim. At each stage, the evidence in this case must be assessed in a light most favorable to the non-movant, here the plaintiff. *See e.g., Doninger v. Niehoff,* 642 F.3d 334, 344 (2d Cir.2011).

Bulldog New York LLC v. Pepsico, Inc., 8 F.Supp.3d 152 (2014)
2014 WL 1284903

## A. Choice of Law

[1]  [2]  [3]   A federal trial court sitting in diversity jurisdiction must apply the law of the forum state, which in this instance is Connecticut, to determine the choice-of-law rules. *Bigio v. Coca-Cola Co.,* 675 F.3d 163, 169 (2d Cir.2012). Here, the Bulldog LOI provides that the "letter of intent and all matters or issues collateral thereto shall be governed by the laws of the State of New York, without regard to its conflict of law provisions." (Ex. 16 to Defs.' Local Rule 56(a)1 Statement (Doc. No. 139–16) ("Ex. 16"), at 1.) Connecticut law "give[s] effect to an express choice of law by the parties to a contract provided that it was made in good faith." *Elgar v. Elgar,* 238 Conn. 839, 679 A.2d 937, 942 (1996); *see also Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 393 (2d Cir.2001). Neither party contests the validity of the choice-of-law provision in the Bulldog LOI. Accordingly, the court applies New York law in construing the contract claims relating to the Bulldog LOI in Count 1.

**4  Although it is arguable that the choice of law provision in the Bulldog LOI includes within its scope the remaining claims, the parties have not raised that point.

[4]  [5]   In resolving choice of law issues for tort claims in Connecticut when there is no agreement between the parties, it is first necessary to establish whether an actual conflict of law exists as the result of which the application of law of one jurisdiction would produce differing results from the application of that of another. *See Dugan v. Mobile Med. Testing Servs., Inc.,* 265 Conn. 791, 830 A.2d 752, 758 (2006). If so, then "the doctrine that the substantive rights and obligations arising out of a tort controversy are determined by the law of the place of injury," also known as "*lex loci delicti*", typically applies. *O'Connor v. O'Connor,* 201 Conn. 632, 519 A.2d 13, 15 (1986). However, the Connecticut Supreme Court has held that *lex loci delicti* does not apply to a tort claim when the application would undermine expectations of the parties or an important state policy, when the application would produce an arbitrary and irrational result, or where "reason and justice" counsel for the application of a different principle. *Id.* at 15, 21. In such cases, Connecticut courts are required to apply the "most significant relationship" analysis as set forth in the Restatement (Second) of Conflict of Laws § 145(1) (1971) (the "Restatement (Second)"). *Id.* at 22.

[6]   Here, assuming the place of injury would be Connecticut, where Bulldog felt the economic consequences of the defendants' actions, application of *lex loci delicti* would undermine the expectations of the parties that New York law would govern their relationship, as expressed in the **\*161** choice of law provision in the Bulldog LOI. Although Bulldog argues that "the application of *lex loci* would not undermine the parties' expectations" because "Pepsi obviously knew it was working with, dealing with, communicating with, negotiating with, and paying[ ] a Connecticut entity", the plain language of the Bulldog LOI undermines this contention. (Pl.'s Mem. Opp. Mot. Summ. J. (Doc. No. 147) ("Pl.'s Mem."), at 37.) The choice-of-law provision in the Bulldog LOI reads: "This letter of intent and all matters or issues collateral thereto shall be governed by the laws of the State of New York, without regard to its conflict of law provisions." (Ex. 16, at 2.) The parties' choice of New York law is not limited to disputes as to the interpretation or enforcement of the Bulldog LOI, but is extended to "all matters or issues collateral thereto." (*Id.*) While it is not clear as a matter of law whether every claim raised in the First Amended Complaint would be within the scope of the clause, and the court does not reach this point because the parties did not brief the issue, the parties' expectations for purposes of *lex loci delicti* analysis can be determined by reference to the provision. The language of the Bulldog LOI makes it clear that the parties intended that all disputes, whether directly related or incidental to the Bulldog LOI, would be governed by New York law. Thus, applying *lex loci delicti* would undermine the expectations of the parties, and the court must use the most significant relationship test instead.

**5  Section 145(1) of the Restatement (Second) provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement (Second) § 145(1). Section 6(2), in turn, states that the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

Bulldog New York LLC v. Pepsico, Inc., 8 F.Supp.3d 152 (2014)

2014 WL 1284903

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) § 6(2). The Connecticut Supreme Court has directed that "[f]or assistance in [their] evaluation of the policy choices set out in §§ 145(1) and 6(2)" courts should look to Section 145(2), since it "establishes black-letter rules of priority to facilitate the application of the principles of § 6 to torts cases." *O'Connor*, 519 A.2d at 23. Section 145(2) calls for consideration of:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) § 145(2). These factors are "to be evaluated according to their relative importance with respect to the particular issue." *Id.; see also Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 190–91 (2d Cir.2009).

[7]   "In addition, when appropriate, Connecticut Courts apply the principle of **\*162** depecage, whereby 'different issues in a single case may be decided according to the substantive law of different states.' " *In re Helicopter Crash Near Wendle Creek, British Columbia on August 8, 2002*, 485 F.Supp.2d 47, 57 (D.Conn.2007) (quoting *Reichhold Chems., Inc. v. Hartford Accident & Indem. Co.*, 252 Conn. 774, 784, 750 A.2d 1051 (Conn.2000)). Therefore, each count in this case will receive an individualized choice of law analysis.

### 1. Counts 2 and 3: Misappropriation of Trade Secrets

As mentioned above, the choice of law analysis must be undertaken while assessing the evidence in a light most favorable to the non-movant. *See e.g., Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir.2011). Bulldog contends that Connecticut law should govern its misappropriation claim because: (1) Bulldog remains, and was at all times relevant to this dispute, based in Connecticut; (2) Bulldog developed the idea for the Bulldog Project in Connecticut; (3) Bulldog engaged in numerous teleconferences and electronic communications with Pepsi from Connecticut, and those communications were clearly marked as coming from Connecticut either in the signature block of the email or because the telephone numbers used were Connecticut numbers; and (4) the Bulldog LOI was signed by Bulldog in Connecticut and was to be performed in Connecticut. Pepsi argues that New York law should apply because the Bulldog Project was always tied to Times Square in New York, and that the essence of the Bulldog Project "was to capitalize on the tourism market of Times Square." (Defs.' Mem. Supp. Mot. Summ. J. (Doc. No. 138) ("Defs.' Mem."), at 42.) Pepsi also points to the fact that all live meetings occurred at Pepsi's Headquarters in Purchase, New York, and that all of Pepsi's decisions and communications emanated from New York.

**\*\*6**   Neither party disputes the facts presented by the other; instead, they disagree about the relative weight that should be given to each fact in determining which state's law should apply.

[8]  As discussed above, the first step in the choice of law analysis is to establish that an actual conflict of law exists, and that the application of law of either jurisdiction would not produce the same result. *See* *Dugan v. Mobile Med. Testing Servs., Inc.,* 265 Conn. 791, 830 A.2d 752, 758 (2006). Because Connecticut has adopted the Uniform Trade Secrets Act and New York has not, the choice of which state's law to apply will make a difference in the court's analysis as to Counts 2 and 3. *See Evans v. General Motors Corp.,* 277 Conn. 496, 893 A.2d 371, 382 n. 13 (2006). In fact, these two counts cannot both be brought. If New York law applies, the CUTSA claim in Count 2 cannot be brought; if Connecticut law applies, a common law claim for misappropriation of trade secrets is preempted by CUTSA. Thus, an actual conflict of law exists for these counts.

Next, the Restatement (Second) § 145(2) factors must be used to facilitate the application of "the § 6 guidelines to the circumstances of the present case." *O'Connor,* 519 A.2d at 23. Section 145(2)(a) of the Restatement calls for an analysis of the location of the injury. However, for trade secret claims, the Restatement (Second) does not put significant weight on this factor, stating that "the place of injury does not play so important a role for choice-of-law purposes in the case of false advertising and the misappropriation of trade values as in the case of other kinds of torts." Restatement (Second) § 145 cmt.f. As the Restatement (Second) points out, the "location of injury" for **\*163** misappropriation claims is often not easily identifiable, and is therefore less important than it otherwise might be. Under the circumstances of this case, it is most likely that the injury occurred where the economic impact was felt, namely Bulldog's headquarters in Connecticut. *Cf. Uniroyal Chem. Co., Inc. v. Drexel Chem. Co. Inc.,* 931 F.Supp. 132, 140 (D.Conn.1996) ("[U]nder Connecticut's choice of law principles, a tort is deemed to have occurred where the injury was sustained, and in misrepresentation cases, the injury occurs where the 'economic impact' is felt.").

In direct contrast, the Restatement (Second) places particular importance on the factor enumerated in Section 145(2)(b), "the place where the conduct causing the injury occurred," when analyzing misappropriation claims. A comment to this section notes that "the principal location of the defendant's conduct is the [factor] that will usually be given the greatest weight in determining the state whose local law determines the rights and liabilities that arise from false advertising and the misappropriation of trade values." Restatement (Second) § 145 cmt.f. Here, Bulldog's allegations suggest that its trade secrets, which were contained in confidential presentation decks and emails to Pepsi representatives, were misappropriated when Pepsico and PCMA revealed them to a competitor from the Xanadu Project during a meeting or meetings at, or by otherwise sending information from, Pepsi's headquarters in New York. Thus, it is apparent that the location of the defendants' conduct that led to Bulldog's injury is New York.

**\*\*7**  The factor to be analyzed under Section 145(2)(c)—"the domicile, residence, nationality, place of incorporation and place of business of the parties"—does not favor one state's laws over the other. "At least with respect to most issues, a corporation's principal place of business is a more important [factor] than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter place." Restatement (Second) § 145 cmt.e. Although all parties in this action are incorporated in Delaware, that state has no other relation to the case. Bulldog is primarily located in Connecticut (despite the fact that it does business under the name "Bulldog New York"), and Pepsico and PCAM are headquartered in New York, but do business nation-wide.

Finally, Section 145(2)(d) calls for an analysis of the place where the relationship is centered. *Dugan v. Mobile Med. Testing Servs., Inc.,* 265 Conn. 791, 830 A.2d 752, 758 (2003) is instructive. There, although the plaintiff was domiciled in the same state in which the defendant was incorporated (Connecticut), the Connecticut Supreme Court held that the relationship was centered in New York because that was the situs of the interactions which formed the basis of the plaintiff's complaint. The court stated that "the relationship between the parties, which was based solely on [the defendant's] administration of the plaintiff's fitness for duty examination [for employment in New York's Fire Department], was centered in New York." *Id.* at 760. Here, the dispute underlying Counts 2 and 3 arises out of a business venture focusing exclusively on Times Square in New York City, and all meetings between Bulldog and Pepsi took place either at Pepsi's location in Purchase or in Times Square. It is plain, then, that the focal point of this relationship was New York City. Therefore, this factor points to the application of New York law for Counts 2 and 3.

2014 WL 1284903

Because two of the Section 145(2) factors favor applying New York law, and one of these two factors is traditionally given
**\*164** the most weight in misappropriation choice of law analyses, and of the other two factors one does not favor application
of the law of either state and the factor favoring Connecticut law does not receive significant weight, the court finds that New
York has the most significant relationship to the misappropriation of trade secrets claims and its law should be applied. *Cf. Id.*
at 760–61 (holding that New York law applied when "the injury causing conduct occurred in New York, and ... the relationship
between the parties was centered in New York," even though both parties were domiciled in Connecticut and the injury occurred
in Connecticut).

Consequently, the motion for summary judgment is being granted as to Count 2 of the First Amended Complaint, as the cause
of action there is available only under a Connecticut statute.

## 2. Count 4: Tortious Interference with Business Expectancy [1]

[1]     The plaintiff's First Amended Complaint does not make clear whether Count 4 for "Tortious Interference" is a claim for tortious
       interference with contractual relations or tortious interference with business expectancy and/or prospective economic advantage.
       However, in its memorandum of law, Bulldog "identifie[s] several business opportunities and relationships with third parties[,]"
       that it contends "Pepsi interfered with ... by willfully failing to comply with, and having no intention of complying with in the
       first instance, its obligations under the May 2007 Agreement." Pl.'s Mem., at 33–34. But, the plaintiff does not identify any actual,
       preexisting contracts with which the defendants interfered. Therefore, because tortious interference with contractual relations requires
       the existence of an enforceable contract, this count is construed, in the light most favorable to the non-movant, to assert a claim
       for tortious interference with business expectancy. *See Catskill Development, L.L.C. v. Park Place Entertainment Corp.,* 547 F.3d
       115, 132 (2d Cir.2008).

**\*\*8** **[9]**   **[10]**   The court must first determine whether an actual conflict of law exists. Under Connecticut law, "the elements
of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another
party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3)
as a result of the interference, the plaintiff suffers actual loss." *American Diamond Exchange, Inc. v. Alpert,* 302 Conn. 494,
28 A.3d 976, 986 (2011) (citing *Hi–Ho Tower, Inc. v. Com–Tronics, Inc.,* 255 Conn. 20, 27, 761 A.2d 1268 (Conn.2000)).
Under New York Law, "to prevail on a claim for tortious interference with business relations ..., *four* conditions must be met:
(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) *the
defendant acted for a wrongful purpose or used dishonest, unfair, or improper means;* and (4) the defendant's acts injured the
relationship." *Catskill Development, L.L.C. v. Park Place Entm't Corp.,* 547 F.3d 115, 132 (2d Cir.2008) (emphasis added). The
Connecticut Supreme Court includes the "additional" New York element of wrongful purpose as an element necessary to prove
interference with contractual relations, but does not include it in the list of elements for interference with business expectancy.
*Compare Appleton v. Bd. of Educ. of Town of Stonington,* 254 Conn. 205, 757 A.2d 1059, 1063 (2000)*with American Diamond
Exchange,* 28 A.3d at 986. [2]

[2]     The court recognizes that the Connecticut Appellate Court has on at least one occasion read the wrongful purpose requirement into
       the tortious interference with business expectancy tort. *See American Diamond Exchange, Inc. v. Alpert,* 101 Conn.App. 83, 920 A.2d
       357, 363 (2007). The Appellate Court remanded *Alpert* to the trial court, which then entered judgment for the plaintiff consistent with
       the Appellate Court's holding. This decision was then appealed to the Connecticut Supreme Court. *See American Diamond Exchange,*
       28 A.3d at 986. There, however, the Connecticut Supreme Court did not consider wrongfulness as an element of this tort. Therefore,
       the court interprets the tort of interference with business expectancy as not requiring this element under Connecticut law.

**\*165** The Second Circuit has recognized that the "wrongful means requirement makes alleging and proving a tortious
interference claim with business relations 'more demanding' than proving a tortious interference" claim without that element.
*Catskill Development,* 547 F.3d at 132. Thus, because New York law contains an added element, which makes proving the
claim more demanding, the court concludes that an actual conflict of law exists with respect to Count 4, necessitating an analysis
under Section 145(2).

Bulldog New York LLC v. Pepsico, Inc., 8 F.Supp.3d 152 (2014)
2014 WL 1284903

[11]   As to Section 145(2)(a), the location of the injury to the plaintiff, that factor favors application of Connecticut law. The business relationships the plaintiff claims were interfered with would have benefited it financially, and it appears that the economic impact of losing business relationships would be felt at its Connecticut headquarters.

As to Section 145(2)(b), the place where the conduct causing the injury occurred, that factor favors application of New York law. Bulldog claims that the actions Pepsico and PCAM took with respect to the Xanadu Project and the announcement concerning it interfered with its prospective business relations. These actions, even if they were directed to other states, were initiated at or emanated from Pepsi's New York headquarters. None of the allegedly interfering conduct occurred in Connecticut; Pepsico and PCAM representatives acted exclusively in New York.

The analysis under the factor in 145(2)(c) is the same as that with respect to the claim for misappropriation of trade secrets, and this factor does not favor one state's laws over the other. The analysis under the factor in 145(2)(d) is also the same as that with respect to the claim for misappropriation of trade secrets, and this factor clearly favors application of New York law.

**9  Thus, two factors, the place where the conduct causing the injury occurred and the place where the relationship between the parties is centered, favor application of New York law, while the place where the injury occurred favors application of Connecticut law, and the remaining factor is neutral. Although Connecticut may have a policy interest in protecting its resident corporations from tortious interference with their business expectancies using its less stringent standard (*see* Restatement (Second) § 6(2)(b)), this alone is not enough to tilt the balance in favor of the application of Connecticut law, as New York would also have a policy interest in protecting its resident corporations from claims for tortious interference under a looser standard than what is normally applicable to them. *See* Restatement (Second) § 6(2)(c). Additionally, to the extent the parties identified a state's law to govern their relationships, they identified New York law. *See* Restatement (Second) § 6(2)(d). Therefore, the court finds that New York law should apply to plaintiff's claim for tortious interference with business relations.

### 3. Count Six: Connecticut Unfair Trade Practices Act

[12]   Tort choice of law rules generally are also applied to determine whether a CUTPA claim can proceed. *See Macomber v. Travelers Prop. and Cas. Corp.*, 277 Conn. 617, 894 A.2d 240, 256–56 (2006); 12 Conn. Prac., Unfair Trade Practices § 8.1. Therefore, the same Restatement (Second) analysis that has been used for the other counts is necessary for Count 6.

*166  [13]   The alleged CUTPA violation here occurred in New York. However, "CUTPA does not require that a violation actually occur in Connecticut, if the violation is tied to a form of trade or commerce intimately associated with Connecticut or if, where Connecticut choice of law principles are applicable, those principles dictate application of Connecticut law." *Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher–Price, Inc.*, 406 F.Supp.2d 175, 200 (D.Conn.2005) (internal citations and quotations omitted).

[14]   Connecticut choice of law principles do not dictate application of Connecticut law with respect to the CUTPA claim. The plaintiff's CUTPA claim has, as its core, claims of conduct that constitutes misappropriation of trade secrets and tortious interference. Therefore, the analysis of each element under Section 145(2) for the CUTPA claim will be a combination of the analyses for those same elements with respect to the misappropriation and tortious interference claims. Section 145(2)(a) favors application of Connecticut law on the misappropriation claim, albeit slightly, and on the tortious interference claim, so this element favors application of Connecticut law to the CUTPA claim as well. Section 145(2)(b) strongly favors application of New York law to both the misappropriation and tortious interference claims, so that element also strongly favors the application of New York law to the CUTPA claim. Section 145(2)(c) is neutral with respect to the previous two claims, so is also neutral for the CUTPA claim. Finally, Section 145(2)(d) also strongly favors application of New York law to the misappropriation and tortious interference claims, and therefore strongly favors application of New York law to the CUTPA claim. Thus, since two factors strongly favor the application of New York law, one factor favors the application of Connecticut law, and the final factor

is neutral, the court concludes that Connecticut choice of law principles dictate the application of New York, not Connecticut, law to this claim.

**\*\*10** A CUTPA claim can also be brought where a violation did not actually occur in Connecticut "if the violation is tied to a form of trade or commerce intimately associated with Connecticut", but that is not the case here. As discussed above, the trade or commerce at issue here was associated exclusively with Times Square in New York City.

Thus, because neither of the conditions for bringing a CUTPA claim where the violation does not actually occur in Connecticut are met here, Bulldog cannot bring a CUTPA claim, and the motion for summary judgment is being granted as to Count 6 of the First Amended Complaint.

## B. Claims in Count 1, 3, and 4

The court has granted the motion for summary judgment as to Counts 2 and 6 based on the choice of law analysis. The remaining claims are Count 1, breach of contract as against PCAM only; Count 3, misappropriation of trade secrets under New York law; and Count 4, interference with business relations under New York law.

### 1. Count 1: Breach of Contract

The plaintiff claims that PCAM breached the Bulldog LOI when it failed to: (a) work in good faith with Bulldog for at least 120 days following execution of the Bulldog LOI to develop the Bulldog Project; (b) work with Bulldog, following the expiration of the 120–day period, to recruit a third-party to be the owner/operator of the Bulldog Project; (c) use its best efforts to assist and support Bulldog in its attempts to negotiate a business deal with a third-party owner operator; (d) pay Bulldog a bonus in the amount set forth in the Bulldog **\*167** LOI; and (e) reach an agreement with Bulldog on additional compensation for the Bulldog Project. Bulldog also claims that PCAM's alleged misappropriation of trade secrets violated the confidentiality provisions of the Bulldog LOI.

**[15]** Under New York law, a claim for breach of contract requires: "the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." *JP Morgan Chase v. J.H. Elec. of New York, Inc.,* 69 A.D.3d 802, 803, 893 N.Y.S.2d 237 (N.Y.App.Div.2010).

The parties do not dispute that the first two elements—the existence of a contract and the plaintiff's performance—are satisfied in this case by the Bulldog LOI and Bulldog's performance thereunder. However, the parties disagree about whether PCAM, in fact, failed to comply with its obligations under the Bulldog LOI, and, if so, what Bulldog's resulting damages were.

In determining whether a genuine issue of material fact exists with respect to PCAM's alleged breach of the Bulldog LOI, the threshold question is when the Bulldog LOI was terminated. It is undisputed that on or around June 6, 2007, a representative from PCAM, Mangelsdorf, called Marchi and orally informed him of PCAM's intent to terminate the contract. This conversation was acknowledged on the same day in an e-mail from Marchi in his capacity as Bulldog's President. Over a year later, on June 23, 2008, PCAM sent a letter to Bulldog to "confirm termination of the LOI." The Bulldog LOI provides that "[e]ither party may terminate this letter of intent at any time with ten (10) days written notice", and further provides that "Pepsi and Bulldog will work together in good faith over the next 120 days on a scope of work for the next phase of the Project.... After the 120 day period, Pepsi and Bulldog will work together in good faith to execute a deal, to the mutual satisfaction of Pepsi and Bulldog, with a third party to be the owner/operator of the Project...." (Ex. 16, at 1.) The parties disagree about whether the combination of Mangelsdorf's oral statement and Marchi's written confirmation (as well as the parties' subsequent actions) effectively terminated the contract.

**\*\*11** **[16]** Under New York law,

> when parties agree that a written contract can be terminated on written notice (or that the agreement
> cannot be terminated orally), the requirement that the notice be written cannot be waived except in
> writing, nor can the parties mutually consent to abandon the contract and substitute another in its place
> unless there is a writing signed by the party against whom the termination or abandonment is sought
> to be enforced.

*Israel v. Chabra,* 12 N.Y.3d 158, 878 N.Y.S.2d 646, 906 N.E.2d 374, 379 (2009) (interpreting the provisions of General
Obligations Law § 15–301(1)) (internal citations omitted). This holds true even when the contract can be terminated unilaterally.
New York General Obligations Law Section 15–301(4) states:

> If a written agreement or other written instrument contains a provision for termination or discharge on
> written notice by one or either party, the requirement that such notice be in writing cannot be waived
> except by a writing signed by the party against whom enforcement of the waiver is sought or by his agent.

Thus, under New York law, if the parties have agreed that the contract cannot be terminated orally, a valid termination can
only be effected by either a signed notice of termination or a writing waiving the provision signed by or on behalf of the party
against whom the waiver is sought to be enforced.

 **\*168**  Here, it is undisputed that there was no written notice of termination prior to June 23, 2008, when PCAM sent a letter
"confirming" that the Bulldog LOI had been terminated in June 2007. In her deposition, Mangelsdorf stated the following:

Q: Did PCAM provide written notice to Bulldog?

A: No.

Q: Did anyone provide written notice to Bulldog?

A: I provided verbal notice, to which he responded in writing.

(Ex. 3 to Defs.' Local Rule 56(a)(1) Statement (Doc. No. 139–3), at 44–45.) Furthermore, neither party contends that Marchi's
confirmation email, sent the same day, constitutes written notice of termination. Instead, the parties disagree about whether
Marchi's email acts as a written waiver sufficient to obviate PCAM's obligations under the written termination clause.

Under New York law, the sufficiency of an email to act as a signed writing is not settled. For example, several courts have
found that "e-mails ... constitute 'signed writings' within the meaning of the statute of frauds, since [the party's] name at the end
of his e-mail signifie[s] his intent to authenticate the contents...."*Stevens v. Publicis S.A.,* 50 A.D.3d 253, 255–56, 854 N.Y.S.2d
690 (N.Y.App.Div.2008), *lv. dismissed*10 N.Y.3d 930, 862 N.Y.S.2d 333, 892 N.E.2d 399 (2008); *see also European Sch. of
Econs. Found. v. Teknoloji Holdings A.S.,* No. 08 Civ. 2235(TPG), 2011 WL 1742017 (S.D.N.Y. May 4, 2011); *Williamson v.
Delsener,* 59 A.D.3d 291, 874 N.Y.S.2d 41 (N.Y.App.Div.2009).[3] However, New York courts have in at least cases refused
to find that an email containing a signature necessarily satisfied the signed writing requirement, holding that "[t]he act of
identifying and sending a document to a particular destination does not, by itself, constitute a signing authenticating the contents
of the document." *Mark Bruce Int'l, Inc. v. Blank Rome LLP,* 19 Misc.3d 1140(A), 866 N.Y.S.2d 92, at \*6 (N.Y.Sup.Ct. May 23,
2008), *aff'd*60 A.D.3d 550, 876 N.Y.S.2d 19 (N.Y.App.Div.2009). In particular, these courts have found that an email "which
contained a *pre-printed signature* [ ] was not a sufficient writing under the statute of frauds." *Bayerische Landesbank v. 45
John St. LLC,* 102 A.D.3d 587, 587, 960 N.Y.S.2d 64 (N.Y.App.Div.2013) (emphasis added); *see also Mark Bruce Intl., Inc.,*
19 Misc.3d 1140(A), at \*6 (comparing pre-printed signature blocks in emails to "automatic imprinting, by a fax machine, of the
sender's name at the top of each page transmitted," which the New York Court of Appeals held did not satisfy the requirement
for a signed writing in *Parma Tile Mosaic & Marble Co., Inc. v. Estate of Short,* 87 N.Y.2d 524, 640 N.Y.S.2d 477, 663 N.E.2d
633 (1996)).

Bulldog New York LLC v. Pepsico, Inc., 8 F.Supp.3d 152 (2014)
2014 WL 1284903

3    The court notes that these cases do not deal with Section 15–301 specifically, but instead with the sufficiency of emails as signed writings for the purposes of the statute of frauds (N.Y. Gen. Oblig. L. §§ 5–701 to 5–705). However, New York courts have treated the writing requirement as being the same for purposes of Section 15–301 and the statute of frauds. *See, e.g., Israel v. Chabra,* 601 F.3d 57, 61 (2d Cir.2010) (referring to 15–301 as a "private statute of frauds"); *# 1 Funding Ctr., Inc. v. H & G Operating Corp.,* 48 A.D.3d 908, 910, 853 N.Y.S.2d 178 (N.Y.App.Div.2008).

**\*\*12** There is no evidence in the record as to whether the signature block in Marchi's June 6, 2007 email to Mangelsdorf was pre-printed or typed in by Marchi. Neither party has stipulated that this block of text containing Marchi's name, Bulldog's operating name, Marchi's cellphone number, and a fax number was either "manually typ[ed]" by Marci or "automatic[ally] **\*169** imprint[ed]" onto the message by his email program "without regard to the applicability of the statute of frauds to the particular document." *Mark Bruce Int'l, Inc.,* 19 Misc.3d 1140(A), at \*5.

**[17]   [18]   [19]**   Furthermore, in addition to needing to show the existence of a signed writing, the defendants must also demonstrate that such writing effectively waived the plaintiff's rights under the contract.

Under New York law, waiver of a contract right is "the voluntary abandonment or relinquishment of a known [contract] right. It is essentially a matter of intent which must be proved." "Because waiver of a contract right must be proved to be intentional, the defense of waiver requires a clear manifestation of an intent by plaintiff to relinquish [his] known right." Whether a party had the intent to waive is usually a matter of fact.

*Randolph Equities, LLC v. Carbon Capital, Inc.,* 648 F.Supp.2d 507, 516 (S.D.N.Y.2009) (quoting *Jefpaul Garage Corp. v. Presbyterian Hosp.,* 61 N.Y.2d 442, 474 N.Y.S.2d 458, 462 N.E.2d 1176, 1177 (1984); *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 585 (2d Cir.2006)) (internal citations and quotations omitted) (alterations in original).

The parties disagree about whether Marchi's email demonstrates the requisite intent to waive the no-oral-termination clause in the 2007 Agreement. To support their position that the written notice requirement was waived, the defendants point to the language Marchi used in the June 7, 2007 email: "A couple things to close the project.... My lawyers need to review the language in your nda with cbre since[ ] Bulldog owns the IP. I think that's it. Outside of Coke, full speed ahead and thanks again for the support." (Ex. 21 to Defs.' Local Rule 56(a)1 Statement (Doc. No. 139–21), at 1.) The defendants also highlight Marchi's deposition testimony:

Q: What did Ms. Mangelsdorf tell you in the call on June 6th or 7th, 2007?

A: She said, "I have some bad news. We're not going forward with the project that you've been working on for awhile."[sic] ...

Q: When the conversation concluded, was there any doubt in your mind that Pepsi was terminating the letter of intent?

A: After the phone call, obviously I understood that Pepsi was terminating....

Q: Did you do any work in furtherance of the agreement you had with Pepsi in the letter of intent after the phone call with Ms. Mangelsdorf?

A: The only thing I did to close the loop on the project was send her an e-mail, I believe to the extent saying that, you know —I don't remember exactly what the e-mail stated, but it was to kind of say, you know, "here it is. I'm moving forward or onward and upward." I don't remember precisely what the e-mail said.

**\*\*13**   (Ex. 8 to Defs.' Local Rule 56(a)1 Statement (Doc. No. 139–8), at 187–189.) PCAM contends that these statements by Marchi demonstrate that after the phone call with Mangelsdorf it was his understanding that the Bulldog LOI was terminated, and that his follow up email constituted a waiver of his right to receive notice of that termination in writing.

However, neither Marchi's email nor his deposition testimony definitively demonstrates that he intended to waive his right to written termination. There is a genuine issue as to whether the actions Marchi took were merely a prudent attempt to

minimize his losses in the face of the defendant's **\*170** clear intention to no longer perform under the contract. The court in *Colman & Hirschmann, Inc. v. Little Tikes, Inc.,* No. 84 Civ. 1296(JMW), 1986 WL 4688 (S.D.N.Y. Apr. 17, 1986) found a similar justification for the plaintiff's actions in a case where "the plaintiff had actual notice from the oral communication [of termination] ... and [the plaintiff] took the steps it did in contemplation of termination...."*Id.* at \*5. In that case the court held that those steps the plaintiff took were "not relevant" to the waiver issue and that

> [t]here was no waiver of the written notice requirement and [the plaintiff's] notification of its employees [of the termination] and representation of [a competitor of the defendant] were prudent business steps in light of [the defendant's] expressed intent to terminate. Written notice was required and without it there was no termination.

*Id.*

PCAM argues that, even if Bulldog did not waive this provision, summary judgment on the breach of contract claim is appropriate because Bulldog is estopped from claiming that the contract was not terminated as a result the actions Marchi took after the June 6, 2007 call and email. PCAM cites to a number of cases to support the proposition that a "party who treat[s] [a] contract as terminated [is] estopped from relying on N.Y. G.O.L. § 15–301 to contest termination." (Defs.' Mem. Supp. Mot. Summ. J. (Doc. No. 138), at 15 n. 8.) However, all of these cases are distinguishable. In *Rose v. Spa Rlty. Assoc.,* 42 N.Y.2d 338, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (1977), for example, the New York Court of Appeals was considering an oral modification to, not an oral termination of, a contract, and the actions taken by the party claiming § 15–301 prevented the modification had induced reliance on the modification from the other party. The court stated that "[o]nce a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking [§ 15–301] to bar proof of that oral modification." *Id.,* 397 N.Y.S.2d 922, 366 N.E.2d at 1283. Here, there is no evidence that Bulldog's actions induced any reliance from PCAM, or that PCAM would have acted differently if not for Bulldog's conduct.

Additionally, the court declines to follow the holding in *Digital Broad. Corp. v. Ladenburg, Thalmann & Co., Inc.,* No. 117041/05, 2008 N.Y. Misc. LEXIS 10179, at \*16–17 (N.Y.Sup.Ct. Dec. 11, 2008), that when "[t]he undisputed evidence demonstrates that [the plaintiff] itself treated the relationship as terminated .... [the plaintiff] is estopped from relying on section 15–301(2) to contest the alleged termination of the Agreement." This holding was based on a statement by the New York Court of Appeals in *Rose* that was itself derived from that court's earlier opinion in *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 122 N.E. 378, 380–81 (1919). However, as recognized by the court in *Israel v. Chabra,* 12 N.Y.3d 158, 878 N.Y.S.2d 646, 906 N.E.2d 374 (2009), the amendments to § 15–301 abrogated the holding in *Beatty. See Israel,* 878 N.Y.S.2d 646, 906 N.E.2d at 380. In fact, all of the cases cited by PCAM in support of its estoppel theory predate *Israel.*

**\*\*14** Finally, the Second Circuit has recognized that "[s]ummary judgment [is] inappropriate on th[e] issue" of estoppel, because "there is an issue of fact whether [the plaintiff] is estopped from denying that the contract had terminated." *Zolar Pub. Co., Inc. v. Doubleday & Co., Inc.,* 529 F.2d 663, 667 (2d Cir.1975). Therefore, Bulldog's reliance on the defendants' oral notification that they no longer intended **\*171** to perform under the contract does not as a matter of law estop Bulldog from claiming that the contract was not terminated. This reliance does, however, have an effect on the damages Bulldog may be able to claim as a result of any breach, which is discussed below.

Thus, because there is no indisputable evidence that Marchi's email either satisfies the signed writing requirement, conveys his intent to waive, or estops him from arguing that the contract was not terminated, a genuine issue of fact exists as to the end date of the contract.

However, this issue of fact is not dispositive of the instant motion; rather the existence of this issue requires the court to assume a termination date of September 15, 2007, as that assumption favors the non-movant.

Bulldog claims that PCAM breached its obligations under the contract by failing to maintain in confidence Bulldog's confidential and proprietary information, and by failing to perform its obligations to Bulldog in good faith. With respect to the breach of

Bulldog New York LLC v. Pepsico, Inc., 8 F.Supp.3d 152 (2014)
2014 WL 1284903

confidentiality claim, Bulldog does not specify precisely what confidential or proprietary information it claims PCAM shared with Xanadu; it appears that the information on which it bases its claim is that described on pages 20 to 24 of Bulldog's memorandum: (i) "glowing tables that simulate ponds that respond to touch with text or other images rising from below"; (ii) "a large LED sign ... the displays the Pepsi logo and also displays other images"; (iii) "an interactive, glassen-closed, climate controlled capsule [in which visitors would ride] to a height of 300 feet offering sweeping views of New York's sky line"; (iv) the fact that the location "would be green powered, including using power generated from wind energy"; (v) "an adjacent indoor facility containing displays that 'previewed new Pepsi commercials, historical commercials and allowed the occupant to play a New York trivia game for a prize to [be] redeemed at the Pepsi World gift shop' "; (vi) "the incorporation of unique recycling receptacles (tubes) throughout the venue"; (vii) an area where, "after purchasing tickets for the ride, the guests 'stood on line watching Pepsi commercials and music videos from all over the world on screens in the queuing area' "; and (viii) a concept "where a picture is taken of the occupants [of the ride], and this picture is electronically transmitted to Pepsi's website where it can be viewed by friends and family." (Pl.'s Mem., at 20–24.)

To the extent that this information is covered by the confidentiality provision in the Bulldog LOI, an issue that the court does not reach, Bulldog has not provided sufficient evidence to demonstrate that there is a genuine issue of material fact regarding PCAM's claimed misappropriation. Both Leshem and Mangelsdorf aver that no confidential information was shared. In response, Bulldog argues that since

> **15** Mangelsdorf was the project leader on both competing projects, [and] had creative input and was exposed to confidential concepts and designs that were similar in nature (e.g. interactive and experiential elements, molecules, bubbles, carbonation, etc.), [this situation] is not unlike those cases in which misappropriation of trade secrets is presumed under the doctrine of inevitable disclosure.

(*Id.* at 21.) However, assuming that the facts here would satisfy the requirements for demonstrating inevitable disclosure, the "[p]laintiff cites no cases—nor has independent research yielded any—in which the risk of inevitable disclosure has been held sufficient to raise a triable issue of fact so as to defeat summary judgment." **172** *Metito (Overseas) Ltd. v. General Electric Co.,* No. 05 Civ. 9478(GEL), 2009 WL 399221, at *11 (S.D.N.Y. Feb. 18, 2009). As the court in *Metito* points out, the doctrine of inevitable disclosure is generally considered in the context of a motion for preliminary injunction. "Extension of the doctrine to the present context, if ever appropriate, would at a minimum require a very strong showing that disclosure is truly inevitable." *Id.* Bulldog has made no such showing, but has instead merely concluded that it would be "impossible for Bulldog's trade secret information, known by Mangelsdorf, to not [a]ffect her work in and influence her decisions with respect to the development of the concepts and designs of the Xanadu project." (Pl.'s Mem., at 22.) This conclusory assertion is not sufficient to make the requisite strong showing that disclosure was inevitable, and, in any case, PCAM has produced evidence that any input Mangelsdorf had on the Xanadu Project did not relate to the creation or inclusion of the elements Bulldog claims were misappropriated from its proposal. Thus, Bulldog has not demonstrated that there is a genuine issue of material fact concerning the breach of the confidentiality provision of the Bulldog LOI.

With respect to the other aspect of Bulldog's breach of contract claim, PCAM asserts that any agreements involving promises to work in good faith with Bulldog were non-binding since they were "either too preliminary or indefinite to be enforceable" under New York law. (Defs.' Mem., at 18.) "The Second Circuit has interpreted New York law as having two types of preliminary agreements that creating binding obligations: 'Type I' and 'Type II.' "*EQT Infrastructure Ltd. v. Smith,* 861 F.Supp.2d 220, 226 (S.D.N.Y.2012) (citing *Brown v. Cara,* 420 F.3d 148, 153 (2d Cir.2005)).

> The hallmark of a Type I agreement is that the parties have agreed to all necessary elements of the contract and are, therefore, bound to the ultimate objective despite the fact that a more formal or elaborate writing has yet to be produced.... The category of Type I preliminary agreements is ... limited to agreements that are "preliminary" in name only.

*Brown,* 420 F.3d at 154. The Bulldog LOI does not satisfy the requirements for a Type I preliminary agreement, at least not with respect to the sections Bulldog claims were breached, because those sections clearly call for more negotiation regarding necessary elements such as the scope of work or the identity of the owner/operator of the Bulldog Project.

**\*\*16**  **[20]**   **[21]**   **[22]**   **[23]**   However, New York law also recognizes Type II preliminary agreements, which the Second Circuit describes as being "created when the parties agree on certain major terms, but leave other terms open for further negotiation." *Adjustire Sys., Inc. v. GAB Bus. Servs., Inc.,* 145 F.3d 543, 548 (2d Cir.1998).

> Under New York law parties who enter into [Type II] agreements ..."accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement...." These agreements do not commit the parties to reach their ultimate contractual objective; instead, such agreements create an "obligation to negotiate the open issues in good faith in an attempt to reach the ... objective within the agreed framework." This obligation bars a party from "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement."

*L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 430 (2d Cir.2011) (quoting **\*173** *Teachers Ins. and Annuity Ass'n of America v. Tribune Co.,* 670 F.Supp. 491, 498 (S.D.N.Y.1987); *Adjustire,* 145 F.3d at 548) (internal citations omitted). Courts applying New York law examine five "considerations relevant to whether a preliminary agreement is a binding Type II agreement":

> "(1) whether the intent to be bound is revealed by the language of the agreement;
>
> (2) the context of the negotiations;
>
> (3) the existence of open terms;
>
> (4) partial performance; and
>
> (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions."

*Brown,* 420 F.3d at 157. Evaluated using these considerations, the Bulldog LOI appears to qualify as a Type II preliminary agreement. First, the intent of the parties to be bound by the Bulldog LOI is demonstrated by the language of the letter. The Bulldog LOI begins: "This *binding* letter of intent sets forth the basic terms for the business relationship between Pepsi–Cola Advertising and Marketing, Inc. ("Pepsi") and Bulldog New York, LLC ("Bulldog")...." (Ex. 16, at 1 (emphasis added).) Furthermore, although it is not part of the "language of the agreement," the final termination letter PCAM sent to Bulldog reiterates the parties' belief that they had a "*binding* letter of intent dated May 18, 2007...." (Ex. CC. to Pl.'s Local Rule 56(a)2 Statement (Doc. No. 148–29), at 2 (emphasis added).) Taking the text of the two documents together, it appears that the parties intended the Bulldog LOI to be binding.

The second factor also appears to favor finding that a binding preliminary agreement existed. Like the project at issue in *Brown,* the Bulldog Project "was subject to numerous contingencies that had the potential to dramatically affect planning, execution, and management. It was in this context that the parties elected to negotiate a general framework within which they could proceed while preserving flexibility in the case of uncertainty." *Brown,* 420 F.3d at 158. The court in *Brown* found that in such a context, parties may opt "for a more open arrangement," and Type II agreements are "consistent with the context of [such] negotiations." *Id.*

**\*\*17**   Similarly, the third factor also favors finding a Type II agreement exists because "where the existence of open terms creates a presumption against finding a binding contract as to the ultimate goal, ... these same omissions may actually supporting finding a binding Type II agreement." *Id.* Here, the parties left open several important terms, but still entered into what they characterized as a "binding letter of intent." While the presence of these terms counsels against finding there is a Type I preliminary agreement that is enforceable as to the ultimate goal, their presence supports a finding that the parties entered into a Type II agreement.

With respect to the fourth factor, the evidence suggests that Bulldog performed under the terms of the Bulldog LOI, at least up until June 7, 2007. Furthermore, Bulldog continued to perform beyond that date under certain portions of the contract, namely the exclusivity provision. This partial performance "cuts strongly in favor of finding the [Bulldog LOI] to be a Type II agreement." *Id.*

As to the final factor, the court does not have enough information to determine what "the customary form" is for transactions similar to the one at issue here, and thus cannot conclude which outcome this factor favors. However, even when courts have found that the final form of the agreement customarily is put into writing, **\*174** they have held that " 'Type II agreements, by definition, comprehend the necessity of future negotiations and contracts,'... so that necessity—explicitly contemplated here ... —does not preclude a finding of a Type II agreement." *EQT Infrastructure Ltd.,* 861 F.Supp.2d at 230 (Quoting *Brown,* 420 F.3d at 158). Therefore, this factor "is essentially neutral in this case." *Id.*

[24]   Finally, the statements set forth in the paragraph entitled "Next Phase" specifically note that the parties will work together in "good faith over the next 120 days" to consummate the "next phase of the Project." (Ex. 16, at 1.) This language evokes "[t]he essence of a Type II preliminary agreement" in that "it creates an 'obligation to negotiate the open issues in good faith in an attempt to reach the [ultimate contractual objective] within the agreed framework.' " *Brown,* 420 F.3d at 157 (quoting *Tribune,* 670 F.Supp. at 498) (alterations in original). Therefore, since the language used strongly suggests that a Type II preliminary agreement was made, and the majority of the considerations support this conclusion, the court holds that the parties were under an obligation to negotiate in good faith.

[25]   [26]   The plaintiff claims that PCAM breached this obligation by failing to (a) work in good faith with Bulldog for 120 days following execution of the Agreement, to develop the Bulldog Project; (b) work with Bulldog, following the 120–day period, to recruit a third party to be the owner/operator of the Bulldog Project; (c) use its best efforts to assist and support Bulldog in its efforts to negotiate a business deal with a third-party owner operator; (d) pay Bulldog a bonus in an amount expressly set forth in the Bulldog LOI; and (e) reach an agreement with Bulldog on additional compensation for the Bulldog Project. The claims in ¶ 93(b), (d) and (e) of the Amended Complaint cannot be maintained at the summary judgment phase because the transaction was not eventually consummated. For Type II preliminary agreements, the parties have

> **\*\*18**   no right to demand performance of the transaction. Indeed, if a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing.

*Adjustrite Sys., Inc.,* 145 F.3d at 548; *see also L–7 Designs,* 647 F.3d at 431; *Tribune,* 670 F.Supp. at 498. Therefore, because the transaction was never consummated, claims with respect to obligations after the initial 120–day period cannot be maintained, and PCAM is entitled to summary judgment on these parts of the plaintiff's breach of contract claim.

With respect to the remaining claims in ¶ 93 of the Amended Complaint, PCAM states—without providing citations to evidence —that "undisputed evidence demonstrates that ... PCAM continued to work toward and consider the Project in good faith, and there is no evidence to the contrary." (Defs.' Reply Supp. Mot. Summ. J. (Doc. No. 155), at 5.) A number of e-mails between the parties tend to suggest that PCAM was working toward and considering the Bulldog Project in good faith with Bulldog between the signing of the Bulldog LOI and June 7, 2007. On the other hand, however, Dawn Hudson, a representative of PCAM wrote to Lon Schwear, of Ozz Marketing, on May 9, 2007, at 10:49 PM: "We are evaluating 3 major properties on both[ ] coasts right now. I'd be interested in your [point of view]. Please don[']t mention to David [Marchi]. I'm not sure we will go to the next phase, even although [I] agree with you that it is fantastic ... but never say never." (Ex. II to **\*175** Pl.'s Local Rule 56(a)2 Statement (Doc. No. 148–35), at 5.) This e-mail, close to the time of the signing of the Bulldog LOI, would tend to support an argument that PCAM lacked good faith in its dealings with Bulldog at that point. In addition, Bulldog has produced evidence demonstrating that PCAM was simultaneously negotiating with Bulldog and Xanadu Ventures, and was fully aware that it could not execute both projects.

As discussed above, the court assumes for purposes of the defendants' motion for summary judgment that the contract was not terminated until September 2007. Thus, there also exists a genuine issue of material fact with respect to whether PCAM was acting in good faith when it attempted the verbal termination. Although PCAM is correct that, under New York law, "[a] party has an absolute, unqualified right to terminate a contract on notice pursuant to an unconditional termination clause without court inquiry into whether the termination was activated by an ulterior motive," *Big Apple Car, Inc. v. City of New York,* 204 A.D.2d 109, 111, 611 N.Y.S.2d 533 (N.Y.App.Div.1994), at issue here is not PCAM's reasons for termination, but rather whether PCAM was acting in god faith when it stopped working toward and considering the Bulldog Project before reaching the end of even the 120–day period.

Thus, "[s]ince courts do not themselves weigh evidence at the summary judgment stage, this standard requires [the court] to determine whether any reasonable trier of fact would have to conclude that the evidence was so strongly in the defendant's favor that there remained no genuine issue of material fact for it to resolve." *Nagle v. Marron,* 663 F.3d 100, 105 (2d Cir.2011). Bulldog has produced sufficient evidence to demonstrate that genuine issues of material fact exist with respect to whether PCAM continued to work toward and consider the Bulldog Project in good faith.

**\*\*19** **[27]**   However, Bulldog fails to produce evidence that could establish the fourth element of a breach of contract claim: damages. In situations where a defendant has breached a Type II Agreement by failing to negotiate in good faith, "lost profits are generally not available where no agreement is reached, [but] out-of-pocket costs may still be appropriate." *Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.,* 765 F.Supp.2d 403, 417 (S.D.N.Y.2011) (footnotes omitted). Here, PCAM's purported oral termination resulted in Bulldog having no out-of-pocket expenses caused by PCAM's failure to negotiate in good faith. Bulldog has produced no evidence of, or even given any indication of, what damages it claims to have suffered either through PCAM's improper termination or through PCAM's bad faith dealing. Bulldog "also fails to offer any evidence that it would have behaved differently if [PCAM] had sent it a written termination notice." *Digital Broad. Corp.,* 2008 N.Y. Misc. Lexis 10179, at \*15. The only damages Bulldog appears to claim relate to its expected profits from the Bulldog Project, which are unavailable for breach of a Type II agreement.

Thus, while Bulldog has demonstrated that genuine issues of material fact exist with respect to whether PCAM continued to work toward and consider the Bulldog Project in good faith as required under the Bulldog LOI, it has not created a genuine issue of material fact with respect to the damages element of its breach of contract claim. Therefore, because proving damages is a necessary element of a breach of contract claim under New York law, the defendants' motion for summary judgment is being granted as to Count 1 of the First Amended Complaint.

### \*176   2. Count 3: Misappropriation of Trade Secrets

**[28]**   In Count 3, Bulldog claims that trade secrets, which were not known outside of Bulldog, Pepsi, and those who signed non-disclosure agreements, were misappropriated by the defendants. "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 117 (2d Cir.2009) (citing *N. Atl. Instruments, Inc. v. Haber,* 188 F.3d 38, 43–44 (2d Cir.1999) (applying New York law)). The defendants contend that no information contained in the Bulldog Project was a protectable trade secret, and, even if there was protectable information, such information was never misappropriated.

**[29]**   **[30]**   **[31]**   **[32]**   **[33]**   In terms of what constitutes a trade secret, under New York common law

> [a] trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it. In determining whether information constitutes a trade secret, New York courts have considered: (1) the extent to which the information is known outside of the business; (2) the extent to

which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

**20** *Faiveley Transport,* 559 F.3d at 117 (internal citations omitted.) Additionally, under New York law, "a trade secret must be used secretly and continuously in commerce." *Hudson Hotels Corp. v. Choice Hotels Intern.,* 995 F.2d 1173, 1177 (2d Cir.1993), *abrogated on other grounds by Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368 (2d Cir.2000). Therefore, " 'the commonly accepted common law definition of a trade secret "does not include a marketing concept or new product idea" submitted by one party to another.' " *Id.* at 1176 (quoting 2 R. Milgrim, *Milgrim on Trade Secrets* § 8.03, at 8–31 (1992 & Supp. 1992)). These are excluded from trade secret protection "because[ ] once [they are] marketed, the idea will no longer be a secret." *Scienton Tech., Inc. v. Computer Assoc. Int'l Inc.,* No. 04–CV–2652(JS)(ETB), 2013 WL 1856653, at *4 (E.D.N.Y. May 1, 2013); *see also LinkCo, Inc. v. Fujitsu Ltd.,* 230 F.Supp.2d 492, 499 (S.D.N.Y.2002) ( "Similar to the architecture of a building, once the combination of [the plaintiff's] elements is seen by the public, the system's architecture will become obvious and easily duplicated."). Thus, while " 'secrecy is a question of fact,' courts have held that there can be no trade secret protection, as a matter of law, if the secrecy is necessarily lost when the design or product is placed on the market." *Id.* at 498 (internal citations omitted) (quoting *Lehman v. Dow Jones, & Co., Inc.,* 783 F.2d 285, 298 (2d Cir.1986)).

[34] Here, any trade secrets claimed by Bulldog would fall squarely into the category of "marketing concept or new product idea" the secrecy of which was intended to be lost once they were revealed to the public. To the extent that Bulldog identifies any of its claimed trade secrets in its papers, it is evident that this **\*177** information was marketed to the defendants, could have been marketed to others, and was intended to eventually be exposed to the public, necessarily resulting in secrecy being lost. In addition, the information Bulldog provided to the defendants was not used by Bulldog continuously and secretly in its business to give it a competitive edge. This information "was not used to run [Bulldog's] business, but was its *product:* like the car that rolls off the production line, this information is what [Bulldog] had to sell." *Lehman,* 783 F.2d at 298 (emphasis in original). Thus, "[o]nce [the Bulldog Project was] built, marketed, and occupied, the features of the [experience] would necessarily be disclosed publicly" and therefore "could not constitute a protectable trade secret because, from that time forward, it could not be used secretly and continuously in its business." *Hudson Hotels,* 995 F.2d at 1177.[4]

---

4   The court is aware that the holding in *Hudson Hotels* dealt specifically with trade secret protection post-commercialization of the new product idea, and that the court acknowledged that "the question whether a marketing concept or a new product idea can constitute a trade secret is murkier." *Hudson Hotels,* 995 F.2d at 1177. However, subsequent decisions by New York courts, as well as other federal circuit courts, have held that a pre-commercialized new product idea is also not a protected trade secret because once it is marketed it will no longer be secret. *See Scienton Tech.,* 2013 WL 1856653, at *4 (collecting cases).

Therefore, there is no genuine issue of material fact as to whether Bulldog conveyed protected trade secrets to the defendants, and the motion for summary judgment is being granted as to Count 3 of the First Amended Complaint.

### 3. Count 4: Tortious Interference with Business Relations

**21  [35]**   In Count 4, Bulldog brings a claim for tortious interference, which, as explained above, the court construes as being brought under a theory of tortious interference with business relations.

[T]o prevail on a claim for tortious interference with business relations ... under New York law, four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.

*Catskill Development, L.L.C. v. Park Place Entm't Corp.,* 547 F.3d 115, 132 (2d Cir.2008). Bulldog claims that because of the defendants' conduct, "third parties were no longer interested in working with Bulldog, specifically citing Pepsi's involvement in Xanadu." (Pl.'s Mem., at 34.) However, the defendants' entering into a business venture with a competitor of Bulldog does not, standing alone, constitute the basis for a claim for tortious interference with business relations:

> The wrongful means requirement makes alleging and proving a tortious interference claim with business relations "more demanding" than proving a tortious interference with contract claim. The standard is more demanding because a plaintiff's mere interest or expectation in establishing a contractual relationship must be balanced against the "competing interest of the interferer," as well as the broader policy of fostering healthy competition.

*Catskill Development,* 547 F.3d at 132 (relying on New York law) (internal citations omitted). Also, although "a defendant's commission of a 'crime or an independent tort' clearly constitutes wrongful means,"*id.,* the fourth element of the tortious interference standard requires that the **\*178** plaintiff can " 'demonstrate *both* wrongful means *and* that the wrongful acts were the *proximate cause* of the rejection of the plaintiff's proposed contractual relations.' " *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada,* 374 F.3d 158, 171 (2d Cir.2004) (quoting *Pacheco v. United Medical Assoc., P.C.,* 305 A.D.2d 711, 712, 759 N.Y.S.2d 556 (N.Y.App.Div.2003)) (emphasis in original).

 [36]   Although there is a genuine issue of fact as to whether Pepsi's conduct in connection with the Bulldog Project constitutes an "independent tort," thereby satisfying the third element of the standard, Bulldog has produced no evidence showing that Pepsi's conduct was the proximate cause of the harm it claims in Count 4. There is no evidence as to the purported reason why the third parties no longer wanted to work with Bulldog, *i.e.* that Bulldog's original ideas were incorporated into the Xanadu Project. Rather Bulldog's contention is supported only by Bulldog's response to an interrogatory. This is insufficient, as a matter of law, to create a genuine issue of material fact because it relies upon the speculation of the plaintiff as to the reasons for the third parties' lack of involvement. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

 **\*\*22**   While it may be true that if Pepsi had chosen to proceed with the Bulldog Project, as opposed to the Xanadu Project, the business relations Bulldog refers to would have come to fruition, this alone does not establish proximate cause. All Bulldog has shown is that these third parties did not enter into a relationship with Bulldog because the Bulldog Project did not progress beyond the letter of intent stage. However, as discussed in connection with Count 1 above, the defendants were under no obligation to move forward with the Bulldog Project. Therefore, Bulldog is unable to establish the requisite causal connection between the alleged bad acts and the harm it claims in Count 4, because this same harm could have occurred even without the alleged bad acts.

Bulldog has produced no evidence that creates a genuine issue of material fact with respect to whether the defendants' alleged conduct proximately caused injury to its business relations with third parties. Therefore, the motion for summary judgment is being granted as to Count 4 of the First Amended Complaint.

### IV. Conclusion
For the reasons set forth above, the defendants' Motion for Summary Judgment (Doc. No. 136) is hereby GRANTED.

The Clerk shall close this case.

It is so ordered.

Bulldog New York LLC v. Pepsico, Inc., 8 F.Supp.3d 152 (2014)

2014 WL 1284903

**Parallel Citations**

2014 WL 1284903 (D.Conn.)

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 6583030
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Ansonia–Milford.

Ronald CORRA
v.

SUNWOOD CONDOMINIUM ASSOCIATION, INC.

No. CV126009466S.    |    Nov. 26, 2012.

**Opinion**

MATASAVAGE, J.

**\*1** This is a decision on the defendant's motion to strike, dated September 7, 2012, filed by Sunwood Condominium Associates, Inc., (hereinafter, Sunwood). On August 3, 2012, the plaintiff, Ronald Corra, filed a four-count revised complaint sounding in tortious interference with a contract, breach of contract, unjust enrichment and libel against Sunwood.

In their motion to strike, the defendant seeks to strike the first, third and fourth counts. The plaintiff filed a timely memorandum in opposition, but at argument on November 19, 2012, plaintiff's counsel consented to the granting of the motion as to the fourth count. This memorandum deals with the defendants' motion to strike the first and third count, namely, the counts alleging tortious interference with a contract and unjust enrichment.

In the first count of his complaint sounding in tortious interference with a contract, the plaintiff alleges as follows. He claims that Sunwood was a duly organized corporation and he was elected president in November 2007. Sunwood "decided that it would be in the best interests of the association if the plaintiff Corra being the president thereof signed as personal guarantor for credit cards issued to the defendant Sunwood."The defendant agreed that if the plaintiff signed as personal guarantor, the association would pay the credit card bills. In reliance of the agreement, plaintiff entered into contractual relationships with the credit card companies, which the defendant was aware, approved and supported. The plaintiff has since ceased being president of the association and has requested that the defendant remove him as guarantor of the credit cards. The defendant has failed to do so and has failed to pay the outstanding balances on the credit cards. Such action has "jeopardized his contractual relationship with the credit card companies" and interfered with the plaintiff's ability to obtain credit with third-party credit card companies.

In the third count sounding in unjust enrichment, the plaintiff re-alleges the allegations of the first count and further alleges that Sunwood has been unjustly enriched by its failure to pay off the credit cards and remove the plaintiff as guarantor. Sunwood has benefited from the products and services purchased with the cards in that most of the same were for products and responsibilities of the defendant.

The defendant, in its motion to strike, claims the motion should be granted because the claim for tortious interference of a contract is legally insufficient as the plaintiff fails to properly plead the existence of a contractual or beneficial relationship with a third party, and that the interference was tortious. The defendant further claims the third count should be stricken as the claim for unjust enrichment is legally insufficient as it includes allegations of an express contract. On October 15, 2012, the plaintiff objected to the motion, and the matter was heard on short calendar on November 19, 2012.

## I.

**\*2** Practice Book § 10–39(a) provides in relevant part: "Whenever any party wishes to contest (1) the legal sufficiency of the allegations of any complaint, counterclaim or cross claim, or of any one or more counts thereof, to state a claim upon which relief can be granted ... that party may do so by filing a motion to strike ..." "The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaint ... to state a claim upon which relief can be granted." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves,* 262 Conn. 480, 498, 815 A.2d 1188 (2003)."[F]or the purpose of a motion to strike, the moving party admits all facts well pleaded."*RK Constructors, Inc. v. Fusco Corp.,* 231 Conn. 381, 383 n. 2, 650 A.2d 153 (1994). Accordingly, "[i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied."(Internal quotation marks omitted .) *Batte–Holmgren v. Commissioner of Public Health,* 281 Conn. 277, 294, 914 A.2d 996 (2007). Furthermore, the court must "construe the complaint in the manner most favorable to sustaining its legal sufficiency."(Internal quotation marks omitted.) *Sullivan v. Lake Compounce Theme Park, Inc.,* 277 Conn. 113, 117, 889 A.2d 810 (2006).

## II.

The defendant claims that count one of the complaint insufficiently alleges a claim of tortious interference with a contract. "[Our Supreme Court] has long recognized a cause of action for tortious interference with contract rights ... The essential elements of such a claim include, of course, the existence of a contractual or beneficial relationship and that the defendant(s), knowing of that relationship, intentionally sought to interfere with it; and, as a result, the plaintiff claimed to have suffered actual loss ... [F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously ... The burden is on the plaintiff to plead and prove at least some improper motive or improper means ... on the part of the [defendant] ... The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification."(Citations omitted; internal quotation marks omitted.) *Stancuna v. Schaffer,* 122 Conn.App. 484, 488 (2010)."[A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself," (Citations omitted.) *Kakadelis v. Defabritis,* 191 Conn. 276, 280 (1983).

To survive a motion to strike, the plaintiff must allege all the requisite elements of the cause of action. The plaintiff's revised complaint is devoid of any claim that the defendant's actions were tortious or were driven by some improper motive or means. While the plaintiff has alleged a breach of his agreement with Sunwood to pay the credit card bill, he has not pled any allegations that Sunwood engaged in any type of fraud, misrepresentation or any other tortious conduct. All breaches of contract are an "interference" to some degree. But absent any allegation of improper motive or means the revised complaint is insufficient to raise a claim for tortious interference with a contract.

**\*3** Accordingly, the defendant's motion to strike count one sounding in tortious interference with contract rights is granted.

## III.

The defendant next claims that the plaintiff's claim for unjust enrichment in the third count is insufficient as the count includes allegations of an express contract. "Unjust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract ... A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another ... With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary

Corra v. Sunwood Condominium Ass'n, Inc., Not Reported in A.3d (2012)

2012 WL 6583030

in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard ... Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy ... Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment."(Citations omitted; internal quotation marks omitted.) *Vertex v. Waterbury*, 278 Conn. 557, 573 (2006).

"Under our pleading practice, a plaintiff is permitted to advance alternative and even inconsistent theories of liability against one or more defendants in a single complaint."(Citations Omitted.) *Dreier v. Upjohn Co.*, 196 Conn. 242, 245 (1985); see also Practice Book § 10–25. In his revised complaint, the plaintiff's second count contains a claim which is entitled breach of contract. In the third count, the plaintiff's claim contains a title of unjust enrichment. The third count clearly contains allegations that the defendant was benefited, did not pay for the benefits, and the failure of payment was to the plaintiff's detriment. Those allegations are sufficient to support a claim for unjust enrichment; whereby, the allegations are definitive enough to notify the court and opposing counsel that such a claim is being made. Further, since unjust enrichment applies wherever justice requires compensation to be given for services rendered under a contract, and no remedy is available by an action on the contract, the court finds that it is not fatal under these alleged circumstances that the plaintiff made reference in the third count to an agreement he had with the defendant.

For the foregoing reasons, the defendant's motion to strike count three is denied.

## IV.

In conclusion, the motion to strike counts one and four is granted; the motion to strike count three is denied.

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Deutsch v. Backus Corp., Not Reported in A.3d (2012)
2012 WL 1871398, 54 Conn. L. Rptr. 30

2012 WL 1871398

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Connecticut,
Judicial District of Hartford.

Paul H. DEUTSCH, M.D.
v.
BACKUS CORP., et al.

No. X07CV106022074S.   |   May 2, 2012.

BERGER, J.

I

**\*1** On May 10, 2010, the plaintiff, Paul H. Deutsch, M.D., filed the instant suit seeking damages in connection with an internal investigation commenced against him by one of the defendants—his employer—Backus Corporation, doing business as the William W. Backus Hospital (Backus), for allegedly violating patient confidentiality rules. In addition to Backus, the plaintiff seeks damages against Backus' officials Richard H. Finley, the vice president of network development, and Edward L. Fisher, formerly a vice president and the chief information officer, and against certain medical staff members, Anthony G. Alessi, M.D., and David A. Kalla, M.D (collectively, the defendants).

On August 27, 2010, the plaintiff filed a revised fifty-eight-page, ten-count complaint.[1] The defendants filed a motion to strike all counts on September 13, 2010. In an extensive opinion on January 14, 2011, the court, Cosgrove, J., granted the motion to strike the counts of statutory action for vexatious litigation, General Statutes § 52–568, violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42–110a et seq., tortious interference with business expectancies, defamation, invasion of privacy, intentional infliction of emotional distress, negligent infliction of emotional distress and tortious interference with contractual relations [51 Conn. L. Rptr. 337]. The court denied the motion to strike the counts of breach of contract and breach of the implied covenant of good faith and fair dealing as well as the prayers for preliminary and permanent injunctive relief. On January 28, 2011, the plaintiff filed a motion to reargue that Judge Cosgrove denied on February 9, 2011.

[1]      In the memorandum of decision, dated January 14, 2011, addressing the motion to strike, Judge Cosgrove stated that the revised complaint consisted of: "Count one is against Backus and sounds in vexatious litigation. Count two is against Backus and sounds in violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42–110a et seq. Count three is against all of the defendants and sounds in tortious interference with business expectancies. Count four is against Backus and sounds in breach of contract. Count five is against Backus and sounds in breach of the covenant of good faith and fair dealing. Count six is against all of the defendants and sounds in defamation. Count seven is against all of the defendants and sounds in invasion of privacy. Count eight is against all of the defendants and sounds in intentional infliction of emotional distress. Count nine is against all of the defendants and sounds in negligent infliction of emotional distress. Finally, count ten is against all of the defendants and sounds in tortious interference with contractual relations."*Deutsch v. Backus Corp.,* Superior Court, judicial district of New London, Docket No. 10 6004265 (January 14, 2011, Cosgrove, J.) (51 Conn. L. Rptr. 337, 338).

The plaintiff filed an eighty-four-page, eleven-count substitute complaint on February 24, 2011. The defendants filed a request to revise on March 10, 2011 and the plaintiff filed objections on April 6, 2011. On June 1, 2011, Judge Cosgrove sustained the objections in part and overruled the objections in part.

2012 WL 1871398, 54 Conn. L. Rptr. 30

The plaintiff filed a 113–page, eleven-count [2] substitute complaint on June 23, 2011 and a revised substitute complaint on June 24, 2011. On July 18, 2011, the defendants filed another motion to strike.

[2]     The plaintiff included the previously struck counts, i.e., count one (statutory vexatious litigation), count six (defamation), count seven (invasion of privacy), count eight (intentional infliction of emotional distress) and count nine (negligent infliction of emotional distress), only to note that they are the subject of a notice of intent to appeal.

Meanwhile, the case was transferred to complex litigation on May 26, 2011. In response to the initial status conference with this court, the plaintiff filed the operative forty-seven-page, twelve-count, second revised substituted complaint on September 30, 2011. [3] On October 14, 2011, the defendants filed a new motion to strike counts two (CUTPA); three (tortious interference with business expectancies); ten (tortious interference with contractual relations); eleven (common-law vexatious litigation); and twelve (prima facie tort) on the grounds that they fail to state causes of action. The defendants also seek to strike the prayers for relief seeking injunctive relief and certain monetary damages. [4] On November 7, 2011, the plaintiff filed a memorandum in opposition to the motion to strike and, on November 21, 2011, the defendants filed a memorandum in reply. This court heard oral argument on January 23, 2012.

[3]     The previously struck counts remain in the operative complaint. See footnote 2.

[4]     The defendants did not move to strike count four (breach of contract) or count five (breach of the covenant of good faith and fair dealing).

## II

**\*2**   "Whenever any party wishes to contest (1) the legal sufficiency of the allegations of any complaint ... or of any one or more counts thereof, to state a claim upon which relief can be granted, or (2) the legal sufficiency of any prayer for relief in any such complaint ... that party may do so by filing a motion to strike the contested pleading or part thereof."Practice Book § 10–39(a)."A motion to strike challenges the legal sufficiency of a pleading ... and, consequently, requires no factual findings by the trial court ... We take the facts to be those alleged in the complaint ... and we construe the complaint in the manner most favorable to sustaining its legal sufficiency ... [I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied."(Internal quotation marks omitted.) *Sturm v. Harb Development, LLC,* 298 Conn. 124, 130, 2 A.3d 859 (2010)."A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged."(Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC v. Ganim,* 303 Conn. 205, 213, 32 A.3d 296 (2011).

## III

In his January 14, 2011 memorandum of decision, Judge Cosgrove summarized the factual background as follows:

From July 2005 to June 2008, the plaintiff was accused of improperly accessing a patient's electronic medical records using another doctor's information for Backus' electronic medical records system on April 2, 2005 and then sending an anonymous complaint letter accompanied by copies of those records to the Connecticut Department of Public Health (department). Finley conducted investigations after the department told him about the letter. He was assisted by Fisher. Finley and Fisher concluded in July 2005 that the plaintiff was responsible for the security breach, based on electronic and video surveillance data showing that the plaintiff had accessed Backus' electronic medical records system using another doctor's information for the system at or around the time of the breach. The plaintiff denied the accusation and repeatedly asked to see the evidence upon which Finley and Fisher relied, to no avail. He finally saw the evidence in February 2006 and learned that it did not show him accessing Backus' electronic medical records system in the manner claimed by Finley and Fisher. Finley and Fisher, as well as the ad hoc committee appointed by Backus' medical executive committee, nonetheless continued to rely upon the

Deutsch v. Backus Corp., Not Reported in A.3d (2012)
2012 WL 1871398, 54 Conn. L. Rptr. 30

evidence and represent it as illustrative of the plaintiff's improper conduct. Additional evidence that would have supported the plaintiff's denial of the accusation was destroyed and therefore made unavailable to him.

The plaintiff further alleges that in August 2005, Backus' medical executive committee, acting upon recommendations made by Finley and Gordon Van Nes, M.D., another member of Backus' medical staff, appointed an ad hoc committee to investigate the accusation against the plaintiff. Alessi and Kalla were members of the ad hoc committee. The medical executive committee held a meeting on September 19, 2005 to receive information from the ad hoc committee and, after considering the ad hoc committee's information, recommended that the plaintiff's medical staff privileges be suspended.

**\*3** Several proceedings regarding the matter were conducted over the course of the next three years. The ad hoc committee prepared a supplemental report in October 2005 and presented it to the medical executive committee during a meeting on November 14, 2005. The medical executive committee voted to recommend that 'corrective action' be taken against the plaintiff's medical staff privileges. It then held a meeting on December 1, 2005, pursuant to the plaintiff's right to appear before it prior to the finalization of the recommendation against him. During the meeting, the medical executive committee voted in favor of a motion to suspend the plaintiff's medical staff privileges for thirty-one days.

The allegations of the complaint continue. A hearing was held on February 21, 2006 for the plaintiff to appeal the medical executive committee's vote. The four-day hearing was overseen by Theodore Tucci, an attorney hired by the defendants. Tucci submitted a report and recommendation to the medical executive committee on May 8, 2006, in which he concluded that the plaintiff had engaged in the improper conduct with which he had been accused. The medical executive committee then held a meeting on July 17, 2006 to review Tucci's report and recommendation. It adopted the report and recommendation. The plaintiff appealed the adoption to Backus' board of trustees (board). The board heard the appeal on October 23, 2006 and remanded the matter back to the medical executive committee on November 9, 2006 with a list of questions to be answered. A supplemental hearing overseen by Tucci was held from February 21, 2007 to February 24, 2007. Tucci issued a supplemental report on June 15, 2007, in which he answered every question in favor of Backus and against the plaintiff. The plaintiff appealed Tucci's report to the board, which heard the appeal on December 10, 2007. On June 26, 2008, the board reversed the recommendation that the plaintiff's medical staff privileges be suspended and dismissed the matter against the plaintiff.

*Deutsch v. Backus Corp.,* Superior Court, judicial district of New London, Docket No. 10 6004265 (January 14, 2011, Cosgrove, J.) (51 Conn. L. Rptr. 337, 337–38).

## A.

Judge Cosgrove struck the CUTPA count of the revised complaint asserted against Backus on the grounds that the internal hospital review proceedings relating to a physician's medical competence are not within CUTPA's purview because they do not implicate an entrepreneurial or business aspect of the provision of services. See *Harris v. Bradley Memorial Hospital & Health Center, Inc.,* 296 Conn. 315, 351, 994 A.2d 153 (2010) ("The purpose of the peer review process is to ensure that only physicians who are professionally competent enjoy privileges at hospitals ... Such decisions do not fall within the ambit of CUTPA."[Citation omitted.] ); *Haynes v. Yale–New Haven Hospital,* 243 Conn. 17, 38, 699 A.2d 964 (1997) ("the touchstone for a legally sufficient CUTPA claim against a health care provider is an allegation that an entrepreneurial or business aspect of the provision of services is implicated, aside from medical competence or aside from medical malpractice based on the adequacy of staffing, training, equipment or support personnel"). This court adopts his reasoning on that issue and considers it to be the law of the case. See *Vidiaki, LLC v. Just Breakfast & Things!!!, LLC,* 133 Conn.App. 1, 7, 33 A.3d 848 (2012) ("The law of the case doctrine expresses the practice of judges generally to refuse to reopen what [already] has been decided ... New pleadings intended to raise again a question of law which has been already presented on the record and determined adversely to the pleader are not to be favored ... Where a matter has previously been ruled upon interlocutorily, the court in a subsequent proceeding in the case may treat that decision as the law of the case, if it is of the opinion that the issue was correctly decided, in the absence of some new or overriding circumstance."[Internal quotation marks omitted.] )

Deutsch v. Backus Corp., Not Reported in A.3d (2012)
2012 WL 1871398, 54 Conn. L. Rptr. 30

**\*4** The plaintiff has now repleaded count two against Backus claiming a violation of CUTPA by including certain allegations that Backus initiated the process against the plaintiff in connection with its entrepreneurial interests. Specifically, the plaintiff alleges:

> 93. The acts, practices and conduct of the Defendant Backus Hospital as described above, which Dr. Deutsch claims caused him substantial injury and harm involved the business or entrepreneurial aspects of the Defendant Backus Hospital's business and they impacted upon the business and entrepreneurial aspects of Dr. Deutsch's business.

> 94. Defendants were acting with improper and anticompetitive motives in furtherance of their own financial gain to the detriment of their competitor, Dr. Deutsch, and they utilized unfair and deceptive trade practices included the use of an incomplete administrative investigation, the issuance of an unwarranted complaint for corrective action and commencement and prosecution of unwarranted disciplinary proceedings against Dr. Deutsch pursuant to the Medical Staff Bylaws § VII. Corrective Action, to secure Dr. Deutsch's unwarranted loss of his qualified right and privileges to use the Defendant Backus Hospital's facilities for his patients, to establish and develop new patient relationships and advantageous business relationships with his medical colleagues.

> 98. Defendants engaged in the acts, practices and conduct as set forth above in paragraphs 1–75 and they acted in furtherance of Defendant Backus Hospital's business and its desire to increase revenues and for its overall financial gain to the loss of its competitor, Dr. Deutsch."

These conclusory allegations do not save this revised attempt to plead a CUTPA count. See *Bridgeport Harbour Place I, LLC v. Ganim, supra,* 303 Conn. at 213. The plaintiff's addition of the above paragraphs do not change the thrust of his 101 paragraphs which are perhaps summarized in paragraph eighty-one that alleges: "The investigation and Medical Staff proceedings against Dr. Deutsch were not kept confidential and they did not constitute legitimate peer review. Hospital officials and members of the Medical Staff involved in the investigations and proceedings leaked information about the charges against Dr. Deutsch to members of the Defendant Backus Hospital Medical Staff while it was prosecuting him, thereby leading Dr. Deutsch's colleagues, hospital staff and patients to believe that the charges were true. Knowledge of the charges and proceedings harmed Dr. Deutsch's professional and personal reputations, medical practice and his relationships with his patients."

Alleging that the intent of investigatory process was solely business related does not make it so; investigating whether a physician violated confidentiality policies is a medical or employment decision that does not implicate CUTPA. See *Harris v. Bradley Memorial Hospital & Health Center, Inc., supra,* 296 Conn. at 351, 994 A.2d 153. The fact that it may have an economic impact on the plaintiff, as would virtually every employment or medical decision, does not change its character. Therefore, the motion to strike count two is granted.

**B.**

**\*5** The defendants next seek to strike count three asserting tortious interference with business expectancies. "It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss."(Internal quotation marks omitted.) *American Diamond Exchange, Inc. v. Alpert,* 302 Conn. 494, 510, 28 A.3d 976 (2011)."The plaintiff need not prove that the defendant caused the breach of an actual contract; proof of interference with even an unenforceable promise is enough ... A cause of action for tortious interference with a business expectancy requires that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously ... It is also true, however, that not every act that disturbs a contract or business expectancy is actionable ... A defendant is guilty of tortious interference if he has engaged in improper conduct ... [T]he plaintiff [is required] to plead and prove at least some improper motive or improper means."(Citations omitted; internal quotation marks omitted.) *Biro v. Hirsch,* 62 Conn.App. 11, 21, 771 A.2d 129,cert. denied, 256 Conn. 908, 772 A.2d 601 (2001).

Deutsch v. Backus Corp., Not Reported in A.3d (2012)
2012 WL 1871398, 54 Conn. L. Rptr. 30

In granting the defendants' first motion to strike this count, Judge Cosgrove held that "[w]hile he alleges that he has suffered and will continue to suffer reputational harm, he does not directly or inferentially allege that this harm has resulted in an actual loss of patients or patient referrals from Backus or other medical institutions or professionals in and around Norwich." *Deutsch v. Backus Corp., supra,* 51 Conn. L. Rptr. at 342. In this motion to strike, the defendants argue that the plaintiff cannot assert interference with Backus. The plaintiff acknowledges this and argues that the interference was, at a minimum, with his patients.

In the current complaint, the plaintiff incorporates the allegations of paragraphs one through ninety-eight of the second count and, in relevant part in the third count, alleges that:

102. Since 2004, although Dr. Deutsch has remained listed on the emergency department call coverage schedule, Defendant Backus Hospital ceased its referral of emergency department patients to him. As a result, Dr. Deutsch lost at least 5 patients per month and additional continuing relationships with the majority of those patients. In addition, Dr. Deutsch lost his opportunities to treat and care for dozens of his existing patients when they presented to the Defendant Backus Hospital's emergency Department for care and they were assigned to a hospitalist employed by the Defendant Backus Hospital instead of being directed to Dr. Deutsch.

\* \* \* \*

104. Defendants knew about Dr. Deutsch's business relationship with patients and professional colleagues at Defendant Backus Hospital and they intentionally and wrongfully sought to and did interfere with them.

**\*6** 105. Defendants knew about Dr. Deutsch's business expectancies derived from his emergency department call coverage and patient referral arrangements with relationship with the Defendant Backus Hospital and they intentionally and wrongfully sought to and did interfere with them.

\* \* \* \*

109. Dr. Deutsch suffered actual and consequential damages as a result of the tortious interference by the Defendants and damages as including the following:

a. Dr. Deutsch lost more than six (6) existing patient relationships including but not limited to relationships with patients in an eight (8) month period including Patients # 1 through # 6 (names redacted).

b. Dr. Deutsch lost at least twenty (20) inpatient referrals from his medical colleagues as sources of those referrals, representing a total approximate loss of $8,405.20.

c. In an eight month period at least six (6) of Dr. Deutsch's patients who presented in the emergency department to the hospitalists employed by Defendant Backus Hospital were directed to physicians other than Dr. Deutsch. The lost income from these patients per patient was approximately $4,270.41 ($533.80/patient). Total estimated lost revenue in this category for an 88 month period is at $46,974.40.

d. Dr. Deutsch also lost approximately five (5) patient referrals per month as a result of the hospitalists' failure to refer patients to Dr. Deutsch at the time of their discharge when he was on call.

e. Dr. Deutsch also lost approximately five (5) inpatient referrals per month from the emergency department of the Defendant Backus Hospital representing the patients who should have been but were not referred to Dr. Deutsch when he was assigned to take emergency call ...

These additional allegations address the shortcomings found by Judge Cosgrove. They now, with the incorporated allegations, allege a business relationship between the plaintiff and his patients, an intentional interference by the defendants and loss by the

plaintiff. See *American Diamond Exchange, Inc. v. Alpert, supra,* 302 Conn. at 510. As such, the motion to strike the tortious interference with business expectancies count must be denied.

### C.

The defendants next seek to strike count ten alleging tortious interference with contractual relations. "A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct."(Internal quotation marks omitted.) *Appleton v. Board of Education,* 254 Conn. 205, 212–13, 757 A.2d 1059 (2000)."The tort of interference with contractual relations is merely a species of the broader tort of interference with prospective business advantage and the tort of interference with business advantage is merely interference with ongoing and existing rather than prospective business advantage."*TMK Associates v. Landmark Development,* Superior Court, judicial district of New London, Docket No. 02 0562077 (August 21, 2003, Corradino, J.) (35 Conn. L. Rptr 387, 392–93), quoting 45 Am.Jur.2d 301 at § 36, page 301.

*7 For the same reasons discussed above as to the count of interference with business expectancies, the motion to strike this count is denied. The operative complaint contains sufficient allegations in paragraphs 99 through 107 to meet the requirements of *Appleton.*

### D.

The defendants next seek to strike count eleven alleging common-law vexatious litigation against Backus, Fisher and Finley. "A vexatious suit is a type of malicious prosecution action, differing principally in that it is based upon a prior civil action, whereas a malicious prosecution suit ordinarily implies a prior criminal complaint."(Internal quotation marks omitted.) *Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn, LLP,* 281 Conn. 84, 94, 912 A.2d 1019 (2007)."In Connecticut, the cause of action for vexatious litigation exists both at common law and pursuant to statute. Both the common law and statutory causes of action [require] proof that a civil action has been prosecuted ... Additionally, to establish a claim for vexatious litigation at common law, one must prove want of probable cause, malice and a termination of suit in the plaintiff's favor ... The statutory cause of action for vexatious litigation exists under § 52–568, and differs from a common-law action only in that a finding of malice is not an essential element, but will serve as a basis for higher damages."(Citations omitted; internal quotation marks omitted.) *Bernhard–Thomas Building Systems, LLC v. Dunican,* 286 Conn. 548, 554, 944 A.2d 329 (2008).

The defendants argue that Backus' internal review process does not constitute a civil action and that the count of statutory vexatious litigation was previously struck on the grounds that such a private review process is not a civil action. Judge Cosgrove discussed the requirement of a termination of a civil action in the plaintiff's favor noting that General Statutes § 52–91 provides that "[t]here shall be one form of civil action ..." and that General Statutes § 52–45a provides that "[c]ivil actions shall be commenced by legal process consisting of a writ of summons ... describing ... the court to which it is returnable ..."*Deutsch v. Backus Corp., supra,* 51 Conn. L. Rptr. at 339–40. He cited *Bernhard–Thomas Building Systems, LLC v. Dunican, supra,* 286 Conn. at 555, 944 A.2d 329, for the proposition that an attachment is not a civil action. *Deutsch v. Backus Corp., supra,* at 339–40.Finally, Judge Cosgrove noted that even to the extent it could be argued that the administrative proceeding in the hospital was commenced in such a fashion and could be deemed to be a administrative type process as described in *Harris v. Bradley Memorial Hospital & Health Center, Inc., supra.* 296 Conn. at 335, 994 A.2d 153, no case has allowed a purely private proceeding to be the basis for a vexatious suit. *Deutsch v. Backus Corp., supra,* at 339–40.

The plaintiff acknowledges in his opposition that a civil action, as so defined, is required for a statutory vexatious claim. Yet, he argues that there is no requirement that the initial matter be limited to a court proceeding to maintain a common-law action under certain Supreme Court cases and that it involve a public board if it was an administrative matter.

Deutsch v. Backus Corp., Not Reported in A.3d (2012)

2012 WL 1871398, 54 Conn. L. Rptr. 30

**\*8** In *DeLaurentis v. New Haven,* 220 Conn. 225, 248, 597 A.2d 807 (1991), the court rejected the argument that because the prior proceeding was administrative "institution of the proceeding cannot give rise to liability."The court noted that "[m]ost courts now agree with the Restatement (Second) of Torts, § 680, which permits liability for vexatious initiation, continuation or procurement of civil proceedings against another before an administrative board that has power to take action adversely affecting the legally protected interests of the other."(Internal quotation marks omitted.) *Id.* On the facts of that case, the court concluded that the plaintiff "was not barred from bringing a vexatious suit action against the mayor simply because it is based upon a proceeding that did not take place in a courtroom."*Id.,* at 249, 597 A.2d 807; see also *Zeller v. Consolini,* 235 Conn. 417, 424, 235 Conn. 417, 667 A.2d 64 (1995) ("[w]e have also recognized that, for purposes of the tort of vexatious litigation, the previous litigation that terminated in the plaintiff's favor may be an administrative, rather than a judicial, proceeding").

In *Gianetti v. Norwalk Hospital,* 211 Conn. 51, 64, 557 A.2d 1249 (1989), the court held that "because the Norwalk Hospital medical staff bylaws are an integral part of the contractual relationship between the plaintiff and this hospital, actions under these bylaws are also subject to judicial review."The Supreme Court has also concluded that "a substantial compliance test as adopted by the Appellate Court is the proper test by which to measure whether a hospital has sufficiently complied with its bylaws in terminating a physician's medical staff privileges."*Owens v. New Britain General Hospital,* 229 Conn. 592, 604, 643 A.2d 233 (1994)."The public has an interest that staff decisions are not made arbitrarily. By requiring hospitals to adhere to their bylaws, the risk of arbitrary decisions is reduced."*Id.,* at 606, 643 A.2d 233. "The same overarching public policy concern that justifies requiring hospitals to adhere to their bylaws in making privileging decisions—namely, ensuring 'the provision of quality medical care to the surrounding public community'—also requires that our review of a hospital's privileging decision must be highly deferential and narrow in scope."*Harris v. Bradley Memorial Hospital & Health Center, Inc., supra,* 296 Conn. at 334, 994 A.2d 153.

In the present case, the plaintiff has pleaded the elements for a common-law claim: proof that a civil action has been prosecuted, want of probable cause, malice and termination of a suit in the plaintiff's favor. He has specifically alleged want of probable cause and malice. For instance in paragraph thirty-eight of count two, incorporated into count eleven, he alleges, "Dr. Van Nes' complaint falsely accused Dr. Deutsch of surreptitiously gaining unauthorized access to Defendant Backus Hospital's EMR database on April 2, 2005, and printing two imaging reports from Patient A's EMR. He also falsely accused Dr. Deutsch of accessing another imaging study dated November 2, 2004 at computer workstation WS156 in the Medical Library and he said that a copy of that report was sent to the Connecticut Department of Health on January 15, 2005."In paragraph forty-two, he avers, "On August 17, 2005, the Ad Hoc Investigating Committee commenced its investigation. Defendants Finley and Fisher falsely told the Ad Hoc Investigative Committee that the evidence conclusively established that Dr. Deutsch had sent the letters to the State when evidence Defendant Backus Hospital possessed, known to Defendants Finely and Fisher actually exonerated Dr. Deutsch ..."

**\*9** He further alleges in paragraph thirty-seven: "On or about August 1, 2005 Defendant Backus Hospital, through Dr. Gordon Van Nes, Medical Director of Defendant Backus Hospital, commenced and prosecuted a complaint against Dr. Deutsch pursuant to Medical Staff Bylaws § VII Corrective Action when he sent a complaint letter to the Medical Executive Committee requesting corrective action and that disciplinary action be initiated against Dr. Deutsch's medical staff privileges."In paragraph fifty-one, he avers that the "Defendants forced Dr. Deutsch to appear before another Special Meeting of the Medical Executive Committee on December 1, 2005 without seeing any reports from the Ad Hoc Investigating Committee, the video or any of the computer records that the Committee had relied upon during its investigation. In so doing, Defendants substantially hindered and restricted his ability to present a meaningful defense against the Defendants' false accusations and they also improperly and unreasonably restricted the Medical Executive Committee's investigation, consideration and review of the matter."Finally, in paragraph seventy-five, he alleges that the administrative complaint and disciplinary proceedings terminated in his favor when the board of trustees dismissed the action against him. [5]

---

[5]  In *Harris v. Bradley Memorial Hospital & Health Center, Inc., supra,* 296 Conn. at 335–36, 994 A.2d 153, the court reversed the trial court's ruling that the favorable termination doctrine is applicable to a physician seeking damages in connection with a suspension

Case 3:14-cv-00733-AWT   Document 51-2   Filed 02/05/15   Page 76 of 148

Deutsch v. Backus Corp., Not Reported in A.3d (2012)
2012 WL 1871398, 54 Conn. L. Rptr. 30

or termination of hospital privileges. The court stated that "[i]f a hospital board's reversal of a peer review panel's recommendation to suspend or terminate a physician's privileges subsequently could be used against the hospital as evidence on the issue of favorable termination, the hospital board's objectivity would be compromised. By way of illustration, if a hospital board were to agree with a physician that the challenged peer review determination was not reasonable, it would subject the hospital to liability. Application of the favorable termination rule in this context, therefore, would not further the public policy interest of ensuring that the only principle guiding a hospital board's resolution of a challenge to a peer review determination is the provision of quality health care to the community and, consequently, would be inconsistent with the public policy goals that have guided our decisions governing review of hospital privileging decisions." *Id.*, at 335–36, 994 A.2d 153. In seeking damages for his suspension, Harris did not allege vexatious litigation, but limited his claims to breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with business expectancies and a violation of CUTPA. *Id.*, at 325, 994 A.2d 153. This elimination of the need for favorable termination in *Harris* in the context of a breach of contract action presumably applies to a vexatious litigation claim under the same reasoning.

In light of these factual allegations, which the court must construe favorable for the plaintiff, *Sturm v. Harb Development, LLC, supra,* 298 Conn. at 130; this court denies the motion to strike the common-law vexatious litigation count. See also *Porcello v. Santanella,* Superior Court, judicial district of Tolland, Docket No. CV 10 6002580 (February 10, 2012, Shapiro, J.) [53 Conn. L. Rptr. 566] (finding issuance of infraction F ticket to be analogous to final determination of rights); *Vizzo v. Ward,* Superior Court, judicial district of Ansonia–Milford at Derby, Docket No. CV 07 5003132 (April 7, 2008, Ripley, J.T.R.) (45 Conn. L. Rptr. 298, 298) (refusing to strike vexatious litigation count because determination by town's board of ethics could have serious implications for legal rights of plaintiff).

E.

The defendants also seek to strike the plaintiff's twelfth count alleging prima facie tort against Backus, Finley and Fisher. The plaintiff essentially alleges that the defendants intentionally caused injury to him by targeting him with a fraudulent investigation of misconduct harmful to his reputation in order to retaliate for anti-competitive reasons while falsifying, withholding or destroying evidence. The defendants move to strike the count "because there is no public policy violation alleged and the Connecticut Supreme Court has recognized a public policy interest in ensuring that the only principle guiding a hospital's conduct of peer review proceedings is the provision of quality health care to the community, not fear of civil liability; the prima facie tort claim is duplicative of Counts Three, Ten, and Eleven; and there are no facts pled to indicate how the alleged losses Plaintiff claims resulted from any of the Defendants' alleged conduct." The plaintiff argues that a violation of public policy is not a required element for a prima facie tort and therefore does not need to be alleged and that allegations of other torts do not foreclose an action for prima facie tort.

**\*10** "Prima facie tort" is defined in 4 Restatement (Second), Torts § 870, p. 279 (1979), as "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability." "[T]he established intentional torts and their established legal privileges amount to crystalizations of the general principle stated in this Section. In determining whether liability should be imposed in a particular case for an established intentional tort, neither court nor jury engages afresh in balancing the conflicting interests of the parties. That has already been done in the creation of the legal rules of liability and privilege and all that is needed is to determine the facts and apply these rules to them." 4 Restatement (Second), Torts § 870, comment c (1979). [6]

---

[6]    Comment (d) continues, "In many situations in which liability has been imposed under the principle stated in this Section, newly recognized categories of intentional tort have been developed or are still in the process of development. A prime example of a tort presently not fully developed is intentional infliction of emotional distress; its contours are not yet fully clear ... Other categories of fairly recent development include injurious falsehood, interference with contractual relations and interference with prospective economic advantage. The more mature the stage of development the more definite the contours of the tort and of the privileges that may be defenses to it."(Citation omitted.) Obviously, the contours of many of these causes of action are now well developed. See *Appleton v. Board of Education, supra,* 254 Conn. at 210, 212–13, 757 A.2d 1059 (setting forth elements of intentional infliction of

emotion distress and tortious interference with contractual relations); *American Diamond Exchange, Inc. v. Alpert, supra,* 302 Conn. at 510 ("[i]t is well established that the elements of a claim for tortious interference with business expectancies are ...").

It is not entirely clear whether the appellate courts of this state would recognize prima facie tort as a viable cause of action. Nevertheless, prima facie tort first appears in Connecticut in *Connors v. Connolly,* 86 Conn. 641, 647, 86 A. 600 (1913). The court did not expressly use the term "prima facie tort," but stated, "[t]hese facts shown [that the plaintiff suffered damage in the loss of his employment, and that this damage was intentionally caused], a prima facie cause of action was made out against those who, thus acting with intent, caused the damage. Recovery, however, might be defeated by the establishment by these persons of a justification, the burden being upon them to do so."*Id.* The court wrote at length that the defendants' justification could not violate public policy. *Id.,* at 648–54, 86 A. 600. More recently, in a dissenting opinion in *Waters v. Autuori,* 236 Conn. 820, 841 n. 7, 676 A.2d 357 (1996), Justice Berdon noted in dicta: "One of the essential elements of [prima facie tort] requires that there must be an intent to injure [the] plaintiff, at least to the extent of infliction of wrongful harm upon [the] plaintiff without just cause or excuse."

In a federal case applying Connecticut law, the court describes prima facie tort as "essentially unknown to modern tort law in Connecticut. The last time the Connecticut Supreme Court—or any appellate court in Connecticut—addressed the viability of such a cause of action was nearly a century ago ... At that time, the tort consisted of intentional infliction of harm, resulting in damage, without legal excuse or justification ... Liability could not be imposed for otherwise lawful conduct unless the conduct was contrary to public policy."(Citations omitted.) *Grigorenko v. Pauls,* 297 F.Supp.2d 446, 450 (D.Conn.2003). In *Grigorenko,* the plaintiff, a Yale University professor, sued two former colleagues who accused her of plagiarism; *id.,* at 448; but the court, assuming our Supreme Court would recognize the cause of action, dismissed the prima facie tort count for failure to state a cause of action because there was no allegation that the defendants' actions violated any public policy. *Id.,* at 450.The court stated:

> *\*11* The absence of such an allegation is particularly significant in this case because Yale imposes an affirmative obligation on scholars to report academic misconduct and public policy strongly supports Yale's freedom to deal with such matters as it deems reasonable and proper.
>
> In this context, defendants' submissions to Yale cannot constitute a prima facie tort unless they had the purpose and effect of abusing the process established by Yale for investigating and resolving allegations of academic misconduct. To plead a viable claim, therefore, plaintiff must allege that the inquiry committee appointed by Dean Hockfield rejected defendants' allegations as groundless. In the absence of such an allegation, permitting plaintiff to proceed would not help vindicate a recognized public policy as contemplated by the prima facie tort cause of action. If anything, it would conflict with the important public policy protecting academic freedom.

*Id.*

In denying a motion to strike in *Brandt v. Walker Digital, LLC,* Superior Court, complex litigation at Stamford, Docket No. X08 CV 03 0194566 (November 1, 2004, Adams, J.) (38 Conn. L. Rptr. 182, 186), the court rejected the proposition that *Connors* requires an allegation that the justification be in violation of public policy. "The theory of a prima facie tort requires an intentional, wrongful or culpable act causing injury if the conduct is not justifiable under the circumstances. Liability may be imposed on the actor under this theory if the actor's conduct does not come within a traditional category of tort liability."*Id.,* at 185.The court concluded that *Connors* discussed public policy only in considering the defendants' justification for their actions, but that the plaintiff was not required to allege that the defendants had violated public policy. *Id.,* at 186.

This court agrees that the plaintiff is not required to allege a violation of public policy. In discussing public policy, *Connors* was simply balancing the interests of the litigants. See 4 Restatement (Second), Torts § 870, comment c (1979). Although the plaintiff alleges that the defendants' conduct was not justifiable in paragraph eighty-three, there is an established public policy as a justification for the defendants. See *Harris v. Bradley Memorial Hospital & Health Center, Inc., supra,* 296 Conn. at 335, 994 A.2d 153 (recognizing "important public policy of ensuring that hospital decision makers are guided only by a concern for ensuring quality health care").

Deutsch v. Backus Corp., Not Reported in A.3d (2012)
2012 WL 1871398, 54 Conn. L. Rptr. 30

Regardless, "a court should not countenance a party's efforts to circumvent the pleading and proof requirements of recognized causes of action."*Brandt v. Walker Digital, supra,* Superior Court, 38 Conn. L. Rptr. at 186. While the plaintiff has a right to plead over and to plead in the alternative, he cannot fail to comply with our rules. See *Parsons v. United Technologies Corp.,* 243 Conn. 66, 87–88, 700 A.2d 655 (1997) (affirming trial court's granting of motion to strike because plaintiff's revised claim was substantively identical to claim that had already been stricken). Judge Cosgrove previously granted the motion to strike the defamation, invasion of privacy, intentional and negligent infliction of emotional distress counts for failure to plead essential facts. The allegations of those counts are very similar to the allegations contained in the twelfth count and the plaintiff is seeking another bite of a different variety of an apple.

**\*12** Finally, the court recognizes that there is a difference of opinion as to whether prima facie tort counts should be struck if there are traditional viable causes of action. Some courts have granted motions to strike prima facie tort counts on these grounds; see, e.g., *Ballard v. Hartford Life Ins. Co.,* Superior Court, judicial district of Hartford, Docket No. CV 09 5031857 (January 18, 2011, Wagner, J.T.R.) ("[i]n order to assert the prima facie tort, however, no other traditional torts must be available for the plaintiff to assert"); *Choy v. Boyne,* Superior Court, judicial District of Hartford, Docket No. CV 06 5005693 (November 30, 2006, Weise, J.) (42 Conn. L. Rptr. 411, 412) (granting motion to strike prima facie tort because alleged conduct fell within traditional tort of defamation); some have denied motions to strike. See, e.g., *Clark v. Pacheco,* Superior Court, judicial district of New London, Docket No. CV 11 6007627, 2011 WL 4347036 (August 24, 2011, Cosgrove, J.) (denying motion to strike prima facie tort as alternative pleading allowed at initial stages of litigation); *S.A. Candelora Enterprises v. Wild,* Superior Court, judicial district of New Haven, Docket No. CV 01 0447877 (February 4, 2002, Thompson, J.) (31 Conn. L. Rptr. 397, 400) (denying motion to strike prima facie tort on grounds that it was barred by economic loss doctrine). This court agrees with the courts that have struck the prima facie tort counts finding traditional viable torts. "[T]he prima facie tort doctrine is not intended to supplant traditional tort elements or traditional tort defenses. Plaintiffs have shown, by the impressive array of torts they allege, that the conduct at issue here is adequately governed by existing torts, even if it is not actionable ...

"The comments to section 870 specifically explain that the section was never intended to be used to evade the elements or defenses required of traditional torts ... California cases have, without explicitly acknowledging the policies behind the prima facie tort, refused to extend it into areas of established tort liability. *Francis v. Dun & Bradstreet,* 3 Cal.App.4th 535, 4 Cal.Rptr.2d 361, 365 (Ct.App.1994) (relabelling defamation claim as 'prima facie tort' does not save claim from 'truth is a complete defense'—'We cannot believe this defense can be abrogated merely because an artful pleader chooses to label the cause of action 'prima facie tort' rather than defamation'); *Gould v. Maryland Sound Industries, Inc.,* 31 Cal.App.4th 1137, 37 Cal.Rptr.2d 718, 728 (Ct.App.1995) (plaintiff 'cannot do an end-run around *Foley [v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373] by attempting to incorporate' claims for breach of implied covenant into an overall 'prima facie tort'). Plaintiffs have experienced no trouble at all in identifying traditional torts which cover the defendants' conduct here. Their prima facie tort claim adds nothing to their case."(Citation omitted.) *Cabanas v. Gloodt Associates,* 942 F.Supp. 1295, 1311 (E.D.Cal.) (1996), aff'd without opinion, 141 F.3d 1174 (1998).

**\*13** In the present case, multiple traditional torts cover the defendants' alleged conduct and several counts have been struck, but several survive the motion to strike. Hence, the motion to strike the twelfth count is granted.

**F.**

The defendants next seek to strike the plaintiff's prayer for relief for temporary and permanent injunctive relief. Judge Cosgrove initially denied the defendants' motion on the grounds that the prayers are unsupported by the allegations because the defendants inadequately briefed their arguments and provided no legal authority.

Nevertheless, "[a] party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law."(Internal quotation marks omitted.) *New Breed Logistics, Inc. v. CT INDY NH TT, LLC,* 129 Conn.App. 563, 571, 19 A.3d 1275 (2011). Here, the plaintiff has not alleged that there is no adequate remedy at law. Additionally, he does not

Deutsch v. Backus Corp., Not Reported in A.3d (2012)
2012 WL 1871398, 54 Conn. L. Rptr. 30

allege any ongoing events indicating a need to prevent irreparable harm; the alleged events occurred in 2005–2007. Therefore, the court grants the motion to strike the prayer for temporary and permanent injunctive relief.

## G.

Finally, the plaintiff concedes that his prayer for attorneys fees for counts three, ten and eleven as well as that for double damages for count eleven should be, and therefore are, stricken.

## IV

For the foregoing reasons, the defendants' motion to strike is denied as to counts three, ten, eleven and granted as to counts two and twelve and granted as to the prayers for relief for permanent and injunctive relief and for attorneys fees for counts three, ten and eleven and for double damages for count eleven.

**Parallel Citations**

54 Conn. L. Rptr. 30

End of Document                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

1996 WL 469742
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.

DWORKIN CONSTRUCTION CORP.
v.
SHREMSHOCK-YODER ARCHITECTS, INC. et al.

No. 380352.   |   Aug. 2, 1996.

**MEMORANDUM OF DECISION**

ZOARSKI.

*1  On May 14, 1996, the plaintiff, Dworkin Construction Corp., filed a twelve-count amended complaint against the defendants, Shremshock-Yoder Architects, Inc. (Shremshock-Yoder), Gerald Shremshock, and Gerald Shremshock, doing business as S-Y.

In count one, the plaintiff alleges the following facts: it is a commercial construction firm and the defendant, Shremshock-Yoder Architect, Inc. is an architectural firm which provided an architectural drawing ("Standard Drawing") to Wendy's Old Fashioned Hamburgers of New York, Inc. (Wendy's) on January 3, 1994. The plaintiff alleges that Shremshock-Yoder developed a second drawing ("Bid Drawing") for Wendy's on July 19, 1994, which the plaintiff claims was less inclusive of the requirements and specifications set forth in the Standard Drawing.

These drawings pertained to a project to remodel an existing building for Wendy's in Guilford, Connecticut. The plaintiff alleges that it relied on the Bid Drawing, pursuant to industry practices, for its calculations and was later awarded the construction contract based on its bid of $198,929.00. The plaintiff alleges that on or about September 11, 1994, Wendy's required the plaintiff to comply with the requirements set forth in the Standard Drawing. The plaintiff claims that it suffered damages of $22,477.00 for additional labor and materials purchases.

The plaintiff further alleges that Shremshock-Yoder negligently misrepresented the requirements of the construction contract by omitting specifications set forth in the Standard Drawing from the Bid Drawing. The plaintiff asserts that Shremshock-Yoder knew or should have known that the Bid Drawing did not accurately set forth all the requirements for the construction project, even though the Bid Drawing would be used as a device to calculate bids. The plaintiff relied on Shremshock-Yoder's professional licenses and preparation for its bid.

Counts five and nine contain the same allegations as count one, except that they name Gerald Shremshock and S-Y, respectively, as defendants.

In pertinent part, the complaint further alleges that the three defendants, Shremshock-Yoder Architects, Inc., Gerald Shremshock, and S-Y, negligently interfered with the construction contract. (Count four; Count eight; Count twelve.)

On May 30, 1996, the defendants filed a motion to strike counts four, eight and twelve of the amended complaint on the grounds that the plaintiff fails to state a claim upon which relief can be granted because Connecticut does not recognize a claim of negligent interference with contractual or business relations and additionally, that the plaintiff failed to plead that the

defendants' conduct was intentional, or that they had any "improper means or motive," both necessary elements for a claim of intentional interference with contract or business relations. The defendants further move on grounds that the plaintiff failed to allege that any of the defendants had knowledge of a contract or that a contract even existed at the time of the defendants' alleged conduct, and finally, that the plaintiff has not alleged conduct on the part of any of the defendants that could be characterized as tortious. They also filed a memorandum of law as required by Practice Book § 155. The plaintiff filed a timely memorandum in opposition to the motion to strike.

**\*2**  "The purpose of a motion to strike is to contest the legal sufficiency of the allegations of any complaint to state a claim upon which relief can be granted." (Internal quotations marks omitted.) *Novametrix Medical Systems, Inc. v. BOC Group, Inc.,* 224 Conn. 210, 214-15, 618 A.2d 25 (1992). "The court must construe the facts in the complaint most favorably to the plaintiff." *Id.,* 215. "A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." *Id.*

In support of their motion to strike, the defendants argue that the plaintiff has failed to state a claim on which relief can be granted because Connecticut does not recognize a cause of action for negligent interference with contractual or business relations. Additionally, they argue that the plaintiff has failed to meet its burden of pleading the necessary elements of an action for intentional interference with contractual or business relations. The defendants, citing to *Blake v. Levy,* 191 Conn. 257, 262, 464 A.2d 52 (1983), state that the essential elements of a cause of action for tortious interference with contract rights or business relations are the existence of a contractual or beneficial relationship, the defendants' knowledge of that relationship, and intentional interference in the relationship, which results in a loss. Additionally, the plaintiff must "plead and prove at least some improper motive or improper means."

The defendants further argue that they prepared the drawings for Wendy's prior to the time of the plaintiff's bid and its resulting construction contract with Wendy's. They state that they had no knowledge of the Dworkin-Wendy's contract. The defendants also assert that the plaintiff has failed to allege any improper motive or means by them. Finally, the defendants point out that the plaintiff has not alleged that it had any contractual relationship with any of the three defendants.

In opposition to the defendants' motion to strike, the plaintiff argues that Connecticut recognizes the tort of negligent interference with a contract. Relying on *Kakadelis v. DeFabritis,* 191 Conn. 276, 279, 464 A.2d 57 (1983), the plaintiff argues that it need not plead or prove malice and motive because it is not a requirement for negligent interference with business relations.

The plaintiff also cites *Kakadelis* for the proposition that "for a plaintiff successfully to prosecute ... it must prove that the defendant's conduct was ... tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ..."*Kakadelis v. DeFabritis, supra,* 191 Conn. 279. The plaintiff asserts that when the defendants allegedly misrepresented Wendy's construction requirements in the Bid Drawing, the defendants interfered with the Dworkin-Wendy's contract which resulted in damages.

"Connecticut has long recognized a cause of action for tortious interference with business relations." *Conrad v. Erickson,* 41 Conn.App. 243, 245, 675 A.2d 906 (1996). "The action was first recognized in *Bulkley v. Storer,* 2 Day (Conn.) 531, 536 (1807)." *Id.,* n. 2. "Connecticut recognizes two causes of action for tortious interference with a contract. These actions are negligent interference with a contract and intentional interference with a contract." *Ferrara v. Rogers,* Judicial District of Stamford-Norwalk at Stamford, Docket No. 094066 (September 11, 1990) (Flynn, J., 5 CSCR 738).

**\*3**  "[T]his court has required privity of contract in order to sustain a claim for negligent interference with contract obligations." (Internal citations omitted). *Blake v. Levy,* 191 Conn. 257, 259, 464 A.2d 52 (1983). "Negligent interference with contractual relations requires privity of contract between the plaintiff and the defendant." *Gillette v. Town of New Milford,* Judicial District of Litchfield, Docket No. 054791 (September 16, 1992) (Pickett, J., 7 CSCR 1248).

In the present case, the plaintiff does not allege the existence of a contract between it and any of the three named defendants. Thus, the plaintiffs have failed to state a claim for negligent interference with contract or business relations.

Although the Connecticut Supreme Court requires "privity of contract in order to sustain a claim for negligent interference with contractual obligation ... there is no such requirement in cases involving intentional interference with business relation." *Blake v. Levy, supra,* 191 Conn. 259. The plaintiff fails to state a claim for such intentional interference. The elements for intentional interference with contract or business relations include "the existence of a contractual or beneficial relationship and that the defendant(s), knowing of that relationship intentionally sought to interfere with it; and as a result, the plaintiff claimed to have suffered a loss." *Solomon v. Aberman,* 196 Conn. 359, 364, 493 A.2d 193 (1985). "[A] plaintiff ... must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously. The burden is on the plaintiff to plead and prove at least some improper motive or improper means." *Id.,* 365. See also *Robert S. Weiss & Assoc., Inc. v. Weiderlight,* 208 Conn. 525, 536, 546 A.2d 216 (1988) (court holds that the plaintiff must allege improper motive or means in an action for tortious interference with a contractual relationship); *Kelley Property Development, Inc. v. Lebanon,* 226 Conn. 314, 342 n. 31, 627 A.2d 909 (1993) (court states that the tort of intentional interference with business expectancy "requires the plaintiff to establish the bad faith, malice or improper motive of the defendant.").

The plaintiff has not alleged that the defendants knew of its contract with Wendy's and that the defendants intentionally interfered with the contract. Nor has the plaintiff met its burden of pleading any improper motive or means.

Therefore, the defendants' motion to strike the fourth, eighth and twelfth counts of the plaintiff's amended complaint is granted because it has failed to allege a cause of action for either negligent or intentional interference with contractual or business relations.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Ehret v. Uber Technologies, Inc., --- F.Supp.3d ---- (2014)
2014 WL 4640170

2014 WL 4640170
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Caren Ehret, Plaintiff,
v.
Uber Technologies, Inc., Defendant.

No. C–14–0113 EMC   |   Signed September 17, 2014

**Synopsis**
**Background:** Customer who had hired passenger car service drivers though mobile telephone application filed putative class action against the car service alleging that a substantial portion of gratuity automatically added to fee was retained by the service, constituting violations of California Unfair Competition Law (UCL) and California Legal Remedies Act (CLRA) as well as breach of contract. Defendant moved to dismiss.

**Holdings:** The District Court, Edward M. Chen, J., held that:

[1] complaint alleged fraud with sufficient particularity;

[2] extra-territorial application of UCL or CLRA was not required, given sufficient nexus between California and alleged misrepresentations in Illinois;

[3] complaint sufficiently alleged economic injury in lost money or property, as required for standing under UCL and CLRA;

[4] complaint stated claim for fraudulent practices under UCL;

[5] complaint stated claim for unfair business practices under UCL; and

[6] since driver was a "donee beneficiary," rather than a "creditor beneficiary," customer could not maintain claim for breach of contract.

Motion granted in part and denied in part.

**Attorneys and Law Firms**

Hall Adams, III, Law Offices of Hall Adams LLC, Jacie Campbell Zolna, Myron Milton Cherry, Myron M. Cherry & Associates LLC, Chicago, IL, Michael Francis Ram, Ram, Olson, Cereghino & Kopczynski LLP, San Francisco, CA, for Plaintiff.

Amit B. Patel, Stephen A. Swedlow, Quinn Emanuel Urquhart & Sullivan, LLP, Chicago, IL, Arthur Miles Roberts, Quinn Emanuel Urquhart and Sullivan, LLP, San Francisco, CA, for Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**

Ehret v. Uber Technologies, Inc., --- F.Supp.3d ---- (2014)

2014 WL 4640170

(Docket No. 44)

EDWARD M. CHEN, United States District Judge

## I. *INTRODUCTION*

**\*1** Plaintiff Caren Ehret seeks to represent a nationwide class of customers who have hired passenger car service drivers through Defendant Uber Technologies, Inc.'s ("Uber") mobile phone application. She alleges that Uber charges a 20% fee above the metered fare for each ride that it misrepresents as a "gratuity" that is automatically added "for the driver." In reality, Plaintiff alleges that a substantial portion of this "gratuity" is retained by Uber as an additional revenue source. Plaintiff asserts claims under the California Unfair Competition Law, Consumer Legal Remedies Act, and for breach of contract. Pending before the Court is Uber's motion to dismiss all of Plaintiff's claims. For the following reasons, the Court **GRANTS** in part and **DENIES** in part Uber's motion.

## II. *FACTUAL BACKGROUND*

Uber provides a mobile phone application that permits consumers to "summon, arrange and pay for taxi cab rides and other transportation services electronically via their mobile phone." First Amended Complaint ("FAC") ¶ 10 (Docket No. 40). Consumers provide payment through the Uber app through credit card information provided by the consumers. *Id.* Plaintiff alleges that on its website and in its application, Uber represents 'Hassle-free Payments" by stating: "We automatically charge your credit card the metered fare + 20% *gratuity.*" *Id.* ¶ 11. Uber allegedly further represents that the "20 % gratuity is automatically added for the driver." *Id.* Finally, when rides are arranged through the Uber app, "the text of the app represents to those consumers that a 20% *gratuity* will be automatically added to the metered fare." *Id.*

Contrary to its representations, Uber allegedly fails to remit the full amount of the "gratuity" charge to its drivers. *Id.* ¶ 13. Rather, it "keeps a substantial portion of this additional charge for itself as its own additional revenue and profit on each ride arranged and paid for by consumers." *Id.* Plaintiff contends that Uber's "gratuity" representations are false, misleading, and likely to deceive members of the public insofar as the term "gratuity" suggests a sum paid to the driver that "is distinct and different from the actual fair." *Id.* ¶ 14. Plaintiff further alleges that by continually misrepresenting the "gratuity" in its advertisements and then keeping a substantial portion of the gratuity, Uber "effectively increases the 'metered fare' and/or is charging an undisclosed fee. This is false advertising." *Id.*

On September 9, 2012, Plaintiff utilized Uber's app to arrange for a taxi cab ride in Chicago, Illinois. *Id.* ¶ 15. Plaintiff alleges that she was misled into "paying sums greater than the 'metered fare' for taxi cab rides based upon Uber's misrepresentations that all of the additional 20% charge over and above the 'metered fare' was a 'gratuity.' " *Id.* ¶ 16. Accordingly, "but for" Uber's misrepresentations, Plaintiff alleges she "would not have agreed to or paid Uber the full amount that Uber charged her and that she paid to Uber." *Id.*

**\*2** Plaintiff asserts five causes of action on behalf of a class. First, she alleges that the conduct alleged constitutes an unfair business practice in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code § 17200. *Id.* ¶¶ 25–30. Second, she alleges that the conduct constitutes an unlawful business practice in violation of the UCL insofar as the conduct in question violates California Civil Code §§ 1572, 1709, 1710, and 1750 and California Business and Professions Code § 17500. *Id.* ¶¶ 31–36. Third, Plaintiff contends that Uber's actions constitute a fraudulent business practice in violation of the UCL. *Id.* ¶¶ 37–41. Fourth, Plaintiff alleges a violation of the Consumers Legal Remedies Act ("CLRA"), Cal. Civ.Code § 1750, *et seq.* *Id.* ¶¶ 42–59. Finally, Plaintiff contends that Uber breached its contract with her and the class by failing to remit the full amount of the collected gratuity to the drivers. *Id.* ¶¶ 60–65. Uber has moved to dismiss all of Plaintiffs asserted claims.

Ehret v. Uber Technologies, Inc., --- F.Supp.3d ---- (2014)
2014 WL 4640170

## III. *DISCUSSION*

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir.2009). While "a complaint need not contain detailed factual allegations ... it must plead 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 129 S.Ct. at 1949.

[1]  [2]  Insofar as Plaintiff's claims sound in fraud, her complaint must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir.2009). Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). To satisfy Rule 9(b), the "complaint must 'identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false.' " *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir.2013) (quoting *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir.2011)). This encompasses the circumstances surrounding reliance. *See Kearns*, 567 F.3d at 1125 (holding that the complaint did not meet the standard of Rule 9(b) partly because the plaintiff failed to specify when he was exposed to the allegedly fraudulent advertisements, which ones he found material, and on which ones he relied).

### A. *Plaintiff Has Pled Sufficient Detail Under Rule 9(b)*

[3]  To begin, the Court finds that Plaintiff has pleaded her UCL cause of action with sufficient particularity to satisfy Fed.R.Civ.P. 9(b). In her FAC, Plaintiff alleges that on September 9, 2012, she used Uber's App to arrange and pay for taxi cab rides in Chicago, IL, and paid 20% over the metered fare "in reliance upon Uber's representation that the 20% charge was a 'gratuity.' " FAC ¶ 15. She further alleged that on its website and in its application, Uber advertises a "Hassle-free Payment" which automatically charges the consumer the metered fair and 20% gratuity." *Id.* ¶ 11. She further alleges that" [b]ut for Uber's misrepresentations Plaintiff would not have agreed to or paid Uber the full amount Uber charged her." FAC ¶ 16. Despite these allegations, Uber contends that Plaintiff has failed to allege when Uber made the alleged representations, when Plaintiff allegedly saw or heard the statement in question, whether she saw it on the website or in the application, and whether she "specifically relied on it." Docket No. 44, at 6.

**\*3** The Court finds that Plaintiff's allegations are sufficiently specific as to when and where Uber made the alleged misrepresentations. While the FAC does not expressly allege when and where Plaintiff saw the statements, it does allege that on September 9, 2012 she used the App and paid the 20% additional charge in reliance on Uber's representation that it was a "gratuity." FAC ¶ 15. The inference is that she knew there was a "20% gratuity" charge and that the source of her knowledge was the App and/or website, if not precisely on September 9, 2012, sometime before then. Plaintiff has specified the statements on which she allegedly relied. The Court declines to require Plaintiff to allege the precise web pages viewed and the precise date she viewed the representation. *See Bronson v. Johnson & Johnson, Inc.*, C 12–04184 CRB, 2013 WL 5731817 (N.D.Cal. Oct. 22, 2013) ("Defendants contend [ ] that Plaintiffs fail to allege 'which pages of the website' were reviewed, 'when' they were viewed,.... But *Kearns* [*v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir.2009) ] did not require such specific allegations."). To so require would be unrealistic and needlessly impede access to an important remedial statute. *See In re Tobacco II Cases*, 46 Cal.4th 298, 328, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009) ("[W]here, as here, a plaintiff alleges exposure to a long-term

advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements.").

Similarly, the Court finds that Plaintiff has sufficiently alleged that Uber's misrepresentations were false and misleading and why they were false and misleading. Specifically, it is alleged that Uber has represented that a 20% gratuity charge is added to each metered fair but that Uber keeps a "substantial" sum for itself. FAC ¶ 13, 14. Uber contends that Plaintiff has failed to allege how much is "substantial" and that this allegation is factually incorrect. Nonetheless, the Court concludes that Plaintiff's allegation is sufficient for purposes of Rule 9(b) and the motion to dismiss stage. The ultimate question under Rule 9(b) is not whether the allegation has been or likely will be proven, but whether the allegations are "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly–Magee v. California,* 236 F.3d 1014, 1019 (9th Cir.2001) (citation omitted)). The Court concludes that Plaintiff's allegations have provided Uber with sufficient detail to defend against Plaintiff's allegations.

### B. *Plaintiff Has Stated a Claim under the UCL and CLRA*
Uber has moved to dismiss the UCL and CLRA claims on a number of bases. Uber contends that Plaintiffs UCL and CLRA claims fail (1) because the UCL does not apply to non-California residents alleging non-California conduct; and (2) because she has failed to allege standing under either statute. The Court first addresses Uber's extraterritoriality arguments, then its standing arguments, before addressing the sufficiency of Plaintiff's allegations.

### 1. *Plaintiff's Claims Do Not Require Extra–Territorial Application of Either the UCL or the CLRA*
[4]   California's Supreme Court has made clear that there is a strong presumption against the extra-territorial application of California law. In *Sullivan v. Oracle Corp.,* 51 Cal.4th 1191, 127 Cal.Rptr.3d 185, 254 P.3d 237 (2011), the court reiterated this long-held rule:

> However far the Legislature's power may theoretically extend, we presume the Legislature did not intend a statute to be "operative, with respect to occurrences outside the state, ... unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter or history."

*Id.* at 1207, 127 Cal.Rptr.3d 185, 254 P.3d 237 (quoting *Diamond Multimedia Systems, Inc. v. Superior Court,* 19 Cal.4th 1036, 1059, 80 Cal.Rptr.2d 828, 968 P.2d 539 (1999)) (internal citation and quotation marks omitted). This presumption against the extraterritorial application has been established in California for almost a century. *See N. Alaska Salmon Co. v. Pillsbury,* 174 Cal. 1, 162 P. 93, 94 (1916). In *Sullivan,* the California Supreme Court made explicit that this presumption applies to the UCL, noting that "[n]either the language of the UCL nor its legislative history provides any basis for concluding the Legislature intended the UCL to operate extraterritorially," and, therefore, the presumption against extraterritoriality "applies to the UCL in full force." *Id.* Simply put, "the UCL does not apply to actions occurring outside of California that injure non-residents." *Ice Cream Distributors of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.,* C–09–5815 CW, 2010 WL 3619884 (N.D.Cal. Sept. 10, 2010), *aff'd,* 487 Fed.Appx. 362 (9th Cir.2012) (internal citation and quotation marks omitted). Courts have assumed the presumption against extraterritoriality applies equally to the CLRA and, based on the reasoning in *Sullivan,* the Court finds no basis to hold otherwise. *See McKinnon v. Dollar Thrifty Auto. Grp., Inc.,* No. C12–4457–SC, 2013 WL 791457 (N.D.Cal. Mar. 4, 2013); *In re iPhone 4S Consumer Litig.,* No. C12–1127–CW, 2013 WL 3829653 (N.D.Cal. July 23, 2013).

*\*4   However, the critical question presented by Plaintiff's complaint is whether application of the UCL and CLRA in the circumstances alleged actually entails an extraterritorial application of those statutes. Multiple courts—including the California Supreme Court in *Sullivan*—have permitted the application of California law where the plaintiffs' claims were based on alleged misrepresentations that were disseminated from California. In *Sullivan,* the court distinguished the cases of *Weshba v. Apple Computer, Inc.,* 91 Cal.App.4th 224, 110 Cal.Rptr.2d 145 (2001) and *Clothsrigger, Inc. v. GTE Corp.,* 191 Cal.App.3d 605, 236 Cal.Rptr. 605 (1997), by noting that, in those cases, "the unlawful conduct that formed the basis of the out-of-state plaintiffs'

Ehret v. Uber Technologies, Inc., --- F.Supp.3d ---- (2014)

2014 WL 4640170

claims (i.e., fraudulent misrepresentations made to induce consumer transactions), and that justified the application of California law to resolve those claims, occurred in California." *Sullivan,* 51 Cal.4th at 1208 n. 10, 127 Cal.Rptr.3d 185, 254 P.3d 237. In *Weshba,* the California Court of Appeals, in the context of Cal. Bus. & Prof.Code § 17500, rejected the argument that California's unfair business law "cannot support nationwide class certification." *Id.* at 241, 110 Cal.Rptr.2d 145. First, the court noted that the defendant (Apple) was a "California corporation" and that the brochures containing the purported misrepresentations "were prepared in and distributed from California." *Id.* at 242, 110 Cal.Rptr.2d 145. A rule permitting application of the UCL or CLRA where the alleged fraudulent activity emanated from California is consistent with the California Supreme Court's statement in *In Re Tobacco II Cases,* 46 Cal.4th 298, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009) that the UCL's focus is "on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." *Id.* at 312, 93 Cal.Rptr.3d 559, 207 P.3d 20.

Multiple federal district courts have denied motions to dismiss similar claims to those raised in this action on the basis of alleged extraterritorial application of California law. For example, in *In re iPhone 4S Consumer Litigation,* No. C12–1127 CW, 2013 WL 3829653 (N.D.Cal. July 23, 2013), plaintiffs asserted, *inter alia,* UCL and CLRA claims against Apple based on alleged misrepresentations regarding the functionality of the iPhone 4's "Siri" feature. *Id.* at *4. Judge Wilken noted that "California courts have concluded that 'state statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California.' " *Id.* at *7 (quoting *Norwest Mortg., Inc. v. Superior Ct.,* 72 Cal.App.4th 214, 224–25, 85 Cal.Rptr.2d 18 (1999)). She noted that the Plaintiffs had alleged that that

> their injuries were caused by Apple's wrongful conduct in false advertising that originated in California.
> Here, Plaintiffs have alleged that Apple's purportedly misleading marketing, promotional activities and
> literature were coordinated at, emanate from and are developed at its California headquarters, and that
> all "critical decisions" regarding the marketing and advertising were made within the state.

On this basis, Judge Wilken held that "California's presumption against the extraterritorial application of its statutes therefore does not bar the claims of the out-of-state Plaintiffs, because this principle is 'one against an intent to encompass conduct occurring in a foreign jurisdiction in the prohibitions and remedies of a domestic statute.' " *Id.* (quoting *Diamond Multimedia Sys.,* 19 Cal.4th at 1060 n. 20, 80 Cal.Rptr.2d 828, 968 P.2d 539). Numerous cases are in accord. *See TRC & Assocs. v. NuScience Corp.,* No. 2:13–cv–6903–ODW(CWx), 2013 WL 6073004, at *5 (C.D.Cal. Nov. 18, 2013) ("[T]he alleged fraudulent conduct occurred in California. The Complaint is not based solely on a commercial transaction outside of California, but is instead based on material misrepresentations originating in California with NuScience, traveling through Florida, and ending up in Ohio with TRC."); *Wang v. OCZ Tech. Group, Inc.,* 276 F.R.D. 618, 630 (N.D.Cal.2011) ("Though Wang's allegations of OCZ's California-based conduct are general, they provide a sufficient basis at the pleading stage for the invocation of California law.... [T]he facts alleged are that the misleading marketing, advertising, and product information are 'conceived, reviewed, approved, or otherwise controlled from [OCZ's] headquarters in California.' "); *In re Mattel, Inc.,* 588 F.Supp.2d 1111, 1119 (C.D.Cal.2008) ("Plaintiffs have adequately alleged that Mattel and Fisher–Price's conduct occurred, if at all, in—or had strong connections to—California. Plaintiffs complain of misrepresentations made in reports, company statements, and advertising that are reasonably likely to have come from or been approved by Mattel corporate headquarters in California,"(citation omitted)).

**\*5  [5]**   In the FAC, Plaintiff alleges that Uber is a "Delaware corporation with its headquarters in San Francisco, California." FAC ¶ 9. It further alleges that:

> The deceptive practices alleged herein were conceived, reviewed, approved and otherwise controlled
> from Defendant's headquarters in San Francisco, California. Furthermore, the misrepresentations and
> omissions alleged herein were contained on Defendant's website and mobile phone application, which
> are maintained in California. When Plaintiff and class members used Defendant's services those [sic]
> transactions, including the billing and payment for those services, were processed on Defendant's servers
> in San Francisco, California.

*Id.* ¶ 6. On the basis of these allegations, the Court finds that Plaintiff has alleged a sufficient nexus between California and the misrepresentations which form the basis of Plaintiff's claims. Specifically, allegations that the misrepresentations were developed in California, contained on websites that are maintained in California, and that billing and payment of services went through servers located in California distinguish this case from those relied upon by Uber in its reply brief. Compare *Cannon v. Wells Fargo N.A.,* 917 F.Supp.2d 1025, 1055–56 (N.D.Cal.2013) (allegations that the defendant was headquartered in California were insufficient to plausibly allege that the advertising in question originated from California); *Gustafson v. BAC Home Loans Servicing, LP,* No. SACV 11–915–JST (ANx), 2012 WL 4761733, at *6 (C.D.Cal. Apr. 12, 2012) (finding the single allegation that "Defendants' scheme was devised, implemented and directed from BAC Home Loans Servicing's and Balboa's offices in California" was "too vague to 'plausibly suggest an entitlement to relief' "); *In re Toyota Motor Corp.,* 785 F.Supp.2d 883, 917 & n. 26 (C.D.Cal.2011) (noting that "Plaintiffs have not alleged that marketing decisions about the representations each Plaintiff saw in his or her home country were made in California").

Plaintiff has provided sufficient factual allegations from which the Court can plausibly infer that Uber's alleged gratuity misrepresentations emanated from California. Accordingly, the Court concludes that, for purposes of the motion to dismiss, application of the UCL and CLRA in these circumstances would not constitute extra-territorial application of these statutes and therefore **DENIES** Uber's motion on this ground.

### 2. *Plaintiff Has Sufficiently Alleged Standing Under the UCL and CLRA*

[6]    [7]    [8] Uber contends that Plaintiff's CLRA and UCL claims fail because Plaintiff has failed to allege economic harm. Proposition 64 amended the UCL to require a Plaintiff to demonstrate that she had "lost money or property as a result of [the] unfair competition." Cal. Bus. & Prof.Code § 17204. Accordingly, standing under the UCL is far narrower than traditional federal standing requirements: "We note UCl's standing requirements appear to be more stringent than the federal standing requirements. Whereas a federal plaintiff's 'injury in fact' may be intangible and need not involve lost money or property, Proposition 64, in effect, added a requirement that a UCL plaintiff's 'injury in fact' specifically involve 'lost money or property.' " *Troyk v. Farmers Group, Inc.,* 171 Cal.App.4th 1305, 1348 n. 31, 90 Cal.Rptr.3d 589 (2009). Similarly, a plaintiff will have standing under the CLRA if she "suffers *any damage* as a result of the use or employment any person of a method, act, or practice declared to be unlawful by Section 1770." *Hinojos v. Kohl's Corp.,* 718 F.3d 1098, 1107 (9th Cir.2013) (emphasis in original) (quoting Cal. Civ.Code § 1780(a)). "[A]ny plaintiff who has standing under the UCL's and FAL's 'lost money or property' requirement will, *a fortiori,* have suffered 'any damage' for purposes of establishing CLRA standing." *Id.* at 1108.

**\*6** In *Kwisket v. Superior Court,* 51 Cal.4th 310, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011), the California Supreme Court addressed the UCL's standing requirement in the context of allegedly misleading advertising. There, plaintiff alleged that Kwikset Corporation produced locksets which were falsely represented in advertising to have been "Made in U.S.A." *Id.* at 316, 120 Cal.Rptr.3d 741, 246 P.3d 877. The Court held that there "are innumerable ways in which economic injury from unfair competition may be shown" such as:

> A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary.

*Id.* at 323, 120 Cal.Rptr.3d 741, 246 P.3d 877. Further, the Court found that "[n]either the text of Proposition 64 nor the ballot arguments in support of it purport to define or limit the concept of 'lost money or property' " and that it did not "supply an exhaustive list of the ways in which unfair competition may cause economic harm." *Id.* Ultimately, on the facts of *Kwikset,* the Court found the following allegations sufficient to establish standing under the UCL:

2014 WL 4640170

      (1) Kwikset labeled certain locksets with "Made in U.S.A." or a similar designation, (2) these representations were false, (3) plaintiffs saw and relied on the labels for their truth in purchasing Kwikset's locksets, and (4) plaintiffs would not have bought the locksets otherwise.

*Id.* at 328, 120 Cal.Rptr.3d 741, 246 P.3d 877. The Ninth Circuit has noted that "*Kwikset* emphasized that Proposition 64 was enacted *not* to eliminate individual consumer suits when the consumer was actually deceived by a misleading advertisement, but rather to stop 'fishing expeditions' by consumers and attorneys who may have never even intended to purchase a product that was being falsely advertised." *Hinojos v. Kohl's Corp.,* 718 F.3d 1098, 1107 (9th Cir.2013).

**[9]** Plaintiff alleges that, but for Uber's "gratuity" misrepresentations, "Plaintiff would not have agreed to or paid Uber the full amount that Uber charged her and that she paid to Uber."FAC ¶ 16. Uber argues this allegation is insufficient to allege that Plaintiff lost money or property for purposes of the UCL. Rather, it argues that Plaintiff received precisely what she bargained for—a "taxi ride at a stated price. Docket No. 44, at 13. Therefore, it contends that "Plaintiff would be in exactly the same position regardless of whether the full 20% charge went to the taxi driver." *Id.* at 14. Relatedly, at the hearing, Uber argued that because the 20% fee allegedly misrepresented as a "gratuity" was a mandatory fee that Plaintiff could not have avoided, how Uber chose to distribute the collected fee was a "mere curiosity" to Plaintiff and, therefore, not an economic injury.

**[10]**   The Court finds that Plaintiff has adequately alleged an economic injury. First, in discussing the "benefit of the bargain" defense upon which Uber relies, the Ninth Circuit has noted that, under *Kwikset,* the defense is "permissible only if the misrepresentation that the consumer alleges was not 'material.' " *Hinojos,* 718 F.3d at 1107. "A misrepresentation is judged to be 'material' if a reasonable man would attach importance" or "if the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." *Kwikset,* 51 Cal.4th at 333, 120 Cal.Rptr.3d 741, 246 P.3d 877 (internal citations and quotation marks omitted). "[T]he materiality of a misrepresentation is typically an issue of fact, and therefore should not be decided at the motion to dismiss stage." *Hinojos,* 718 F.3d at 1107 n. 7 (citing *In re Steroid Hormone Product Cases,* 181 Cal.App.4th 145, 104 Cal.Rptr.3d 329 (2010)). That is the case here. *Cf.Kasky v. Nike, Inc.,* 27 Cal.4th 939, 969, 119 Cal.Rptr.2d 296, 45 P.3d 243 (2002) ("For a significant segment of the buying public, labor practices do matter in making consumer choices.")

**\*7**  **[11]**  Second, by alleging that she would not have agreed to the full amount that Uber charged her but for Uber's purported misrepresentation, Plaintiff has alleged a sufficiently material misrepresentation. Contrary to Uber's argument, to obtain standing under the UCL, it is not necessary to allege and prove the plaintiff would not have entered the transaction but for the misrepresentation. Such but-for causation is only one of the "innumerable" ways of establishing standing identified in *Kwikset,* 51 Cal.4th at 323, 120 Cal.Rptr.3d 741, 246 P.3d 877. Economic injury sufficient to support UCL standing exists where the plaintiff "surrender[ed] in a transaction more, or acquire[d] less than he or she otherwise would have." *Id.* As Uber acknowledged, a UCL claim is stated when the plaintiff, as a result of a defendant's misrepresentation, did not receive what he or she had bargained for. Reply Br., p. 5. This makes sense; materiality for purposes of the UCL is defined not in terms of a "but for" cause, but whether a reasonable person "would attach importance" to it. *Kwikset,* 51 Cal.4th at 333, 120 Cal.Rptr.3d 741, 246 P.3d 877. Here it is enough that Plaintiff has alleged that but for Uber's misrepresentations, she would not "have agreed to or paid Uber the full amount that Uber charged her and that she paid to Uber." FAC ¶ 16.

Whether Plaintiff had the option of not paying the additional fee (the 20% gratuity) because it was integral to Uber's charge is immaterial to standing under the UCL. A number of cases are instructive on this point. In *Blessing v. Sirius XM Radio Inc.,* 756 F.Supp.2d 445 (S.D.N.Y.2010), the court interpreted the CLRA's standing requirements. There, plaintiffs who purchased defendant's satellite digital radio services alleged that the defendant had misrepresented in its customer agreements that a "royalty fee" would be included in the subscription cost and that this charge would be "limited to the amount necessary to 'pass through' its own increased costs.' " *Id.* at 450. Instead, Plaintiffs alleged that the royalty fee charged "exceeded the amount of Defendant's increase in royalty obligations." *Id.* Plaintiffs asserted a claim under the CLRA, and the Southern District of New York found that plaintiffs could proceed with this claim. It held that the "California plaintiffs suffered injury by paying a Royalty Fee that was greater than what it would have been had it been calculated as an actual 'pass through' of the fee paid

by Defendant. This states a claim under § 1770(a)(5) [of the CLRA]." *Id.* at 455. Importantly, the court did not suggest the payment of the included "royalty fee" was avoidable by the consumer.

Similarly, in *Johnson v. Wal–Mart Stores, Inc.,* 544 Fed.Appx. 696, 697 (9th Cir.2013), plaintiff alleged that Wal–Mart included a $9 fee every time a customer purchased a car battery and misrepresented the fee was required by California law. In fact, California law did not require the imposition of the fee and Wal–Mart kept the nine dollars for itself. *Id.* at 697 Plaintiff alleged that "she would not have paid the additional nine dollar fee if she had known that California law did not require her to pay it and that Wal–Mart intended to keep the nine dollars for itself." *Id.* The Ninth Circuit found that these factual allegations "permit a reasonable inference that Johnson paid more 'than she otherwise would have' if Wal–Mart had not engaged in the alleged misrepresentation." *Id.*

Uber contends that this case is distinguishable on this basis since the fee was not "mandatory" because the customers could opt to not give Wal–Mart the old battery and avoid the fee. Uber mis-reads *Johnson.* First, the complaint in that action did not allege that plaintiffs could have avoided the recycling fee by *not* bringing in an old car battery; rather, it alleged that the fee could only be avoided *by bringing in* an old car battery. Second, and more significantly, the Ninth Circuit in *Johnson* did not find significant (or even mention) the fact that recycling fee was somehow avoidable. Rather, it simply stated that it was "reasonable to infer that [plaintiff], if correctly informed, would not have given Wal–Mart the nine dollar fee in addition to paying seventy-seven dollars for the battery." *Id.*

[12]  These cases are consistent with longstanding rule that under the UCL even a mandatory charge can be deceptive if it is labeled as something it is not. For example, in *McKell v. Washington Mutual, Inc., supra,* 142 Cal.App.4th 1457, 49 Cal.Rptr.3d 227, plaintiff alleged that Washington Mutual had represented in its statements that certain costs of underwriting and wire transfers were included. These fees were "mandatory" insofar as Washington Mutual required home buyers to pay them. Nonetheless, the court found that plaintiff had stated a claim under the UCL's fraudulent prong:

> *8  Looking at these documents, plaintiffs reasonably would conclude that the fees charged were the costs Washington Mutual incurred in providing these services. The fees charged were substantially above Washington Mutual's costs, however.... Washington Mutual's practice of charging its customers more for services than the actual cost of those services, with no indication to the customers that they were doing so, may constitute a deceptive business practice within the meaning of the UCL, as a reasonable consumer likely would believe that fees charged in connection with a home mortgage loan bore some correlation to services rendered.

*Id.* at 1472, 49 Cal.Rptr.3d 227; *see also People v. Dollar Rent–A–Car Sys., Inc.,* 211 Cal.App.3d 119, 129, 259 Cal.Rptr. 191 (1989) (holding that the defendant violated the UCL by charging for the "retail cost" of car repairs in excess of actual repair costs).

To hold otherwise would result in perverse outcomes. Were the UCL to recognize economic injury only where a consumer proves he or she would not have entered the transaction at all would mean that someone who, for example: (1) bought a computer advertised at a processor speed of 2ghz but which actually ran at 1.8ghz; (2) purchased a car advertised as having an engine that ran at 250 horsepower when, in fact, it only had 225 horsepower; (3) paid for service in which the seller that falsely represented it included necessary transaction fees; or (4) donated to a charity which falsely representing that a certain percentage of the funds would go to beneficiaries as opposed to overhead, would be left with no remedy under the UCL despite being defrauded by the defendant if she cannot prove she would not have entered the transaction at all. The economic injury requirement of Proposition 64 was not intended to gut the UCL; it was intended to stop drive-by lawsuits and "fishing expeditions" by attorneys representing clients who never intended to purchase the product. *See Hinojos,* 718 F.3d at 1107; *see also Kwikset,* 51 Cal.4th at 321, 120 Cal.Rptr.3d 741, 246 P.3d 877 ("While the voters clearly intended to restrict UCL standing, they just as plainly preserved standing for those who *had* had business dealings with a defendant and had lost money or property as a result of the defendant's unfair business practices."). Allowing standing in the case at bar—where a false representation is made to raise the

price of a service which the plaintiff would not have agreed to pay had the truth been told, does not frustrate the purpose of Proposition 64; rather, it furthers it. [1]

[1]     Indeed, it is also plausible that had Uber not made the alleged misrepresentation, the total fee it charged would have been less than what it charged with the misrepresentation. In this regard, there is an arguable cause-in-fact in that consumers paid more than they would have but for Uber's alleged misrepresentation.

At the hearing, Uber relied extensively on the California Court of Appeal decision in *Searle v. Wyndham International, Inc.*, 102 Cal.App.4th 1327, 126 Cal.Rptr.2d 231 (2002). There, plaintiff alleged that after ordering room service at one of defendant's hotels, she was assessed a 17% service charge which was, in fact, a gratuity paid to the server. At the same time, the room service bill allegedly contained a blank line for the customer to add a tip or gratuity. *Id.* at 1330, 126 Cal.Rptr.2d 231. Plaintiff alleged that the service charge was deceptive under the UCL as customers were "not advised the service charge is in fact a gratuity paid to the server." *Id.* The California Court of Appeal found that plaintiff had failed to state a claim, finding that "[w]hat a hotel does with the revenue it earns—either from the mini-bar, in home movies or its room service charges—is of no direct concern to hotel guests." *Id.* at 1334, 126 Cal.Rptr.2d 231. Rather, the "room service patron[ ] is given both clear notice the service being offered comes at a hefty premium and the freedom to decline the service.... [T]he patron has no legitimate interest in what the hotel does with the service charge." *Id.*

**\*9** *Searle* is readily distinguishable. There, the defendant made no representation about the nature of the service charge or where the collected funds would be distributed. There was no representation made one way or the other regarding whether the "service charge" was actually a gratuity payable to the server. Rather, it was—as Uber repeatedly argued at the hearing—a mandatory charge that was presented to the plaintiff as a charge attendant to ordering room service. In the case at bar, in contrast, it is alleged that Uber expressly represented a 20% charge was added to every metered fare specifically for purposes of paying the driver a gratuity. In short, in *Searle,* there was no misrepresentation; here, allegedly, there was. [2]

[2]     Uber's reliance on *Aron v. U–Haul Co. of Cal.*, 143 Cal.App.4th 796, 49 Cal.Rptr.3d 555 (2006) for the same proposition is misplaced. In that case, the court found that the challenged refueling fee was as a practical matter unavoidable and unfair. The court did not hold that a UCL claim cannot lie where a challenge fee is avoidable. Other cases cited by Uber in its briefs involve situations in which no misrepresentation affecting the efficacy of the product was found. *See, e.g.,Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F.Supp.2d 962, 971–72 (C.D.Cal.2014) ("In this case, Plaintiffs have not alleged an actual economic injury because they have not had any negative experiences with the PCS and have not identified any false representations about the automatic precollision braking feature made by Toyota.").

The Court cannot conclude at the motion to dismiss stage that Uber's representations regarding gratuities is immaterial as a matter of law. Accordingly, Uber's motion to dismiss Plaintiff's UCL and CLRA claims for lack of standing is **DENIED.**

### 3. *Plaintiff Has Stated a Claim Under the UCL's Fraudulent and Unfairness Prongs*

**[13]    [14]    [15]**   To state a claim under the UCL's fraudulent prong based on false advertising or promotional practices "it is necessary only to show that members of the public are likely to be deceived." *In re Tobacco II,* 46 Cal.4th at 312, 93 Cal.Rptr.3d 559, 207 P.3d 20. The standard for finding a likelihood of deception is that of a "reasonable consumer who is neither the most vigilant and suspicious of advertising claims nor the most unwary and unsophisticated, but instead is 'the ordinary consumer within the target population.' " *Chapman v. Skype Inc.,* 220 Cal.App.4th 217, 226, 162 Cal.Rptr.3d 864 (2013) (quoting *Lavie v. Procter & Gamble Co.,* 105 Cal.App.4th 496, 509–10, 129 Cal.Rptr.2d 486 (2003)). As this Court recognized in *O'Connor v. Uber Technologies, Inc.,* No. C–13–3826 EMC, 2013 WL 6354534 (N.D.Cal. Dec. 5, 2013), three separate tests have been developed to determine if conduct is "unfair" for purposes of the UCL. *Id.* at \*16–17. In this case, both parties apply the test which holds that conduct is "unfair" if it is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *SeePlumlee v. Pfizer, Inc.,* No. 13–cv–0414–LHK, 2014 WL 4275519, at \*5 (N.D.Cal. Aug. 29, 2014) ("A business practice violates the unfair prong of the UCL if it is contrary to 'established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits.' ").

Ehret v. Uber Technologies, Inc., --- F.Supp.3d ---- (2014)
2014 WL 4640170

[16]   In addressing similar allegations regarding Uber's alleged "gratuity" misrepresentations, this Court has previously held:

The Complaint alleges the following: Uber advertises "on its website and in marketing materials, that gratuity is included and there is no need to tip the drive," reasonable customers would expect that drivers would receive that gratuity, Uber does not remit the entirety of the gratuity to drivers, and as such, Uber's statements are "deceptive and misleading." These allegations make it plausible that a reasonable consumer would likely be deceived to the detriment of drivers.

*10   O'Connor, 2013 WL 6354534, at *17. Similarly, here, Plaintiff has alleged that Uber represents that it automatically charges consumer credit card "the metered fare + 20% *gratuity*" and that this "20% gratuity is automatically added for the driver" while, at the same time, it "keeps a substantial portion of this additional charge for itself as its own additional revenue and profit." FAC ¶ 13. These allegations are sufficient to plausibly allege that a reasonable consumer would be deceived and, as a result of this deception, they expended more money than they otherwise would have but for the misrepresentation (as discussed above).

[17]   [18]   Similarly, in determining whether a business practice is unfair under the approach adopted by the parties, "California courts balance the 'impact on its alleged victim' against 'the reasons, justifications, and motives of the alleged wrongdoer.' " *Plumlee,* 2014 WL 4275519, at *5 (quoting *McKell v. Wash. Mut., Inc.,* 142 Cal.App.4th 1457, 1473, 49 Cal.Rptr.3d 227 (2006)). As discussed above, Plaintiff has alleged that Uber adds a fee above its metered fair, misrepresents this fee as a gratuity that is given to the consumers, and keeps a substantial portion of this fee to boost its revenue. The Court cannot conclude at this early stage that the alleged cost of this misrepresentation to Uber's consumers is justified by Uber's reasons and motives. *SeePirozzi v. Apple, Inc.,* 966 F.Supp.2d 909 (N.D.Cal.2013) ("Apple offers nothing in the way of 'reasons, justifications, or motives,' or 'utility of [its[ conduct,' to weigh against the alleged harm. Thus, 'the Court cannot say that Apple's practices are not injurious to consumers, or that any benefit to consumers outweighs the harm.' " (citation omitted)).

In arguing that Plaintiff has failed to state a claim under either the fraudulent or unfairness prongs of the UCL, Uber relies almost exclusively on the California Court of Appeal's decision in *Searle,* discussed above. Uber appears to contend that *Searle* stands for the proposition that where a charge is mandatory, the consumer has no legitimate interest in what is ultimately done with the funds recouped as a result of that charge. Similarly, it contends that, under *Searle,* so long as a consumer is not deceived about the *total cost* of the services it receives from the defendant, the UCL is not offended. Docket No. 44, at 8–9.

For the reasons stated above in connection with standing, Uber reads *Searle* too broadly. The Court finds that Plaintiff has stated a claim under the UCL's fraudulent and unfairness prongs, and Uber's motion to dismiss on this ground is **DENIED.**

### 4. *Plaintiff Has Stated a Claim Under the CLRA.*

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ.Code § 1770. Plaintiff alleges that Uber violated a number of the CLRA's provisions.

[19]   [20]   First, Plaintiff alleges that Uber has violated § 1770(a)(5), which makes it unlawful to represent "that goods or services have ... characteristics ... which they do not have." Cal. Civ.Code § 1770(a)(5). Similarly, Plaintiff alleges a violation of § 1770(a)(9) which prohibits "advertising goods or services with intent not to sell them as advertised." *Id.* § 1770(a)(9). Plaintiff's arguments under both sections are similar—that Uber representing that it would collect and automatically remit a 20% gratuity to the driver, "thus allowing the consumer to arrange for a taxi without the necessity fo pulling out his or her wallet and/or exchanging cash with the driver," Uber has misrepresented a characteristic and benefit of its service. Docket No. 46, at 12. The Court finds Plaintiff's allegations are sufficient to state a claim under § 1770(a)(5). As alleged, Uber represents that its application service remits a 20% gratuity to drivers when, in fact, it does not do so. This is sufficient to allege that Uber's service was advertised as having a characteristic it did not have. *Cf.Blessing,* 756 F.Supp.2d at 455 (holding that the plaintiffs

2014 WL 4640170

had stated a claim for violation of sections 1770(a)(5) and 1770(a)(9), where the defendant represented it was charging a "pass through" royalty fee, but where the actual royalty fee was much less.)

**\*11**  **[21]**  Second, Plaintiffs have alleged that Uber has violated § 1770(a)(14), which prohibits a defendant from "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." Cal. Civ.Code § 1770(a)(14). The Court finds that Plaintiff has sufficiently alleged a violation of this provision. The allegation that Uber represented that the 20% gratuity fee would be remitted to drivers is sufficient to allege the existence of an obligation on the part of Uber—an obligation that Uber misrepresented by using the charged fee as a revenue source. *See Blessing,* 756 F.Supp.2d at 455 (finding that plaintiff had stated a claim under § 1770(a)(14) because, the "royalty fee" imposed by the defendant "certainly imposes an 'obligation' and the alleged misrepresentation with respect to that fee ... suggests that the obligation entails covering a 'pass through' of increased royalty obligations when in fact it is a source of additional and 'substantial revenue' ").

**[22]**  **[23]**  However, the Court finds that Plaintiff has failed to state a claim under §§ 1770(a)(13) or 1770(a)(16). Section 1770(a)(13) prohibits making "false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ.Code § 1770(a)(13). Plaintiff has failed to state a claim under this section because she has failed to allege that Uber made any representations with regards to a "fee reduction" nor, contrary to her arguments in her opposition, has she alleged that Uber ever represented that its service was a "free or no fee service." Finally, § 1770(a)(16) makes unlawful "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." *Id.* § 1770(a)(16). Plaintiff asserts that Uber violated § 1770(a)(16) by charging the consumer's credit card after representing that it would remit the 20% gratuity to the driver. She argues that charging the card is "necessarily" "representing" that Uber would remit the amount according to its prior representation. The Court disagrees. This subsection "appears to target not the initial representation in a transaction, but a subsequent representation which is deceptive." *Blessing,* 756 F.Supp.2d at 455. Here, Plaintiff has not alleged the existence of a representation subsequent to the alleged initial misrepresentation, and the Court concludes that the subsequent charging of the credit card does not constitute a "representation" on the part of Uber.

### 5. *Plaintiff Has Stated a Claim Under the UCL's Unlawful Prong*
**[24]**  **[25]**  **[26]**  "By proscribing 'any unlawful' business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) (citations and quotation marks omitted). The UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." *Id.* Because the Court finds that Plaintiff has adequately alleged a violation of the CLRA, she has also sufficiently alleged a violation under the unlawfulness prong of the UCL.

### 6. *Summary*
For the foregoing reasons, the Court finds that Plaintiff has stated a claim under the fraudulent, unfairness, and unlawful prongs of the UCL. Further, Plaintiff has stated a claim under the CLRA to the extent she relies on § 1770(a)(5), (9), (14) but has failed to state a claim under the CLRA to the extent she relies on § 1770(a)(13), (16). Accordingly, Uber's motion to dismiss is **GRANTED** with respect to CLRA claims under § 1770(a)(13) and (16); in all other respects the motion to dismiss is **DENIED.**

### C. *Plaintiff Has Failed to State a Claim for Breach of Contract*
**[27]**  **[28]**  **[29]**  Under California law, "[a] cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *CDF Firefighters v. Maldonado,* 158 Cal.App.4th 1226, 1239, 70 Cal.Rptr.3d 667 (2008). Where a plaintiff has failed to allege that the defendant's breach has caused her to suffer any damage, a breach of contract action for damages will not lie. *See Low v. LinkedIn Corp.,* 900 F.Supp.2d 1010, 1028 (N.D.Cal.2012) (noting that to state a claim for breach of contract, plaintiff must plead "the contract, plaintiffs' performance ... defendant's breach, and damage to plaintiff

therefrom"); *see also Bramalea Cal., Inc. v. Reliable Interiors, Inc.,* 119 Cal.App.4th 468, 14 Cal.Rptr.3d 302 (2004) ("A breach of contract is not actionable without damage."). Further, "[t]o establish contractual damages, a Plaintiff must establish 'appreciable and actual damage,' "—"[n]ominal damages, speculative harm, or threat of future harm do not suffice to show legally cognizable injury." *Id.*

**\*12** Uber argues in its motion, even if the alleged breach in question had not occurred—that is, if Uber had remitted the 20% gratuity as it allegedly promised in its advertisements—Plaintiff (and the class of Uber customers) would be in precisely the same financial position as they are *after* the breach. According to Uber, Plaintiff has not, and cannot, allege that they suffered damages for purposes of a breach of contract action.

[30] In contrast to its briefing on the UCL claim, Plaintiff does not respond to the argument that it has suffered cognizable contract damages, even if the parol evidence of the advertisement is considered in interpreting the terms and conditions of the contract. Plaintiff's failure to respond is understandable. Under common law contract principles, a promisee's right to enforce a contract term that benefits a third party depends on whether that third party is a "creditor" beneficiary or a "donee" beneficiary. If the beneficiary is a creditor, the promisee can sue for contract damages for the promisor's failure to benefit the donee. If the beneficiary is a donee, the promisee cannot sue for such damages.

In *In re Marriage of Smith & Maescher,* 21 Cal.App.4th 100, 26 Cal.Rptr.2d 133 (1993), the court addressed a marital separation agreement in which the husband agreed to pay for his children's undergraduate education. *Id.* at 104, 26 Cal.Rptr.2d 133. Eventually, the husband stopped paying the expenses, and the wife filed an action to enforce the separation agreement. The marital separation agreement was governed by Massachusetts law and the court, applying the Restatement (Second) of Contracts held that in that case, the "promisee cannot recover damages which may be suffered by the intended third party beneficiary." *Id.* at 107, 26 Cal.Rptr.2d 133. The court noted that the Restatement differentiates between "creditor" beneficiaries (that is, beneficiaries who receive payments from the promisor of a debt or obligation owed the beneficiary by the promisee) and "donee" beneficiaries who essentially receives a "gift" in the form of the promisor's obligation to it. *Id.* at 106, 26 Cal.Rptr.2d 133. The court then held that if a "promisor does not pay the promisee's debt to the creditor beneficiary, then the promisee will remain liable to the beneficiary for the full amount of the debt and could directly suffer damages in this full amount. In contrast, if the promisor does not perform its obligation to the donee beneficiary, the promisee will not be liable to the beneficiary for such performance," and thus will not incur cognizable damages to support a claim for breach of contract against the promisor. *Id.* at 106, 26 Cal.Rptr.2d 133. The court did note, a promisee may sue for specific performance. *Id.*

[31] While tips or gratuities may be customary in the service industry, they are not binding obligations on the part of customers. Uber's failure to remit the 20% gratuity to the drivers does not leave Plaintiff or the putative class members liable to the drivers for any debt or amount. Accordingly, the drivers are properly considered donee beneficiaries. *See Dateline Builders, Inc. v. City of Santa Rosa,* 146 Cal.App.3d 520, 526, 194 Cal.Rptr. 258 (1983) ("A person is a donee beneficiary only if the promisee's contractual intent is either to make a gift to him *or to confer on him a right against the promisor.*" (emphasis added)). Hence, Plaintiff cannot seek damages for breach of contract for Uber's failure to benefit drivers. Plaintiff has not and, on the basis of the allegations in the FAC, cannot allege that Uber's alleged breach of the contract caused her to suffer any contract damages. [3]

---

[3]     Plaintiff does not seek specific performance or assert any common law fraud claims.

**\*13** [32] Such a holding is not inconsistent with the Court's holding above that Plaintiffs' have suffered an economic injury for purposes of the UCL. Breach of contract actions seeking recovery of damages are focused on placing plaintiffs in the same position they would have been in had defendants performed their contractual obligations. *See, e.g., General Employees Trust Fund v. Victory Bldg. Maint., Inc.,* No. C06–6654 CW (MEJ), 2007 WL 1288393, at \*5 (N.D.Cal. Apr. 11, 2007). For the reasons stated above, Plaintiffs are not entitled to any money damages under this test. Plaintiffs UCL claim, by contrast, is not limited to the strictures of the alleged contractual terms its prescriptions are aimed at unlawful or unfair business practices (wherein a violation may be found even if conduct violates no specific law). *See Cel–Tech Commc'ns,* 20 Cal.4th at 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 ("In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice

Ehret v. Uber Technologies, Inc., --- F.Supp.3d ---- (2014)

2014 WL 4640170

versa."). Nor is the UCL geared to award traditional contract damages. *See In re Tobacco II,* 46 Cal.4th at 312, 93 Cal.Rptr.3d 559, 207 P.3d 20 (" 'A UCL action is equitable in nature; damages cannot be recovered.... We have stated under the UCL, [p]revailing plaintiffs are generally limited to injunctive relief and restitution.' " (quoting *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1144, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003)). Under the UCL claim, the operative effect of the 20% gratuity statement is not a contractual promise, but rather an alleged misrepresentation which skewed the transaction and caused Plaintiffs to expend more money than they otherwise would have had the representation not been made. Stated another way, the breach of contract claim looks at the 20% gratuity statement and asks how Plaintiffs can be put in the same situation they would be in had Defendants performed. The UCL claim looks at the 20% gratuity statement and asks how Plaintiffs would be positioned had the misrepresentation not been made.

Accordingly, Uber's motion to dismiss this claim is **GRANTED** and the claim is dismissed with prejudice.[4]

[4]    The Court notes that in *O'Connor v. Uber* it dismissed a claim alleging breach of implied contract asserted under a third-party beneficiary theory brought on behalf of the drivers. *See O'Connor v. Uber Techs., Inc.,* No. C13–3826 EMC, 2014 WL 4382880, at *6–8 (N.D.Cal. Sept. 4, 2014). The class in *O'Connor* chose to rely on an implied-in-fact contract theory that the Court found was barred by an express provision of Uber's terms and conditions. The plaintiff in *O'Connor* did not allege, as Plaintiffs do here, that the gratuity-based representations were incorporated by reference into the Terms and Conditions.

## IV. *CONCLUSION*

For the foregoing reasons, Uber's motion to dismiss Plaintiff's UCL claims is **DENIED.** Further, Uber's motion to dismiss Plaintiff's CLRA claim is **DENIED** to the extent Plaintiff's claim is predicated on Cal. Civ.Code § 1770(a)(5), (9), (14) and **GRANTED** to the extent the claim is predicated on Cal. Civ.Code § 1770(a)(13), (16). The CLRA claim under these latter provisions is dismissed with prejudice. Finally, Uber's motion to dismiss is **GRANTED** to the extent it seeks dismissal of Plaintiff's breach of contract claim. That claim is dismissed with prejudice.

This order disposes of Docket No. 44.

IT IS SO ORDERED.

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Manzo v. Uber Technologies, Inc., Not Reported in F.Supp.2d (2014)

2014 WL 3495401

2014 WL 3495401
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Miguel Manzo, individually and on behalf of a class of similarly situated and aggrieved persons; and
Omar Alsubbah, individually and on behalf of similarly situated and aggrieved persons, Plaintiffs,

v.

Uber Technologies, Inc.; Ahmad Abudayeh, individually, as representative of a class of similarly
situated persons, and as an actual and/or apparent agent of defendant Uber Technologies, Inc.;
and Lucky Livery, Inc., individually, as representative of a class of similarly situated persons,
and as an actual and/or apparent agent of defendant Uber Technologies, Inc., Defendants.

No. 13 C 2407    |    Signed July 14, 2014

**Attorneys and Law Firms**

Hall Adams, III, Law Offices of Hall Adams, Chicago, IL, for Plaintiffs.

Amit B. Patel, Stephen A. Swedlow, Quinn Emanuel Urquhart & Sullivan LLP, Chicago, IL, for Defendants.

## *OPINION AND ORDER*

SARA L. ELLIS, United States District Judge

**\*1** Plaintiffs, taxi and livery drivers, sue Uber Technologies, Inc. ("Uber") and taxi and livery drivers who use Uber, alleging that Uber misrepresents its rates, misidentifies itself as a transportation company, and illegally operates in violation of Chicago Municipal Code provisions regulating the taxi and livery industries. Plaintiffs base their lawsuit on the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 *et. seq.* and the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), 815 Ill. Comp. Stat. 510/1 *et. seq.* The Court denies Uber's motion to dismiss [8] with regard to Count I because Manzo states a valid claim that Uber misrepresents the cost of its service, the nature of the gratuity, and its status as a transportation provider. Additionally, the Court denies Uber's motion to dismiss Count II with regard to the allegations that Uber misrepresents the cost of livery service procured via Uber relative to competing services. The Court dismisses the allegations in Counts I and III premised on violations of applicable taxi and livery ordinances. Finally, the Court dismisses the remainder of Count III because Manzo does not claim that he is harmed by the alleged misrepresentations.

## BACKGROUND [1]

[1]    The facts in the background section are taken from Plaintiffs' Complaint and are presumed true for the purpose of resolving Defendants' motion to dismiss. *See Virnich v. Vorwald,* 664 F.3d 206, 212 (7th Cir.2011).

Plaintiff Miguel Manzo, a Chicago cab driver, brings Count I against Uber and Ahmad Abudayeh. In Count III, Manzo sues Lucky Livery, Inc. ("Lucky"). In both Counts, Manzo seeks to represent a class of similarly situated cab drivers. Plaintiff Omar Alsubbah, a livery driver in Chicago, brings Count II of the Complaint against Uber and Lucky. Likewise, Alsubbah seeks to represent a class of similarly situated livery drivers.

Uber provides a mobile phone application that connects drivers with customers who need a ride. Uber customers can request a ride via three types of vehicles: a medallion-bearing taxi, a livery vehicle, or a private vehicle driven by the car's owner. Drivers

who subscribe to Uber use the application to pick up rides in their vicinity. The driver's mobile phone tracks the distance and duration of the ride and charges passengers accordingly. For rides in a taxi, customers pay the taxi's meter rate plus an automatic 20% "gratuity." The gratuity is split evenly between the driver and Uber.

Defendant Ahmad Abudayeh drives a taxi in Chicago and uses Uber to find passengers and collect payment. Defendant Lucky is a limousine company operating in the Chicago area; Lucky's drivers subscribe to Uber and they provide rides and accept payment via Uber. Plaintiffs sue Abudayeh and Lucky individually as agents of Uber and as representatives of classes of taxi drivers and limousine companies that use Uber.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed.R.Civ.P. 12(b)(6); *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer,* 649 F.3d 610, 614 (7th Cir.2011). To survive a Rule 12(b)(6) motion, a complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

**\*2** Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank,* 649 F.3d at 615 (citation omitted). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.,* 477 F.3d 502, 507 (7th Cir.2007). "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

## ANALYSIS

Uber moves to dismiss the entire complaint based on *Dial A Car, Inc. v. Transportation, Inc.,* which stands for the proposition that a plaintiff cannot use a Lanham Act claim to declare the defendant's conduct unlawful under a local taxicab regulation when the taxicab commission has not yet done so. 82 F.3d 484, 490 (D.C.Cir.1996). Uber contends that *Dial A Car* applies equally here because the Lanham Act is the federal equivalent to the ICFA and IUDTPA. *Republic Tobacco L.P. v. N. Atl. Trading Co.,* No. 06 C 2738, 2007 WL 1424093, at \*4 (N.D.Ill. May 10, 2007). Because *Dial A Car* relates primarily to Count II, the Court analyzes Uber's argument in Section II of this opinion. To the extent that Uber's *Dial A Car* argument relates to the other claims, the Court's analysis in Section II applies equally to all claims. Although Uber's motion to dismiss does not challenge the sufficiency of the elements of each claim, the Court analyzes the sufficiency of each count below.

### I. Count I—Manzo v. Uber and Abudayeh

In Count I, Manzo sues Uber and Mr. Abudayeh pursuant to the ICFA and IUDTPA, alleging that Uber deceptively represented on its website that Uber taxis charge "standard taxi rates," when, in fact, riders were charged the meter fare plus a 20% "gratuity." Plaintiffs also base Count I on the allegation that the "gratuity" was actually split between the taxi's driver and Uber. The claim against Abudayeh stems from his purported agency relationship with Uber and his concealment of the fact that he splits with Uber any "gratuities" he receives on Uber rides.

To state an IUDTPA claim that Uber misrepresented its livery rates and the nature of the gratuity, Manzo must allege:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 819 (7th Cir.1999).

Manzo alleges that Uber's misrepresentation of its fares as "standard" and its misidentification of a portion of the fare as a "gratuity" have the tendency to deceive, the deception was material, and the statements drew customers away from Manzo's taxi service and toward Uber. At this stage, Manzo need not prove these claims, but must plausibly allege each element with particularity. *See Iqbal,* 556 U.S. at 678. Uber's motion to dismiss does not challenge the plausibility of any of these elements and the Court finds that Manzo has satisfied his burden.

**\*3** Additionally, Manzo alleges in Count I that Uber published "false, misleading and confusing representations suggesting that Uber is a transportation service provider when, in fact, it is not." Doc. 1–1 at 9. Specifically, Manzo claims that Uber suggests that it provides or is otherwise responsible for providing the car and driver, in part by referring to the "Uber fleet," "Uber black cars," and "Uber taxis." *Id.* at 5. Manzo alleges that Uber's misleading statements harm him because "[i]f fare-paying passengers knew and understood that Uber actually disavowed control over and/or responsibility for the suitability, safety, and quality of 'its' taxi drivers and vehicles, those passengers would have foregone and would likely forego arranging for taxi transportation through [Uber] ... and instead resort to conventional curb-side hail or call-and-dispatch taxi transportation provided by Manzo." *Id.* at 10.

The IUDTPA provides Manzo with a cause of action if Uber "causes a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; [or] causes a likelihood of confusion or of misunderstanding as to the affiliation, connection, or association with or certification by another." 815 Ill. Comp. Stat. 510/2. Manzo alleges that Uber and Abudayeh misrepresent that Uber provides transportation services, leading to confusion among customers as to the source or certification of taxi services procured via the Uber application. While Uber's motion to dismiss does not contend that Manzo failed to plead any of these elements, the Court finds that Manzo has plausibly alleged a cause of action against Uber and Abudayeh.

## II. Count II—Alsubbah v. Uber and Lucky

In Count II, Alsubbah, a livery driver, sues Uber and Lucky pursuant to the ICFA and the IUDTPA. Alsubbah makes two principal allegations: that Uber violates Chicago Municipal Code provisions regulating taxi and livery services, and that Uber misrepresents its livery fares as being at or below fares charged by other livery services. The Court finds that Alsubbah's allegation premised on violations of the Chicago Municipal Code fails to state a cause of action under either the ICFA or the IUDTPA and is barred by the D.C. Circuit's rationale in *Dial A Car.* However, the Court denies the motion to dismiss with regard to Alsubbah's allegation that Uber misrepresents its livery rates.

### A. Alleged Violations of Chicago Municipal Code

Alsubbah claims that Lucky and livery drivers who use Uber violate the Chicago Municipal Code by using a metering device —the smartphone's GPS feature—to determine the fare for an Uber livery passenger, rather than using a fixed fare arranged in advance. *See* Chi. Mun.Code 9–114–060; *id.* 9–114–280. Alsubbah alleges as well that "Lucky and Uber misrepresent to fare-paying passengers that their fare charges and/or manner of imposing fare charges for livery transportation are lawful (when they are not) with the intent that those passengers will rely on those misrepresentations." Doc. 1–1 at 13. The Court finds that, as a matter of law, these allegations fail to state a claim pursuant to the ICFA or IUDTPA for the same reasons outlined in *Dial A Car.*

In *Dial A Car,* the D.C. Circuit held that the plaintiff limousine service could not bring a Lanham Act claim against a competing taxicab company when the plaintiff sought only to declare the defendant's conduct illegal under local taxicab ordinances and regulations. *Dial A Car,* 82 F.3d at 490 ("[W]e cannot find a single case that purports to extend the [Lanham] Act to allow federal judges to interpret and *enforce* municipal regulations...."). Suing under the Lanham Act, the federal statutory equivalent to the portions of the ICFA and the IUDTPA that Alsubbah relies upon here, the plaintiff asked the court to conclude that the defendant's limousine service violated a D.C. Taxicab Commission Order. *Id.* at 489. The Court of Appeals refused, stating that the plaintiff "should be forced to take its argument to the D.C. Taxicab Commission and lobby the Commission to crack down on [the defendants'] activities, assuming they are proscribed." *Id.* at 490.

 **\*4** This rationale bars Alsubbah's claims that Uber and Lucky's violations of Chicago taxicab regulations create a cause of action under the ICFA or IUDTPA. Alsubbah alleges that Uber violates certain taxicab regulations by using an illegal metering device rather than charging a fee negotiated in advance. *See* Chi. Mun.Code 9–114–280; *id.* 9–114–060. Bringing a claim under the ICFA and IUDTPA to enforce these violations is directly akin to what the *Dial A Car* plaintiff sought to do. The D.C. Circuit stated that: "it appears that appellant is simply using the Lanham Act to try to enforce its preferred interpretation of [a D.C. Taxicab Commission Office Administrative Order] instead of adjudicating the issue before the Commission. We reject such a gambit." 82 F.3d at 488. The Court agrees with the D.C. Circuit and finds that Alsubbah cannot use the ICFA or the IUDTPA "as a backdoor method" to bring a claim that Uber violates Chicago taxi and livery regulations. *Id.* at 490.

Plaintiffs attempt to distinguish *Dial A Car* by citing a footnote in the opinion which noted that if the taxicab regulation were so clear that its interpretation is not in dispute, a plaintiff could use the Lanham Act or a state equivalent to bring a claim to enforce the regulation. *Dial A Car, Inc.,* 82 F.3d at 489 n.3 ("We agree with the dissent that, hypothetically speaking, a regulation might conceivably be drafted that would be so clear on its face that no good faith doubt concerning its interpretation would be possible, even without an explicit statement from the Taxicab Commission."). However, the Court does not find this distinction convincing. Like the Taxicab Commission Order in *Dial A Car,* the Chicago Municipal Code provisions at issue are subject to alternative interpretations. For example, the Chicago Bureau of Affairs & Consumer Protection may find that a smartphone equipped with Uber does not constitute a taximeter. A taximeter is defined as "a device which records and indicates a charge or fare measured by the distance traveled, waiting time, number of passengers, and any extra charges set forth in this chapter." Chi. Mun.Code 9–112–010. Nor does Municipal Code section 9–114–280 so clearly bar Uber's conduct that the Court will distinguish *Dial A Car* on this basis. [2]

[2]     Chicago Municipal Code section 9–114–280 states: "No livery vehicle shall be parked on any public way for a time longer than is reasonably necessary to accept passengers in answer to a call for service and no passenger shall be accepted for any trip in such vehicle without previous engagement for such trip, at a fixed charge or fare, through the station or office from which said vehicle is operated."

Moreover, on a motion to dismiss the Court need not accept as true Alsubbah's claim that Uber operates illegally under the Chicago Municipal Code, as this is an allegation of law, not fact. *McCauley v. City of Chicago,* 671 F.3d 611, 616 (7th Cir.2011) ("[W]e accept the well-pleaded facts in the complaint as true, but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth."). Therefore, the Court rejects Alsubbah's argument that Uber's illegal existence creates a claim under the ICFA or IUDTPA. The Court dismisses all claims premised on Uber's violation of local ordinances or Uber's failure to inform customers of any violation.

## B. Alleged Misrepresentations of Uber Livery Rates

In Count II, Alsubbah also claims that Uber misrepresented its livery rates as being "at or below fares charged by other regulated livery services." Doc. 1–1 at 12. Alsubbah contends that, in fact, livery fares procured via Uber "are substantially higher" than fares charged by Alsubbah and other livery services. *Id.* Alsubbah alleges that Uber and Lucky's material misrepresentation deceived customers as to the cost of livery service procured via Uber and that this misrepresentation drew customers away from his livery service. The Court finds that Count II states a valid claim with regard to the allegation that Uber misrepresented

its livery rates as being at or below market price. Again, the accuracy of Alsubbah's factual assertions is not at issue here. *See Iqbal,* 556 U.S. at 678.

**\*5** Uber does not argue that Count II fails to allege any of the necessary elements of a claim under the ICFA or IUDTPA. Instead, Uber asserts that *Dial A Car* mandates dismissal of the entire action, including this allegation. While the Court agrees that *Dial A Car* bars claims premised merely on Uber's illegality, it does not warrant dismissing Plaintiffs' allegations that Uber made actual misrepresentations that independently create a cause of action under the ICFA or IUDTPA. Plaintiffs base much of their complaint on alleged misrepresentations separate and apart from the legality of Uber's service. Therefore, the Court finds that these claims survive, even when applying the holding in *Dial A Car. See Boston Cab Dispatch, Inc. v. Uber Techs., Inc.,* No. 13–10769–NMG, 2014 WL 1338144, at \*25 (D.Mass. Feb. 28, 2014) ("A number of reasons counsel against dismissing Count II on the basis of Uber's *Dial A Car* argument."), *report & recommendation adopted in part & rejected in part,* No. 13–10769–NMG, 2014 WL 1338148 (D.Mass. Mar. 27, 2014).

In *Boston Cab Dispatch,* the court rejected Uber's argument that *Dial A Car* justified dismissing the action, noting that the plaintiff had validly alleged that Uber made certain misrepresentations. *Id.* The court distinguished *Dial A Car* on the basis that the alleged misrepresentations were "not within the exclusive purview of the" taxicab commission and the "claim does not require the special competence of the Commissioner to decide the issues." *Id.* at \*25–26. The Court finds that *Dial A Car* does not bar Plaintiffs' allegations that Uber misrepresented its taxi or livery rates or its status as a transportation provider, as those claims are not premised on the illegality of Uber's service and will not require the Court to interpret local taxi or livery regulations.

## II. Count III—Manzo v. Lucky

In Count III, Manzo sues Lucky, repeating the allegations in Count II. The Court's dismissal of the claims in Count II premised on Uber's violation of local taxi rules applies equally to Manzo's claims against Lucky. Manzo cannot, as a matter of law, sustain a claim under the ICFA or IUDTPA that merely seeks to enforce Chicago taxicab laws. Therefore, the Court dismisses Manzo's allegations in Count III based on Lucky's violations of the Chicago Municipal Code.

Moreover, the Court dismisses Count III in its entirety because Manzo does not allege any harm. In Count III, Manzo asserts that Uber misrepresents that its livery rates are priced at or below the market price for livery services provided by other livery services. But Manzo does not allege that statement harms his taxi business. *Thomas v. Urban P'ship Bank,* No. 12 C 6257, 2013 WL 1788522, at \*11 (N.D.Ill. Apr. 26, 2013) (dismissing plaintiff's IUDTPA claim because she failed to allege any harm resulting from the defendant's conduct). Nor does Manzo plead sufficient facts to allow the Court to reasonably infer that he is harmed by Uber's misrepresentation such that Manzo can sue Lucky. Because harm is a necessary element of this claim, the Court dismisses Count III in its entirety. *See Twombly,* 550 U.S. at 562 (noting that a complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery").

## CONCLUSION

Uber's motion to dismiss [8] is granted in part and denied in part. The Court dismisses Plaintiffs' allegations that Uber operates illegally and misrepresents the illegal nature of its services. Count III is dismissed in its entirety as Manzo does not plausibly allege that he is harmed by Uber's misrepresentations of livery rates. All dismissals are without prejudice. Additionally, the Court denies the motion to dismiss with regard to Count I's allegations that Uber misrepresents the cost of its taxi rates, the nature of the gratuity, and its status as a transportation provider and Count II's allegations that Uber misrepresents the cost of its livery rates relative to competing services.

---

Raymond Road Associates, LLC v. Taubman Centers, Inc., Not Reported in A.2d (2009)
2009 WL 939848, 47 Conn. L. Rptr. 313

2009 WL 939848

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Connecticut,
Judicial District of Waterbury.

RAYMOND ROAD ASSOCIATES, LLC et al.
v.
TAUBMAN CENTERS, INC. et al.
Town of West Hartford et al.
v.
Taubman Centers, Inc. et al.

Nos. X02UWYCV075007877S, X02UWYCV075007876S.   |   March 5, 2009.

**Attorneys and Law Firms**

Day Pitney LLP, Hartford, CT, for Raymond Road Associates, LLC et al.

Bingham McCutchen LLP, Updike Kelly & Spellacy, Hartford, CT, PHV Aviv Joseph, PHV Segal Bruce, Honigman Miller, Bloomfield Hills, MI, PHV Gorga Nicholas B., Honigman Miller Schw, Detroit, MI, for Taubman Centers, Inc. et al.

DENNIS G. EVELEIGH, Judge.

### I. BACKGROUND

**\*1** Plaintiffs Raymond Road Associates LLC (hereinafter referred to as "Raymond"), BBS Development LLC (hereinafter referred to as "BBS"), and Blue Back Square LLC (hereinafter referred to as "Blue Back") are the developers and owners of Blue Back Square, a retail, commercial, and residential development in West Hartford Center. In the second suit referenced above the plaintiffs are the Town of West Hartford (hereinafter referred to as the "Town") and the West Hartford Town Council (hereinafter referred to as the "Council").

Defendants The Taubman Company LLC (hereinafter referred to as "Taubman"), West Farms Mall LLC (hereinafter referred to as "West Farms"), West Farm Associates, Victor J. Dowling Jr. (hereinafter referred to as "Dowling"), Taubman Centers, Inc., and The Taubman Realty Group Limited Partnership, are the owners and operators of West Farms Mall (hereinafter referred to as the "Mall"), a regional mall located partly in West Hartford. It is alleged that the defendants engaged in a lengthy campaign to delay and prevent the development of Blue Back Square in West Hartford in order to preserve the Mall's competitive position.

It is alleged that the Defendants paid for and controlled numerous lawsuits designed solely to obstruct or delay the project. It is further alleged that, although nominally brought in the names of individual West Hartford residents, these actions were paid for and controlled by the Defendants. There were four administrative appeals taken from zoning approvals by the Town. Plaintiff BBS was a named defendant in these actions. On November 4, 2004, it is alleged that defendants caused service of a complaint brought by defendant West Farms against each of the plaintiffs. In 2005, another suit was commenced by a West Hartford resident in which all of the plaintiffs herein were named as defendants. On June 23, 2005, Defendants, it is alleged, initiated another suit against the Town, BBS, and Blue Back. On June 26, 2005, another suit was initiated in which BBS was a named defendant. On May 12, 2006, another suit was instituted in which Blue Back was a named defendant. It is further alleged that the defendants attempted to prevent Crate & Barrel, the Blue Back Square Project's anchor tenant, from locating a store in Blue Back Square. In total, there were twelve actions initiated against some or all of the plaintiffs relating to Blue Back Square.

Raymond Road Associates, LLC v. Taubman Centers, Inc., Not Reported in A.2d (2009)

2009 WL 939848, 47 Conn. L. Rptr. 313

All of the actions, it is alleged, resulted in either a withdrawal of action filed by the defendants or a Court ruling in favor of the plaintiffs. The defendants were unsuccessful in all of the lawsuits.

The plaintiffs have sued all of the Defendants on numerous grounds. The causes of action sound in common-law and statutory vexatious litigation, abuse of process, tortious interference with contractual and business relations, and CUTPA. They claim that the activities of the defendants have damaged them in excess of $30,000,000.00.

The defendants have filed Motions to Strike all of the counts of the plaintiffs' Complaints. The Court heard argument on the matter on February 25, 2009, and reserved decision on the matter. In view of the fact that the motions are essentially the same, the Court has combined the two motions in its Memorandum of Decision. Where differences exist between the two cases the Court will differentiate the two cases in its opinion.


## II. DISCUSSION

### A. Standard of Review

**\*2** A motion to strike tests the legal sufficiency of the allegations contained in the pleadings. *Faulkner v. United Techs Corp.,* 240 Conn. 576, 580, 693 A.2d 293 (1997). "In determining whether a motion to strike should be granted, the sole question is whether, if the facts alleged are taken to be true, the allegations provide a cause of action or defense." *County Fed. Sav. & Loan Ass'n v. Eastern,* 3 Conn.App. 582, 585, 491 A.2d 402 (1985). "This includes the facts necessarily implied and fairly provable under the allegations." *Westport Bank and Trust Co. v. Corcoran, Mallin & Aresco,* 221 Conn. 490, 495, 605 A.2d 1009 (1992). Additionally, the court must interpret the facts alleged in the light most advantageous to the nonmoving party and "construe the complaint in the manner most favorable to sustaining its legal sufficiency." *Warner v. Konover,* 210 Conn. 150, 152, 553 A.2d 1138 (1989). In doing so, the court must "read the allegations broadly, rather than narrowly." *Macomber v. Travelers Property & Casualty Corp.,* 261 Conn. 620, 629, 804 A.2d 180 (2002). "If facts provable in the complaint would support a cause of action, the motion to strike must be denied." *Lombard v. Edward J. Peters, Jr., P.C.,* 252 Conn. 623, 626, 749 A.2d 630 (2000).

### B. Vexatious Litigation

Plaintiffs have sued the defendants in both Common-Law (Count I) and Statutory (Count II) Vexatious Litigation. Defendants have moved to strike these counts on numerous grounds.

Connecticut recognizes both statutory and common-law vexatious litigation claims. It has been held that "[t]he elements of common-law or statutory cause of action for vexatious litigation are identical." *Norse Systems, Inc. v. Tingley Systems, Inc.,* 49 Conn.App. 582, 596, 715 A.2d 807 (1998). To establish a common-law claim for vexatious litigation, "it is necessary to prove want of probable cause, malice and a termination of suit in the plaintiffs' favor." *Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn, LLP,* 281 Conn. 84, 94, 912 A.2d 1019 (2007). "A statutory action for vexatious litigation under General Statutes Section 52-568... differs from a common-law action only in that a finding of malice is not an essential element, but will serve as a basis for higher damages." *Id.*

Defendants argue that both counts should be stricken because some of the plaintiffs were not defendants in all of the cases referenced. There is no question that the counts as alleged, if proven, state a cause of action for both statutory and common-law vexatious litigation. There is also merit to the plaintiffs' claim that the want of probable cause relates to an overall pattern of delay, as alleged, which is reflected in all of the lawsuits on a global basis.

Raymond Road Associates, LLC v. Taubman Centers, Inc., Not Reported in A.2d (2009)
2009 WL 939848, 47 Conn. L. Rptr. 313

An entire count in a complaint may not be stricken if part of that count states a legally sufficient cause of action. *Wachtel v. Rosol,* 159 Conn. 496, 499, 271 A.2d 84 (1970). Similarly, courts will deny motions to strike an entire count alleged against multiple defendants if allegations are sufficient as to one of the defendants. *Webster v. Pequot Mystic Hotel, LLC,* Superior Court, Judicial District of New London at New London, Docket No. 556799, (January 10, 2002, Hurley, J.T.R.)[31 Conn. L. Rptr. 217].

   *3  The allegations in Counts I and II are sufficient to state causes of actions in both common-law and statutory vexatious litigation. Defendants' Motion to Strike is denied with regard to the first ground.

Second, defendants claim that Counts I and II should be stricken, because, except for one of the suits involving West Farms, they were not named plaintiffs in any of the lawsuits in question. Under both the common law and Connecticut General Statutes Section 52-568, there is no question that plaintiffs can bring vexatious litigation claims against non-parties to the prior suit who supported or contributed to the prosecution of a prior suit. As stated in *Lyons v. Heid,* Superior Court, Judicial District of Fairfield at Bridgeport, Docket No. CV 94 031 11 75S (March 22, 1995, Maiocco, J.), "Accordingly, if the defendant supported the lawsuit he would be deemed to prosecute a civil action." Likewise, in *Spear v. Summit Med. Ctr.,* Superior Court, Judicial District of Hartford-New Britain at Hartford, Docket No. 52 59 39 (April 24, 1994, Sheldon, J.), "A person prosecutes a civil action when he initiates it or contributes materially to its prosecution." Further, the vexatious litigation statute expressly contemplates non-parties and provides for a cause of action against such persons. C.G.S. 52-568 reads as follows:

> Any person who commences and prosecutes any Civil action or complaint against another, in his own name or in the name of others ... (1) without probable cause, shall pay such other person double damages, or (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages.

As noted in *Midstate Electronics, Co. v. Nova Electronics,* Superior Court, Judicial District of New Haven at New Haven, Docket No. CV 92-0334782 (November 12, 1993, Fracasse, J.) [10 Conn. L. Rptr. 349], "the plain language of the statute ... does not require a defendant to be named as a plaintiff in the original action." Judge Corradino provided an excellent explanation of the rationale behind extending liability for vexatious litigation beyond mere parties in *TMK Assocs. v. Landmark Dev.,* Superior Court, Judicial District of New London at New London, Docket No. 562077 (August 21, 2003, Corradino, J.)[35 Conn. L. Rptr. 387], when he stated that "any other reading would allow people to bring suits by proxy and avoid the heavier statutory penalties deemed necessary by the legislature if the [statute's] substantive requirements were otherwise to be met."

Plaintiffs have alleged that all defendants financed and controlled the underlying actions. They have further alleged that while the actions may have nominally been brought in the names of taxpayers of the Town, the defendants actually paid for and controlled the lawsuits. The allegations are sufficient for both the common-law and statutory cause of action of vexatious litigation.

Third, defendants contend that the plaintiffs lack standing because they were not parties to all of the prior lawsuits. All of the plaintiffs were parties to at least one of the prior lawsuits. Many of them were parties to several of the prior lawsuits. Plaintiffs allege that they each had a specific and legal interest in the successful completion of Blue Back Square which was threatened by the vexatious legal proceedings initiated by the defendants, and that these interests have been injuriously affected. Such allegations, if proven, establish that the plaintiffs were aggrieved by the allegedly vexatious lawsuits filed by the defendants. These allegations are sufficient pursuant to the dictates of *Wesley v. Schaller Subaru, Inc.,* 277 Conn. 526, 538, 893 A.2d 389 (2006). Plaintiffs, therefore, have standing to bring claims based on all actions, even those actions in which they were not parties. Defendant's reliance upon the case of *Bernhard-Thomas Bldg. Sys., LLC v. Dunican,* 286 Conn. 548, 944 A .2d 329 (2008) is misplaced. The issue of non-parties in a vexatious litigation sense was not discussed. The issue in *Bernhard* was whether a prejudgment remedy constituted the prosecution of a civil action. The Court made a general statement about vexatious litigation permitting a party who had been wrongfully sued to recover damages. However, there is no indication in that case that the Court intended to preclude plaintiffs who were not parties to prior actions from bringing vexatious litigation claims based on those claims. Even though the plaintiffs in this case may not have been named in every case involving the defendants, the allegations

Raymond Road Associates, LLC v. Taubman Centers, Inc., Not Reported in A.2d (2009)

2009 WL 939848, 47 Conn. L. Rptr. 313

are that they were parties to those actions in a practical sense. Plaintiffs have alleged that they participated in the underlying actions in which they were not actually named as parties and that they incurred attorneys fees in defending the actions and costs from the delays effected by them. The allegations contained in the complaint are sufficient to establish the plaintiffs' standing.

*4 Fourth, defendants contend that the plaintiffs have not alleged sufficient facts to establish a lack of probable cause. "Probable cause is the knowledge of facts sufficient to justify a reasonable person in the belief that there are reasonable grounds for prosecuting the action."*Vandersluis v. Weil,* 176 Conn. 353, 356, 407 A.2d 982 (1978)."Thus, in the context of a vexatious suit action, the defendant lacks probable cause if he lacks a reasonable, good faith belief in the facts alleged and the validity of the claim asserted."*DeLaurentis v. New Haven,* 220 Conn. 225, 256, 597 A.2d 807 (1991). Plaintiffs allege that "Defendants filed objectively baseless lawsuits and administrative petitions without probable cause, without an objectively reasonable basis in fact or law for their claims and without an objectively reasonable expectation that they ultimately would prevail on the merits."Plaintiffs further make more specific allegations condemning many of the lawsuits. Further, as stated in *Economy Petroleum Corp. v. Paulauskas,* Superior Court, Judicial District of Hartford at Hartford, Docket No. CV00 82 21 16S (August 1, 2003, Sheldon, J.)[35 Conn. L. Rptr. 347],"the unilateral abandonment or withdrawal of a claim or action ... suggests that the plaintiff lacked probable cause to pursue the claim or action further."The lack of probable cause may be further exacerbated where, as in the instant case, there were twelve legal actions, many of which were ultimately withdrawn. Plaintiffs have also alleged a pattern of conduct relating to the twelve cases. Plaintiffs' allegations are sufficient, if proven, to establish probable cause.

Fifth, defendants claim that the plaintiffs have improperly joined Common-Law and Statutory Vexatious Litigation claims. They base their argument entirely on the 1836 case of *Whipple v. Fuller,* 11 Conn, 582 (1836) which, indeed, held that such pleading was improper. However, as explained in *TMK Assocs. Supra:* at 10224-24

For the particular proposition now being discussed, *Whipple* has not been cited by any appellate court for 177(sic) years. There is good reason for that-in the late 19th Century, the predecessor to Section 52-97 of the General Statutes was passed, which is embodied in Section 10-21, "Joinder of Causes of Action" of the *Practice Book.*All manner of actions may now be joined. As concisely stated in Horton & Knox, *Connecticut Practice* (2003 Ed .), alternative and even inconsistent pleadings are "now permitted under Section 10-25 of the Practice Book; absent a showing of prejudice to the opposing parties, there is no general prohibition of inconsistent pleadings (see commentary to *Practice Book* Section 10-25 at page 412),""Prejudice is not a factor here-even *Whipple* recognized that a common-law and statutory vexatious litigation claim are separately viable and modern procedure and the nature of this case do not present insuperable problems that would prejudice either one side or the other if the claims are joined. Also, there can be no claim that "good faith" is at issue since each separate legal theory even under *Whipple,* as noted, "are good."

*5 The *TMK Associates* court added that *Whipple* also "does not conform with present day practice, if we examine types of litigation where the appellate courts have allowed certain types of different claims, common-law and statutory, to be joined in the same suit."*Id.* at 10225.The court concluded that "our modern rules of practice have, in effect, gone beyond *Whipple* and our appellate courts have abrogated its operation."*Id.* at 10226.In view of the changes in our practice since 1836, *Whipple* is no longer relevant. The Motions to Strike Counts I and II are denied.

### C. Abuse of Process

Under Connecticut Law, "an action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed."*Mozzochi v. Beck,* 204 Conn. 490, 494, 529 A.2D 171 (1987). A party states a claim for abuse of process by alleging "specific misconduct intended to cause specific injury outside of the normal contemplation of private litigation."*Id.* at 497.Plaintiffs allege that defendants initiated and prosecuted various legal proceedings in an effort to protect themselves from competition by obstructing the development of Blue Back Square, causing retailers to withdraw their commitments to operate at Blue Back Square, and deterring other potential tenants from

Raymond Road Associates, LLC v. Taubman Centers, Inc., Not Reported in A.2d (2009)

2009 WL 939848, 47 Conn. L. Rptr. 313

locating there. Plaintiffs also allege that through these actions, defendants attempted to use the legal process for a purpose for which it was not intended, including the delay of the Project, and have caused substantial injury to the plaintiffs as a result. Contrary to the defendants' position, such allegations are sufficient to establish, if proven, a case for Abuse of Process pursuant to *Mozzochi*.

### D. Tortious Interference with Contractual and Business Relations

Defendants seek to strike claims for tortious interference with contractual or business relations as to plaintiffs Raymond and BBS on the ground that the Amended Complaint does not sufficiently allege a business relationship between these plaintiffs and Crate & Barrel or other unnamed tenants. The Connecticut Supreme Court has stated that "a claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct."*Appleton v. Board of Educ.,* 254 Conn. 205, 212-13, 757 A.2d 1059 (2000). The Amended Complaint does allege that these "plaintiffs have contractual and beneficial relationships with Crate & Barrel and with other intended tenants of Blue Back Square, which relationships were known to defendants."This factual allegation satisfies the first and second elements of a tortious interference claim. As stated in *Bernardini v. Lombard,* Superior Court, Judicial District of Litchfield at Litchfield, Docket No. CV01 08 62 76S (March 14, 2003, Frazzini, J.)[34 Conn. L. Rptr. 305]."Our law requires merely that plaintiff plead that a defendant has tortiously interfered with an existing or prospective business relationship."Plaintiffs specifically allege the defendants interfered with plaintiffs' business relationships with intended tenants of Blue Back Square by initiating and prosecuting vexatious legal proceedings and abusing the legal process. Plaintiffs have, therefore, alleged that defendants' interference with their business relationships was tortious. Allegations of vexatious litigation can form the basis for a tortious interference claim if the prior litigation terminated in the plaintiff's favor. *Zeller v. Consolini,* 235 Conn. 417, 424, 666 A.2d 64 (1995). Further, contrary to the defendants' position, plaintiffs are not required to disclose the identity of third parties with whom they had prospective business relationships in order to state a claim for tortious interference. *Vivirito v. Terra Firma, Inc.,* Superior Court, Judicial District of New London at Norwich, Docket No. 4102776 (August 29, 2006, Hurley, J.).

 **\*6** Plaintiffs also allege tortious conduct by the defendants independent of the vexatious litigation and abuse of process claims. A plaintiff can establish that a defendant's conduct was tortious by showing "that the defendant was guilty of fraud, misrepresentation, intimidation, or molestation ... or that the defendant acted maliciously."*Blake v. Levy,* 191 Conn. 257, 263, 464 A.2d 52 (1983). Plaintiffs allege that the defendants interfered with plaintiffs' business relationships by intimidating and using economic coercion to dissuade prospective tenants in Blue Back Square. Plaintiffs allege further that the defendants maliciously interfered with plaintiffs' business relationships in order to obstruct or delay the development of Blue Back Square. In the context of a tortious interference claim, malice is alleged if "the defendant intentionally interfered with its business relations without justification."*American Diamond Exchange v. Alpert,* 101 Conn.App. 83, 105, 920 A.2d 357 (2007). Thus, plaintiffs sufficiently allege tortious conduct by virtue of defendants' intimidation of prospective tenants and their malicious interference with plaintiffs' business relationships. Plaintiffs have also adequately alleged that defendants' interference resulted in an injury that was "wrongful by some measure beyond the fact of the interference itself."*Blake, supra,* at 262.

Plaintiffs allege that the defendants attempted to "prevent the competitive threat posed by Blue Back Square by delaying its development until the combined costs of delay and constant litigation caused plaintiffs to withdraw their proposal," and that defendants waged a "campaign to destroy Blue Back Square by imposing on it the burdens of delay and unremitting although meritless litigation."If the allegations against the defendants are proven, defendants are liable for such consequential losses caused by their tortious interference with plaintiffs' business relationships, including delay. *Alpert, supra,* at 103, n. 12.The Amended Complaint expressly alleges facts supporting plaintiffs' claim for damages. All of the requisite allegations constituting a tortious interference with contractual and business relationships have been made by the plaintiffs in the Amended Complaint. Defendants' Motion to Strike is denied with regard to this Count.

Raymond Road Associates, LLC v. Taubman Centers, Inc., Not Reported in A.2d (2009)

2009 WL 939848, 47 Conn. L. Rptr. 313

### B. Connecticut Unfair Trade Practices Act (CUTPA)

Defendants contend that plaintiffs Raymond and BBS lack standing to bring a CUTPA claim because the Amended Complaint does not allege that they had a transactional, competitive, or commercial relationship with any of the defendants. They also contend that the Amended Complaint does not allege that Blue Back had such a relationship with defendants West Farms, Taubman or Dowling.

Connecticut General Statutes Section 42-110g(a) provides that "any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action."Connecticut General Statutes Section 42-110(b)(a) provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."Courts "have adopted the criteria set out in the 'cigarette rule' by the Federal Trade Commission for determining when [an act or] practice is unfair: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-[whether], in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (competitors or other businesspersons)."*Willow Springs Condo. Association, Inc. v. Seventh BRT Dev. Corp.,* 245 Conn. 1, 43, 717 A.2d 77 (1998).

**\*7**  The Amended Complaint does allege that plaintiffs and defendants were competitors. The Connecticut Supreme Court has held that "a competitor or other business person can maintain a CUTPA cause of action without showing a consumer injury."*Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 496, 656 A.2d 1009 (1995). The goal of protecting competitors and other business people "requires giving protection to direct competitors but also at times to business people who have that type of a commercial relationship to the alleged wrongdoer which is such that the latter's unfair and deceptive acts might deleteriously affect fair competition in a particular market place."*Conn. Water Co. v. Town of Thomaston,* Superior Court, Judicial District of Hartford at Hartford, Docket No. CV94 0535590S (April 24, 1997, Corradino, J.). Defendants concede that Blue Back has a competitive relationship with West Farms, as owner of the Mall. The Amended Complaint alleges that Raymond and BBS were developers of Blue Back Square and therefore had a competitive relationship with the entities affiliated with the Mall who are named as defendants. In addition, the Amended Complaint alleges that the defendants were directly or indirectly involved with the ownership or management of the Mall and therefore had a competitive relationship with Blue Back. Thus, the Amended Complaint sufficiently alleges that plaintiffs were part of the broader class of persons sought to be protected from harm in the competitive marketplace by defendants' alleged unfair trade practices. In the one case cited by the defendants, wherein a homeowner association was held not to have standing to bring a CUTPA counterclaim against a landowner who was not a member of the association, the homeowner association failed to allege that it was a competitor of the plaintiff, that it was involved in any business or commercial activities with the plaintiff, or that it stood in a consumer relationship with the plaintiff. *Gilbert v. Beaver Dam Ass'n of Stratford,* Superior Court, Judicial District of Fairfield at Bridgeport, Docket No. CV00 374905S (July 24, 2001, Rush, J.). By contrast, the Amended Complaint herein alleges that plaintiffs stood in a competitive relationship with the defendants and, therefore, have standing to bring a CUTPA claim.

Several courts have held that CUTPA claims can be predicated on allegations of vexatious litigation and abuse of process. See *Olympia Sales, Inc. v. Roberts Enters., Inc.,* Superior Court, Judicial District of Hartford at Hartford, Docket No. CV05 4017724 (May 2, 2006, Tanzer, J.); *Bender Plumbing Supplies, Inc. v. S & S Servs.,* Superior Court, Judicial District of New Haven at Meriden, Docket No. CV04 0287111S (December 14, 2004, Tanzer, J.); *TCW Realty Fund II v. Pearle Vision,* Superior Court, Judicial District of Hartford-New Britain Housing Session, Docket No. CVH-4490 HD, HA 1094 (October 29, 1996, Beach, J.); and *Shea v. Chase Manhattan Bank, N.A.,* Superior Court, Judicial District of Stamford-Norwalk at Stamford, Docket No. CV96 0149647S (July 27, 2000, Tierney, J.)[27 Conn. L. Rptr. 579],*aff'd,*64 Conn.App. 624, 781 A.2d 352 (2001). The one case cited by the defendants did not consider a CUTPA claim based on allegations of either vexatious litigation or abuse of process. See *NY-Conn. Corp. v. Southbury Diagnostic Imaging Ctr. LLC,* Superior Court, Judicial District of Waterbury at Waterbury, Docket No. CV99 0158613 (October 24, 2000, Weise, J.)[28 Conn. L. Rptr. 521]. In view of the fact that this Court has held

Raymond Road Associates, LLC v. Taubman Centers, Inc., Not Reported in A.2d (2009)

2009 WL 939848, 47 Conn. L. Rptr. 313

that the Amended Complaint contains sufficient allegations to support actions sounding in vexatious litigation and abuse of process, Defendants' Motion to Strike Count V on this ground must be denied.

**\*8** Plaintiffs' allegations that the defendants tortiously interfered with the plaintiffs' business relationships also establish a proper allegation that defendants engaged in unfair or deceptive trade practices in violation of CUTPA. The Connecticut Supreme Court has held that "it is difficult to conceive of a situation where tortious interference would be found but a CUTPA violation would not. Because the tort standard is more stringent, a plaintiff who alleges both claims is harmed only if the trial court applies the tort standard to the CUTPA claim."*Sportsmen's Boating Corp. v. Hensley,* 192 Conn. 747, 757, 474 A.2d 780 (1984).

Defendants have also claimed that the plaintiffs have not alleged an ascertainable loss. Plaintiffs have alleged that they have suffered monetary damages as a result of defending multiple vexatious suits initiated by the defendants and the consequent delays in opening Blue Back Square, and that these damages were in excess of $30,000,000.00. The allegations are sufficient to meet the requirements of the "cigarette rule."

Defendants claim that the CUTPA claim must be stricken because defendants' actions in filing and allegedly abusing process did not occur in the conduct of trade or commerce. Specifically, defendants claim that they cannot be liable under CUTPA because initiating lawsuits is not their primary line of business. The logical conclusion of this strained reasoning would be that only lawyers would be subject to lawsuits sounding in CUTPA based upon vexatious litigation and abuse of process since only lawyers commence litigation and initiate service of process as part of their primary line of business. As indicated above, this position has already been rejected by numerous courts.

With regard to the West Hartford case, the plaintiffs and the private developers were parties to the Master Agreement which provided for the development of Blue Back Square with public and private investments. The Council was the legislative arm though which the town of West Hartford acted and, as such, is a proper party to the action. The private developers were to contribute $110 million dollars and the plaintiffs were to contribute $48.8 million dollars. The public fund would be provided by the plaintiffs through the issuance of municipal bonds. In essence, the plaintiffs were partners with the private developers in the Blue Back Square project. They claim a loss of tax revenue, lost revenue from the parking fees in the area of the Blue Back Square Project and increased financing costs as the result of the defendants' actions. The allegations in the plaintiffs' Amended Complaint are sufficient, if proven, to establish a CUTPA claim.

### III. CONCLUSION

Based upon the foregoing reasons, the Defendants' Motions to Strike are denied.

**Parallel Citations**

47 Conn. L. Rptr. 313

---

End of Document
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Sanford Hall Agency, Inc. v. Dezanni, Not Reported in A.2d (2004)
2004 WL 3090673, 38 Conn. L. Rptr. 420

2004 WL 3090673

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Connecticut,
Judicial District of New Haven.

The SANFORD Hall Agency, Inc.
v.
Lynne M. DEZANNI et al.

No. CV044000576, 86708.   |   Dec. 2, 2004.

**Attorneys and Law Firms**

Garrett Flynn, Farmington, for The Sanford F. Hall Agency Inc.

Pullman & Comley LLC, Hartford, for Lynne M. Dezzani, Sinclair Insurance Group Inc.

**Opinion**

FRANK S. MEADOW, Judge Trial Referee.

 *1  The plaintiff, The Sanford Hall Agency, Inc., is a Connecticut insurance agency with its principal place of business in Avon, Connecticut. The plaintiff brings together insurance carriers and persons in need of insurance. On July 13, 2004, the plaintiff filed with the court an application for a temporary injunction against the defendants, Lynne M. Dezzani and Sinclair Insurance Group, Inc. Dezzani was employed by the plaintiff as a personal lines salesperson [1] from 1990 until the time she accepted a position with the defendant, Sinclair. The defendant Sinclair's principal place of business is Wallingford, Connecticut.

[1]     Personal lines policies means insurance policies such as automobile and homeowners insurance.

Dezzani and Sinclair filed an answer to the verified complaint, the pleadings were closed by the parties and the trial for permanent injunctive relief was held. Both parties filed post-trial briefs.

"A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law ... A prayer for injunctive relief is addressed to the sound discretion of the court ..." (Internal quotation marks omitted.) *Maritime Ventures, LLC v. Norwalk*, 85 Conn.App. 38, 45, 855 A.2d 1011 (2004).

The complaint is in five counts. *Count one* alleges that Dezzani breached her written employment agreement with the plaintiff by soliciting or attempting to solicit the plaintiff's clients and disclosing the plaintiff's customer's information to Sinclair. *Count two* alleges that Dezzani and Sinclair have misappropriated the plaintiff's "protected information." *Count three* alleges a breach of fiduciary duty by Dezzani. *Count four* alleges that Dezzani and Sinclair acted unethically and deceitfully in taking the plaintiff's information, tantamount to theft of a portion of the plaintiff's business capital. *Count five* against Sinclair alleges tortious interference with a contract.

Dezzani admitted signing the restrictive covenant and terminating her services with the plaintiff. She claims, however, that the termination was due mainly to her concerns for her job security after finding out that the plaintiff was considering selling the business to another agency. Dezzani and Sinclair raise four special defenses: the agreement was not supported by consideration; Dezzani does not pose a legally cognizable threat to the plaintiff's customer relationship and even if she does pose a threat to the customer relationship, the agreement is overbroad and thus unenforceable; and the agreement reserves to Dezzani the right to compete in case the plaintiff sells its business and the plaintiff is in the process of being sold. [2]

Sanford Hall Agency, Inc. v. Dezanni, Not Reported in A.2d (2004)

2004 WL 3090673, 38 Conn. L. Rptr. 420

2    In fact, the business was sold to a New Jersey insurance agency on November 1, 2004.

Dezzani became employed by the plaintiff after it had acquired Clark & Dodd in 1990, an insurance agency which had employed Dezzani since 1985. After the acquisition, Dezzani became an at-will employee of the plaintiff where she continued doing what she did before-selling personal lines policies "in-house" to phone-in and walk-in customers. She was also acting as a customer service representative for customers whose last names started with letters A through F. At that time, her compensation was mainly salary-based. She received a commission only on occasional sales that came in specifically to her.

*2  In 1994, the plaintiff's president went to an insurance conference where he obtained a form for a noncompete agreement, which he distributed to all of the employees. The plaintiff told Dezzani that everyone in the agency had to sign it. The relevant parts of the agreement state as follows: "In consideration of the compensation mentioned above and/or elsewhere in this contract, the Producer hereby covenants that he shall not: A. Canvass, solicit or accept business for any other insurance agency, from any present or past clients of the Agency. B. Give any other person, firm or corporation the right to canvass, solicit or accept any business for any other insurance agency, from any present or past clients of the Agency. C. Directly or indirectly request or advise any present or future clients of the agency to withdraw, curtail or cancel their business with the Agency. D. Directly or indirectly disclose to any other person, firm or corporation the names of past, present or future clients of the agency. Directly or indirectly induce or attempt to influence any employee of the Agency to terminate his or her employment with the Agency ... The provisions of this section ... shall apply during the employment and shall also apply for a period of two years after termination of employment ..."

Dezzani took the agreement home to discuss it with her husband, which led to two changes to the agreement. Dezzani asked to be free of any restraints if she were fired or the agency was sold. The exceptions were added to the agreement and both parties signed it. On January 24, 1995, the plaintiff distributed to its employees an Employee Handbook which, among other things, states that the information handled by the agency is of a personal nature to its clients and is never to be discussed outside the office, and the agency information, such as expiration lists, is the property of the agency. In 1997, Dezzani and the plaintiff agreed she could receive commissions for a new category of life and health insurance policies and executed an addendum to that effect.

On April 23, 2004, Dezzani obtained from the plaintiff a list containing a compilation of the policy expiration dates for a number of the plaintiff's clients. In May 2004, Dezzani was contacted by a headhunter working for Sinclair, she interviewed for the position and was ultimately offered employment. After the interview, but before Dezzani made a decision whether to accept the new position, the plaintiff announced to its employees that it was engaging in a transaction for the sale of its assets. Out of concern for her job, Dezzani went to the plaintiff to discuss her future job prospects. She was told that she would be recommended for a position with the new owner and that there were others in the agency who would not be good prospects for long-term employment with the new owners. After this conversation, Dezzani accepted the position with Sinclair on June 11, 2004.

### DISCUSSION

### BREACH OF CONTRACT

*3  The plaintiff argues that Dezzani breached the contract she had with the plaintiff, in particular the plaintiff alleges Dezzani is in breach of the covenant not to compete. The plaintiff argues that Dezzani "surreptitiously obtained" a compilation list of the plaintiff's clients and the expiration dates of their policies and subsequently quit her job with the plaintiff and accepted a position with Sinclair, the plaintiff's competitor. The plaintiff further argues that Dezzani "directly or indirectly" disclosed to Sinclair the names of the plaintiff's clients and that, as a result, a significant number of the plaintiff's clients switched their accounts to Sinclair. The plaintiff also argues that the restrictive covenant is reasonable and thus should be enforced.

Sanford Hall Agency, Inc. v. Dezanni, Not Reported in A.2d (2004)
2004 WL 3090673, 38 Conn. L. Rptr. 420

Dezzani argues that she did not breach the agreement between her and the plaintiff because the covenant not to compete is overbroad rendering it unenforceable. She further argues that, even if the agreement is not overbroad, it still should not be enforced because she does not pose a threat to the plaintiff's relationship with the customers.

"In order to be valid and binding, a covenant which restricts the activities of an employee following the termination of his employment must be partial and restricted in its operation in respect either to time or place ... and must be reasonable-that is, it should afford only a fair protection to the interest of the party in whose favor it is made and must not be so large in its operation as to interfere with the interests of the public. The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family."(Citations omitted; internal quotation marks omitted).*Scott v. General Iron & Welding Co.*, 171 Conn. 132, 137, 368 A.2d 111 (1976)."The five factors to be considered in evaluating the reasonableness of a restrictive covenant ancillary to an employment agreement are: (1) the length of the time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests."*Robert S. Weiss & Associates, Inc. v. Wiederlight,* 208 Conn. 525, 529, n. 2, 546 A.2d 216 (1988)."The five-prong test of *Scott* is disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable."*New Haven Tobacco Co. v. Perrelli,* 18 Conn.App 531, 534, 559 A.2d 715,cert. denied, 212 Conn. 809, 564 A.2d 1071 (1989).

The covenant in this case is unenforceable due to the nature of Dezzani's employment, she is in no position to threaten the plaintiff's interests in its customer relationships. Although Dezzani may have had initial contact with the plaintiff's customers while selling the insurance policies, normally her contact with the customers would end there. The transactions were also conducted largely over the phone and entertaining or socializing with the clients was extremely rare. In addition, the original sales agents did not renew the policies at the expiration time because such renewals were handled by the insurer and not the agent, making Dezzani's sales a one-time deal. Thus, Dezzani's contact with the customers was too infrequent and irregular to pose any threat to the plaintiff's relationships with its customers.

**\*4** In addition, the restrictive covenant in this case is overbroad. The covenant in question not only prevents Dezzani from soliciting or accepting any business from the plaintiff's past or present clients, but also bans her from requesting or advising any future clients of the plaintiff to withdraw or cancel their business with the plaintiff. This language, thus, prevents Dezzani from being able to solicit and attract any possible future clients who have no relationship with the plaintiff but are looking for insurance and are in the plaintiff's range of business. Since such a restriction puts unnecessary restraints on ordinary competition, it is against public policy.

Using the *Scott* criteria Dezzani has proved that the covenant not to compete in this case is unreasonably broad in that it affords more protection to the employer than necessary, interferes with the interests of the public and prevents Dezzani from pursuing her occupation. Accordingly, the application to enforce the non-compete clause of the employment contract cannot be granted.

## CUTSA

The plaintiff argues that Dezzani and Sinclair violated the Connecticut Uniform Trade Secrets Act (CUTSA) General Statutes § 35-50 et seq., by taking and misappropriating the plaintiff's customer lists. The plaintiff claims its customer lists are entitled to protection under the act because it constitutes a trade secret. The plaintiff further claims that its customer lists are extremely valuable commercially, not "readily ascertainable by proper means" and its efforts to maintain its secrecy are "reasonable under the circumstances."

Sanford Hall Agency, Inc. v. Dezanni, Not Reported in A.2d (2004)

2004 WL 3090673, 38 Conn. L. Rptr. 420

Dezzani and Sinclair counter that the plaintiff's customer lists are not entitled to protection under CUTSA because the plaintiff fails to establish that the list is in fact a trade secret. They argue that the plaintiff's customer lists were readily obtainable, were not protected in any way and the information in the list does not have any "independent economic value."

CUTSA defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."General Statutes § 35-51(d). See also *Elm City Cheese Co. v. Federico,* 251 Conn. 59, 69-70, 752 A.2d 1037 (1999). There are a number of factors the courts must consider when deciding whether something constitutes a trade secret. These factors are: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Additional factors cited by courts are: (7) the extent to which the principal-agent relationship was a confidential or fiduciary one; (8) the method by which the former agent acquired the alleged secret; (9) the former agent's personal relationship with the customers; and (10) the unfair advantage accruing to the former agent from the use of his former principal's alleged secret."*Nationwide Mutual Ins. Co. v. Stenger,* 695 F.Supp. 688, 691 (D.Conn.1988).

**\*5** The court is not convinced in this case that the plaintiff's customer list constitutes a trade secret, which is to be protected. The information contained in the list, although no doubt of value to the plaintiff, was not protected by reasonable measures designed to limit access to it, thus undermining the plaintiff's argument that the list contains information confidential in nature. The plaintiff also did not provide enough evidence to show that it extended substantial time, money and effort in collecting the information on the list. In fact, the list of customers was generated in the ordinary course of business. There was no special incentive used to create such a customer list. Because there is no evidence that Dezzani acquired and that Sinclair used any trade secrets of the plaintiff, there has been no misappropriation of a trade secret by Dezzani and Sinclair. The court, thus, is not persuaded that the list in question merits protection as a trade secret. Accordingly, the court finds that there was no violation of CUTSA in this case.


### *BREACH OF FIDUCIARY DUTY*

The plaintiff argues that Dezzani, as an employee, owed a fiduciary duty of loyalty, good faith and honesty. The plaintiff claims that Dezzani was entrusted with its "protected information" which she promised not to disclose or use against the plaintiff. The plaintiff further argues that Dezzani violated this fiduciary duty by breaching her contractual obligations to work for the plaintiff's competitor, Sinclair, by disclosing and misappropriating the confidential information for her own benefit and soliciting the plaintiff's clients for her own and Sinclair's commercial advantage.

Dezzani responds that there was nothing in her employment contract that dealt with trade secrets and confidentiality or the disclosure of underwriting information, renewal dates, etc. She argues that her employment contracts only prohibited the disclosure of customer names to protect their privacy.

"An agent is a fiduciary with respect to matters within the scope of his agency."*Taylor v. Hamden Hall School, Inc.,* 149 Conn. 545, 552, 182 A.2d 615 (1962)."The very relationship implies that the principal has reposed some trust or confidence in the agent and that the agent or (employee) is obligated to exercise the utmost good faith, loyalty and honesty toward his principal or employer. In the absence of clear consent or waiver by the principal, an agent during the term of the agency, is subject to a duty not to compete with the principal concerning the subject matter of the agency."(Citation omitted.) *News America Marketing v. Marquis,* Superior Court, complex litigation docket at Stamford, Docket No. X00 CV 00 0177440 (October 22, 2003, Rogers, J.)

Sanford Hall Agency, Inc. v. Dezanni, Not Reported in A.2d (2004)

2004 WL 3090673, 38 Conn. L. Rptr. 420

In the present case, no evidence was presented that Dezzani used any confidential information to compete with the plaintiff's business before her resignation from the position with the plaintiff. Although there is evidence that several of the plaintiff's clients terminated their policies and Dezzani even admitted she caused all but one or two of those cancellations,[3] the customers who canceled their insurance policies with the plaintiff did not do so until well after Dezzani left her employ with the plaintiff. Dezzani thus did not compete with the plaintiff's business while still employed there. Accordingly, Dezzani did not breach her fiduciary duty to the plaintiff.

[3]   One of the plaintiff's witnesses testified that the plaintiff would normally receive two to three policy cancellations in a year. The witness further testified that the plaintiff received over twenty documents terminating the plaintiff's relationship with its clients after Dezzani left.

## CUTPA

**\*6** The plaintiff claims that Dezzani and Sinclair violated the Connecticut Unfair Trade Practices Act (CUTPA) General Statutes § 42-110a et seq., by "immorally, unethically, deceitfully and unscrupulously ... misappropriating [the plaintiffs] Protected Information, including (but not limited to) deceptively taking such information while [Dezzani] was in [the plaintiff's] employ."Dezzani and Sinclair argue that they did not make an unfair use of any of the plaintiff's "trade secrets" and that Sinclair's intention of bring Dezzani was not to misappropriate the plaintiff's information.

"No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."General Statutes § 42-110b. "Connecticut courts, when determining whether a practice violates CUTPA, will consider (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen) ... Thus, a violation of CUTPA may be established by showing either an actual deceptive practice ... or a practice amounting to a violation of public policy ... Whether a practice is unfair and thus violates CUTPA is an issue of fact ... The facts found must be viewed within the context of the totality of circumstances which are uniquely available to the trial court."(Citation omitted; Internal quotation marks omitted.) *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 433-34, 849 A.2d 382 (2004).

There was no evidence presented in this case that the hiring of Dezzani by Sinclair was unscrupulous, unfair or deceptive nor is there any evidence that such behavior violates any public policy. Dezzani interviewed with Sinclair after receiving a call from a headhunter working for Sinclair. Sinclair offered her a position with the company on much better terms than the plaintiff did. She was to receive a better compensation package, and to be relieved of her customer service representative duties and allowed to branch into the commercial lines side of the insurance business, which is usually much more lucrative. Although Dezzani enjoyed her work for the plaintiff, she decided to accept the position, mainly because the plaintiff was about to sell its business and she was worried about her future position. There was no evidence presented that hiring an individual already employed by another offends any public policies. Sinclair simply hired an experienced worker with relevant knowledge of the insurance industry to provide better service for its customers. In fact such actions are normally seen as a good practice for the public by creating competition and promoting the improvement of one's skills. No showing was made that Dezzani or Sinclair used unfairly any "trade secrets" of the plaintiff, since the plaintiff did not prove that Dezzani misappropriated any such secrets. Accordingly, Dezzani and Sinclair did not violate CUTPA.

## TORTIOUS INTERFERENCE WITH CONTRACT

Sanford Hall Agency, Inc. v. Dezanni, Not Reported in A.2d (2004)

2004 WL 3090673, 38 Conn. L. Rptr. 420

**\*7** Lastly, the plaintiff alleges that Sinclair intentionally and maliciously induced Dezzani to breach her obligations under her employment contract, despite Sinclair's knowledge of the existence of this employment contract. Sinclair denies these allegations and argues that there was no tortious interference with a contract because the contract is not enforceable.

"A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct."(Internal quotation marks omitted.) *Appleton v. Board of Education,* 254 Conn. 205, 212-13, 757 A.2d 1059 (2000)."Although Connecticut courts long [have] recognized a cause of action for tortious interference with contract rights ... [the case law indicates, nonetheless,] that not every act that disturbs a contract or business expectancy is actionable ... [F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously ... [An] action for intentional interference with business relations requires the plaintiff to plead and prove at least some improper motive or improper means ... The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification ... In other words, the [plaintiff] bears the burden of alleging and proving lack of justification on the part of the [defendant].

"Stated simply, to substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference resulted from the defendant's commission of a tort. [A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself ... [Not e]very act of interference is ... tortious."(Citation omitted; internal quotation marks omitted.) *Downes-Patterson Corp. v. First National Supermarkets, Inc.,* 64 Conn.App. 417, 429, 780 A.2d 967,cert. granted258 Conn. 917, 782 A.2d 1242 (2001) (appeal dismissed June 25, 2002).

The plaintiff did not allege and prove any lack of justification on the part of Sinclair. While the evidence shows the existence of a contract between Dezzani and the plaintiff as well as the fact that Sinclair was aware of the existence of such an employment contract, the plaintiff did not establish an intent to interfere with that relationship on the part of Sinclair. Sinclair hired Dezzani because it considered her a skilled professional insurance salesperson whose expertise would benefit Sinclair's customers. The plaintiff also did not demonstrate any malice or intentional interference on the part of Sinclair. There is no evidence on record that Sinclair required Dezzani to bring in the plaintiff's clients or to misappropriate any company information as a condition of her employment.

**\*8** While hiring one of the plaintiff's employees may be viewed as an interference with the plaintiff's business, it does not mean that it is tortious since not all interference is considered to be tortious. The plaintiff failed to prove the five elements necessary to establish tortious interference with a contract.

Accordingly, the court enters judgment in favor of the defendants Dezzani and Sinclair on all counts.


**Parallel Citations**

38 Conn. L. Rptr. 420

---

End of Document                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 7823216

2009 WL 7823216
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

SERIN, et al., Plaintiffs,

v.

NORTHERN LEASING SYSTEMS, INC., et al., Defendants.

No. 7:06–CV–1625.   |   Dec. 18, 2009.

**OPINION & ORDER [Resolving Doc. Nos. 31, 33, 41, 43]**

JAMES S. GWIN, [1] District Judge.

[1]    The Honorable James S. Gwin of the United States District Court for the Northern District of Ohio, sitting by designation.

**\*1** Defendants Northern Leasing Company, Jay Cohen, Rich Hahn, and Sara Krieger move this Court to dismiss the Amended Complaint in this civil RICO case. [Doc. 41, 43.] The Plaintiffs oppose the motion. [Doc. 34.] The Defendants have replied. [Doc. 44.]

To resolve the Defendant's motion to dismiss, the Court must decide whether the Plaintiffs' Complaint "contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."*Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citations omitted). Because the Plaintiffs have met this standard, the Court **DENIES** the Defendants' motion to dismiss.

**I. Background**

In their Complaint, Plaintiffs Melinda Serin, Judson Russ, Long Sui Lim, Gordon Redner, Peri Kettler, and Thomas J. Smith (collectively "Plaintiffs") allege that Defendants Northern Leasing Systems, Inc. ("NLS" or "Northern Leasing"), Jay Cohen, Rich Hahn, and Sara Krieger engaged in a racketeering scheme by forging leases bearing the Plaintiffs' names and signatures and then commencing lawsuits against the Plaintiffs in New York City Civil Court, in an effort to extort money from the Plaintiffs, who all live out-of-state. The Plaintiffs assert claims under the federal Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 and 1964, and New York's Anti–Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 349.

Defendant Northern Leasing Systems, Inc. finances equipment leases, including leases of credit card point-of-sale terminals and other equipment to small businesses. [Doc. 26 at 17; Doc. 43 at 3.] Jay Cohen, Rich Hahn, and Sara Krieger are, respectively, the President, Vice President for Sales, and Vice President for Operations of Defendant NLS. [Doc. 26 at 2–3.]

Plaintiff Melinda Serin, a resident of Washington, D.C., says she began receiving letters and phone calls from the Defendants in early 2003, demanding payments on a lease that she says she had no knowledge regarding. [*Id.* at 4.] Serin contacted the Defendants and informed them that she had not signed or guaranteed such a lease, and that any lease bearing her signature must be a forgery. [*Id.*] Serin subsequently received a General Release from Northern Leasing releasing her from any obligations under the lease, which was notarized on June 24, 2003. [*Id.* at 5, 35.] However, Serin alleges that she continued to receive communications from the Defendants, including a May 17, 2005 letter demanding payment of $2,478 on the same lease and threatening litigation. [*Id.* at 5.] Serin then received a letter dated June 15, 2005 that indicated that the Defendants had initiated a lawsuit against her in New York City Civil Court. [*Id.*] Serin contacted the Defendants, who in a letter dated September

Serin v. Northern Leasing Systems, Inc., Not Reported in F.Supp.2d (2009)
2009 WL 7823216

2, 2005, demanded a notarized affidavit of forgery and at least three other pieces of evidence. [*Id.*] Serin sent the requested documents but never received any response regarding the Defendants' investigation into the forgery. [*Id.* at 6.] Serin alleges that the Defendants instead demanded $2,000 to mark her account as closed and to remove adverse entries on her credit report. [*Id.*]

**\*2** Serin then learned that Defendants had filed against her in the New York City Civil Court. [*Id.* at 7.][2] Upon receiving notice that the case was scheduled for January 23, 2006 and that she was required to appear in person to defend against the suit in New York, Serin traveled to New York and appeared in City Civil Court on that day. [*Id.*] The Defendants' representative also appeared in court on January 23, and voluntarily withdrew the action. [*Id.*] Serin alleges that despite the suit's being dismissed, the Defendants made derogatory entries in her personal credit report, which has had adverse effects on her personally. [*Id.*]

2      The lawsuit appears to have actually been filed on May 17, 2005. [Doc. 26 at 37.]

In May 2002, Plaintiff Judson Russ, a resident of Orlando, Florida, discovered that NLS had been debiting funds from four of his corporate bank accounts. [*Id.* at 8.] After he demanded explanation, the Defendants informed him that someone had signed four equipment leases in the name of his corporation, and also signed his name as a personal guarantor. [*Id.*] Upon inspecting the leases, Russ discovered that they were forged, as he was out of the country in the Ukraine at the time the documents were signed. [*Id.*] The Defendants requested that Russ provide evidence of the forgery, which he did. [*Id.*] Russ closed the bank accounts from which the Defendants had been making the withdrawals. [*Id.* at 9.] The Defendants then proceeded to debit funds from a different corporate account. [*Id.*] After Russ closed additional corporate bank accounts, the Defendants brought four lawsuits against Russ-personally-in New York City, requesting $8,366.28 in damages. [*Id.*] Upon receiving notice of his required personal attendance, Russ hired lawyers in New York traveled to New York, and testified in Court. [*Id.* at 10.] The Judge dismissed the lawsuit on December 4, 2003. [*Id.* at 10, n. 2.] Russ also alleges that the Defendants made derogatory entries in his personal credit report and that he has suffered adverse consequences as a result. [*Id.* at 10.]

In May 2001, Plaintiff Long Soui Lim received a copy of a Summons and Verified Complaint, filed by the Defendants against him in the City Civil Court of New York, demanding $2,060.26 from him personally as a guarantor on a lease. [*Id.* at 11.] Lim contacted the Defendants and informed him that the signatures on the lease had been forged. [*Id.*] He also told them that the summons had been delivered to an old address in Smyrna, Georgia, and gave the Defendants his new address, in Marietta, Georgia. [*Id.*] Lim sent the Defendants documents to verify the forgery. [*Id.*] After not hearing back from the Defendants, Lim sent two letters to the Defendants in July 2001, one of which was personally addressed to Defendant Krieger, but never received a response. [*Id.*] On July 23, 2003, the Defendants initiated a lawsuit against Lim in New York City Civil Court. [*Id.* at 12.] Lim never received a copy of the summons and complaint as it was again delivered to his old address, despite his supplying the Defendants with his correct address. [*Id.*] The Defendants obtained a default judgment against Lim in the amount of $3,253.63 in May 2004. [*Id.*] Lim again wrote to Defendant Krieger and requested from the Defendants a copy of the judgment but received no response. [*Id.* at 12–13.] Lim eventually hired a lawyer in New York, and the court dismissed the lawsuit on April 20, 2006 for insufficient service and want of jurisdiction. [*Id.* at 14, n. 3.] Despite his ultimate success in the litigation, Lim, like the other Plaintiffs, alleges that he suffered adverse consequences as a result of the Defendants' making derogatory entries in his personal credit report. [*Id.* at 14.]

**\*3** In early 2004, Plaintiff Gordon Redner, a resident of Duncanville, Texas, noticed that the Defendants had made electronic withdrawals from his bank account. [3] [Doc. 26 at 14.] Redner contacted the Defendants, who claimed that he had signed and personally guaranteed a lease with them. [*Id.*] Redner alleges that he had never seen the lease before, that the document was forged, and that he never authorized NLS to automatically deduct funds from his bank account. [*Id.* at 15.] Eventually, Redner closed his bank account to prevent further deductions. [*Id.*] The Defendants then sent Redner letters threatening to sue him in New York. [*Id.*] The Defendants also made derogatory entries in Redner's personal credit report. [*Id.*]

3      In their original Complaint, the Plaintiffs acknowledge that Redner had contact with the Defendants' local sales representative in Texas on approximately January 27, 2004, and that Redner signed two applications to lease credit card equipment from Sterling Payment Technologies and First American–Hurst. [Doc. 1 at 13.] However, Redner alleges that these representatives did not mention

Northern Leasing, that Redner did not sign a lease with NLS, and that he had never heard of NLS until he noticed the debits from his bank account. [*Id.*]

Plaintiff Peri Kettler was the principal of Yodamo, Inc., a small business in Port Townsend, Washington. [*Id.*] On January 9, 2002, Kettler alleges she received and signed a one-page lease agreement with the Defendants for a credit card payment terminal. [*Id.*] Kettler claims that she then received equipment different from that specified in the lease. [*Id.* at 16.] She complained, but the Defendants said the lease was noncancellable and sent her a copy of a four-page lease, which was not the lease that Kettler had signed. [*Id.*] Kettler alleges that her signature was forged as guarantor of this lease. [*Id.*] On March 11, 2002, Kettler returned the equipment and attempted to cancel the lease. [*Id.*] Northern Leasing refused the equipment and continued making monthly deductions from Yodamo's bank account. [*Id.*] Kettler subsequently closed Yodamo's account, and the Defendants threatened Kettler with litigation. [*Id.*] Northern Leasing sued Kettler personally in New York City Civil Court demanding payment on the allegedly forged lease.[4] [*Id.*] The Defendants also made adverse entries in Kettler's personal credit report. [*Id.* at 17.]

[4]    Although unclear, the Amended Complaint suggests that the Defendants obtained a default judgment against Kettler, but that this judgment was subsequently vacated. [Doc. 26 at 16, n. 4.] The Amended Complaint also states that Defendant Krieger swore to the veracity of the Defendants' complaint against Kettler. [*Id.* at 16.]

In Winter 2002, Plaintiff Thomas J. Smith, a resident of Waukesha, Wisconsin, began receiving calls and letters from the Defendants demanding payment on a lease he had allegedly personally guaranteed.[5] [Doc. 26 at 17.] Smith alleges that his signature was forged and that he never entered into an agreement with the Defendants. [*Id.*] The Defendants filed an action against Smith in New York City Civil Court to collect payment, with interest and costs, on the lease Smith had allegedly personally guaranteed.[6] [*Id.*] Smith also claims that the Defendants made adverse entries in his personal credit report. [*Id.*]

[5]    Like Plaintiff Redner, Smith also apparently had an agreement with an affiliate of the Defendants for the leasing of credit card equipment. [*See* Doc. 1 at 16.] The Plaintiffs' original Complaint states that Smith "arranged for credit card processing facilities" with a local supplier, Tarly Dall, in October 2002, but later stopped using the facilities when he discovered they were charging higher rates than promised. [*Id.*]

[6]    Again, Defendant Krieger swore to he truth of the Complaint. [Doc. 26 at 17.] The Court denied both Smith's motion to dismiss for forum non conveniens and NLS's motion for summary judgment, finding that there was a triable issue of fact as to whether Smith ever entered into a contract with NLS. [*Id.* at 17, n. 6.] It is unclear what the current status of this suit is.

On March 1, 2006, the Plaintiffs initiated the present action against the Defendants. In their Complaint, the Plaintiffs alleged that the Defendants' commencing of small-claims proceedings against the out-of-state Plaintiffs on the forged leases constituted extortion, and that this pattern of extortion amounted to a racketeering scheme and entitled the Plaintiffs to damages under 18 U.S.C. §§ 1962 and 1964. [Doc. 1 at 17–26.] The Plaintiffs further claimed that the Defendants' actions violated New York's consumer protection statute, N.Y. Gen. Bus. Law § 349, and that the Plaintiffs were entitled to damages under this law as well. [*Id.* at 26–27.]

*4 On June 17, 2006, the Defendants filed a Motion to Dismiss the Complaint [Doc. 15], which this Court granted on September 2, 2008 [Doc. 23]. In dismissing the action, this Court held that the filing of meritless lawsuits alone, absent any other finding of fraud or other activity, does not constitute extortion and does not establish a pattern of racketeering activity required to support a RICO claim under § 1962. [Doc. 23 at 7.] The Court further held that the Plaintiffs' RICO conspiracy claim must be dismissed because it relied on the same allegations as the substantive RICO claim. [*Id.* at 8.] Finally, the Court dismissed the Plaintiffs' claim under the New York consumer protection statute, N.Y. Gen. Bus. Law § 349, because the Plaintiffs were not consumers within the definition of the Act. [*Id.* at 9.] The Court granted the Plaintiffs' request for leave to file an Amended Complaint. [*Id.* at 10.]

The Plaintiffs filed their Amended Complaint on October 3, 2008. In their Amended Complaint, the Plaintiffs again make claims under the federal civil RICO statute, 18. U.S.C. § § 1962 and 1964 and the New York consumer protection statue, N.Y. Gen. Bus. Law § 349. [Doc. 26.] The Plaintiffs allege that the Defendants and certain unidentified attorneys and salesmen constituted

an enterprise that affected interstate commerce, and that the Defendants conducted the enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). [*Id.* at 19.] In their Amended Complaint, the Plaintiffs allege that the Defendants committed numerous predicate acts of Mail Fraud, in violation of 18 U.S.C. § 1341. [*Id.* at 19–22.] The Plaintiffs claim that these predicate acts of mail fraud and the filing of frivolous lawsuits, which they argue amount to extortion, constitute a pattern of racketeering activity. [*Id.* at 27–29.] Because this alleged violation of 18 U.S.C. § 1962(c) caused injury to the Plaintiffs, they claim treble damages, interest, and costs under 18 U.S.C. § 1964(c). [*Id.* at 29.] The Plaintiffs further assert that the Defendants and others conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). [*Id.* at 30–31.] Finally, the Plaintiffs claim that they are entitled to protection under N.Y. Gen.Stat. § 349 because none of them entered into a business relationship with the Defendants and the Defendants caused them injury as individuals by suing them personally and creating derogatory entries in their personal credit reports. [*Id.* at 31–32.]

The Defendants filed a motion to dismiss the Amended Complaint, which is currently before the Court. [Doc. 41.] In support of their Motion, the Defendants argue that the Plaintiffs' RICO claim should be dismissed because the Plaintiffs fail to adequately allege predicate acts of racketeering activity [Doc. 43 at 8–14], fail to allege an adequate "pattern" of racketeering activity [*id.* at 14–17], and fail to adequately allege a RICO "enterprise" [*id.* at 17–20]. The Defendants also allege that some of the Plaintiffs' RICO claims are barred by the applicable statute of limitations, [*id.* at 17–22] and that the Plaintiffs' RICO conspiracy claims must be dismissed because their substantive RICO claim is without merit [*id.* at 22]. The Defendants further argue that the Plaintiffs' Section 349 claim should be dismissed because the Plaintiffs are not consumers and because the Plaintiffs did not seek leave to amend or replead their Section 349 claim. [*Id.* at 23–24.] Finally, the Defendants argue that the Court should not grant the Plaintiffs leave to further amend their Complaint. [*Id.* at 24–25.]

**\*5** The Plaintiffs oppose the Defendants' motion. [Doc. 34.] The Plaintiffs argue that they have adequately alleged that the Defendants committed mail fraud. [*Id.* at 4–9.] They further claim that extortion is also properly considered a predicate act because the Court previously ruled only that extortion standing alone was insufficient, and the Plaintiffs have now added allegations of mail fraud. [*Id.* at 9–12.] The Plaintiffs also argue that the Defendants' mailing of numerous similar documents over several years constitutes a "pattern" of racketeering activity [*id.* at 13–15], that the Plaintiffs' Complaint meets the pleading requirements to allege a RICO enterprise different and distinct from the Defendants [*id.* at 15–19], that all of their RICO claims are timely [*id.* at 19–20], and that the RICO conspiracy claims should survive [*id.* at 21–22]. Finally, the Plaintiffs claim that their Section 349 claim is valid because the Amended Complaint indicates that the Defendants' conduct was harmful to the public, and the Court did not restrict their ability to amend or replead this claim. [*Id.* at 22–24.] The Defendants have replied, reiterating the arguments they put forth in their motion. [Doc. 44.] The Defendants also argue that the Court should not consider the letters, court decisions, news articles, and other documents referenced in and attached to the Plaintiffs' opposition brief. [*Id.* at 1–2.]

## II. Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), "a court should assume the[ ] veracity" of "well-pleaded factual allegations," but need not accept a plaintiff's legal conclusions as true. *Iqbal,* 129 S.Ct. at 1949. Federal Rule of Civil Procedure 8 provides the general standard of pleading and only requires that a complaint "contain ... a short plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2)."Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."*Iqbal,* 129 S.Ct. at 1949 (citations removed).Rule 8 does not require "detailed factual allegations, but it requires more than an unadorned, the-defendant-unlawfully-harmed-me accusation."*Id.* (citations and internal quotations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Id.* (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 570 (2007)). The plausibility requirement is not a "probability requirement," but requires "more than a sheer possibility that the defendant has acted unlawfully." *Id.*

Serin v. Northern Leasing Systems, Inc., Not Reported in F.Supp.2d (2009)

2009 WL 7823216

The Supreme Court has explained the line between possible and plausible: "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citations and internal quotations omitted).

**\*6** The elements of a RICO claim that are based on the defendant's alleged fraud are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).*Air China Ltd. v. Nelson Li,* 2009 WL 857611, \*3 (S.D.N.Y. March 31, 2009). In contrast to the liberal pleading standard in Rule 8, Federal Rule of Civil Procedure 9 requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake."Fed.R.Civ.P. 9(b). In RICO claims in which the alleged predicate acts are frauds, "Rule 9(b) calls for the complaint to specify the statements it claims are false or misleading, give the particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements."*Moore v. PaineWebber, Inc.,* 189 F.3d 165, 173 (2d Cir.1999).

In contrast, an action under New York's Consumer Protection Statute, Section 349 of the New York General Business Law, is not subject to the heightened pleading standard of Rule 9(b), but need only meet the "bare-bones notice pleading requirements of Rule 8(a) ."*City of New York v. Smokes–Spirits.com, Inc.,* 541 F.3d 425, 455 (2d Cir.2008), *cert. granted on other grounds, Hemi Group, LLC v. City of New York,* 129 S.Ct. 2159 (2009).

### III. Analysis

**A. RICO Claim: 18 U.S.C. § 1962(c)**

The Plaintiffs assert a claim under 18 U.S.C. § 1964, more commonly known as the civil provision of the Racketeer Influenced Corrupt Organizations Act ("RICO"). To recover under § 1964, a plaintiff must show that the defendant committed a substantive RICO violation under 18 U.S.C. § 1962 that caused an injury to the plaintiff's business or property. *Smokes–Spirits. com,* 541 F.3d at 439. In order to establish a RICO violation under § 1962(c), the section on which the Plaintiffs rely, a plaintiff must show four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985).

The Defendants argue that the Plaintiffs' civil RICO claim should be dismissed because (1) the Plaintiffs do not sufficiently allege predicate acts of racketeering activity, (2) the Plaintiffs fail to make out a pattern of racketeering activity, (3) the Plaintiffs fail to adequately plead the existence of a RICO enterprise, and (4) some of the Plaintiffs' RICO claims are barred by the applicable statute of limitations.

*1. Pattern of Racketeering Activity*

a. *Sufficiency of Allegations of Predicate Acts of Racketeering*

The Plaintiffs allege that Defendants engaged in a pattern of racketeering activity by extorting money from the Plaintiffs by threatening and initiating lawsuits against them in New York City to recover on fraudulent leases. In support of their RICO claims, the Plaintiffs allege that the Defendants committed predicate acts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, and extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951 and New York's Extortion Act, N.Y. Penal Law § 155.05. Responding, the Defendants argue that the Plaintiffs' RICO claims should be dismissed because the Plaintiffs fail to adequately allege predicate acts of either mail/wire fraud or extortion.

**\*7** A defendant engages in a pattern of racketeering activity by committing at least two predicate acts of racketeering, as defined in § 1961(1), within a period of ten years. 18 U.S.C. § 1961(5). Mail and wire fraud are forms of racketeering activity for purposes of RICO. 18 U.S.C. § 1961(1)(B); *Anza v. Ideal Steel Supply Corp .,* 547 U.S. 451, 454 (2006). To successfully make a claim of mail or wire fraud as a predicate act, a plaintiff must allege (1) the existence of a scheme to defraud, (2) the defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme. *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir.1996). It is not necessary for a

plaintiff to show that the defendants actually mailed or wired anything themselves. *Smokes–Spirits. com,* 541 F.3d at 446 (citing *Pereira v. United States,* 347 U.S. 1, 8 (1954)); *see also McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992). It is also unnecessary that the mail or wire communications themselves contain fraudulent communications. *Schmuck v. United States,* 489 U.S. 705, 711 (1989). It is sufficient that the plaintiff allege that the defendant caused the mailing or transmission and that the mailing or transmission was for the purpose of executing, or incidental to an essential part of, a scheme which itself has a fraudulent and deceptive purpose. *Id.;Smokes–Spirits.com,* 541 F.3d at 446; *McLaughlin,* 962 F.2d at 191.

A plaintiff must allege mail fraud with the particularity required by Federal Rule of Civil Procedure 9(b).*McLaughlin,* 961 F.2d at 191. In applying Rule 9(b) to predicate acts of mail or wire fraud, Southern District of New York courts have articulated different requirements to apply in either a *"per se"* or "in furtherance of fraud" context. *Am. Med. Ass'n v. United Healthcare Corp.,* 588 F.Supp.2d 432, 442 (S.D.N.Y.2008); *see also In re Sumitomo Copper Litig.,* 995 F.Supp. 451, 456 (S.D.N.Y.1998). In a case in which a plaintiff claims that the mailings themselves were fraudulent, i.e., that the mailings themselves contained false or misleading information, Rule 9(b) requires that the complaint specify the fraud involved, and identify the parties responsible for the fraud and where and when the fraud occurred. *In re Sumitomo Copper Litig.,* 995 F.Supp. at 456. *See also Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993); *McLaughlin,* 961 F.2d at 191. However, in a case in which the plaintiff claims that the mails or wires were "simply used in furtherance of a master plan to defraud, the communications themselves need not have contained false or misleading information themselves," and "a detailed description of the underlying scheme and the connection of the mail and/or wire communications to the scheme is sufficient to satisfy Rule 9(b)."*In re Sumitomo Copper Litig.,* 995 F. Supp at 456;*see also Southern Illinois Laborers' and Employers Health and Welfare Fund v. Pfizer Inc.,* 2009 WL 3151807, at *4, n. 10 (S.D.N.Y. Sept. 30, 2009); *Evercrete Corp. v. H–Cap. Ltd.,* 429 F.Supp.2d 612, 624 (S.D.N.Y.2006); *Spira v. Nick,* 876 F.Supp. 553, 559 (S.D.N.Y.1995). In such a case, particularity as to the mailings themselves is unnecessary. Am. Med. Ass'n, 588 F.Supp.2d at 443. "In complex civil RICO actions involving multiple defendants, therefore, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity. In such cases, Rule 9(b) requires only that the plaintiff delineate with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme."*In re Sumitomo Copper Litig.,* 995 F.Supp. at 456 (internal citations omitted).

**\*8** The Plaintiffs in this case do not allege that the letters and/or wire transmissions themselves contained misrepresentations. Rather, the Plaintiffs argue that the communications are part of an ongoing scheme by the Defendants to defraud them. The Plaintiffs describe with the required amount of particularity the details of the racketeering scheme: they describe in detail how the Defendants allegedly forged leases in each Plaintiff's name; how the Defendants made electronic deductions from the bank accounts of Plaintiffs Russ, Redner, and Kettler; how the Defendants then called and/or mailed letters to each Plaintiff demanding payment on the leases and threatening litigation if the Plaintiffs refused to pay; how the Defendants initiated litigation in New York City Civil Court against Plaintiffs Serin, Russ, Lim, Kettler, and Smith; how these Plaintiffs personally appeared and defended these allegedly meritless lawsuits; and how the Defendants allegedly made adverse entries in all of the Plaintiffs' personal credit reports. The general allegations of mail fraud in Paragraph 93 of the Amended Complaint, when read in the context of the specific allegations the Plaintiffs make earlier in the Amended Complaint, are sufficient to adequately plead mail fraud. *See In re Sumitomo Copper Litig.,* 995 F.Supp. at 457.

Moreover, it is also unnecessary for the Plaintiffs to allege that each of the individual Defendants personally committed at least two of the predicate acts of mail and/or wire fraud. It is sufficient that the Plaintiffs allege that the individuals committed the predicate acts of mail and wire fraud by directing NLS and its employees to use the mails and/or wires to further the fraudulent scheme. *See Smokes–Spirits.com,* 541 F.3d at 446;*accord Pereira,* 347 U.S. at 8–9 ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used"). Because the Amended Complaint alleges that the individual Defendants, by nature of their positions within Northern Leasing, orchestrated, supervised, monitored, and/or oversaw the day-to-day operations of the alleged scheme, the Plaintiffs' allegations against all of the Defendants are sufficient to allege a pattern of racketeering activity for purposes of RICO. *See Smokes–Spirits,* 541 F.3d at 446. Based upon the information contained

in the Amended Complaint, the Plaintiffs have adequately met their pleading requirement with respect to their mail and wire fraud claims under Rule 9(b).

The Defendants also claim that the Amended Complaint does not adequately allege mail fraud because the Plaintiffs fail to establish that they reasonably relied on the Defendants' misrepresentations to their detriment. [Doc. 43 at 9–10.] The Defendants claim that "in order to prevail in a RICO action predicated on any type of fraud, including mail and wire fraud, the plaintiff must establish reasonable reliance on the defendants' purported misrepresentations or omissions."[*Id.* at 9.] The Defendants' contention is contrary to the Supreme Court's holding in *Bridge v. Phoenix Bond & Indemnity Co.,* 128 S.Ct. 2131 (2008), in which the Court held: "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations."*Id.* at 2145.In considering "whether a plaintiff asserting a [civil] RICO claim predicated on mail fraud must plead and prove that it relied on the defendant's alleged misrepresentations," the Court held that "a showing of first-party reliance is not required."128 S.Ct. at 2134. Following *Bridge,* this Court concludes that the Plaintiffs do not need to allege that they relied on the Defendants' misrepresentations to their detriment to allege a predicate act of mail (or wire) fraud. The Court holds that the Plaintiffs have made sufficient allegations of mail and wire fraud and denies the Defendants' motion to dismiss on that ground.

**\*9** The Defendants also argue that the RICO claims should be dismissed to the extent they rely on predicate acts of extortion. The Defendants argue that because the Court, in dismissing the original Complaint, held that the filing of meritless lawsuits could not constitute extortion under either federal or New York law, that holding requires the Court to dismiss the extortion-based claims in the Amended Complaint. Because the Court finds that the Plaintiffs have adequately pleaded a pattern of racketeering in which the alleged enterprise committed multiple predicate acts of mail and/or wire fraud in further of its allegedly fraudulent and extortionate scheme, it finds that it is not necessary to consider whether the filing of lawsuits could itself be considered a predicate act of extortion for RICO purposes. *Compare Lemelson v. Wang Labs., Inc.,* 874 F.Supp. 430, 434 (D.Mass.1994) (denying defendant's motion to dismiss under 12(b)(6) where plaintiff alleged predicate acts of mail and wire fraud in furtherance of scheme to extort money through pattern of litigation involving claims based upon fraudulently obtained patents).

**b. *Continuity***
The Supreme Court has held that to satisfy the "pattern" requirement, a plaintiff must further show that the predicate acts "are related, *and* that they amount to or pose a threat of continued criminal activity."*H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239 (1989) (emphasis in original). The "relatedness" requirement is satisfied if the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."*Id.* at 240 (internal citations omitted). "Continuity" can be either closed-or open-ended. *Id.* at 241.A plaintiff alleging a RICO violation may demonstrate closed-ended continuity by sufficiently alleging a series of related predicate acts extending over a "substantial period of time." *Id.* at 242.In considering whether the continuity requirement is satisfied, the Second Circuit has consistently held that a period of less than two years is not a "substantial period of time." *Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 184 (2d Cir.2008); *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 242 (2d Cir.1999); *GICC Capital Corp. v. Tech. Finance Group,* 67 F.3d 463, 467 (2d Cir.1995)."Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists."*Cofacredit,* 187 F.3d at 242.

To satisfy open-ended continuity, in contrast, a plaintiff need not show that the predicate acts extended over a substantial period of time, but must show that there was "a threat of continuing criminal activity beyond the period during which the predicate acts were performed."*Id.*"Where the enterprise is engaged primarily in racketeering activity, and the predicate acts are inherently unlawful, there is a threat of continued criminal activity, and thus open-ended continuity."*Id.* at 242–43.However, where the enterprise primarily conducts a legitimate business, there must be some evidence from which the court may infer that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity. *Id.* at 242;*see also H.J. Inc.,* 492 U.S. at 243 ("The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the

sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO 'enterprise.' ")

**\*10**  The Defendants argue that the Plaintiffs fail to adequately allege either closed-or open-ended continuity.[7] In their Amended Complaint, the Plaintiffs allege that the Defendants committed at least twenty separate acts of mail fraud, spanning a period from January 2002 to September 2005.[8]  [Doc. 26 at 20–22.] The Defendants argue that only four of these alleged acts of mail fraud should be considered predicate acts because the remaining mailings were not in furtherance of the fraudulent scheme. [Doc. 44 at 6.] The Defendants claim that the Plaintiffs "define the fraudulent scheme as the 'commencement or threat of bogus legal proceedings ...*not* the forged leases or wrongful electronic deductions.' " [*Id.* at 6–7 (citing Doc. 34 at 20).] However, the Defendants blatantly misrepresent the Plaintiffs' brief. The Plaintiffs, in response to the Defendants' contention that their claims are time barred,[9] stated:

[7]    The parties also dispute whether the Court should consider the additional materials the Plaintiffs attached to their opposition brief in considering this issue. While the Court notes that it may examine documents incorporated into the Complaint by reference and matters of which it may take judicial notice in addition to the Complaint itself, *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007); *Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993), it finds in this case that the allegations contained within the Amended Complaint are sufficient to decide this issue, and thus does not find it necessary to look to outside materials.

[8]    The Court agrees with the Defendants that any mailing that the Defendants did not mail or cause to be mailed should not be considered a predicate act.

[9]    This claim is discussed in Part III.3, *infra.*

Here, the pattern of racketeering activity was defendants' mail and wire fraud, and commencement or threat of bogus legal proceedings based on false representations. The ***RICO injury*** is, thus, ***not*** the forged leases or wrongful electronic deductions. [Doc. 34 at 20 (emphasis in original).] The Defendants' attempt to misrepresent the Plaintiffs' allegations is transparent. The Plaintiffs specifically allege that the "fraudulent scheme" involved the acts of mail and wire fraud. Because the Court finds, for the reasons described above, that the Plaintiffs have adequately pleaded the predicate acts of mail and wire fraud as part of the Defendants' ongoing fraudulent scheme, all of these acts of mail fraud are properly considered as predicate acts in considering whether the Plaintiffs have pleaded a "pattern of racketeering activity."

The Court finds that Plaintiffs have adequately alleged both closed-and open-ended continuity. The Court measures the duration of a pattern of racketeering activity by the RICO predicate acts the Defendants commit. *Cofacredit,* 187 F.3d at 243. The Amended Complaint alleges that the Defendants' first act of mail fraud occurred in January 2002. The Plaintiffs claim that the Defendants then committed multiple predicate acts of mail fraud over the next three-and-a-half years. The Plaintiffs allege that these acts of mail fraud had a similar purpose, similar methods of commission, similar victims, and similar results. *See H.J. Inc.,* 492 U.S. at 240. The Plaintiffs have therefore adequately alleged a series of related predicate acts of mail fraud extending over a "substantial period of time," here more than three years, and have satisfied the closed-ended continuity requirement. *See id.* at 242.

The Plaintiffs have also adequately alleged open-ended continuity. Where an enterprise primarily conducts a legitimate business, in order to plead open-ended continuity a plaintiff must allege that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts threatens continued racketeering activity. *See Spool,* 520 F.3d at 185; *Cofacredit,* 187 F.3 d at 242. The Plaintiffs have alleged twenty instances of mail fraud in which the Defendants sought payment on forged leases and threatened litigation if the Plaintiffs refused to pay. The Defendants' alleged fraudulent scheme is not "inherently terminable," but could continue indefinitely. *Compare GICC Capital* 67 F.3d at 466 (no open-ended continuity because looting scheme was *"inherently* terminable" because there was nothing left to loot); *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 180–81 (no threat of continued criminal activity after defendant had conveyed assets and filed for bankruptcy) *with Beauford v. Helmsley,* 865 F.2d 1386, 1392 (2d Cir.) (en banc), *vacated and remanded,*492 U.S. 914,*adhered to on remand,*893 F.2d 1433,*cert. denied,*493 U.S. 992 (1989) (finding open-ended continuity and pattern of racketeering activity in one-time

fraudulent mailing to thousands of individuals because of threat of future fraudulent mailings). The allegations in the Amended Complaint sufficiently plead that the fraudulent scheme constitutes the regular way of operating business for the Defendants, and that there is a threat of continued racketeering activity. *See Air China Ltd.,* 2009 WL 857611, at *5 (finding open-ended continuity and pattern of racketeering activity where defendants committed more than twenty acts of mail fraud in which they made fraudulent representations about their business).

**\*11** The Plaintiffs have adequately pleaded that the Defendants committed at least two predicate acts of racketeering activity and that these acts were related and continuous. The Court therefore finds that the Plaintiffs have sufficiently alleged a pattern of racketeering activity and deny the Defendants' motion to dismiss on this ground.

### 2. RICO Enterprise

The Defendants further argue that the Plaintiffs Amended Complaint should be dismissed because the Plaintiffs fail to adequately allege the existence of a RICO enterprise. To successfully plead the existence of a RICO enterprise, a plaintiff must allege the existence of two distinct entities: "(1) a 'person'; and (2) an 'enterprise' that is not simply the same person referred to by a different name."*Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161 (2001). In arguing that the Plaintiffs have not pleaded a RICO enterprise, the Defendants rely on Second Circuit precedent that "a corporate entity may not be simultaneously the 'enterprise' and the 'person' who conducts the affairs of the enterprise through a pattern of racketeering activity ."[Doc. 43 at 18 (quoting *Bennett v. United States Trust Co.,* 770 F.2d 308, 315 (2d Cir.1985).] *See also Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 244 (2d Cir.1994) (corporate defendant associated with its own employees or agents carrying on regular affairs of the defendant cannot be a RICO enterprise).

However, the Supreme Court distinguished these cases, and overruled the Second Circuit, in *Cedric Kushner Promotions, Ltd. v. King,* holding that the president and sole shareholder of a closely-held corporation who conducts that corporation's affairs through a pattern of racketeering activity could be considered a RICO person distinct from the corporation, the alleged RICO enterprise. 533 U.S. 158, 164–66 (2001). The Court held that a corporation and its employees are not legally identical, and can be considered distinct entities for the purposes of RICO. *Id.* at 166.Moreover, "[a] corporate entity may be held liable as a RICO person 'where it associates with others to form an enterprise that is sufficiently distinct from itself.' " *Stolow v. Greg Manning Auctions Inc.,* 258 F.Supp.2d 236, 247 (S.D.N.Y.2003) (quoting *Riverwoods Chappaqua Corp.,* 30 F.3d at 344). A RICO claim survives the distinctness requirement where there is only a partial overlap between the RICO person and the RICO enterprise. *Riverwoods Chappaqua Corp.,* 30 F.3d at 344; *Jacobson v. Cooper,* 882 F.2d 717, 720 (2d Cir.1989).

A plaintiff does not need to plead the existence of RICO enterprise with particularity, but must only "provide a clear and concise statement of the enterprise pursuant to Rule 8 of the Federal Rules of Civil Procedure."*Sony Music Entm't Inc. v. Robinson,* 2002 WL 272406, at *6 (S.D.N.Y. Feb. 26, 2002); *Trustees of Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.,* 886 F.Supp. 1134, 1145 (S.D.N.Y.1995). In their Amended Complaint, the Plaintiffs allege that "[t]he association of Defendants, certain attorneys retained by Defendants, salesmen and others whose identities are known only to Defendants at this time constituted an enterprise within the meaning of 18 U.S.C. § 1961(c)." [Doc. 26 at 18.] The Plaintiffs further allege that "[e]ach Defendant is a person within the meaning of 18 U.S.C. § 1961(3) and separate from the enterprise."[*Id.*] The Plaintiffs have not alleged that all of the individuals participating in the RICO enterprise are merely employees or agents of Defendant Northern Leasing. The Court therefore finds that the Plaintiffs have sufficiently pleaded an enterprise that is distinct from the Defendants, *see Stolow,* 258 F.Supp.2d at 247; *Sony Music Entm't,* 2002 WL 272406, at *5, and denies the Defendants' motion to dismiss for failure to plead a RICO enterprise.

### 3. Statute of Limitations

**\*12** The Defendants also argue that the Court should dismiss as time-barred the claims of Plaintiffs Serin, Lim, Russ, Kettler, and Smith. [10] While the RICO statute does not contain an explicit statute of limitations, the Supreme Court has held that civil RICO actions are subject to the same four-year limitations period as contained the Clayton Act. *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 188–89 (1997); *Agency Holding Corp. v. Malley–Duff & Associates,* 483 U.S. 143, 156 (1987). The limitations period

begins to run when the plaintiff discovers or should have discovered his RICO injury. *Rotella v. Wood,* 528 U.S. 549, 552–554 (2000); *In re Merrill Lynch Ltd. P'ships Litig.,* 154 F.3d 56, 60 (2d Cir.1998). The Second Circuit has adopted a "separate accrual" rule under which a new claim accrues and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a new and independent injury. *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102 (2d Cir.1988) ("[E]ach time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962, a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury").

10    In their brief in support of their Motion to Dismiss, the Defendants say that the Court should dismiss as time-barred the claims of only three Plaintiffs, but then go on to argue that Serin's, Lim's, Kettler's, and Russ's claims are barred by the statute of limitations. [Doc. 43 at 20–21.] In their Reply Brief, the Defendants argue that five Plaintiffs' claims should be dismissed as time-barred, alleging in a footnote that Plaintiff Smith also suffered his injury outside the limitations period. [Doc. 44 at 13, n. 13.] While the Court does not look favorably upon claims raised only in reply, because the Plaintiffs' RICO claims survive for similar reasons, the Court will consider this claim with respect to each of these five Plaintiffs.

The Defendants argue that the claims of Plaintiffs Serin, Russ, and Kettler should be dismissed as time-barred because they had inquiry notice of their injuries at the time the first deductions were made from their bank accounts. Relying on the affidavit of Defendant Krieger, the Defendants claim that the first deductions from Serin's, Russ's, and Kettler's accounts occurred in September 2001, April 2001, and January 2002, respectively, or more than four years before the Plaintiffs filed their original Complaint on March 1, 2006. However, in considering the Defendants' motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations contained in the Amended Complaint, and draw all reasonable inferences in the Plaintiffs' favor.*Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). In deciding a 12(b)(6) motion, a court may consider documents incorporated into, referenced in, or integral to the pleadings, as well as matters of which it may take judicial notice. *See id.* at 152–53; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007); *Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993). However, a court should only consider such a document in disposing of a 12(b)(6) motion when it is clear that the plaintiff relied on the terms and effect of the document in drafting the complaint.*Chambers,* 282 F.3d at 153.

Defendant Krieger's affidavit is not such a document, and the Court will not consider it in deciding the present 12(b)(6) motion. Accordingly, the Court will accept as true the allegations contained in the Amended Complaint. In their Amended Complaint, the Plaintiffs allege that Serin began receiving calls and letters from the Defendants in early 2003, and that she had previously never heard of the Defendants. The Amended Complaint further alleges that Russ first discovered deductions from his bank accounts in May 2002. Accordingly, the Court finds that the Plaintiffs have alleged that Serin and Russ suffered all of their injuries within the four-year limitations period and denies the Defendants' motion to dismiss their claims as time-barred. The Court further notes that Plaintiffs Serin's and Russ's claims are also not barred for the reasons discussed below.

**\*13**  The Defendants argue that Plaintiff Lim's claims are time-barred because he knew or should have known of his injury by May 2001, when he received a copy of the Summons and Verified Complaint filed by the Defendants. The Defendants similarly argue that Plaintiff Kettler's claims are barred by the statute of limitations because she knew or should have known of her injury when she received a forged lease in February 2002. The Defendants therefore suggest that Lim's and Kettler's claims should be dismissed because they both "either discovered or should have discovered their RICO injuries before March 1, 2002, four years prior to the date on which plaintiffs commenced this action."[Doc. 44 at 13.] The Defendants also claim that Plaintiff Smith's claims are time-barred because he alleges that the Defendants first contacted him in the Winter of 2002. [Doc. 44 at 13, n. 11.]

However, in considering the statute of limitations in civil RICO cases, the Second Circuit has explicitly rejected the general federal rule of accrual that in cases involving continuing violations and injury the statute of limitations begins running upon the commission of the first overt act causing damage and does not permit a subsequent injury to start the limitations period anew.*Bankers Trust Company,* 859 F.2d at 1104. Instead, the Second Circuit has held RICO actions are subject to a rule of separate accrual: "[E]ach time [a] plaintiff discovers or should have discovered an injury caused by defendant's violation of § 1962, a new cause of action arises as to that injury, regardless of when the actual violation occurred."*Id.* A plaintiff suing under the civil RICO statute therefore may recover for any specific injury caused by the defendant's RICO violation if he discovered

or should have discovered that specific injury within four years of the time he brings suit.*Id.;Bingham v. Zolt,* 66 F.3d 553, 560 (2d Cir.1995).

The Plaintiffs allege that they were injured by, *inter alia,* wasting time and resources in responding to Defendants' calls and letters, retaining lawyers and incurring expenses to defend against the New York litigation, and adverse entries in their credit reports. [Doc. 26 at 29.] Plaintiffs Serin, Russ, Lim, Kettler, and Smith[11] each incurred expenses and inconvenience in responding to the Defendants' lawsuits in New York. The Defendants initiated lawsuits against each of these Plaintiffs after March 1, 2002.[12] Each Plaintiff therefore suffered at least one separate and distinct injury as a result of the alleged RICO violation within the limitations period. While some Plaintiffs may be barred from recovering damages for injuries they sustained prior to March 1, 2002,[13] because each Plaintiff suffered some specific injury that he or she discovered or should have discovered after this date, the Court denies the Defendants' motion to dismiss any of the Plaintiffs' claims on statute of limitations grounds.

[11]   The Amended Complaint does not allege that the Defendants initiated a lawsuit against Plaintiff Redner. However, the Defendants do not challenge Redner's claims under the statute of limitations and admit that any and all of Redner's injuries occurred during the limitations period.

[12]   The Amended Complaint suggests that the Defendants initiated two separate lawsuits against Defendant Lim. For purposes of RICO, the expenses incurred in defending the second lawsuit would be considered separate and distinct injuries from those incurred in the first lawsuit.

[13]   Plaintiffs may still be able to recover for injuries suffered outside the limitations period if they can prove an exception such as fraudulent concealment. *Bankers Trust,* 859 F.2d at 1105.

**B. Conspiracy Claim: 18 U.S.C. § 1962(d)**
**\*14**  The Defendants also move to dismiss the Plaintiffs' claims under the RICO conspiracy provision, 18 U.S.C. § 1962(d). The Defendants claim that the Plaintiffs' conspiracy claim must fail because they argue that the Plaintiffs have failed to plead a legally sufficient substantive RICO violation. However, because the Court finds that the Plaintiffs have adequately pleaded a substantive RICO claim, it must examine the Defendants' RICO claim on the merits.

To state a civil RICO conspiracy claim, a plaintiff must plead "the existence of an agreement to violate RICO's substantive provisions."*Cofacredit,* 187 F.3d at 244 (quoting *United States v. Sessa,* 125 F.3d 68, 71 (2d Cir.1997)). The plaintiff must allege that the defendants "agreed to commit the substantive RICO offense by agreeing to participate in the racketeering acts related to the conspiracy, and that each knew the general nature of the [RICO] conspiracy and that the conspiracy extend[ed] beyond his individual role."*Air China Ltd.,* 2009 WL 857611, at \*6 (quoting *United States v. Cervone,* 907 F.2d 332, 344 (2nd Cir.1990)). RICO conspiracy claims are subject to the more relaxed pleading standards of Federal Rule of Civil Procedure 8(a).*Air China Ltd.,* 2009 WL 857611, at \*6. *See also Baisch v. Gallina,* 346 F.3d 366, 376 (2d Cir.2003) ("[T]he requirements for RICO's conspiracy charges under § 1962(d) are less demanding"). A plaintiff must allege that a RICO conspirator intended to "further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that [the defendant] has adopted the goal of furthering or facilitating the criminal endeavor."*First Capital Asset Mgmt.,* 385 F.2d at 178. In the civil context, a plaintiff must allege that a RICO conspirator "knew about and agreed to facilitate the scheme."*Baisch,* 346 F.3d at 377 (quoting *Salina v. United States,* 522 U.S. 52, 65 (1997)).

The Plaintiffs allege that the Defendants conspired with others to commit predicate acts of mail fraud in furtherance of their scheme to extort money from the Plaintiffs; that each of the individual Defendants, by nature of their positions at Northern Leasing, knew of the general nature of the conspiracy and facilitated the furtherance of the conspiracy; and that none of the Defendants have withdrawn or otherwise dissociated themselves from the conspiracy or the other conspirators. Furthermore, the knowledge of Defendants Cohen, Hahn, and Krieger can be imputed to the corporate entity they allegedly controlled and utilized to further the conspiracy, Defendant NLS. *See Air China Ltd.,* 2009 WL 857611, at \*6. Thus the Plaintiffs have sufficiently

alleged their RICO conspiracy claim against all of the Defendants under the liberal pleading requirements of Rule 8(a), and the Defendants' motion to dismiss is denied with regard to this claim.

## C. Deceptive Trade Practices Claim: N.Y. Gen. Bus. Law § 349

**\*15** New York General Business Law Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce...."N.Y. Gen. Bus. Law § 349(a). Under the Act, "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages ... or both such actions."N.Y. Gen. Bus. Law § 349(h). The Defendants argue that the Plaintiffs do not qualify for protection under Section 349 because they are not "consumers" under the definition of the statue. [14] The Plaintiffs claim that they are consumers because they did not enter into business agreements or transactions with the Defendants. The Plaintiffs further argue that they are entitled to relief under the statute because they have suffered harm as individuals, as the Defendants sued each Plaintiff in his or her individual capacity and made derogatory entries in each Plaintiff's personal credit report.

[14]    The Defendants also argue that the claim should be dismissed because the Court dismissed this claim as pleaded in the original Complaint in its September 2, 2008 order, and, according to the Defendants, did not give the Plaintiffs leave to re-plead this claim. As stated in the September 2 Order, the Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)." [Doc. 23 at 10 (quoting *Porat v. Lincoln Towers Cmty. Ass'n,* 464 F.2d 274,276 (2d Cir.1996).] In that order, the Court gave the Plaintiffs general leave to amend their Complaint. The Court now finds that the Plaintiffs have not exceeded the scope of that leave in re-pleading the Section 349 claim.

Federal courts in New York have interpreted the "expansive language" of Section 349 as evidence that the statute "was intended to be broadly applicable, extending far beyond the reach of common law fraud."*New York v. Feldman,* 210 F.Supp.2d 294, 301 (S.D.N.Y.2002). The Second Circuit has held that while Section 349"is, at its core, a consumer protection device ... it does provide a right of action to any person who has been injured by reason of any violation of this section."*Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris USA, Inc.,* 344 F.3d 211, 218 (2d Cir.2003) (quoting *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 264 (2d Cir.1995)). The Second Circuit therefore held in *Securitron* that a corporation could sue under Section 349 to halt a competitor's deceptive trade practices, even though the plaintiff was neither a consumer nor standing in the shoes of a consumer. 65 F.3d at 264. The Second Circuit has directed that "[t]he critical question [in assessing the validity of a § 349 claim] is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer...."*Id.*

While the Plaintiffs claim that they are all consumers under the statute, the Amended Complaint alleges that Plaintiff Kettler is the principal of Yodamo, Inc. and suggests that Yodamo may have entered into a business transaction with the Defendants. [15] However, the fact that one or more Plaintiffs may be a business or a small business owner is not necessarily fatal to the Plaintiffs' claims under Section 349. *See, e.g., Dupler v. Costco Wholesale Corp.,* 249 F.R.D. 29, 43 at n. 3 (E.D.N.Y.2008) (allowing Section 349 claim to proceed on behalf of class containing businesses where deceptive practice was found to affect the public interest). As stated above, the central question is not whether all of the Plaintiffs are consumers, but whether the Defendants' actions affect the public interest. In *Securitron,* the court found that the defendants' actions were contrary to the public interest because their false representations caused a regulatory agency to "undertake unnecessary investigations and interfered with its decision-making process."*Id.* The Plaintiffs here allege that the Defendants filed frivolous lawsuits, containing false averments and based upon forged documents, in the New York City civil courts. The Court therefore finds that, while it is not clear that all of the Plaintiffs are consumers entitled to the protections of N.Y. Gen. Bus. Law § 349, the Plaintiffs have sufficiently alleged that the Defendants' practices affect the public interest in New York for this claim to survive a 12(b)(6) motion to dismiss.

[15]    The Plaintiffs' original Complaint also made clear that Plaintiff Russ was the principal of Rapid Case Advances, Inc., a Florida corporation.

Serin v. Northern Leasing Systems, Inc., Not Reported in F.Supp.2d (2009)
2009 WL 7823216

### IV. Conclusion

**\*16**  For the foregoing reasons, the Court **DENIES** the Defendants' motion to dismiss on all grounds.

IT IS SO ORDERED.

---

End of Document                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 416059

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Waterbury.

WEBSTER FINANCIAL CORP. et al.

v.

William McDONALD et al.

No. CV084016026S.   |   Jan. 28, 2009.

**Attorneys and Law Firms**

Carmody & Torrance, waterbury, for Webster Financial Corp. et al.

Wiggin & Dana LLP, New Haven, for William McDonald et al.

**Opinion**

BRUNETTI, J.

**\*1** The issue before the court is the defendants' motion to strike counts one through nine of the plaintiffs' complaint. For the following reasons the court denies the defendants' motion as to counts one, three, six, eight and nine and grants the defendants' motion as to counts two, four, five, and seven.

## *FACTS*

On April 29, 2008 the plaintiffs, Webster Financial Corporation (Webster) and USI Insurance Services of Connecticut, Inc. (USI), formerly known as Webster Insurance, Inc.,[1] commenced this action by service of process against the defendants, William McDonald (McDonald) and Shoff Darby, Inc. (Shoff Darby).[2]

[1]  The plaintiff, USI Insurance Company formally changed its name from Webster Insurance, Inc. to USI Insurance Services of Connecticut, Inc. on February 29, 2008.

[2]  Then referring to both USI and Webster Financial we will use "the plaintiffs." Likewise when referring to both McDonald and Shoff Darby, then we will use "the defendants."

The plaintiffs filed a nine-count complaint in which they allege the following facts. On February 11, 2003, the defendant, McDonald, while employed as senior vice president at USI, entered into an employment agreement with USI. A copy of this agreement is attached to the plaintiffs' pleadings. The agreement contained a non-compete and a non-solicitation clause. The two clauses operate for the greater period of either: (1) two years following McDonald's termination; or (2) for as long as McDonald receives benefits under a prescribed deferred compensation plan or salary continuation policy.[3] The non-compete clause, found at paragraph eight of the agreement, prohibits McDonald from soliciting and providing insurance services similar to those rendered by USI to anyone who was a client or potential client twelve months prior to McDonald's termination. The clause also forbids McDonald from accepting employment with any other insurance business within twenty-five miles of any insurance office of the defendants in the state of Connecticut.[4]

3    Paragraphs 8(a) and nine provide that the agreement operates "[d]uring the term of Employee's employment with the Company and for the greater of: (I) a period of two years following the termination of Employee's employment for any reason or (ii) for so long as the Employee shall be entitled to receive benefits under the Damman Associates, Inc. Deferred Compensation Plan or the Webster Bank Salary Continuation Policy ..."

4    Paragraph 8(a) of the agreement provides that McDonald will not: "(1) attempt in any manner to solicit or accept from any Client business of the type performed by the Company or to persuade any Client of the Company to cease to do business or to reduce the amount of business any such Client has customarily done or contemplates doing with the Company, whether or not the relationship between the Company and such Client was originally established in whole or in part through Employee's efforts; (2) provide or render insurance services or products of the type provided or rendered by the Company to any Client of the Company; (3) be employed by (as an owner, employee, officer, director, independent contractor, agent, partner, or in any other capacity), represent, render consulting or advisory services to, or participate or be connected in the management, or control within 25 miles of any insurance office of the Company or the Parent in the state of Connecticut, of any business that is competitive with the Company or engaged in the business of providing insurance services; or (4) interfere with, disrupt or attempt to disrupt the relationship, contractual or otherwise, between the Company and any of its suppliers, distributors, clients, or employees, or take any action that adversely affects the Company's business."

The non-solicitation clause, found at paragraph nine in the contract, prohibits McDonald from soliciting past or current clients, accepting business from past or current clients, providing services to any past or current client and providing services to any organization that performs insurance services similar to the defendants. The clause also forbids McDonald from inducing other employees of the plaintiffs to terminate their employment with the plaintiffs. [5]

5    Paragraph nine provides that McDonald shall not: "(a) solicit, induce, or attempt to induce, any past or current Client of the Company to cease doing insurance agency or brokerage business in whole or in part with the Company; (b) accept business from, do business with, or provide services to any past or current Client of the Company or other person, firm, partnership, corporation or other entity which performs insurance services materially similar to or competitive with those provided by the Company; or (c) either on his own account or for any person, firm, partnership, corporation or other entity, solicit, induce, attempt to induce, interfere with, or endeavor to cause any employee of the Company to terminate his or her employment with the Company." The agreement further defines Client, at paragraph 7(b) as: "any person, firm, or corporation that was a client or potential client at the time of Employee's termination or who was in such capacity at any time during the twelve months immediately preceding the Employee's termination."

The complaint further alleges that on September 21, 2007, McDonald resigned from USI and joined Shoff Darby, a competitor of USI, located within twenty-five miles of USI's office in Westport, Connecticut. After McDonald began his employment at Shoff Darby, he began to solicit and sell insurance products to USI's former clients. McDonald also contacted USI's current employees and attempted to induce them to terminate their positions with USI. In their complaint, the plaintiffs assert several causes of action based on the defendants' alleged violation of the agreement.

On June 20, 2008, the defendants moved to strike the complaint in its entirety. As required by Practice Book § 10-42, the defendants submitted a memorandum of law in support of the motion. The plaintiffs filed their memorandum of law in opposition to the motion to strike on July 23, 2008. On September 19, 2008, the defendants filed a reply memorandum of law in support of their motion to strike.

## DISCUSSION

### A

### *Motion to Strike Standard*

2009 WL 416059

**\*2** "The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaint ... to state a claim upon which relief can be granted."(Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves*, 262 Conn. 480, 498, 815 A.2d 1188 (2003). In ruling on a motion to strike, "[t]he role of the trial court [is] to examine the [complaint], construed in favor of the [plaintiff], to determine whether the [plaintiff has] stated a legally sufficient cause of action."(Internal quotation marks omitted.) *Dodd v. Middlesex Mutual Assurance Co.,* 242 Conn. 375, 378, 698 A.2d 859 (1997)."A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged."(Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves*, 262 Conn. 480, 498, 815 A.2d 1188 (2003).

"In ruling on a motion to strike, the court is limited to the facts alleged in the complaint."(Internal quotation marks omitted .) *Faulkner v. United Technologies Corp.,* 240 Conn. 576, 580, 693 A.2d 293 (1997)."Where the legal grounds for ... a motion [to strike] are dependent upon underlying facts not alleged in the plaintiff's pleadings, the defendant must await the evidence which may be adduced at trial, and the motion should be denied."(Internal quotation marks omitted.) *Commissioner of Labor v. C.J.M. Services, Inc.,* 268 Conn. 283, 293, 842 A.2d 1124 (2004).

*B*

***Count One: Breach of Covenant Not to Compete (Against McDonald)***

In count one, the plaintiffs assert that McDonald breached his agreement with USI by accepting employment with Shoff Darby and providing services to USI's clients in violation of the restrictive covenants contained in the agreement. The defendants argue that the court should strike count one on the ground that the non-compete and non-solicitation clauses are overly broad and therefore unenforceable. Specifically, the defendants attack the covenant on two grounds: (1) the agreement is too broad because it limits McDonald from soliciting potential clients; and (2) the agreement is potentially unlimited in duration because the time limitation is conditioned upon McDonald's enrollment in USI's deferred compensation plan.

The plaintiffs argue that the covenants are reasonable. The plaintiffs further argue that even if the covenants are deemed unreasonable as currently written, the agreement contains a "blue pencil" provision which would allow the court to modify the time and geographical scope of the covenant in conformance with the law. In response, the defendants argue that the "blue pencil" provision is not helpful to the plaintiffs because in order to make the agreement reasonable under the law, the court would effectively have to rewrite the contract, an action that is forbidden under Connecticut law.

At the outset, it is important to note that the defendant is using a motion to strike to attack the illegality and enforceability of the agreement between McDonald and USI. On a motion to strike, the court is limited to facts alleged in the complaint, and therefore "[a]ny illegality which may arguably exist [must be] apparent upon a facial examination of either the challenged pleading or the copy of the contract that is attached to the challenged pleading."*Russo Associates, Inc. v. Refined Sugars, Inc.,* Superior Court, judicial district of Fairfield, Docket No. CV 93 0307744 (May 17, 1994, Rodriguez, J.) (9 C.S.C.R. 631)."[I]llegality not apparent on the face of the pleadings must be specially pleaded."*Norwalk Door Closer Co., Inc. v. Eagle Lock & Screw Co.,* 153 Conn. 681, 686, 220 A.2d 263 (1966). [6] The court cannot "consider facts outside of the pleadings in order to rule on the legality or enforceability of the covenant not to compete."*Russo Associates, Inc. v. Refined Sugars, Inc., supra,* at 9 C.S.C.R. 631.The Supreme Court has also noted that trade restraints, such as restrictive covenants, require a finding of reasonableness, which is commonly a question of fact and can only be struck down without the appropriate factual findings if it is "per se unreasonable." *Deming v. Nationwide Mutual Ins. Co.,* 279 Conn. 745, 759 n. 15, 905 A.2d 623 (2006); see also *Elida, Inc. v. Harmour Realty Corp.,* 177 Conn. 218, 226-28, 231-32, 413 A.2d 1226 (1979)."Per se rules of illegality should only be applied to conduct which is shown to be manifestly anti-competitive ..."*Elida, Inc. v. Harmour Realty Corp., supra,* at 231, 413 A.2d 1226.

[6]    This conclusion is in line with Practice Book § 10-50 requiring parties to plead "illegality not apparent on the face of pleadings" as a special defense.

**\*3** A covenant not to compete is valid and enforceable if the "restraint is reasonable." *New Haven Tobacco Co. v. Perrelli,* 18 Conn.App. 531, 533, 559 A.2d 715,cert. denied, 212 Conn. 809, 564 A.2d 1071 (1989)."The five factors to be considered in evaluating the reasonableness of a restrictive covenant ancillary to an employment agreement are (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests."*Robert S. Weiss & Associates, Inc. v. Wiederlight,* 208 Conn. 525, 529 n. 2, 546 A.2d 216 (1988)."The five prong test ... is disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable."*New Haven Tobacco Co. v. Perrelli, supra,* at 534, 559 A.2d 715.

The Appellate Court has not addressed the issue of whether a restrictive covenant prohibiting solicitation and service of potential clients renders a covenant per se unreasonable. At least one Superior Court has concluded that a blanket ban against soliciting future clients "who have no relationship with the plaintiff but are ... in the plaintiff's range of business ... [P]uts unnecessary restraints on ordinary competition ..."*Sanford Hall Agency, Inc. v. Dezzanni,* Superior Court, judicial district of New Haven, Docket No. CV 04 4000576 (December 2, 2004, Meadow, J.T.R.) (38 Conn. L. Rptr. 420). Other Superior Courts have upheld covenants prohibiting the solicitation of potential clients that the employee may have had contact with or learned of during a specified time period during the employee's employment. For example, in *Cuna Mutual Life Ins. Co. v. Butler,* Superior Court, judicial district of Middlesex, Docket No. CV 07 5002153 (June 21, 2007, Aurigemma, J.), the court upheld a restrictive covenant prohibiting an employee from soliciting and selling to potential clients with whom the employee had contact within the last six months preceding her termination. The court reasoned that this restriction was reasonable and narrowly drawn because the employee was only prohibited from marketing to those clients with whom she dealt during her employment. See also *Hilb, Rogal & Ham Co. v. Pawlich,* Superior Court, judicial district of Hartford, Docket No. CV 94 0705183 (March 31, 1995 Corradino, J.). In *Robert J. Reby & Co., Inc. v. Bryne,* Superior Court, judicial district of Danbury, Docket No. CV 05 4004259 (July 13, 2006, Schuman, J.), the court upheld a restrictive covenant that prohibited an employee from soliciting potential customers that were identified to him through leads developed in the course of his employment. The court reasoned that this covenant was reasonable because the employee was only barred from soliciting those customers and not barred from actually selling the product to them.

**\*4** Thus, in order for a covenant addressing potential clients to be reasonable, the potential clients must be readily identifiable and narrowly defined such that the former employee "can still market ... products to multitude of potential customers ..."*Cuna Mutual Life Ins. Co. v. Butler, supra,* Superior Court, Docket No. CV 07 5002153.

In fact, the purpose of the covenant is to protect employers where the "employment involves the imparting of ... contacts and associations with clients or customers ... [and] to restrain the use ... of the knowledge and acquaintance so acquired, to injure or appropriate the business which the party was employed to maintain and enlarge."*May v. Young,* 125 Conn. 1, 7, 2 A.2d 385 (1938)."As to scope, the restraint may reasonably cover actual clients or customers of an employer whose business with them would be subject to injury through the activities contracted against ."*Id.,* at 8, 2 A.2d 385. Indeed, "[t]he fact that an employer seeks to protect his interest in potential new customers in a *reasonably limited market area* as well as his existing customers at the time the employee leaves does not render the covenant unreasonable."(Emphasis added.) *Robert S. Weiss & Associates, Inc. v. Wiederlight, supra,* 208 Conn. at 533, 546 A.2d 216. Thus, courts have upheld geographic restrictions, restraining employees from doing business in a given area, a restraint which has the very effect of prohibiting contact with potential clients by virtue of their location to the employer. *Id.*

In the present case, the covenant prohibits McDonald from soliciting and servicing those entities that were current or potential clients in the last twelve months prior to his termination. This is patently different from the case in which employers barred contact with unknown future clients who the employee may never have come in contact with or acquired any special knowledge about in the course of their employment. The present case concerns potential clients or leads from a specified time period in which McDonald could have come in contact with and acquired information about. Even though McDonald may not have had direct contact with every potential client, he had an opportunity to gain the "knowledge and acquaintance so acquired, to injure or appropriate the business which [he] was employed to maintain and enlarge."*May v. Young, supra,* 125 Conn. at 7, 2 A.2d

385. USI is entitled to protect the specialized knowledge he may have acquired. Moreover, the connection between USI and these clients is no more tenuous, than an employer's connection with potential clients in a given geographic area. Thus, it cannot be said that such a provision renders the covenant invalid upon its face. [7]

[7]    To be sure, the defendants argue that in *Webster Insurance, Inc. v. Levine,* judicial district of New Haven, Docket No. CV 06 4020633 (December 12, 2006, Meadow, J.T.R.), the court struck down a similar covenant imposed by the defendants that forbade the employee from soliciting and doing business with both the employer's former and current clients. That case, however, concerned a motion for a prejudgment injunction, where findings of fact were made. Significantly, the court concluded that the limits placed upon the employee forbidding him from contacting former clients were unreasonable because the employer did not have the capacity to serve some of those former clients and therefore the clause was more about limiting competition and less about protecting its interests. That factual scenario is not present here and entertaining such an analysis would require the court to look at facts outside the pleadings.

The defendants' second argument is equally without merit. "In order to be valid and binding, a covenant which restricts the activities of an employee following the termination of his employment must be partial and restricted in its operation in respect to *either time or place*..." (Emphasis added; internal quotation marks omitted.) *Scott v. General Iron & Welding Co.,* 171 Conn. 132, 137, 368 A.2d 111 (1976)."[T]ime and geographic restrictions in a covenant not to compete are valid if they are reasonably limited and fairly protect the interests of both parties."*Robert S. Weiss & Associates, Inc. v. Wiederlight, supra,* 208 Conn. at 530, 546 A.2d 216. "[T]ime and geographical considerations are to be reviewed as intertwined when a determination is made on the reasonableness of the limitations of an employee's post-termination activities ..."*Van Dyck Printing Co. v. Dincola,* 43 Conn.Supp. 191, 197, 648 A.2d 898, (1993), aff'd, 231 Conn. 272, 648 A.2d 877 (1994)."A restriction covering a large area might be reasonable if in effect for a brief time, while a restriction covering a small area might be reasonable for a longer time."*Id.* Although "the more recent cases have involved finite temporal restrictions" our courts have upheld permanent limitations on an individual's ability to practice his profession. *Robert J. Reby & Co., Inc. v. Bryne, supra,* Superior Court, Docket No. CV 05 4004259; *Styles v. Lyon,* 87 Conn. 23, 86 A. 564 (1913). In *Robert J. Reby & Co.,* the court upheld a clause prohibiting the employee from soliciting current and potential clients of his current employer. Although the clause was not a pure non-compete, it contained no geographical or time restrictions. In an older case, *Cook v. Johnson,* 47 Conn. 175, 177-78 (1879), the Supreme Court upheld a permanent restriction on a dentist's ability to practice within a ten-mile radius of the person to whom he sold his business. One court, albeit in a different context, discussed treatment of covenants not to compete in our courts and determined that "Connecticut law does not require any such presumption of invalidity" as to lack of time or geographic restrictions. *Newinno, Inc. v. Peregrim Development,* Superior Court, judicial district of Fairfield, Docket No. CV 02390074 (June 3, 2003, Stevens, J.) [35 Conn. L. Rptr. 30]."The mere fact that the duration of the restriction as to time is indefinite or perpetual will not of itself avoid the contract if it is limited as to place, and is reasonable and proper in all other respects."*Cook v. Johnson,* 47 Conn. 175, 178 (1879); see also *Newinno, Inc. v. Peregrim Development, supra,* Superior Court, Docket No. CV 02 390074; *Robert J. Reby & Co., Inc. v. Bryne, supra,* Superior Court, Docket No. CV 05 4004259.

**\*5** The present case concerns a covenant that operates for the greater of either two years or for so long as McDonald receives benefits under a deferred compensation plan. Under our case law, the mere fact that the covenant could be unlimited in duration does not make the covenant "per se unreasonable" on its face. Moreover, the covenant contains other limitations. The non-compete provision creates a geographic limitation, prohibiting McDonald from participating in the insurance business within a twenty-five mile radius from USI offices and the anti-solicitation is limited in that it is applicable only to former and present clients. [8] Covenants that are applicable only to former and present customers are automatically limited in geography in that they are "limited to that area in which the customers are located."*New Haven Tobacco Co. v. Perrelli, supra,* 18 Conn.App. at 537, 559 A.2d 715. While non-compete clauses containing radius restrictions have typically received greater scrutiny by the courts, radius restrictions have been upheld in several contexts. *Robert S. Weiss & Associates, Inc. v. Wiederlight, supra,* 208 Conn. at 531, 546 A.2d 216; *Scott v. General Iron & Welding Co.,* 171 Conn. 137-39 (upholding a statewide restriction). Finally, the covenant is not completely unlimited in duration, it is tied to a specific event that being the cessation of McDonald's participation in a deferred compensation plan.

8      The agreement is a little unclear in that paragraph nine specifically prohibits McDonald from soliciting current or past clients. Paragraph 7(b), however, defines client as: "any person, firm, or corporation that was a client or potential client at the time of Employee's termination or who was in such capacity at any time during the twelve months immediately preceding the Employee's termination."

In short, taking the covenant as a whole, nothing on the face of the contract renders the covenant unenforceable as a matter of law. Later proceedings may reveal that the covenant protects the employer in areas where they do not do business or that the prohibitions are not narrowly tailored to the business situation, but because on a motion to strike the court is limited only to the face of the pleadings, and nothing on its face renders the covenant per se unreasonable, the motion to strike is denied. Further, because the covenant on its face is not unreasonable, the court need not address the parties' arguments concerning the "blue pencil rule" at this time.

C

### Count Two Breach of Implied Covenant of Good Faith and Fair Dealing (Against McDonald)

In count two, the plaintiffs assert that McDonald breached the implied covenant of good faith and fair dealing by (1) inducing USI's clients to cease doing business with USI; (2) accepting insurance business from and servicing USI's clients; and (3) interfering with USI's contractual relationships between USI and its employees. The defendants argue that because a breach of contract is required for the claim of the breach of the implied covenant of good faith and fair dealing and because a claim of breach of contract cannot lie where a restrictive covenant is unenforceable, the plaintiffs' claims under count two must fail. Alternatively, the defendants argue, that even if the plaintiffs' claims for breach of contract survive, the plaintiffs' claims under count two are insufficient because they fail to allege facts showing bad faith on the part of McDonald. Specifically, the defendants argue that the facts alleged in count two show only that McDonald breached his contract, and an express contractual breach is insufficient to support a showing of bad faith. The plaintiffs argue that because the covenant not to compete is reasonable and enforceable, the defendants have breached the contract, and consequently, their claim for breach the implied covenant of good faith and fair dealing is not barred on that ground. Alternatively, the plaintiffs argue that a claim under the covenant of good faith and fair dealing could be brought on the theory that McDonald misappropriated confidential information that he gained during his employment in contravention of the contract.

  **\*6** Because the covenant is not per se unreasonable, the defendants' first argument is no longer viable and the only issue remaining is whether the plaintiffs have sufficiently alleged bad faith.

"[E]very contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement ... The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term ..."*Ramirez v. Health Net of the Northeast, Inc.,* 285 Conn. 1, 16 n. 18, 938 A.2d 576 (2008)."Most courts decline to find a breach of the covenant apart from a breach of an express contract term ... Stated otherwise, the claim [that the covenant has been breached] must be tied to an alleged breach of a specific contract term, often one that allows for discretion on the part of the party alleged to have violated the duty."(Citation omitted; internal marks quotations omitted.) *Landry v. Spitz,* 102 Conn.App. 34, 47, 925 A.2d 334 (2007).

"To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith."(Internal quotation marks omitted.) *Ramirez v. Health Net of the Northeast, Inc., supra,* 285 Conn. at 16-17 n. 18, 938 A.2d 576. "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some sinister motive ... Bad faith means more than mere negligence; it involves a dishonest purpose."(Internal

quotation marks omitted.) *Landry v. Spitz, supra*, 102 Conn.App. at 42-43, 925 A.2d 334. The Appellate Court has noted, however, that: "[a] complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."(Internal quotation marks omitted.) *Elm Street Builders, Inc. v. Enterprise Park Condominium Ass'n., Inc.*, 63 Conn.App. 657, 667, 778 A.2d 237 (2001)."Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes them to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty."*Id.*

A breach of contract, itself, however, is not a breach of the implied covenant of good faith dealing. *On Site Gas Systems, Inc. v. Environics, Inc.*, Superior Court, complex litigation docket at Hartford, Docket No. X09 CV 04 4006239 (October 17, 2008, Shortall, J.). In *On Site Gas Systems, Inc.*, the Superior Court determined that allegations that the defendant used confidential information in violation of a nondisclosure agreement "may amount to a breach of the non-disclosure agreement, but they do not even imply a sinister or dishonest purpose."The court stated that "[t]his is tantamount to saying that the breach of the contract, itself, is a breach of the covenant of good faith and fair dealing, and that is not the law."*Id.;* see also *Fairfield Financial Mortgage Group, Inc. v. Salazar,* Superior Court, judicial district of Danbury, Docket No. CV 00 0339752 (April 23, 2003, Moraghan, J.T.R.) ("Thus, in cases which have allowed claims of breach of implied covenant of good faith and fair dealing, there have been allegations beyond simple breach of contract that support a claim of the implied covenant").

 *\*7* In the present case, in count two, the plaintiffs have alleged that McDonald violated the covenant of good faith and fair dealing by soliciting and doing business with USI's clients and interfering with USI's employees' employment contracts in contravention of their agreement. The plaintiffs further allege in count two, by incorporation of paragraphs one through twenty-four, that McDonald, under the terms of his contract, agreed that he would refrain from both soliciting and servicing USI's clients and interfering with the employment relationships between USI and its current employees. While the plaintiffs' allegations in count two demonstrate that McDonald breached his contract with USI, similar to the allegations in *On Site Gas Systems, Inc.*, they do not demonstrate that McDonald acted in bad faith. In count two, the plaintiffs do not allege any facts creating even an inference that McDonald's actions were the result of anything more than an honest mistake, that he had a dishonest purpose, or even that his breach was wilful. The plaintiffs' second argument that McDonald misappropriated confidential information is flawed for the same reasons. Again, while these facts might support a breach of contract claim, they do not support a claim of the implied covenant of good faith and fair dealing. See *On Site Gas Systems, Inc. v. Environics, Inc., supra,* Superior Court, Docket No. X09 CV 04 4006239 (determining that the plaintiff's allegations of misuse of confidential information amount only to a breach of the disclosure agreement and do not sink to the level of bad faith).

Accordingly, the court finds that the plaintiffs have not alleged enough facts to support allegations of bad faith on the part of McDonald, and therefore, the defendants' motion to strike count two is granted.

### D

#### Count Three Breach of Fiduciary Duty (Against McDonald)

In count three, the plaintiffs assert that McDonald breached his fiduciary duty to USI by (1) soliciting and servicing USI's former employees; and (2) interfering with USI's contractual relationships between USI, its employees, and clients. The defendant argues, however, that all of the transgressions forming the basis for the plaintiffs' claims occurred after McDonald terminated his employment relationship and that McDonald no longer owed a fiduciary duty to the plaintiffs at that time. The plaintiffs do not dispute that the transgressions alleged in their complaint occurred after McDonald terminated his employment with USI. Instead, the plaintiffs argue that McDonald owed a fiduciary duty to the plaintiffs by virtue of his restrictive covenant. Thus, the principle bone of contention between the two parties is the issue of when a fiduciary duty ends in an employment relationship containing a restrictive covenant.

An employee, as a fiduciary, "is obligated to exercise the utmost good faith, loyalty, and honesty toward his ... employer."*Town & Country House & Homes Service v. Evans*, 150 Conn. 314, 317, 189 A.2d 390 (1963)."[An employee] during the term of the agency, is subject to a duty not to compete with the principal ..."*Id.*"Generally speaking, in the absence of a restrictive covenant, a former employee may compete with his or her former employer upon the termination of employment."*Elm City Cheese Co. v. Federico*, 251 Conn. 59, 69, 752 A.2d 1037 (1999)."Thus, before the end of his employment, he can properly purchase a rival business and upon termination of the employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment ... in direct competition with the agent's business."(Internal quotation marks omitted.) *Town & Country House & Homes Service v. Evans, supra*, at 317, 189 A.2d 390. Nonetheless, "[e]ven after the employment has ceased, however, the employee remains subject to a duty not to use ... confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer."(Internal quotations marks omitted.) *Elm City Co. v. Federico, supra*, at 69, 752 A.2d 1037.

*\*8* The plaintiffs argue that the phrase "absence of a restrictive covenant" implies that a fiduciary duty exists between a former employee and a former employer after the termination of an employment relationship. McDonald argues that the phrase refers only to a contractual obligation independent of any fiduciary duty owed by an employee, and accordingly, McDonald is only liable on the basis of contract law.

The Appellate Courts have not addressed this issue, however, at least one Superior Court determined that this clause "when read in its full context, refers to a breach of contract and not necessarily to a breach of fiduciary duty."*Troxler Electronic Lab., Inc. v. Pallila*, Superior Court, judicial district of Danbury, Docket No. 316518, (May 10, 1995, Stodolink, J.) (14 Conn. L. Rptr. 205). Nevertheless, the court in *Troxler Electronic Lab, Inc. v. Pallila, supra*, 14 Conn. L. Rptr. at 205, concludes that in this context "a fiduciary's duty extends past the termination of agency."Courts in other jurisdictions have reached a similar conclusion finding that "[w]hile the termination of employment typically ends a fiduciary duty ... this is not so where an employment contract contains a valid restrictive covenant."*Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F.Sup.2d 398, 414 (N.D.Ill.2001); see also *Composite Marine Propellers v. Van Der Woude*, 962 F.2d 1263 (7th Cir.1992)."A fiduciary duty rests on the validity of an underlying contract."*Id.* A review of the Restatement (Third) of Agency supports this conclusion stating that, "[a]n agent has a duty to act in accordance with the express and implied terms of any contract between the agent and principal."Restatement (Third), Agency, Duty Created by Contract, § 8.07 p. 334 (2005).

In the present case, in their complaint, the plaintiffs allege that McDonald breached his fiduciary duty to USI by competing with USI and interfering with USI's contractual relations in contravention of the restrictive covenant, after he had terminated his relationship and joined Shoff Darby. Therefore, because an employee who enters into an agreement containing a restrictive covenant has a fiduciary duty, created by the contract, not to compete upon the termination of the agency relationship, the court finds the plaintiffs have alleged facts supporting a breach of a fiduciary duty. Accordingly, the defendants' motion to strike count three is denied.

### E

### Tortious Interference: Counts Four (Against McDonald), Five (Against Shoff Darby), Six (Against McDonald) and Seven (Against Shoff Darby)

#### 1. Counts Four and Six (Against McDonald)

In count four, the plaintiffs assert that McDonald tortiously interfered with the contractual relationships between USI and its employees by (1) trying to persuade USI's employees to terminate their employment with USI; (2) advising USI employees that their non-compete clause was unenforceable; and (3) offering to guide the employees through the termination process.

The defendants first argue that the plaintiffs' complaint fails to state a cause of action because the plaintiffs do not allege facts showing either tortious conduct or an improper motive. The plaintiffs counter that they have in fact alleged tortious conduct or an improper motive. Specifically, the plaintiffs argue that the facts show that McDonald engaged in misrepresentation by informing USI's employees that the covenant not to compete was unenforceable and offering to guide them through their termination process.

**\*9** "A claim for intentional interference with contractual [or business] relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct."*Rioux v. Barry,* 283 Conn. 338, 351, 927 A.2d 304 (2007). The same basic proof requirements apply to a claim of tortious interference with business relations as tortious interference with contractual relations, except the former requires proof of a business relationship, whereas the latter requires proof of a contractual relationship. *Robinson v. Robinson,* 103 Conn.App. 69, 77, 927 A.2d 364 (2007)."[F]or a plaintiff successfully to prosecute ... an action [of tortious interference with business relations] it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously ... [An] action for intentional interference with business relations ... requires the plaintiff to plead and prove at least some improper motive or improper means ... [A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself."(Internal quotation marks omitted.) *Downes-Patterson Corp. v. First National Supermarkets, Inc.,* 64 Conn.App. 417, 429, 780 A.2d 967,cert. granted, 258 Conn. 917, 782 A.2d 1242 (2007)."Like the definition that emerges from our own cases, the Restatement (Second) of Torts defines intentional interference with business relations to cover a broad range of behavior."*Blake v. Levy,* 191 Conn. 257, 261, 464 A.2d 52 (1983)."Every act of interference is not, however, made tortious."*Id.*

A similar factual scenario was addressed in *Desrosier of Greenwich v. Shumway Capital Partners,* Superior Court, judicial district of Stamford, Docket No. CV 05 4004621 (May 30, 2006, Lewis, J.T.R.). In that case, on a motion to strike, the plaintiffs alleged that the defendants contracted with the plaintiffs to hire a consultant from the plaintiff's company, and in return, the defendants agreed that they would not solicit the consultant for employment at their company. *Id.* Subsequent to the agreement, the defendants encouraged the consultant to quit his employment with the plaintiffs and advised him that the non-compete clause in his own agreement was unenforceable. *Id.* The defendants eventually hired the consultant in contravention of their agreement with the plaintiff. *Id.* The court concluded that based on those allegations, the plaintiff had alleged both an improper motive and intentional interference by showing that the defendants "[terminated their] service contract with the plaintiff and subsequently [hired] away the plaintiff's [employee] to perform similar work."*Id.* The court noted that "[t]he purpose of the clause in the agreement forbidding the defendant from hiring any of the plaintiff's employees was more than likely included to prevent just such an occurrence."*Id.*

**\*10** In the present case, the plaintiffs allege that McDonald solicited employees in contravention of his agreement, encouraged employees to quit their positions with USI and join Shoff Darby, and advised them that their covenants were not enforceable. Thus, the plaintiffs, similar to the plaintiffs in *Desrosier of Greenwich v. Shumway Capital Partners,* have sufficiently alleged improper motive on the part of McDonald.

The defendants next argue that the plaintiffs fail to allege facts showing an actual loss, which is a necessary component of a claim for tortious interference. The plaintiffs counter that they have alleged facts showing loss by pleading that they were harmed and entitled to damages.

"In order for the plaintiff to establish liability for interference with a contractual relationship, the plaintiff must show that the defendants' tortious conduct caused the [employees] to terminate [their] relationship with the plaintiff."*Collum v. Chapin,* 40 Conn.App. 449, 452, 671 A.2d 1329 (1996)."Unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss ... it is an essential element of the tort of unlawful interference ... that plaintiff suffers actual loss."*Appleton v. Board of Education,* 254 Conn. 205, 213, 757 A.2d 1059 (2000)."Thus, it must appear that, except for the

Webster Financial Corp. v. McDonald, Not Reported in A.2d (2009)

2009 WL 416059

tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into a contract or made a profit ... Such a determination is a question for the trier of fact, as is the question of whether the plaintiff has suffered an actual loss ... If the question is whether the plaintiff would have succeeded in attaining a prospective business transaction in the absence of [the] defendant's interference, the court may, in determining whether the proof meets the requirement of reasonable certainty, give due weight to the fact that the question was made hypothetical by the very wrong of the defendant."(Citations omitted; internal quotation marks omitted.) *American Diamond Exchange, Inc. v. Alpert,* 101 Conn.App. 83, 97, 920 A.2d 357,cert. denied, 284 Conn. 901, 931 A.2d 261 (2007).

In *Desrosier of Greenwich v. Shumway Capital Partners, supra,* Superior Court, Docket No. CV 05 4004621, the court, applying the test delineated above, determined that "[a]lthough the plaintiff has not specified the damages it suffered, the allegations [that the employee left employment and the employer thereby incurred a loss were] sufficient to show that it is reasonably certain that the plaintiff suffered a monetary loss since it was deprived of the benefit it would have received from the services of [its employee]."*Id.*

In the present case, the plaintiffs allege that they suffered harm. However, unlike the plaintiffs in *Desrosier of Greenwich,* the plaintiffs have not alleged that any of the employees actually left USI as a result of McDonald's behavior. *Id.* To be sure, the plaintiffs have alleged that they have suffered harm, but, these allegations are conclusory. "A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged."(Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves,* 262 Conn. 480, 498, 815 A.2d 1188 (2003).

### 2. Count Six

**\*11** In count six, the plaintiffs assert that McDonald tortiously interfered with USI's business relationship between USI and its clients by soliciting and attempting to do business with their clients. The defendants argue that the plaintiffs' complaint fails to state a cause of action because the plaintiffs do not allege facts showing either (1) tortious conduct, (2) an improper motive, or (3) actual loss. Specifically, the plaintiffs argue that the facts show that McDonald engaged in misrepresentation by falsely informing USI's clients that one of USI's employees was leaving the company to have a child. The plaintiffs further argue that they have alleged facts showing actual loss by pleading that they were harmed and entitled to damages. Applying the principles articulated above in count four, the plaintiffs have sufficiently alleged both an improper means and actual loss. The plaintiffs allege that McDonald falsely informed a current USI client that one of its brokers was a stay at home mother. Reading the complaint in a light most favorable to the plaintiffs, the plaintiffs have alleged that McDonald used "at least some improper motive or means" to gain USI's client's business. *Blake v. Levy, supra,* 191 Conn. at 262, 464 A.2d 52.

In the present case, the plaintiffs have pleaded, by incorporation of paragraph nineteen, that the defendants are now the brokers of record for the plaintiffs' former or potential clients. It can be inferred from those facts that the plaintiffs have actually lost current or prospective clients due to the misrepresentations of the client. Although, the plaintiffs do not specifically name the client that was lost as a result of McDonald's actions, on a motion to strike "[w]hat is necessarily implied [in an allegation] need not be expressly alleged."(Internal quotation marks omitted.) *Violano v. Fernandez,* 280 Conn. 310, 318, 907 A.2d 1188 (2006)."Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically."(Internal quotation marks omitted.) *Id.* Moreover, in light of the more lenient standard for proving actual loss in tortious interference with business relations claims, articulated by the Appellate Court above, Superior Courts have not required such a level of specificity on motions to strike. See *Tassmer v. McManus,* Superior Court, judicial district of New Haven, Docket No. CV 08 5018061 (October 1, 2008, Bellis, J.) (concluding that plaintiffs alleged a claim for tortious interference despite their failure to name willing prospective buyers that were lost or an existing contract that was impaired); see also *NEJ, Inc. v. Kentucky Apparel, LLP,* Superior Court, judicial district of Waterbury, Docket No. CV 05 4006714 (February 10, 2006, Brunetti, J.) (finding that the plaintiffs' allegations of damage to their business relationships and reputation in eyes of customers were sufficient to show actual loss even though plaintiffs did not plead loss of tangible specific customer). Thus construing the complaint broadly, the

plaintiffs sufficiently plead the "actual loss" element of tortuous interference and accordingly, the defendants' motion to strike count six is denied.

### 3. Counts Five and Seven

**\*12** In count five, the plaintiffs assert that Shoff Darby tortiously interfered with USI's contractual relationship with McDonald, and in count seven, the plaintiffs allege that Shoff Darby tortiously interfered with USI's business relationships with its clients. The defendants argue that the plaintiff's allegations in counts five and seven are insufficient because they fail to show that Shoff Darby acted maliciously or had an improper motive. The plaintiffs appear to argue that they stated a claim of tortious interference by alleging: (1) Shoff Darby knew of the restrictive covenant; (2) acted tortiously and interfered with the relationship; and (3) obtained a financial benefit in doing so. They appear to be arguing that these allegations alone are enough to support their claim. They further argue that Shoff Darby participated in a scheme to divert customers away from USI and consequently, acted with an improper motive.

As stated above, to support a claim for tortious interference, "the plaintiff must plead and prove at least some improper motive or improper means."*American Diamond Exchange v. Alpert, supra,* 101 Conn.App. at 90, 920 A.2d 357. "This element may be satisfied by proof that the defendant is guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously."(Internal quotations omitted.) *Blake v. Levy, supra,* 191 Conn. at 261, 464 A.2d 52. The Supreme Court has determined in *Robert S. Weiss & Associates, Inc. v. Wiederlight, supra,* 208 Conn. at 536, 546 A.2d 216, a factually identical case, that allegations of mere knowledge of a restrictive covenant coupled with allegations that the defendant encouraged the restricted party to sell insurance in the restricted area do not "fairly imply that the [defendant] acted with ... malice."Superior courts have also reached the same conclusion that mere knowledge of a restrictive covenant alone does not arise to a claim for tortious interference with either the employer's contractual relations with their employees or their business relations with their clients.*Pediatric Occupational Therapy Services, Inc. v. Wilton,* Superior Court, judicial district of Waterbury, Docket No. CV 02 0174833 (July 5, 2004, Alander, J.) (37 Conn. L. Rptr. 115); see also *Sanford Hall Agency, Inc. v. Dezzanni,* Superior Court, *supra,* 38 Conn. L. Rptr. at 420.Nor does hiring an employee in violation of a restrictive covenant arise to a claim for tortious interference. *Pediatric Occupational Therapy Services, Inc. v. Wilton, supra,* 37 Conn. L. Rptr. at 115. Indeed, an employer has an adequate, business-related justification to hire "a skilled professional ... whose expertise would benefit [its] customers."*Sanford Hall Agency, Inc. v. Dezzanni, supra,* 38 Conn. L. Rptr. at 420. "While hiring one of the plaintiff's employees may be viewed as interference with the plaintiff's business, it does not mean that it is tortious since not all interference is considered to be tortious."*Id.*

**\*13** Similar to the plaintiff in *Robert S. Weiss & Associates, Inc.,* the most the complaint alleges is that Shoff Darby knew of the covenant's terms when it hired McDonald. This fact alone is not enough for a claim of tortious interference on either the basis that Shoff Darby interfered with USI's contractual relations with McDonald or its business relations with its clients. [9]

---

[9]    It should be noted that this factual scenario is distinguishable from the scenario presented in *Desrosier of Greenwich v. Shumway Capital Partners, supra,* Superior Court, Docket No. CV 05 4004621, cited above in count four. That case concerned a company who hired a consultant from another company in contravention of their own agreement that they would not solicit that consultant for employment purposes. In the present case, Shoff Darby does not have such a contract with USI.

To be sure, plaintiffs alleged in their complaint that Shoff Darby obtained some financial betterment at the expense of USI, and they argue in their memorandum in opposition that Shoff Darby participated in a scheme or conspiracy to divert customers. Neither of these allegations are sufficient. First, the plaintiffs do not allege in count seven or count five of their complaint that Shoff Darby participated in a scheme to divert customers. "It is well established that a motion to strike must be considered within the confines of the pleadings and not external documents ..."*Zirinsky v. Zirinsky,* 87 Conn.App. 257, 268 n. 9, 865 A.2d 488,cert. denied, 273 Conn. 916, 871 A.2d 372 (2005). Second, mere allegations of encouragement on the part of a present employer or financial betterment are insufficient to arise to claims of tortious interference. *Robert S. Weiss & Associates, Inc. v. Wiederlight,*

Webster Financial Corp. v. McDonald, Not Reported in A.2d (2009)
2009 WL 416059

*supra*, 208 Conn. at 535-36, 546 A.2d 216. There is nothing in counts five or seven of the complaint indicating that Shoff Darby acted improperly such as requiring McDonald to "bring in the plaintiff's clients or misappropriate any company information as a condition of [his] employment."*Sanford Hall Agency, Inc. v. Dezzanni, supra*, 38 Conn. L. Rptr. at 420. Therefore, the defendants' motion to strike counts five and seven are granted.

## F

### CUTPA Violations: Counts Eight (Against McDonald) and Nine (Against Shoff Darby)

### 1. Count Eight

In count eight, the plaintiffs assert that all of McDonald's aforementioned transgressions violate CUTPA. [10] The defendants first argue that the CUTPA claim against McDonald is invalid because it is based upon the premise that McDonald was acting in contravention of the non-compete agreement. The defendants contend that absent the non-compete agreement, McDonald's actions would not violate CUTPA, and it follows that because the non-compete is unenforceable, McDonald's actions do not violate CUTPA. At the outset, the court having concluded in count one that the covenant is not per se unreasonable, the defendants' first argument is no longer viable. The defendants next argue that, assuming the non-compete is enforceable, the plaintiffs' CUTPA allegations are nothing more than legal conclusions that are unsupported by factual allegations. Specifically, the defendants argue that the plaintiffs' allegations at best allege a breach of contract, and a mere breach of contract does not violate CUTPA. The plaintiffs contend that they have alleged more than a breach of contract claim. Specifically, the plaintiffs argue that they have alleged that McDonald has (1) solicited and serviced clients in contravention of the agreement; (2) spread false rumors about USI clients to USI clients; (3) solicited and attempted to persuade USI employees to terminate their relationships; (4) told USI's employees that their covenants were unenforceable; and (5) offered to guide those employees through the termination process. The defendant counters that McDonald's attempts to solicit USI's employees and the misrepresentation stemming from those attempts do not satisfy CUTPA because the plaintiffs have failed to show that they were injured as a result of McDonald's actions.

[10]    Connecticut Unfair Trade Practices Act, General Statutes § 42-110 et seq.

**\*14**  "CUTPA provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce ... In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice ... Thus, in order to prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited act and that, as a result of this act, the plaintiff suffered an injury."(Citations omitted; emphasis in original; internal quotation marks omitted.) *Stevenson Lumber Co.-Suffield, Inc., v. Chase Associates, Inc.,* 284 Conn. 205, 213-14, 932 A.2d 401 (2007).

"It is well settled that in determining whether a practice violates CUTPA [the Connecticut Supreme Court] has adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1)[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons] ... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to lesser extent it meets all three."(Internal quotation marks omitted.) *Ventres v. Goodspeed Airport, LLC,* 275 Conn. 105, 155, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S.Ct. 1913, 164 L.Ed.2d 664 (2006).

"A claim under CUTPA must be pleaded with particularly to allow evaluation of the legal theory upon which the claim is based."(Internal quotation marks omitted.) *S.M.S. Textile Mills, Inc. v. Brown, Jacobson, Tillinghast, Lahan & King, P.C.,* 32 Conn.App. 786, 797, 631 A.2d 340,cert. denied, 228 Conn. 903, 634 A.2d 296 (1993)."[N]ot every contractual breach rises to the level of a CUTPA violation."*Hudson United Bank v. Cinnamon Ridge Corp.,* 81 Conn.App. 557, 571, 845 A.2d 417 (2004). Although "the same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation;"*Greene v. Orsini,* 50 Conn.Supp. 312, 315, 926 A.2d 708 (2007); "[a] breach of contract claim can make out a legally sufficient CUTPA claim [only] as long as there are substantial aggravating circumstances."(Internal quotation marks omitted.) *Alliance Food Management v. Gem Sensors,* Superior Court, judicial district of Waterbury, Docket No. CV 06 5002996 (June 12, 2007, Gallagher, J.). [11]

[11]   "Although there is a split of authority in the Superior Courts as to what is necessary to establish a CUTPA claim for a breach of contract, the vast majority of Superior Court decisions [conclude] that, absent allegations of sufficient aggravating circumstances, [a] simple breach of contract, even if intentional, does not amount to a violation of [CUTPA]." (Internal quotation marks omitted.) *Centimark Corp. v. Village Manor Associates,* Superior Court, judicial district of Windham, Docket No. CV 03 0070166 (June 21, 2007, Martin, J.). The Supreme Court appears to have adopted this standard in *Lydall v. Ruschemeyer,* 282 Conn. 209, 247, 919 A.2d 421 (2007), citing a federal district court standing for the same proposition.

"It has been held that a misrepresentation can constitute an aggravating circumstance that would allow a simple breach of contract claim to be treated as a CUTPA violation; it would in effect be a deceptive act ... CUTPA liability should not be imposed, however, when a defendant merely has not delivered on a promise unless the defendant made a representation as to a future act coupled with a present intent not to fulfill the promise."(Internal quotation marks omitted.) *Centimark Corp. v. Village Manor Associates,* Superior Court, judicial district of Windham, Docket No. CV 03 0070166 (June 21, 2007, Martin, J.). Yet, "[even an] innocent misrepresentation can amount to a CUTPA violation."*Friedlander Limited Partnership v. Cohen,* Superior Court, judicial district of Bridgeport, Docket No. CV 04 0412547 (April 15, 2005, Skolnick, J.)."Where ... a defendant made a representation during the course of the defendant's business practice, with or without the intent to deceive or fraud, and that misrepresentation led a plaintiff to lose money or property, that plaintiff has alleged a cause of action under CUTPA ... Negligent misrepresentation suffices as a basis for a CUTPA claim and as an aggravating factor making a breach of contract action also the basis of a CUTPA claim."*Id.*

**\*15** Breaches of contract that are considered "egregious and unconscionable" can also arise to CUTPA violations. *Beebe v. Kasmun Builders, Inc.,* Superior Court, judicial district of Tolland, Docket No. CV 90 46122 (February 10, 1993, Klaczak, J.) For example, "[m]ultiple breaches of contract may also raise a breach of contract claim to the level of a CUTPA violation."*Ameripride Services, Inc. v. U.S. Food Service, Inc.,* Superior Court, judicial district of Hartford, Docket No. CV 04 0835453 (June 7, 2006, Tanzer, J.). In *Green v. Orsini, supra,* 50 Conn.Supp. at 316, 926 A.2d 708, the court found a CUTPA violation where the defendants violated their restrictive covenant on multiple occasions. After violating the covenant, the defendants promised they would refrain from further violations but continued to compete with the defendants in spite of their promises. *Id.* The court determined that both the misrepresentations and multiple violations of the covenant separately constituted aggravating factors. *Id.* Further, the Supreme Court, in *Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 494, 656 A.2d 1009 (1995), intimated that an employee who accepts a position with a competing business and then, acting as a competitor, makes false representations that harm the former employer, may violate CUTPA. In the context of addressing a different issue, the Supreme court concluded that these allegations "may constitute a violation of CUTPA."*Id.* Indeed, a plaintiff can allege aggravating circumstances by alleging that "the defendants solicited and sold services to [a former employer's customers] in direct competition with [the employer] ..."*Sabatasso v. Bruno,* Superior Court, judicial district of New Haven at Meriden, Docket No. CV 03 0284486 (March 7, 2005, Tanzer, J .)

In the present case, the plaintiffs allege that McDonald spread false rumors to USI's customers concerning USI employees and violated the non-compete provisions of the contract several times. The actions allegedly taken by McDonald are similar to those taken by the defendants in *Green v. Orsini* and *Realty Co. v. Larsen* and constitute aggravating circumstances sufficient for CUTPA violation.

Further, because the plaintiff has alleged sufficient aggravating factors on the basis that McDonald repeatedly breached the covenant and by making false statements to USI's clients, the court need not reach the defendants' third argument that plaintiffs failed to show that USI was harmed by McDonald's actions aimed at USI's employees. The court finds that the plaintiffs have alleged sufficient facts to support a claim under CUTPA. The defendants' motion to strike count eight is denied.

### 2. Count Nine

As to count nine, the defendants argue that the plaintiffs base their alleged CUTPA violations on the presumption that Shoff Darby tortiously interfered with the plaintiffs' business. The defendants argue that because the plaintiffs fail to state a cause of action for tortious interference, the CUTPA violation must fail as well. Further, the defendants contend that there is no basis for the claim that Shoff Darby somehow violated CUTPA by hiring McDonald in violation of the non-compete clause. The plaintiffs argue that their claim amounts to more than a mere tortious interference claim. They contend that Shoff Darby engaged in unfair trade practices by (1) hiring McDonald in spite of their knowledge of the restrictive covenant; (2) soliciting, servicing and interfering with USI's relationship with its clients; and (3) assisting, advising, aiding and or allowing McDonald to spread false rumors about USI's employees.

**\*16** "[T]he essential difference between a tort claim for interference with business expectancies and a claim under CUTPA is the standard by which the alleged acts are measured. While liability in tort is imposed only if the defendant maliciously or deliberately interfered with a competitor's business expectancy, CUTPA liability is premised on a finding that the defendant engaged in unfair competition and unfair deceptive trade practices."*Sportsmen's Boating Corp. v. Hensley,* 192 Conn. 747, 755, 474 A.2d 780 (1994)."[I]mproper conduct that does not rise to the level of tortious interference may, nonetheless, constitute a CUTPA violation."*Par Painting, Inc. v. Greenhorne & O'Mara, Inc.,* 61 Conn.App. 317, 328, 763 A.2d 1078,cert. denied, 255 Conn. 951, 770 A.2d 31 (2001).

At least one Superior Court has determined that hiring an employee in spite of covenant not to compete does not necessarily constitute an "unscrupulous, unfair or deceptive" act. *Sanford Hall Agency, Inc. v. Dezzanni, supra,* 38 Conn. L. Rptr. at 420. Further, one Superior Court has concluded that merely soliciting business in spite of having knowledge of an existing contract is "insufficient to support a CUTPA claim."*Giordano Associates, Inc. v. Yagovane,* Superior Court, judicial district of New Haven, Docket No. CV 06 5002958, (June 6, 2007, Cosgrove, J.). Moreover, naked "allegations of usurpation and diversion of business are insufficient to maintain a cause of action ... [under] CUTPA ..."*Baer v. New England Home Delivery Services, LLC,* Superior Court, judicial district of New Haven, Docket No. CV 06 4021976 (October 18, 2007, Lopez, J.).

In their complaint, the plaintiffs allege that Shoff Darby engaged in unfair practices by hiring McDonald and soliciting insurance business from USI's clients to be serviced by McDonald in contravention of the non-compete clause. These allegations alone merely restate their claims for tortious interference and do not violate CUTPA. The plaintiffs, however, further allege that Shoff Darby assisted or advised McDonald to spread false rumors about USI's employees. These allegations, if true, could support a claim under CUTPA. Therefore, the plaintiffs have alleged sufficient facts in support of their CUTPA claim against Shoff Darby, and accordingly, the defendants' motion to strike count nine is denied.

### CONCLUSION

For the foregoing reasons, the court denies the defendants' motion to strike counts one, three, six, eight and nine and grant the defendants' motion to strike counts two, four, five, and seven.

Yellow Group LLC v. Uber Technologies Inc., Not Reported in F.Supp.2d (2014)
2014 WL 3396055, 2014-2 Trade Cases P 78,833

2014 WL 3396055
United States District Court, N.D. Illinois, Eastern Division.

Yellow Group LLC, et al, Plaintiffs,

v.

Uber Technologies Inc., Defendant.

No. 12 C 7967    |    Signed July 10, 2014

**Attorneys and Law Firms**

Carrie A. Hall, Michael A. Stiegel, Paul R. Coble, Zachary J. Watters, Michael Best & Friedrich LLP, Chicago, IL, for Plaintiffs.

Amit B. Patel, Andrew H. Schapiro, Stephen A. Swedlow, Quinn Emanuel Urquhart & Sullivan, LLP, Chicago, IL, John B. Quinn, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, CA, for Defendant.

### *OPINION AND ORDER*

SARA L. ELLIS, United States District Judge

**\*1** Approximately thirty Plaintiffs, comprising of taxi medallion owners, taxi affiliations, and livery service providers, sued Uber Technologies Inc. ("Uber"), alleging that Uber competes unfairly by misrepresenting certain features of its service, misleading customers as to an association between Uber and Plaintiffs, and encouraging taxi drivers to breach their agreements with Plaintiffs. Uber filed a motion to dismiss the Second Amended Complaint for failure to state a claim and lack of standing. Uber's motion to dismiss [89] is granted in part and denied in part. The Court dismisses Taxi Affiliation Plaintiffs' claim in Counts I and IV premised on alleged misrepresentations of insurance coverage because this claim does not allege an actual misrepresentation of the insurance coverage of uberX drivers and passengers. The Court also dismisses Plaintiff Your Private Limousine's claims in Counts II, III, and V, as these counts fail to state a claim on behalf of Your Private Limousine. Finally, the Court dismisses without prejudice all claims brought by the Medallion Owner Plaintiffs, as they do not have standing to bring Counts I and IV and do not state a valid cause of action in Counts II, III, V, and VI.

### BACKGROUND [1]

[1]  Unless otherwise noted, the facts in the background section are taken from Plaintiffs' Second Amended Complaint and are presumed true for the purpose of resolving Uber's motion to dismiss. *See Virnich v. Vorwald,* 664 F.3d 206, 212 (7th Cir.2011).

Plaintiffs identify themselves in three groups: (1) the Taxi Affiliation Plaintiffs, (2) the Medallion Owner Plaintiffs, and (3) Your Private Limousine. The Taxi Affiliation Plaintiffs are comprised of Flash Cab, Yellow Cab, and related entities; they operate taxi dispatch services in the Chicago area and own intellectual property related to their taxi brands. [2] The Medallion Owner Plaintiffs own City of Chicago taxi medallions, some of which are leased to cab drivers who operate within one of the Taxi Affiliation Plaintiffs' affiliations. [3] Your Private Limousine is a livery service operating in the Chicago area.

[2]  The Taxi Affiliation Plaintiffs are Yellow Group LLC, Yellow Cab Affiliation Inc., Taxi Affiliation Services LLC, 5 Star Flash, Inc., and Taxi Medallion Management, LLC.

[3]  The Medallion Owner Plaintiffs are YC1 LLC, YC2 LLC, YC17 LLC, YC18 LLC, YC19 LLC, YC20 LLC, YC21 LLC, YC22 LLC, YC25 LLC, YC26 LLC, YC29 LLC, YC32 LLC, YC37 LLC, YC49 LLC, YC51 LLC, YC52 LLC, YC56 LLC, Chicago

Yellow Group LLC v. Uber Technologies Inc., Not Reported in F.Supp.2d (2014)
2014 WL 3396055, 2014-2 Trade Cases P 78,833

> Medallion One LLC, Chicago Medallion Five LLC, Chicago Medallion Six LLC, Chicago Medallion Seven LLC, and Chicago Medallion Eleven LLC.

Defendant Uber provides a mobile phone based application that connects customers with taxi, livery, and non-chauffer drivers. Uber customers can request a ride via three types of vehicles: a medallion-bearing taxi, a livery vehicle, or an uberX vehicle.[4] Taxi, livery, and non-commercially licensed drivers that subscribe to Uber use the application to pick up rides in their vicinity. Customers pay for the rides automatically and electronically via credit card information stored within their Uber application. Some Uber drivers are associated with Flash Cab, Yellow Cab, or Your Private Limousine. As a result, when a customer orders a taxi via Uber, the driver who accepts the fare may arrive in a vehicle bearing Flash Cab or Yellow Cab trademarks. Likewise, when a customer uses Uber to request a limousine, the driver who provides the customer's ride may be affiliated with Your Private Limousine.

[4]    UberX is a service in which non-commercially licensed drivers use their personal vehicles as unlicensed taxicabs.

**\*2** Previously, the Court granted in part and denied in part Uber's motion to dismiss the First Amended Complaint. Plaintiffs filed a Second Amended Complaint, which Uber has moved to dismiss in its entirety.


## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). The party asserting jurisdiction has the burden of proof. *United Phosphorus, Ltd. v. Angus Chem. Co.,* 322 F.3d 942, 946 (7th Cir.2003), *overruled on other grounds by Minn–Chem, Inc. v. Agrium, Inc.,* 683 F.3d 845 (7th Cir.2012). The standard of review for a Rule 12(b)(1) motion to dismiss depends upon the purpose of the motion. *Apex Digital, Inc. v. Sears, Roebuck & Co.,* 572 F.3d 440, 443–44 (7th Cir.2009). If a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction (a facial challenge), the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See id.; United Phosphorus,* 322 F.3d at 946. If, however, the defendant denies or controverts the truth of the jurisdictional allegations (a factual challenge), the Court may look beyond the pleadings and view any competent proof submitted by the parties to determine if the plaintiff has established jurisdiction by a preponderance of the evidence. *See Apex Digital,* 572 F.3d at 443–44; *Meridian Sec. Ins. Co. v. Sadowski,* 441 F.3d 536, 543 (7th Cir.2006).

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed.R.Civ.P. 12(b)(6); *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer,* 649 F.3d 610, 614 (7th Cir.2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.


## ANALYSIS

**I. Statutory Claims (Counts I–IV)**
In Counts I through IV, Plaintiffs bring two claims under the Lanham Act and two claims under the Lanham Act's parallel Illinois statutes. As the parties acknowledge, and as the Court has previously held, the analysis is the same under the Lanham Act and the relevant Illinois statutes. Doc. 66 at 7; *Dynamic Fluid Control (PTY) Ltd. v. Int'l Valve Mfg., LLC,* 790 F.Supp.2d 732, 740 (N.D.Ill.2011). Therefore, the Court will analyze the federal and state statutory counts together.

## A. Misrepresentation of Rates, Licensure, and Insurance (Counts I and IV)

In Count I, Plaintiffs sue Uber pursuant to 15 U.S.C. § 1125(a)(1)(B) for deceptively representing on its website that Uber taxis charged "standard taxi rates," when in fact riders were charged the meter fare plus a 20% "gratuity" that was split between the driver and Uber. Plaintiffs also point to a statement in an Uber blog post in which Uber stated that all uberX vehicles were "licensed by the city of Chicago, and driven by a licensed chauffeur." Doc. 77 ¶ 40. Plaintiffs further allege in Count I that Uber misrepresented the scope of the insurance coverage for uberX drivers and passengers. Uber allegedly stated that "there will be a $2,000,000 insurance policy applicable to ridesharing trips,"*id.* ¶ 43, and later claimed that uberX drivers and passengers would be subject to $1 million in coverage. Plaintiffs contend that this misrepresents reality because Uber does not provide any insurance coverage to drivers and passengers. In Count IV, Plaintiffs bring these same claims pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.*

### 1. Standing

**\*3** Uber moves to dismiss Counts I and IV under Federal Rule of Civil Procedure 12(b)(1), asserting that Plaintiffs lack standing to bring a claim for false advertising because they do not directly compete with Uber. Uber argues that courts "within this district have required that the plaintiff and defendant be direct competitors, *i.e.,* that the plaintiff 'show that it competes at the same level of business as the defendant.' " *Platinumtel Commc'ns, LLC v. Zefcom, LLC,* No. 08–CV–1062, 2008 WL 5423606, at \*6 (N.D.Ill.Dec. 30, 2008) (quoting *Medallion Prods., Inc. v. McAlister,* No. 06 C 2597, 2008 WL 5046055, at \*5 (N.D.Ill. Nov. 20, 2008)); *see alsoGail Green Licensing & Design Ltd. v. Accord, Inc.,* No. 05 C 5303, 2006 WL 2873202, at \*5 (N.D.Ill. Oct. 5, 2006).

But the Supreme Court recently criticized this rule, stating that "[i]t is thus a mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect *only* the false-advertiser's direct competitors." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 134 S.Ct. 1377, 1392 (2014). The Supreme Court makes clear that a plaintiff suing for false advertising pursuant to the Lanham Act need not directly compete with the defendant, but must allege an injury to a commercial interest in reputation or sales, and that the injury must flow directly from the deception wrought by the defendant's advertising, such that the false advertising directly caused consumers to divert their business from the plaintiff. *Id.* at 1391.

To succeed on their Lanham Act and Illinois statutory claims, Plaintiffs will be required to prove that Uber's false advertising directly harmed Plaintiffs' reputation or sales. Uber asserts that because the Taxi Affiliation Plaintiffs and Your Private Limousine do not receive a percentage of drivers' fares or a dispatching fee, they cannot allege harm flowing from the false advertising. However, at this stage, the Court is satisfied that the Taxi Affiliation Plaintiffs and Your Private Limousine have plausibly alleged that Uber's deceptive advertising has caused customers to refrain from using their dispatch services. Plaintiffs further plausibly allege that this diversion of business harms the economic value of their business and their reputation. Therefore, the Taxi Affiliation Plaintiffs and Your Private Limousine satisfy the *Lexmark* test, at least at this stage of the proceedings. The Court notes that the Taxi Affiliation Plaintiffs would also satisfy the direct competitor test, based on the limited record before the Court. *SeeBoston Cab Dispatch, Inc. v. Uber Techs., Inc.,* CIV.A. No. 13–10769–NMG, 2014 WL 1338148, at \*6 (D.Mass. Mar. 27, 2014) ("The Court agrees with the magistrate judge that there is sufficient evidence that Uber exercises control over (or is 'in charge of') vehicles-for-hire that compete with plaintiffs in the private transportation business.").

However, the Court finds that the Medallion Owner Plaintiffs do not have standing to assert a claim for false advertising as they do not allege that Uber's false advertising causes them a direct injury. The Medallion Owner Plaintiffs allege that Uber's presence in the market decreases the value of taxi medallions by enabling drivers of non-commercially licensed cars to pick up fares via the Uber application. The Medallion Owner Plaintiffs do not allege that their injury flows directly from Uber's misrepresentations. Therefore, to the extent that the Medallion Owner Plaintiffs bring false advertising claims, the Court dismisses those claims.

### 2. Sufficiency of Allegations

**\*4**  Uber also moves to dismiss the deceptive representation counts for failure to state a claim pursuant to Rule 12(b)(6). As noted above, Counts I and IV hinge on Plaintiffs' allegations that Uber misrepresented its taxi rates and uberX drivers' licensure and insurance. To state a claim under 15 U.S.C. § 1125(a)(1)(B), Plaintiffs must allege:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 819 (7th Cir.1999).

Uber asserts that Plaintiffs have not stated a valid claim because they cannot plausibly allege that they are harmed as a result of Uber's alleged misstatements. Again, Uber asserts that Plaintiffs' income comes from lease payments from drivers, not a percentage of the fares its drivers collect or a fee for dispatching rides. That is, Uber asserts that Your Private Limousine's and the Taxi Affiliation Plaintiffs' streams of income are not diminished as fares are diverted from their dispatch service to Uber.

But the Taxi Affiliation Plaintiffs allege that they are damaged because the value of their business "is largely a product of the number of passengers using their services." Doc. 77 ¶ 58. Plaintiffs assert that "[t]he more passengers that use the Yellow and Flash dispatches, the more valuable those services are to the members of the Yellow and Flash affiliations and the greater the goodwill associated with their names, trademarks, and trade dress." *Id.* Plaintiffs claim that if customers use Uber instead of Plaintiffs' dispatch services, Plaintiffs' reputation will be damaged and, more importantly, Plaintiffs will not be able to charge drivers as much for the right to participate in Plaintiffs' services, including dispatching taxis and livery vehicles. Whether these assertions are true is not at issue here. The question is whether Plaintiffs have plausibly alleged a cause of action. *Iqbal,* 556 U.S. at 678. The Court finds that the Taxi Affiliation Plaintiffs and Your Private Limousine state a plausible claim that Uber's alleged misrepresentations regarding Uber's rates and uberX drivers' licensure and insurance caused them harm. The Court finds that Plaintiffs have also alleged all other elements of a claim pursuant to § 1125(a)(1)(B).

Plaintiffs also allege that Uber misrepresents that uberX drivers and passengers will be covered by a $1 million or $2 million insurance policy, by stating that "[a]t a minimum, there will be a $2,000,000 insurance policy applicable to ridesharing trips," Doc. 77 ¶ 43, and "[a]t a minimum, there will be a $1,000,000 per-incident insurance policy applicable to ridesharing trips,"*id.* ¶ 44. Plaintiffs assert that this statement is untrue because "Uber does not have insurance that covers UberX passengers or drivers for either $2,000,000 or $1,000,000. In fact, Uber has no commercial insurance that will cover an UberX passenger or driver in an accident." *Id.* ¶ 45. But as Uber points out, Uber did not assert that it would provide the insurance policy to uberX drivers and riders, rather that drivers and riders would be covered by at least $1 million or $2 million in insurance. Plaintiffs do not actually allege that this statement is false. Instead, Plaintiffs allege merely that Uber does not provide the insurance, and that uberX drivers do not have commercial automobile insurance. Because Plaintiffs do not allege an actual misrepresentation, the Court dismisses without prejudice the allegation that Uber misrepresented insurance coverage of uberX drivers and passengers.

### B. Misrepresentation of Association (Counts II and III)

**\*5**  In Count II, Plaintiffs claim that Uber violates section 43(a)(1)(A) of the Lanham Act, which creates a cause of action against false representations that are "likely to cause confusion ... or to deceive as to the affiliation, connection, or association of such person with another person, or as to the ... approval of his or her goods, services, or commercial activities by another person." 11 U.S.C. § 1125(a)(1)(A). Plaintiffs, who are not affiliated with Uber, assert that Uber has misrepresented an association by occasionally referring to its "fleet partners." Yellow Group also alleges that Uber also used a yellow colored SUV in one of its

advertisements. The SUV in the ad did not contain Yellow Cab's logo or name, but did include a taxi number 1317. Plaintiffs contend that taxi number 1317 has been assigned to a Yellow cab and of the same make and model as the SUV featured in Uber's advertisement. Plaintiffs claim that Uber's representations are likely to cause confusion or to deceive the public as to the association between Uber and Plaintiffs or the source of Uber's services. Plaintiffs further assert that this confusion is exacerbated by the fact that when a customer orders a taxi or livery vehicle via Uber, a vehicle bearing the Flash or Yellow trademarks will often arrive to pick up the fare. In Count III, Plaintiffs allege that these misrepresentations violate the Illinois Uniform Deceptive Trade Practices Act.

To succeed on this claim, Plaintiffs must prove that (1) Uber made a false or misleading representation of fact (2) in interstate commerce (3) in connection with goods or services, (4) the misleading statement is likely to cause confusion as to Uber's affiliation or association with Plaintiffs or Plaintiffs' approval of Uber's service, and (5) this conduct has harmed or will harm Plaintiffs. *See* 15 U.S.C. § 1125(a)(1); *Boston Cab Dispatch, Inc.,* 2014 WL 1338148, at *4.

The Court finds that the Taxi Affiliation Plaintiffs have plausibly alleged the elements of a claim under § 1125(a)(1)(A). They assert that Uber's representations and the very nature of its service is likely to confuse Uber customers regarding an association between Uber and Flash or Yellow Cab, and that this conduct harms Flash and Yellow Cab's taxi dispatch business. The Taxi Affiliation Plaintiffs plausibly allege that Uber's representations are misleading and are likely to cause confusion among customers to the detriment of the Taxi Affiliation Plaintiffs. Taken together, the Court finds that these allegations satisfy the elements of § 1125(a)(1)(A), sufficient to survive a motion to dismiss.

However, the Court finds that the Medallion Owner Plaintiffs do not state a claim because they do not allege that they have been harmed by Uber's alleged misrepresentations. *See Twombly,* 550 U.S. at 562 (noting that a complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery"). Instead, the only harm the Medallion Owner Plaintiffs allege is that Uber's existence in the marketplace depresses the value of taxi medallions. Because the Medallion Owner Plaintiffs do not claim or allow the Court to infer that they are harmed by Uber's alleged misleading statements, their claims under Counts II and III are dismissed.

On the livery side, Your Private Limousine alleges that, as a result of Uber's references to "fleet partners" and the fact that a Your Private Limousine vehicle may pick up an Uber customer who requests livery service, customers are likely to be led to believe "that the livery company sponsors, approves of, or endorses Uber." Doc. 77 ¶ 64. Plaintiffs assert that this confusion is even worse in the livery context "[g]iven that trademarks and trade dress are not as prevalent on the livery side of transportation services." *Id.* But this argument rings hollow. Your Private Limousine does not allege that its cars bear its trademark or any other language or logo that would identify a limousine as being owned or operated by Your Private Limousine. Therefore, Your Private Limousine cannot assert confusion caused by one of its vehicles responding to a customer's Uber livery request. Your Private Limousine's claims are thus limited to its allegations that Uber improperly refers to its "fleet partners."

With the references to "fleet partners" as its only allegation, the Court finds that Your Private Limousine has not plausibly alleged that Uber made any "false or misleading representation of fact" likely to confuse customers about the association between Uber and Your Private Limousine. 15 U.S.C. § 1125(a)(1)(A). Referring to "fleet partners," on its own, is not a misrepresentation of fact, as it could accurately refer to the owners and drivers of independent livery vehicles that have contracted directly with Uber. And because, by Plaintiffs' own admission, livery vehicles generally do not contain identifying markings of the livery company, it is highly unlikely that a customer would even know that he or she was riding in a Your Private Limousine vehicle and would therefore infer that Your Private Limousine is one of Uber's "fleet partners." Moreover, the reference to "fleet partners" is not a specific, concrete, or measurable statement such that it could, on its own, entitle Your Private Limousine to a Lanham Act claim. *Rosenthal Collins Grp., LLC v. Trading Techs. Int'l, Inc.,* No. 05 C 4088, 2005 WL 3557947, at *10 (N.D.Ill.Dec. 26, 2005). Your Private Limousine has not plausibly alleged a misrepresentation or confusion that would likely result from Uber's reference to "fleet partners." Thus, the Court grants the motion to dismiss Counts II and III as they relate to Your Private Limousine and the Medallion Owner Plaintiffs, but denies the motion as it relates to the Taxi Affiliation Plaintiffs' claims.

Yellow Group LLC v. Uber Technologies Inc., Not Reported in F.Supp.2d (2014)
2014 WL 3396055, 2014-2 Trade Cases P 78,833

## II. Tortious Interference with Contractual Relations (Count V)

**\*6** Count V alleges that Uber "intentionally and knowingly encouraged individual taxi drivers to breach their agreements" with the Taxi Affiliation Plaintiffs. To prevail on this claim under Illinois law, Plaintiffs must prove that (1) they had an enforceable contract with their drivers, (2) Uber was aware of the contract, (3) Uber intentionally and unjustifiably induced breach of the contract, (4) the breach occurred as a result of Uber's tortious conduct, and (5) Plaintiffs suffered damages. *Schmusenberg v. Univ. of Chicago,* No. 96 C 2467, 1996 WL 451313, at \*2 n.2 (N.D.Ill. Aug. 7, 1996). The Taxi Affiliation Plaintiffs allege that Uber encourages three principal breaches of the Taxi Affiliation Plaintiffs' agreements with drivers. The Taxi Affiliation Plaintiffs assert that Uber encourages drivers to violate the trademark clause in the drivers' contracts by providing drivers with Uber branded "hangtags" to suspend from the cabs' interior rearview mirrors. They further allege that Uber encourages drivers to use their cell phones while driving and requires drivers to process credit card transactions via the Uber app, actions that violate local laws which are incorporated by reference into the contracts. Finally, the Taxi Affiliation Plaintiffs claim that by simply subscribing to Uber, drivers violate their agreements with the Taxi Affiliation Plaintiffs that they will not use competing dispatch services.

Uber contends that the Taxi Affiliation Plaintiffs cannot prevail on this claim because they have not alleged that they are harmed by the breach of contract. However, the Court infers damages stemming from the drivers' breach because the Taxi Affiliation Plaintiffs allege that using Uber's dispatch service harms the Taxi Affiliation Plaintiffs' business. As discussed above, the Taxi Affiliation Plaintiffs plausibly allege that losing customers from their dispatch services to Uber causes the Taxi Affiliation Plaintiffs economic and reputational damage. Therefore, the Court finds that the Taxi Affiliation Plaintiffs state a valid cause of action for tortious interference with contractual relations. In addition to alleging harm, the Taxi Affiliation Plaintiffs have plausibly alleged each of the other elements of tortious interference such that they can survive a motion to dismiss.

However, Count V does not properly allege a cause of action on behalf of the Medallion Owner Plaintiffs. With regard to the Medallion Owner Plaintiffs' contracts with drivers, the second amended complaint states that "[a]ll drivers that are associated with Yellow Affiliation and Flash or who lease a vehicle under the Medallion Owner Plaintiffs' medallion licenses agree to abide by the ordinances and rules and regulations promulgated by the City of Chicago." Doc. 77 ¶ 102. From this, it appears that the Medallion Owner Plaintiffs challenge the use of cell phones while driving and Uber's payment system, asserting that both violate governing laws and regulations.[5] But the Medallion Owners do not plausibly allege or allow the Court to infer that they have been harmed by their drivers' violations of these contract provisions. Unlike the Taxi Affiliation Plaintiffs, the Medallion Owner Plaintiffs do not plausibly assert any reputational or economic harm stemming from the drivers' violations of local ordinances or regulations. *See Cartwright v. Cooney,* 788 F.Supp.2d 744, 754 (N.D.Ill.2011) ("Absent any allegation from which the Court plausibly could infer damages as a result of Defendant's conduct, Plaintiff cannot maintain a claim for tortious interference with contractual relations."). Therefore, Count V is dismissed for failure to state a claim as it relates to the Medallion Owner Plaintiffs.

---

[5] Plaintiffs cite an Illinois statute that a driver "may not use a hand-held mobile telephone while driving a commercial motor vehicle,"625 Ill. Comp. Stat. 5/6–527(a), and a regulation that cabs "must process electronic forms of payment through their affiliations or licensed medallion managers," Doc. 77 ¶ 96.

Additionally, it does not appear that Count V even attempts to state a claim on behalf of Your Private Limousine. Count V mentions only "taxi drivers" and "their agreements with Taxi Plaintiffs." Doc. 77 ¶¶ 139–40. Although Count V also incorporates paragraphs 1 through 115 by reference, none of those paragraphs state a claim for tortious interference of contract on behalf of Your Private Limousine. To the extent that Count V could be read to include a claim on behalf of Your Private Limousine, that claim is dismissed without prejudice. Thus, the motion to dismiss Count V is denied with respect to the Taxi Affiliation Plaintiffs, but granted with respect to the Medallion Owner Plaintiffs and Your Private Limousine.

## III. Illinois Common Law Unfair Competition (Count VI)

*7  In Count VI, Plaintiffs claim that "Uber's business practices violate numerous laws and regulations" and therefore provide Uber with an "unfair competitive advantage." *Id.* ¶¶ 143–44. Uber moves to dismiss this claim based on the rationale that "[c]ommon law unfair competition claims 'rise or fall' based on the Lanham Act." *Ho v. Taflove,* 696 F.Supp.2d 950, 956 (N.D.Ill.2010), *aff'd sub nom.Seng–Tiong Ho v. Taflove,* 648 F.3d 489 (7th Cir.2011). As the Court noted in the context of the motion to dismiss the First Amended Complaint, the Illinois Deceptive Trade Practices Act does not foreclose the possibility of proceeding on an Illinois common law claim for unfair competition. *See*815 Ill. Comp. Stat. 510/2(c) ("This Section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State."). Uber's argument to dismiss Count VI is premised entirely on the proposition that the Court would dismiss the statutory counts in their entirety, a proposition that has not come to fruition. This Opinion does, however, dismiss all statutory claims brought by the Medallion Owner Plaintiffs. Because the Court dismisses all of the Medallion Owner Plaintiffs' claims and because Count VI does not contain any additional allegations that could allow the Court to find that the Medallion Owner Plaintiffs have stated a valid cause of action at common law, the Court dismisses Count VI as it relates to the Medallion Owner Plaintiffs. *Ho,* 696 F.Supp.2d at 956. Count VI survives as it relates to the claims of the Taxi Affiliation Plaintiffs and Your Private Limousine, as they have valid statutory claims.

## IV. *Dial A Car*

Uber also contends that the D.C. Circuit's opinion in *Dial A Car, Inc. v. Transportation, Inc.* warrants dismissing the entire Second Amended Complaint. 82 F.3d 484 (D.C.Cir.1996). In *Dial A Car,* the D.C. Circuit held that the plaintiff limousine service could not bring a Lanham Act claim against a competing taxicab company when the plaintiff sought only to enforce violations of local taxicab ordinances and regulations. *Id.* at 490 ("we cannot find a single case that purports to extend the [Lanham] Act to allow federal judges to interpret and *enforce* municipal regulations"). Suing under the Lanham Act, the plaintiff asked the court to conclude that the defendant's limousine service violated a D.C. Taxicab Commission Order. The Court of Appeals held that the plaintiff "should be forced to take its argument to the D.C. Taxicab Commission and lobby the Commission to crack down on [the defendants'] activities, assuming they are proscribed." *Id.* The complaint in *Dial A Car* therefore hinged on the allegation that the defendant's service was illegal.

Here, while Plaintiffs certainly believe and assert that Uber's service violates certain local ordinances and regulations, they are careful to base the Second Amended Complaint on allegations of misrepresentation separate and apart from the legality of Uber's service. *See*Boston Cab Dispatch, Inc. v. Uber Techs., Inc.*, No. CIV.A. 13–10769–NMG, 2014 WL 1338144, at *25 (D.Mass. Feb. 28, 2014) ("A number of reasons counsel against dismissing Count II on the basis of Uber's *Dial A Car* argument."), *report & recommendation adopted in part & rejected in part,*No. 13–10769–NMG, 2014 WL 1338148 (D.Mass. Mar. 27, 2014). Therefore, as the court held in *Boston Cab Dispatch, Inc.,* the Court finds that *Dial A Car* does not bar Plaintiffs' surviving allegations that Uber misrepresented certain facts, such as taxi rates, the licensure of uberX drivers, and Uber's association with the Taxi Affiliation Plaintiffs.

To the extent that the Second Amended Complaint alleges that Uber violated the Lanham Act or its Illinois equivalents by simply operating illegally or by misrepresenting the legality of its service, those allegations fail under the rationale in *Dial A Car. Dial A Car, Inc.,* 82 F.3d at 488 ("[I]t appears that appellant is simply using the Lanham Act to try to enforce its preferred interpretation of [a D.C. Taxicab Commission Office Administrative Order] instead of adjudicating the issue before the Commission. We reject such a gambit.").

## CONCLUSION

Uber's motion to dismiss [89] is granted in part and denied in part. The Court grants the motion to dismiss the claims of the Taxi Affiliation Plaintiffs in Counts I and IV regarding alleged misrepresentations of insurance coverage. The Court denies the motion to dismiss with regard to all other claims by the Taxi Affiliation Plaintiffs. The Court further grants the motion to dismiss

**Yellow Group LLC v. Uber Technologies Inc., Not Reported in F.Supp.2d (2014)**

2014 WL 3396055, 2014-2 Trade Cases P 78,833

Your Private Limousine's claims in Counts II, III, and V. Your Private Limousine's claims in Counts I, IV, and VI survive. Finally, the Court dismisses all claims by the Medallion Owner Plaintiffs. All claims dismissed are dismissed without prejudice.

**Parallel Citations**

2014-2 Trade Cases P 78,833

---

End of Document             © 2015 Thomson Reuters. No claim to original U.S. Government Works.