UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------------x
                                    :
GREENWICH TAXI, INC., ACE TAXI      :
SERVICE, INC., CASINO CAB COMPANY,  :
INC., CURTIN MOTOR LIVERY SERVICE,  :
INC., EAST HARTFORD CAB COMPANY,    :
INC., EXECUTIVE 2000 TRANSPORTATION,:
LLC, FARMINGTON VALLEY CAB, LLC,    :
GROTON CAB COMPANY, INC.,           :
LASSE'S LIVERY SERVICE, INC.,       :
SUBURBAN TRANSPORTATION, INC.,      :
TAXICABS AND LIVERY COUNCIL OF      :
CONNECTICUT, INC., THE WATERBURY    :  Civil No. 14cv733 (AWT)
YELLOW CAB & SERVICE COMPANY, INC., :
TORRINGTON VALLEY CAB, LLC, UNION-  :
LYCEUM TAXI COMPANY, INC., and      :
YELLOW CAB COPMANY OF NEW LONDON &  :
GROTON, INC.,                       :
                                    :
            Plaintiffs,             :
                                    :
                                    :
v.                                  :
                                    :
UBER TECHNOLOGIES, INC. and         :
LYFT, INC.,                         :
                                    :
            Defendants.             :
                                    :
-----------------------------------x
```

**RULING ON DEFENDANT UBER TECHNOLOGIES, INC.'S MOTION TO DISMISS**

The plaintiffs bring this seven-count action against defendant Uber Technologies, Inc. ("Uber"). The plaintiffs allege in their amended complaint that Uber misrepresented its services in violation of 15 U.S.C. § 1125(a)(1)(B) and § 1125(a)(1)(A) of the Lanham Act in Count I and Count II, respectively; that Uber engaged in unfair and deceptive trade

practices in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, et seq. ("CUTPA") in Count III; that Uber intentionally interfered with contractual relationships in Count IV; that Uber violated the "use or invest" prohibition in 18 U.S.C. § 1962(a), the Racketeer Influenced and Corrupt Organization Act ("RICO"), in Count V; that Uber violated the "interest in or control over" prohibition in 18 U.S.C. § 1962(b), RICO, in Count VI; and that Uber violated the "conduct of enterprise" prohibition in 18 U.S.C. § 1962(c), RICO, in Count VII.

Uber moves to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6).[1]  The plaintiffs in their memorandum of law in opposition to the motion have requested leave to file a second amended complaint.  For the reasons set forth below, the motion to dismiss is being granted, and the plaintiffs' request for leave to amend is being granted.

---

[1] In the alternative, the defendant has requested that the court abstain from exercising jurisdiction under the doctrine of primary jurisdiction.  "Primary jurisdiction applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body . . . ."  United States v. 43.47 Acres of Land, 45 F. Supp. 2d 187, 191 (D. Conn. 1999) (internal quotation marks and citation omitted).  The court declines to abstain because the motion to dismiss raises issues beyond the plaintiffs' asserted interpretation of the regulatory scheme concerning Connecticut taxicab and livery vehicles.  In addition, because the court is concluding that Dial A Car, Inc. v. Transp., Inc., 82 F.3d 484, 490 (D.C. Cir. 1996), applies, there is no danger that the court's ruling could "possibly contradict the outcome of[] the ongoing political and regulatory process." (Memorandum of Law in Support of Motion to Dismiss, Doc. No. 37-1 ("Mem. in Supp."), at 41.)

I.    **FACTUAL ALLEGATIONS**

"The [amended] complaint, which [the court] must accept as true for purposes of testing its sufficiency, alleges the following circumstances." Monsky v. Moraghan, 127 F.3d 243, 244 (2d Cir. 1997).

The plaintiffs allege that the Connecticut Department of Transportation is the state authority that regulates taxicab and livery services.  The plaintiffs allege that on or about April 24, 2014, Uber began taxicab and/or livery operations in Connecticut without complying with state laws and regulations concerning such operations.  The plaintiffs allege that Uber offers three types of conveyance-for-hire vehicles in Connecticut: UberX, UberBLACK Cars, and Uber SUVs.[2]

The plaintiffs allege that Uber communicates with customers through a free smart phone application ("app").  The app allows consumers in Connecticut to summon a low-cost everyday vehicle (UberX) or a more expensive livery car, including a "black car" or an "SUV".  Once a user opens the Uber app, it displays a map of the user's location, or a designated pickup point, displays the available vehicles in the neighborhood, and states the wait time for each type of car.  The user then selects the type of car he or she wants based on how much the user wants to spend and how many cars in each price range are nearby.  The app then

_____

[2] The plaintiffs allege that Uber's other services, UberTAXI and UberLUX, are not currently available in Connecticut.

displays the name and photograph of the driver of the selected Uber-affiliated car and sends a text message to the user with the driver's projected arrival time and cellular phone number.

The plaintiffs allege that Uber owns no cars, no taxicab certificates, no livery permits and no plates, and employs no drivers. The plaintiffs allege that Uber is, in fact, providing taxicab and livery services in Connecticut because the affiliated cars are hailed by Uber's smart phone app on an "on demand" (for taxicabs) or "prescheduled" (for livery vehicles) basis and are assigned to customers through Uber's computer system with fares determined by Uber's fare charging system.

The plaintiffs allege that the defendant "partners" with the plaintiffs' drivers, each of "who[m] make[s] an illegal side deal with Uber to take its customers while simultaneously working a normal shift with his or her authorized company." (Amended Complaint and Application for TRO, Preliminary Injunction and Permanent Injunction, Doc. No. 33 ("Am. Compl."), ¶ 60.) The plaintiffs allege that the defendant, inter alia, misrepresents to customers its compliance with Connecticut laws and regulations, misrepresents its insurance coverage, misrepresents the safety of its drivers, misrepresents its affiliation with lawfully operating taxicab and livery companies, and misrepresents its fares.

The plaintiffs also allege that the defendant unfairly

competes with them because the defendant is not complying with
Connecticut laws and regulations concerning taxicabs and livery
vehicles which the plaintiffs must follow, and that the
defendant is tortiously interfering with the contractual
relationships between the plaintiffs and their drivers as well
as the contractual relationships between the plaintiffs and
credit card processing companies.

## II.  LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the
court must accept as true all factual allegations in the
complaint and must draw inferences in a light most favorable to
the plaintiff.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).
Although a complaint "does not need detailed factual
allegations, a plaintiff's obligation to provide the 'grounds'
of his 'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a
cause of action will not do." Bell Atlantic Corp. v. Twombly,
550 U.S. 550, 555 (2007) (citing Papasan v. Allain, 478 U.S.
265, 286 (1986) (on a motion to dismiss, courts "are not bound
to accept as true a legal conclusion couched as a factual
allegation")).  "Nor does a complaint suffice if it tenders
naked assertions devoid of further factual enhancement."
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly,
550 U.S. at 557 (internal quotation marks omitted)).  "Factual

5

allegations must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations omitted).  However, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." Id. at 570.  "The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Mytych v. May Dep't Store Co., 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)). "The issue [on a motion to dismiss] is not whether [the] plaintiff will prevail, but whether he is entitled to offer evidence to support his claims." United States v. Yale New Haven Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 232).

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993).

## III. DISCUSSION

### A.   Count I: False Advertising, 15 U.S.C. § 1125(a)(1)(B)

"Section 1125(a) . . . creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S.Ct. 1377, 1384 (2014).   For false advertising, the Lanham Act provides, in pertinent part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

> To establish a false advertising claim under Section 43(a) of the Lanham Act, a plaintiff must prove the following elements: (1) the defendant has made a false or misleading statement; (2) the false or misleading statement has actually deceived or has the capacity to deceive a substantial portion of the intended audience; (3) the deception is material, in that it is likely to influence purchasing decisions; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

Merck Eprova AG v. Gnosis S.p.A., 901 F. Supp. 2d 436, 449-50 (S.D.N.Y. 2012) aff'd, 760 F.3d 247 (2d Cir. 2014).

The pleading standard under Federal Rule of Civil Procedure 8 applies to false advertising claims.[3]  See John P. Villano Inc. v. CBS, Inc., 176 F.R.D. 130, 131 (S.D.N.Y. 1997) ("No matter how parsed, a claim of false advertising under the Lanham Act . . . is not identical to a claim of fraud.  Fraud requires, not just the making of a statement known to be false, but also, inter alia, a specific intent to harm the victim and defraud him of his money or property. . . .  By contrast, no fraudulent intent . . . is required under 15 U.S.C. § 1125.").

1.   *Compliance with State Transportation Laws and Regulations*

Uber contends that under Dial A Car, Inc. v. Transp., Inc., 82 F.3d 484, 490 (D.C. Cir. 1996), the plaintiffs' allegations of violations of Connecticut transportation laws and regulations do not create an actionable cause of action under the Lanham Act for false advertising.  Uber contends that under Dial A Car the plaintiffs "cannot use the Lanham Act to enforce their subjective interpretation of local transportation laws" when "it is not even clear that Connecticut's transportation laws apply to a technology company like Uber[,]" which owns no cars, employs no drivers and provides "smartphone-based

---

[3] Some courts in this Circuit have applied the heightened pleading standard of Federal Rule of Civil Procedure 9(b) to false advertising claims where the courts found the claims sound in fraud.  See Volunteer Firemen's Ins. Servs., Inc. v. McNeil & Co., 221 F.R.D. 388, 393 (W.D.N.Y. 2004) (finding that Rule 9(b)'s heightened pleading requirement is appropriate where the claim was essentially a claim for fraud); L.S. v. Webloyalty.com, Inc., 3:10-CV-1372 CSH, 2014 WL 3547640, at *6 (D. Conn. July 17, 2014) (same).

transportation-request service."  (Mem. in Supp., at 5-6.)

In Dial A Car, a luxury car service company sued two taxicab companies, alleging that they were violating the Lanham Act "by misrepresenting to Dial A Car's actual and potential corporate account customers that their taxicabs can legally provide within [D.C.] the same [luxury car] service as Dial A Car."  82 F.3d at 486.  Dial A Car claimed that by using regular taxicabs to provide luxury car service in D.C. the two taxicab companies were violating an administrative order issued by the D.C. Taxicab Commission.  The D.C. Circuit noted that the Commission had not addressed, in an adjudication or formal ruling, whether the luxury car service provided by the taxicab companies violated the administrative order in question and "there [wa]s no dispute that such a question [wa]s within the jurisdiction of the D.C. Taxicab Commission."  Id. at 488.  The D.C. Circuit concluded that the issue was a matter of statutory construction for the Commission and held that the Lanham Act does not provide a cause of action for Dial A Car to enforce its preferred interpretation of the administrative order.  The court stated that "at a minimum, there must be a clear and unambiguous statement from the Taxicab Commission regarding [the taxicab companies'] status before a Lanham Act claim can be entertained."  Id. at 489 (emphasis in original).

Here, the plaintiffs allege that Uber's affiliated vehicles

9

must be considered as taxicabs and livery vehicles under
Connecticut regulations because they can be hailed by Uber's
smart phone app on an "on demand" (taxicabs) or "prescheduled"
(livery vehicles) basis; that under Connecticut statutes, all
taxicabs or livery vehicles must have taxicab certificates and
livery permits; that Uber's affiliated vehicles have neither
taxicab certificates nor livery permits; and that Uber
misrepresented to its consumers that its vehicles are operating
lawfully in Connecticut.  In addition, the plaintiffs allege
that Uber has misrepresented to customers that it complies with
Connecticut taxicab and livery laws and regulations concerning
vehicle inspection; and that Uber has violated such laws and
regulations concerning vehicle drivers, insurance, driver
safety, anti-discrimination, and fare limits.

Because the plaintiffs' allegations of violations of
transportation laws and regulations are based on their
interpretation that Uber-affiliated cars are taxicabs and livery
vehicles under Connecticut statutes and that Connecticut laws
and regulations governing taxicab and livery companies apply to
Uber, the circumstances here present the same issue as in Dial A
Car -- namely, whether there exists a cause of action under the
Lanham Act for making a false or misleading statement when the
falsity or misrepresentation hinges on a regulatory authority's

anticipated statutory interpretation.[4]  Therefore, the court
concludes that to the extent that Count I is based on
allegations that the defendant misrepresented to customers that
it is complying with Connecticut laws and regulations governing
taxicabs and livery vehicles, Count I is being dismissed.

> 2.   *Other Misrepresentations*

The plaintiffs assert that <u>Dial A Car</u> only applies to
Uber's alleged misrepresentations concerning the legality of its
services and that they otherwise have adequately pleaded other
misrepresentations concerning "ridesharing," "driver partners,"
"operating legally," "insurance coverage," "safety," and
"pricing."  However, the court concludes that the plaintiffs
have not adequately pleaded that these alleged representations
are false or misleading.

As to a representation by Uber that it is a "ridesharing"
service, there is no such allegation in the amended complaint.
The word "ridesharing" appears in the amended complaint as part
of the title of a consumer alert issued by the Connecticut
Insurance Department.  That alone is insufficient to support an
inference that Uber represented that it is a "ridesharing"
service and the representation is false or misleading.

As to having "partner" drivers, the plaintiffs assert that

---

[4] Also, it is not disputed that "the Connecticut legislature recently tasked
the Connecticut Department of Transportation and other agencies with studying
. . . whether the existing regulatory structure [as to taxicabs and livery
vehicles] applies to companies like Uber."  (Mem. in Supp., at 1).

there are numerous examples of this alleged misrepresentation
and that Uber has admitted that operators of their vehicles are
not "partners" by referring to them as "third-party
transportation providers."  As support, the plaintiffs point to
the allegations pleaded in paragraphs 32, 46, 60, 62, 68 and 77
of the amended complaint.  In paragraph 32, the plaintiffs have
pleaded that Uber induces Uber's drivers ("partners") to use
Uber's computerized dispatching and credit card billing system;
paragraph 46 makes an allegation about a statement concerning
Uber's selection of "partners" that appears to predate Uber's
presence in Connecticut; in paragraph 60, the plaintiffs have
pleaded that Uber "partners" with legally operating Connecticut
taxicab and livery drivers; in paragraph 62, the plaintiffs have
pleaded that Uber's "partners" are a fleet of gypsy taxicabs; in
paragraph 68, the plaintiffs have pleaded that Uber falsely
suggests to customers that it "partners" with lawfully operating
taxicab and livery companies; and paragraph 77 contains a
conclusory allegation that Uber fabricated a nonexistent
"partnership" with legally owned and operated taxicab and livery
companies.[5]

However, even accepting these allegations in the amended
complaint as true, the plaintiffs have not pleaded, nor can it
reasonably be inferred, what it means to be an Uber "partner"

---

[5] Paragraph 77 is not incorporated into Count I.

and why the representation is false or misleading.[6]  Similarly,
Uber's use of the term "third-party transportation providers,"
as pleaded in paragraph 49, also does not support an inference
that "partner" was a false or misleading representation.

As to Uber's representation that it operates legally, the
plaintiffs assert that it is a misrepresentation on the theory
that Uber must operate in compliance with Connecticut taxicab
and livery vehicle laws and regulations.  Under Dial A Car, this
alleged misrepresentation is not an actionable claim under the
Lanham Act.

The plaintiffs also assert that they have pleaded that Uber
markets its insurance coverage to consumers and that Uber's
representations about its insurance are false.  As support, the
plaintiffs point to the allegations in paragraphs 42, 44 to 46,
59, and 64 to 66.  In paragraph 42, the plaintiffs have alleged
merely that Uber does not regularly recheck insurance, but the
plaintiffs have not alleged that Uber has represented to
customers that it regularly rechecks insurance.  Rather, the
allegation is that "Uber tells its customers it inspects these
vehicles . . . ."  (Am. Compl., ¶ 42.)  In paragraphs 44 and 45,
the plaintiffs have pleaded that Uber has represented that
anyone with any commercial license and any commercial auto

---

[6] It appears that the plaintiffs use "partner" to mean two different things:
(1) a driver (see Am. Compl., ¶ 9) or (2) an association with taxicab and
livery vehicle drivers (see id., ¶ 60).

insurance can drive an Uber-affiliated black car or SUV in
Connecticut and that anyone with a personal license and personal
auto insurance can drive an UberX vehicle.  In the same
paragraphs, the plaintiffs also have pleaded that it is nearly
impossible to collect on Uber's liability insurance and that the
Connecticut Insurance Department issued a consumer alert stating
that Uber's drivers may not be covered by their personal
automobile insurance.  However, the allegation in the amended
complaint appears merely to be that Uber represented that "all
that is <u>required to operate</u> an UberX vehicle is 'a personal
license and personal auto insurance.'"  (Am. Compl., ¶ 44
(emphasis added).)  The plaintiffs have not alleged that Uber
represented to customers that Uber's drivers are covered by
their commercial or personal insurance, and the consumer alert
does not support an inference.  Likewise, the plaintiffs have
not alleged that Uber made a representation to customers
concerning its liability insurance.[7]  In paragraphs 64 and 65,
the plaintiffs have not alleged that Uber made any
representation concerning insurance coverage.  In paragraph 66,
the plaintiffs' allegation that the defendant made a
misrepresentation appears to be based on the contention that
Connecticut laws and regulations concerning taxicabs and livery
vehicles apply to Uber.  To the extent that the plaintiffs'

---

[7] The plaintiffs have alleged that Lyft, Inc., not Uber, offers a $1 million
per-incident insurance policy.

allegation is based on that theory, the alleged
misrepresentation is not actionable under <u>Dial A Car</u>.

As to Uber's alleged misrepresentation about safety, the
plaintiffs point to the allegations in paragraphs 42, 47 and 49.
In paragraph 42, the plaintiffs have alleged merely that the
defendant told its customers that it inspects its vehicles, but
"upon information and belief, Uber only superficially inspects
these vehicles and checks registration and information when the
owner first signs up." (Am. Compl., ¶ 42.) This paragraph does
not support an inference that Uber's representation was false or
misleading because the plaintiffs have not alleged that Uber has
represented to customers that it rechecks vehicles. The
plaintiffs also appear to assert that in paragraph 42, they have
alleged that the defendant has misrepresented to customers that
Uber conducts extensive criminal background checks and driving
histories, but there is no such allegation in paragraph 42. In
paragraph 47, the plaintiffs have alleged merely that Uber has
claimed that if a driver dips below a certain star rating, it
will "no longer do business with" him or her. (Am. Compl.,
¶ 47.) The plaintiffs also have alleged that "every driver
receives a five star rating simply for signing up with
Uber . . . [and] a driver only drops below a 'Five Star' rating
if dissatisfied customers take the trouble to post negative
reviews, [but] Uber continues to use drivers even after they

have received multiple negative reviews." (Id.)  However, the allegation that Uber continues to use drivers who have received multiple negative reviews does not support an inference that the statement Uber will "no longer do business with" these drivers was false or misleading because the plaintiffs have not alleged that Uber has represented to customers that it will no longer do business with a driver whose rating dips below five stars.

The plaintiffs also assert that they have alleged in paragraph 49 that the waiver of liability Uber requires all first-time customers to execute shows that "Uber deceptively requires consumers to waive Uber's legal responsibility for its violations of its own representations."  (Memorandum of Law in Opposition to Uber Technologies, Inc.'s Motion to Dismiss, Doc. No. 52 ("Mem. in Opp."), at 8.)  Uber's waiver states, in pertinent part, that Uber

> will not assess the suitability, legality, or ability of any third party transportation providers and you expressly waive and release the company from any and all liability, claims, or damages arising from or in any way related to the third party transportation provider.  The company will not be a party to disputes, negotiations of disputes, between you and such third party providers.

(Am. Compl., ¶ 49.)  However, the plaintiffs have not pleaded any allegation that suggests that Uber used deception to cause customers to execute its waiver.  In addition, the plaintiffs have not alleged that Uber made any representation concerning

16

the safety of its drivers such that the language in the waiver
would make the representation false or misleading.

The plaintiffs, pointing to paragraphs 30, 58, 59.iii.d.
and 60.i, also assert that they have adequately pleaded that
Uber misrepresented to customers that its pricing is simple.  In
paragraph 30, the plaintiffs have alleged merely that using
Uber's app, a customer can choose a car he or she wants
"[d]epending on how much the user wants to spend and how many
cars in each price range are nearby . . . ."  (Am. Compl., ¶
30.)  However, the plaintiffs have not identified any
representation that was made by Uber.  In paragraph 58, the
plaintiffs have alleged that Uber's user agreement allows it to
use "surge" pricing when demand becomes "high" or "intense" and
that "[t]he mechanism for determining ['surge' pricing] appears
arbitrary and unpredictable, made solely at the discretion of
[Uber]."  However, these allegations do not support an inference
that Uber made a representation to customers that its pricing is
simple or show that some representation is false or misleading.
In paragraph 59.iii.d., the plaintiffs have alleged that Uber
does not comply with a tariff or rate schedule approved by the
Commissioner of the DMV for taxicabs and livery vehicles.  To
the extent the plaintiffs' allegation of misrepresentation is
based on a failure to follow a Commissioner approved tariff or
rate schedule, such misrepresentation is not actionable under

17

Dial A Car.  In paragraph 60.i, the plaintiffs have pleaded that
the defendant violates state regulations by charging a mandatory
20% "gratuity" and a $1 fee.  However, there is no dispute that
the gratuity only applies to UberTAXI, which is not available in
Connecticut.  In addition, the plaintiffs have not pleaded
allegations sufficient to support the conclusion that there was
a misrepresentation, unlike the allegations in Ehret v. Uber
Tech., Inc., No. C-14-0113 EMC, 2014 WL 4640170, at *1 (N.D.
Cal. Sept. 17, 2014) ("Plaintiff alleges that she was misled
into paying sums greater than the 'metered fare' for taxi cab
rides based upon Uber's misrepresentations that all of the
additional 20% charge over and above the 'metered fare' was a
'gratuity.'"), and in Manzo v. Uber Tech., Inc., No. 13 C 2407,
2014 WL 3495401, at *2 (N.D. Ill. July 14, 2014) (stating that
the plaintiff "allege[d] that Uber deceptively represented on
its website that Uber taxis charge 'standard taxi rates,' when,
in fact, riders were charged the meter fare plus a 20%
'gratuity'" and alleged that "the 'gratuity' was actually split
between the taxi's driver and Uber").

Based on the foregoing, to the extent that Count I is based
on alleged misrepresentations concerning "ridesharing," "driver
partners," "operating legally," "insurance coverage," "safety,"
and "pricing," Count I is being dismissed because the plaintiffs
have not adequately pleaded any of these alleged

misrepresentations.

**B.   Count II: False Association, 15 U.S.C. § 1125(a)(1)(A)**

Section 1125 of the Lanham Act provides:

> Any person who, on or in connection with any
> goods or services, or any container for goods, uses in
> commerce any word, term, name, symbol, or device, or
> any combination thereof, or any false designation of
> origin, false or misleading description of fact, or
> false or misleading representation of fact,
> which . . . is likely to cause confusion, or to cause
> mistake, or to deceive as to the affiliation,
> connection, or association of such person with another
> person, or as to the origin, sponsorship, or approval
> of his or her goods, services, or commercial
> activities by another person . . . shall be liable in
> a civil action by any person who believes that he or
> she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).  For false association, in addition

to showing that the defendant's use of the plaintiffs'

trademarks is likely to cause confusion, a plaintiff also has to

establish that "(1) it has a valid mark that is entitled to

protection under the Lanham Act; and that (2) the defendant used

the mark, (3) in commerce, (4) in connection with the sale . . .

or advertising of goods or services . . . without the

plaintiff's consent."  1-800 Contacts, Inc. v. Whenu.com, Inc.,

414 F.3d 400, 407 (2d Cir. 2005) (internal quotation marks and

citation omitted).

The defendant contends that the plaintiffs have failed to

allege that they have recognizable trademarks.  The plaintiffs

assert that their trademarks can be inferred from the amended

19

complaint.  However, no allegation in the amended complaint relates to any plaintiff having "recognizable logos, designs and color schemes [that] appear on each of the vehicles driven by the authorized lessee drivers[.]"  (Mem. in Opp., at 15.)  While the plaintiffs have alleged that Uber "partners" with legally operating Connecticut taxicab and livery drivers and that the plaintiffs are lawfully operating taxicab and livery companies,[8] these allegations are insufficient to support an inference that the plaintiffs' taxicabs and livery vehicles are associated with any recognizable marks or associated with valid marks entitled to protection.

The plaintiffs also assert that in Yellow Group LLC v. Uber Tech., Inc., No. 12 C 7967, 2014 WL 3396055, (N.D. Ill. July 10, 2014), the court declined to dismiss false association claims based on arguments similar to the ones here.  However, in Yellow Group LLC, the court based, in part, its decision to dismiss a plaintiff's false association claim against Uber on the same reason stated above -- namely, the plaintiff "d[id] not allege that its cars bear its trademark or any other language or logo that would identify a limousine as being owned or operated by [it]."  Id. at *5.

Therefore, Count II is being dismissed.

_____

[8] Plaintiff Taxicabs and Livery Council of Connecticut, Inc. is not a taxicab or livery company.

**C. Counts V to VII – Violations of the Racketeer Influenced and Corrupt Organizations Act**

Uber contends that the plaintiffs have failed to state claims for violations of RICO.  "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." Plainville Elec. Prods. Co. v. Vulcan Advanced Mobile Power Sys., LLC, 638 F. Supp. 2d 245, 250 (D. Conn. 2009) (quoting DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001)) (internal quotation marks omitted).  "To satisfy the first element of a RICO claim -- that is, to establish a substantive RICO violation -- a plaintiff must show a 'pattern of racketeering activity.'" Plainville Elec. Prods. Co., 638 F. Supp. 2d at 250.  Where, as here, the plaintiffs' alleged RICO violations are based on wire fraud, they "must allege that the defendant made two predicate communications, via interstate commerce, that constitute a pattern of racketeering activity."  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993).  "[A]llegations of predicate . . . wire fraud acts should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent."  Id.  "[A]ll allegations of fraudulent predicate acts[] are subject to the heightened pleading requirements of Federal Rule of Civil

Procedure 9(b)."  First Capital Asset Management, Inc. v. Satinwood, Inc., 385 F.3d 159, 178 (2d Cir. 2004).  In addition to alleging the particular details of fraud, the plaintiffs must "provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference of fraudulent intent."  Powers v. British Vita, P.L.C., 57 F.3d 176, 184 (2d Cir. 1995).

The plaintiffs appear to rely on the same alleged misrepresentations that form the bases for their Lanham Act claims to assert that they have adequately pleaded predicate communications.  For the same reasons that the misrepresentations claimed by the plaintiffs fail to support their Lanham Act claims, the plaintiffs have failed to adequately state RICO claims against the defendant under the heightened pleading standard of Rule 9.  In addition, the plaintiffs appear to assert that Uber's customers accessed the defendant's fraudulent communications via its smart phone app. However, the plaintiffs have merely alleged that in making an electronic hail, the defendant's app "displays the available vehicles"; that the customer "chooses the type of car they want"; and the app "displays the driver's name and photograph on the user's smart phone[.]"  (Am. Compl., ¶ 30.)  These allegations do not support an inference that any misrepresentation claimed by the plaintiffs was communicated to

customers via Uber's smart phone app.  Therefore, Counts V, VI and VII are being dismissed.

**D.  State Law Claims**

*1.  Violation of CUTPA*

The defendant contends that the plaintiffs have failed to state a claim under CUTPA.  CUTPA prohibits persons from engaging in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b.  In determining whether a practice violates CUTPA, the Connecticut Supreme Court is

> guided by the criteria set out in the Federal Trade Commission's so-called cigarette rule: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons.

Zulick v. Patrons Mut. Ins. Co., 287 Conn. 367, 378 n.11 (2008) (internal brackets omitted).[9]  "All three criteria do not need to be satisfied to support a finding of unfairness.  A practice may be unfair because of the degree to which it meets one of the

---

[9] The Connecticut Supreme Court has questioned the continued viability of the cigarette rule and whether the rule should be abandoned in favor of the "substantial injury test."  However, the Connecticut Supreme Court most recently declined to address the issue in Artie's Auto Body, Inc. v. Hartford Fire Ins. Co., 317 Conn. 602, n.13 (2015), holding that because the CUTPA claim failed even under the more lenient cigarette rule, the court will wait for the legislature to clarify its position with respect to the proper test. In light of the holding, it appears that the Connecticut Supreme Court has not yet abandoned the cigarette rule.

criteria or because to a lesser extent it meets all three."
Cheshire Mortgage Serv., Inc. v. Montes, 223 Conn. 80, 106
(1992). "Thus[,] a violation of CUTPA may be established by
showing either an actual deceptive practice . . .[,] or a
practice amounting to a violation of public policy."  Id.

As to the first prong of the cigarette rule, the plaintiffs
have alleged that the defendant's conduct violates the public
policy established by Connecticut laws and regulations
pertaining to taxicabs and livery vehicles.  (See Am. Compl.,
¶ 80.)  As stated above, the Connecticut Department of
Transportation has been tasked with "(1) review[ing] how
emerging technologies, such as smartphone applications,
currently fit into the regulatory scheme, and (2) offer[ing]
recommendations as to how and if such technologies and the
businesses offering them should be regulated . . . ."  Conn.
Public Act No. 14-199, § 19 (2014).  Therefore, the plaintiffs
cannot show that the defendant's conduct violated an established
public policy.

Also, the plaintiffs assert that the defendant's actions
violate "general concepts that serve to establish a broader
public policy favoring the safety of the public and fair
competition . . . ."  (Mem. in Opp., at 33.)  However, the
plaintiffs have not cited any common law, statutory, or other
established concept of unfairness that supports their asserted

24

public policy.  Even assuming "a broader public policy favoring the safety of the public and fair competition" exists, the plaintiffs' allegations are insufficient, for the reasons stated above, to show that defendant's actions violated such policy.

As to the second prong, the plaintiffs have not pleaded allegations that establish that the defendant's actions are "immoral, unethical, oppressive or unscrupulous" because the plaintiffs merely rely upon the alleged misrepresentations giving rise to their Lanham Act claims, and the court has concluded that the plaintiffs have not adequately pleaded these alleged misrepresentations.

As to the third prong, the plaintiffs allege that the defendant's "unfair and deceptive acts and practices have caused substantial injury to consumers and lawfully operating taxicab and livery companies[.]"  (Am. Compl., ¶ 82.)  "The independent nature of the consumer injury criterion does not mean that every consumer injury is legally 'unfair.'"  McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 569 (1984).  "To justify a finding of unfairness the injury must satisfy three tests.  It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided."  Id. at 569-70. Even assuming that the plaintiffs have adequately pleaded a

substantial injury, they have not pleaded any allegation concerning the absence or presence of countervailing benefits to consumers or competition or concerning whether the injury is one consumers themselves could not have reasonably avoided.

Therefore, the court is dismissing Count III.

### 2. *Tortious Interference with Contractual Relationships*

The defendant contends that the plaintiffs have failed to adequately plead a claim for tortious interference with contractual relationships. "[I]n order to recover for a claim of tortious interference with business expectancies, the claimant must plead and prove that: (1) a business relationship existed between the plaintiff and another party; 2) the defendant intentionally interfered with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffered actual loss." Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 32-33 (2000). The Connecticut Supreme Court has stated that

> not every act that disturbs a contract or business expectancy is actionable. For a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously[.] An action for intentional interference with business relations . . . requires the plaintiff to plead and prove at least some improper motive or improper means. . . . The plaintiff in a tortious interference claim must demonstrate malice on the part

26

of the defendant, not in the sense of ill will, but
intentional interference without justification.

Daley v. Aetna Life & Cas. Co., 249 Conn. 766, 805-06 (1999)
(citations, original brackets, and internal quotation marks
omitted).  "A claim is made out only when interference resulting
in injury to another is wrongful by some measure beyond the fact
of the interference itself."  Blake v. Levy, 191 Conn. 257, 262
(1983) (citing Top Service Body Shop, Inc. v. Allstate Ins. Co.,
238 Or. 201, 209 (1978)) (internal brackets omitted).

    Here, the plaintiffs have not adequately pleaded that
Uber's interference with the contractual relationships between
the plaintiffs and their taxicab and livery drivers and between
the plaintiffs and credit card processing companies was
tortious.  As to taxicab and livery drivers, the allegations in
the amended complaint are that Uber induced the plaintiffs'
drivers to "illegally substitute [Uber's] computerized
dispatching and credit card billing system for the [plaintiffs']
lawfully operated dispatching systems and billing systems"; that
Uber had a "full-tilt campaign to woo taxicab and livery
drivers"; that "Uber . . . 'partners' with legally operating
Connecticut taxicab and livery drivers"; and that Uber
"convince[s] lawfully operating taxicab drivers to sign on to
their services and get more fare-paying customers[.]"  (Am.
Compl., ¶¶ 32, 35, 60 and 69.)  These allegations do not support

27

a reasonable inference that Uber "induced" the plaintiffs'
drivers to "partner" with Uber through fraud, misrepresentation,
intimidation or molestation, or that Uber acted maliciously.
Cf. Top Service Body Shop, Inc., 283 Or. at 210 ("In the present
case, Top Service pleaded both improper motives and improper
means of interference.  It alleged that Allstate sought to and
did induce Top Service's patrons not to have Top Service repair
their automobiles, making false statements about the quality of
plaintiff's workmanship and threats about withdrawing insurance
coverage or subjecting the settlement of claims to possible
arbitration.").

        The plaintiffs also make a number of other assertions in
support of their contention that Uber's interference is
tortious.  However, these assertions are either allegations that
are legal conclusions or are not reasonably inferred from the
factual allegations in the amended complaint.

        As to Uber's interference with credit card processing
companies, the plaintiffs assert that Uber's improper motive has
been adequately pleaded because the plaintiffs have alleged that
Uber "illegally bypass[es] the credit card systems installed in
Plaintiffs' authorized taxicabs and livery vehicles" and that
Uber acts with "the intent of inserting itself illegally into
the Connecticut taxicab/livery market[.]"  (Mem. in Opp., at
26.)  However, the plaintiffs' allegations are "naked assertions

devoid of further factual enhancement" to show that Uber's conduct was done maliciously or that Uber used fraud, misrepresentation, intimidation or molestation.  Iqbal, 556 U.S. at 678.

Therefore, because the plaintiffs have failed to plead factual allegations essential to an action for tortious interference with contractual relationships, Count IV is being dismissed.

### E.   Request to Amend

The plaintiffs have requested in their memorandum that they be permitted to amend their allegations.  Uber requests that the dismissal of the amended complaint be with prejudice because the plaintiffs have already amended their complaint once.  However, this is the plaintiffs' first request to amend in response to a motion to dismiss.  In addition, "[i]n the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on the part of the [plaintiffs], repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. - the leave sought should be . . . 'freely given.'"  Foman v. Davis, 371 U.S.C. 178, 182 (1962).  Such reasons appear to be absent here.

Therefore, the court is granting the plaintiffs' request for leave to amend.

**IV. CONCLUSION**

Accordingly, Defendant Uber Technologies, Inc.'s Motion to Dismiss (Doc. No. 37) is hereby GRANTED.  The plaintiffs are given leave to file a second amended complaint within 30 days from the date of this ruling.

It is so ordered.

Signed this 13th day of August 2015, at Hartford, Connecticut.


                                    _____/s/_____
                                    Alvin W. Thompson
                              United States District Judge